**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| In re: INOTIV, INC. SECURITIES LITIGATION | Case No. 4:22-cv-00045-PPS-JEM |

**LEAD PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................2

II.    JURISDICTION AND VENUE .......................................................................12

III.   THE PARTIES..................................................................................................12

     A.  Lead Plaintiff ..........................................................................................12

     B.  Defendants ...............................................................................................13

IV.   BACKGROUND ..............................................................................................16

     A.     The Company and Its Business...............................................................16

     B.     Inotiv's Acquisition of Envigo...............................................................18

     C.     The Regulatory Environment Governing the Company's Business. ...................22

V.    THE CONCEALMENT OF SHOCKING ANIIMAL WELFARE CONDITIONS AT THE CUMBERLAND FACILITY AND A CRIMINAL SUBPOENA REGARDING THE IMPORTATION OF NON-HUMAN PRIMATES.........................26

     A.     July 2021 USDA Inspection of the Cumberland Facility Finds Extensive Aniaml Welfare Violations. ......................................................................26

     B.     The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection in October 2021. ..................30

     C.     The USDA Finds Continuing and New Animal Welfare Violations at the Cumberland Faciility in November 2021. ...........................................................33

     D.     The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection in March 2022.....................38

     E.     The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection on May 3, 2022. ...................39

     F.     Defendants' Knowledge of Conditions at the Cumberland Facility.....................40

     G.     Federal and State Agents Raid the Cumberland Facility and Obtain a Temporary Restraining Order Against Envigo That Ultimately Led to the Closure of the Cumberland Facility .......................................................41

     H.     Federal Criminal Subpoena to Envigo and OBRC Related to Ongoing Investigation into the,Importation of Non-Human Primates. ................................54

i

VI.    LEAD PLAINTIFF'S INVESTIGATION AND CONFIDENTIAL SOURCES ............59

    A.  Confidential Witnesses .................................................................................59

        1.  Confidential Witness 1 ....................................................................59

        2.  Confidential Witness 2 ....................................................................62

        3.  Confidential Witness 3 ....................................................................63

        4.  Confidential Witness 4 ....................................................................66

    B.  Allegations of Serious Animal Welfare Problems at the Cumberland Facility Would Have Been Known to Defendants Through the Due Diligence Process Based on Reports of Previous Animal Welfare Violations There ...............................67

    C.  Virginia Passes "Beagle Bills" in Response to Outrage Over the Cumberland Facility ....................................................................................71

    D.  Humane Society Report of Animal Suffering During Testing Performed at an Inotiv Research Facility in Indiana ................................................................72

VII.   DEFENDNATS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF FACTS THAT THE COMPANY WAS REQUIRED TO DISCLOSE ..............................................................................73

    A.  September 21, 2021 Business Combination Conference Call, Investor Presentation, and Merger Agreement .........................................................73

    B.  October 5, 2021 Proxy Statement ...............................................................78

    C.  November 5, 2021 Merger Closing Press Release.......................................80

    D.  November 5, 2021 – Ongoing Publication of Cumberland Facility Fact Sheet ..........80

    E.  November 5, 2021 – Ongoing Publication of Non-Human Primate Fact Sheets ........82

    F.  November 11, 2021 Statement on PETA Report..........................................84

    G.  November 16, 2021 Statement on USDA Inspections..................................86

    H.  November 16, 2021 Presentation to the Jefferies London Healthcare Virtual Conference .....................................................................................88

    I.  January 27, 2022 Press Release Announcing the Acquisition of OBRC....................89

    J.  February 3, 2022 Testimony Before Virginia Senate Subcommittee .........................91

K.  February 16, 2022 Q4 2021 Form 10-Q ................................................................97

L.  Q2 2022 Earnings Call................................................................................99

M.  May16, 2022, Q2 2022 10-Q ....................................................................100

N.  August 10, 2022 Earnings Call ................................................................101

O.  August 12, 2022, Q3 2022 10-Q ..............................................................101

VIII.  EVENTS FOLLOWING THE REVELATION OF TRUTH ABOUT THE CUMBERLAND FACILITY ............................................................................102

IX.  ADDITIONAL ALLEGATIONS OF SCIENTER – FOR PURPOSES OF LEAD PLAINTIFF'S SECTION 10(b) AND RELATED SECTION 20(a) CLAIMS ONLY ............................................................................................................105

X.  VIOLATIONS OF SEC RULES REGARDING DISCLOSURES IN PUBLIC FILINGS .......................................................................................................109

XI.  LOSS CAUSATION AND ECONOMIC LOSS ....................................................111

XII.  *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE .........................117

XIII.  NO SAFE  HARBOR ........................................................................................120

XIV.  CLASS ACTION ALLEGATIONS ....................................................................120

XV.  CLAIMS BROUGHT PURSUANT TO §10(b) AND 20(a) OF THE EXCHANGE ACT.............................................................................................123

COUNT 1

Violations Of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder (Against All Defendants)..............................................................127

COUNT II

Violations of Section 20(a) of the Exchange Act (Against Defendants Leasure and Taylor) ....................................................................................129

XVI.  CLAIMS BROUGHT PURSUANT TO §14(a) AND 20(a) OF THE EXCHANGE ACT.............................................................................................129

## COUNT III

Violations of Section 14(a) of the Exchange Act (a) of the Exchange Act (Against Defendants Inotiv, Leasure, and Taylor) ........................................................................132

## COUNT IV

Violations of Section 20(a) of the Exchange Act (Against Defendants Leasure and Taylor) ...............................................................................................................133

PRAYER FOR RELIEF ...........................................................................................134

DEMAND FOR TRIAL BY JURY ..........................................................................135

Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System ("Lead Plaintiff" or "Oklahoma Police"), on behalf of itself and all other similarly situated investors, alleges the following based upon personal knowledge with respect to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon an investigation by its counsel, which included, *inter alia*, a review and analysis of: (i) filings made by Inotiv, Inc. ("Inotiv") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements from or concerning Inotiv and/or Envigo RMS, LLC ("Envigo," collectively with Inotiv, the "Company");[1] (iii) securities analyst reports and media reports about the Company; (iv) interviews with former employees of Inotiv or Envigo who were employed before and/or during the Class Period (defined herein); (v) the proceedings in the action styled as *United States of America v. Envigo RMS, LLC*, No. 6:22-cv-00028-KNM (W.D. Va.); (vi) reports of U.S. Department of Agriculture ("USDA") inspections of the Company's facilities; (vii) the proceedings in the action styled as *United States of America v. Gary Tucker*, 1:21-cr-20263-WPD (S.D. Fla.); (viii) the proceedings in the action styled as *United States of America v. Omaliss Keo, et al.*, No. 1:21-cr-20340-KMW (S.D. Fla.), *unsealed* Nov. 16, 2022; and (ix) other publicly available information concerning the Company. The undersigned counsel's investigation into the factual allegations contained herein is continuing. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein and will continue to be revealed after a reasonable opportunity for discovery.

---

[1] As alleged herein, Inotiv acquired Envigo on or about November 5, 2021. Unless otherwise specified, references to the "Company" refer to Inotiv in connection with events occurring prior to November 5, 2021 and to Inotiv and Envigo collectively with respect to events occurring on or after November 5, 2021.

Lead Plaintiff brings this action on behalf of itself and all other similarly situated investors who purchased or otherwise acquired Inotiv common stock on the NASDAQ exchange and/or through transactions within the United States, during the Class Period from September 21, 2021 through November 16, 2022, inclusive (the "Class Period"), and were damaged thereby.  Lead Plaintiff asserts claims for violations of: (a) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder ("Rule 10b-5"); (b) Section 14(a) of the Exchange Act and SEC Rule 14a-9 ("Rule 14a-9") promulgated thereunder, on behalf of investors who owned Inotiv common stock and were entitled to vote on matters necessary to effectuate the acquisition of Envigo at a special meeting of Inotiv shareholders on November 4, 2021; and (c) Section 20(a) of the Exchange Act against Defendants Robert W. Leasure, Jr. ("Leasure") and Beth A. Taylor ("Taylor") as controlling persons of Inotiv.

## I.    INTRODUCTION

1.    This case concerns a series of false and misleading statements and material omissions by Defendants (defined below) before, during, and after Inotiv's acquisition of Envigo, a leading commercial provider of research animals—euphemistically referred to in the industry as "research models"—and related services, as well as false and misleading statements and material omissions concerning the Company's non-human primate-related business and the risks thereto, including but not limited to the January 2022 acquisition of Orient Bio Resource Center ("OBRC"), a leading importer of non-human primates used in research.  While Inotiv was conducting its due diligence for the "transformational" acquisition of Envigo, the USDA was conducting inspections of Envigo's large-scale beagle breeding facility in Cumberland, Virginia (the "Cumberland Facility") and citing Envigo with numerous critical violations of the Animal Welfare Act ("AWA").  These serious violations, and issues related to a separate grand jury subpoena that had been served on Envigo in June 2021 in connection with its non-human primate

2

importation business, were concealed, omitted, or otherwise not disclosed from investors starting when the Envigo acquisition was announced. Similarly, Defendants concealed from investors that OBRC had also been served with a grand jury subpoena regarding the importation of non-human primates in June 2021—as part of the same federal criminal probe in which the subpoena to Envigo was issued, and in which employees of the Company's "principal supplier of non-human primates" and two officials of the Cambodian government were indicted on multiple charges.

2.      Following the closing of the Envigo acquisition, Defendants continued to conceal and/or downplay the material, adverse information concerning the severity of the persistent and serious animal welfare problems at the Cumberland Facility, despite multiple USDA inspection reports finding repeated and severe AWA violations there. After nearly ten months in which Envigo took little or no corrective action to address the animal welfare crisis at the Cumberland Facility, on May 18, 2022, agents from the USDA Office of the Inspector General and other federal and state law enforcement agencies took the extraordinary step of raiding the Cumberland Facility and moving for an *ex parte* temporary restraining order ("TRO") to rescue 145 neglected animals and force the Company's compliance with the AWA. In promptly issuing the TRO, a federal judge held: "Envigo is engaged in serious and ongoing violations of the [AWA]," and issued the TRO "to put a halt to such violations pending further proceedings." After previously maintaining that the Company was cleaning up its act at the Cumberland Facility, Defendants quickly changed course and, after about three weeks, agreed to shutter the entire Cumberland Facility, resulting in the transfer of approximately 4,000 beagles to the Humane Society of the United States so that the dogs could be put up for adoption.

3.      Similarly, Defendants concealed from investors material adverse information regarding the fact that Envigo and OBRC had been served with grand jury subpoenas in connection

with an ongoing federal criminal investigation into the importation of non-human primates from Asia that threatened the Company's access to those critical research models. After eventually disclosing that Envigo and OBRC had received subpoenas and claiming that the Company was cooperating with the government, on November 17, 2022, Defendants revealed a previously undisclosed and material piece of information about the federal criminal investigation: that a focus of the investigation was the Company's "principal supplier of non-human primates," leading to the indictment of officers and employees of that supplier on multiple felony counts. Moreover, according to documents filed in the criminal proceeding that were unsealed on November 16, 2022, it was likely that OBRC was a co-conspirator in the international primate smuggling ring addressed in the indictments.

4.      As news of these adverse facts began to enter the market, Inotiv's stock price declined significantly, losing nearly 90% of its value from the start of the Class Period.

5.      Inotiv is a contract research organization ("CRO") based in West Lafayette, Indiana that specializes in providing nonclinical and analytical drug discovery and development services to customers in the pharmaceutical, chemical, and medical device industries, as well as to academic and governmental research institutions. Like other CROs, Inotiv uses live animals to test the safety and effectiveness of experimental drugs and other products in the ordinary course of its business. The Company's products and services have historically focused on supporting the early phases of drug and device development including pharmacology, toxicology, pathology, and other scientific analyses performed before a drug or product may proceed to clinical trials in humans.

6.      Inotiv was founded in 1974 as Bioanalytical Systems, Inc. ("BASi"). In approximately 2016, BASi was faced with financial and strategic difficulties, including declining revenues, that began when large pharmaceutical company customers shifted their business to

larger, multi-service CROs.  In response, BASi's leadership engaged Defendant Leasure, a purported "turnaround expert," as a financial consultant.  Starting in 2017, the Company "reinvented" itself under Leasure's strategic guidance to become a "fully integrated 'solutions-oriented' CRO" by making internal investments to increase capacity and capabilities and, critically, by expanding the Company's business through "strategic acquisitions."  Defendant Leasure was named the Company's Chief Executive Officer ("CEO") in early 2019 and under his leadership, the Company—which rebranded itself as Inotiv in March 2021—has completed more than a dozen acquisitions to grow the Company from $20 million in revenues in 2016 to a projected $460 million in revenues in 2022.

7.    The Envigo acquisition is the most significant of the Company's acquisitions, and Defendants describe the acquisition as "transformational to the Company's underlying business." The Envigo acquisition resulted in the creation of the Company's Research Models and Services ("RMS") segment, which accounts for nearly three quarters of Inotiv's revenues and involves the breeding, importing, and selling of live animals for research purposes, as well as the manufacture and distribution of various products and services associated with the use of animals in research.   In addition to providing an in-house source of research animals for the Company's Discovery and Safety Assessment ("DSA") business segment, the RMS segment offers research animals for sale and is a global leader in the production and sale of some of the most widely used research models.

8.    Two categories of Envigo's research animals were particularly important to the acquisition and throughout the Class Period: beagles and non-human primates.  Beagles are a preferred breed of dog for use in research due to the dogs' typically docile demeanor—research beagles sell for as much as $1,000 per animal and Envigo provided approximately 25% of all research beagles to the market.  The health and temperament of these animals was an important

consideration for Envigo's customers.  Primates are considered critical to research given that they are the animals closest to humans and have been increasingly in demand and in short supply, particularly a critical and endangered species called the long-tailed macaque (sometimes referred to among researchers as cynomolgus monkeys) which, according to a September 28, 2022 article published by Bloomberg Businessweek, sell for as much as $35,000 per animal (up from approximately $11,000 per animal) following a COVID-era export ban imposed by the government of China that drastically limited the supply of research primates in the United States.

9.    When Inotiv announced the Envigo acquisition on September 21, 2021, a press release that Inotiv filed with the SEC quoted Defendant Leasure as stating that the Envigo acquisition would allow the Company to meet "increasing demand for specialty and disease-specific models."  In that press release, Defendants stressed that Inotiv and its clients would benefit from Envigo's "long history and broad expertise supplying critical research models and services to the scientific community," as well as the "leading research models and services from Envigo including genetically engineered models and services (GEMS), contract breeding services," and other related services.

10.    In the lead up to the Envigo acquisition, Defendants released a number of statements, including those made in or incorporated by reference into Inotiv's October 5, 2021 Definitive Proxy Statement (or, as defined below, the "Proxy"), that touted the Envigo acquisition and the purportedly high quality of Envigo's research animals and the value of the RMS segment to the Company's business and customers while concealing material information from Inotiv's investors.  In reality, Envigo had received notice of multiple serious AWA violations at the Cumberland Facility that raised significant concerns about the health, quality, and demeanor of the beagles raised there and was producing documents in response to a grand jury subpoena

concerning the importation of primates that potentially implicate the supply of those critical research models.

11. Inotiv and its senior leadership (including Defendants Leasure and John E. Sagartz, DVM, Ph.D., DACVP ("Sagartz")) were directly involved in extensive due diligence into Envigo prior to the acquisition that included receipt of detailed business information from Envigo and a month-long series onsite inspections of Envigo facilities between July 20, 2021 and August 20, 2021 (the "Due Diligence Tour"). The Due Diligence Tour, in which Defendant Carmen Wilbourn ("Wilbourn") also participated as a then-Envigo executive, included visits to the Cumberland Facility and Envigo's Alice, Texas primate facility.

12. Through the deep dive into Envigo's operations during the due diligence process, including the Due Diligence Tour, Defendants were or would have been made aware of significant concerns regarding Envigo's compliance with the legal and regulatory frameworks governing the treatment of animals bred and/or imported for research purposes. This included, but was not limited to, the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo and/or the Company's "principal supplier of non-human primates" would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates—issues that implicated Envigo's ability to provide Inotiv and its customers with quality research beagles and a supply of non-human primates.

13. Notably, Defendants Leasure, Sagartz, and Wilbourn personally witnessed and/or learned of the shocking and inhumane treatment of beagles at Envigo's Cumberland Facility that was documented in multiple USDA inspection reports, including reports from the same time frame as the start of the Due Diligence Tour. The USDA conducted multiple inspections during and after

the Due Diligence period that consistently noted severe and ongoing animal welfare violations, including: dogs were housed in overcrowded cages; animal waste was not sufficiently cleaned, resulting in accumulations of waste that created health hazards for the animals and noxious odors; there were excessively high temperatures in the kennels where dogs and puppies lived; dogs did not have sufficient access to safe food and water; dog food was infested with insects and pests; fighting was rampant among the dogs, with dogs suffering numerous fight-related injuries; flooring of cages had gaps large enough for the legs and feet of puppies and dogs to fall through, causing injuries and entrapment; facilities were in an obvious general state of disrepair; there were sick or injured dogs who needed veterinary care and were not being treated; and there was only one staff veterinarian responsible for the care of approximately 5,000 animals. Among other things, the USDA found that the "accumulation of feces, urine, standing water, insects (both dead and alive) and uneaten food," created an "overpowering ammonia and fecal odor that emanate[d] from below the kennels." The conditions at the Cumberland Facility described in the USDA's inspection reports and as described by CW1 and CW3 (*see* §§ V.A-B, VI.A.1, and VI.A.3 below) would have been obvious to anyone on the Due Diligence Tour, including Defendants Leasure, Sagartz, and Wilbourn. Similar conditions at the Cumberland Facility and the related risk of AWA violations there also were or would have been known to Defendants through the due diligence process due to negative publicity about the Cumberland Facility and a resulting push for legislative action from the Virginia legislature in 2019-2020.

14. Defendants similarly learned or would have learned through the due diligence process—including through Defendants' visit to the Envigo primate facility in Alice, Texas during the Due Diligence Tour—that, on June 15, 2021, Envigo had received a grand jury subpoena in connection with an ongoing federal criminal investigation into the importation of "live non-human

primates" from Asia and was cooperating with the government in responding to the subpoena. Access to a supply of non-human primates was among the leading justifications for the Envigo acquisition that Defendant Leasure noted when he spoke at the Jefferies London Healthcare Virtual Conference on November 16, 2021. The existence of a federal criminal investigation into the critical business of primate importation—and the potential risk that Envigo and/or the Company's "principal supplier" of primates might become enmeshed in that investigation—would have been or should have been known to Defendants no later than August 4, 2021, during the due diligence process and Due Diligence Tour, when an individual employed by OBRC, which was later acquired by Inotiv in January 2022, pled guilty to a count of making false statements to federal investigators in connection with an investigation into the possible international trafficking of non-human primates. That OBRC executive attended in person meetings with Defendant Leasure just prior to the announcement that Inotiv would acquire OBRC (a transaction in which the OBRC executive would personally profit), after the executive pled guilty to a felony and was sentenced. Moreover, Defendants would have been aware of the ongoing federal criminal investigation into the importation of non-human primates at the time of the OBRC acquisition in January 2022, including with respect to the fact that OBRC was implicated in that investigation as a potential co-conspirator of the Company's principal source of non-human primates, due to OBRC having received a grand jury subpoena in June 2021—a fact that Defendants knew or should have known as a result of due diligence prior to the acquisition of OBRC.

15. Notwithstanding Defendants' knowledge of significant adverse material information regarding Envigo, Defendants continued to tout the Envigo acquisition and the purportedly high quality of Envigo's research animals and the value of the RMS segment to the Company's business and customers while concealing material information from Inotiv's

investors.  Starting with the announcement of the Envigo acquisition on September 21, 2021 (the date on which the Class Period begins) and continuing through the Class Period, Defendants concealed the reality that Envigo was confronted with governmental scrutiny that threatened two aspects of its core business—the sale of research beagles and primates.  Specifically, Defendants concealed from Inotiv's investors the fact that USDA inspectors had consistently found ongoing animal welfare violations at the Cumberland Facility, as well as the fact that Envigo had received a grand jury subpoena concerning the importation of non-human primates from Asia and was producing documents in response to that subpoena.  Defendants concealed this information in order to (a) induce Inotiv's shareholders to vote in favor of measures necessary to effectuate the acquisition of Envigo and (b) deceive the market and artificially inflate the price of Inotiv's stock.

16.    Finally, after at least four inspections showing material, severe, ongoing problems and over 60 violations of the AWA, the government took the extraordinary step of raiding the Cumberland Facility.  On May 18, 2022, federal and state law enforcement officials, began to execute a federal search and seizure warrant at the Cumberland Facility.  While executing the warrant, government agents observed and documented the Company's ongoing failures to comply with the AWA (*see* § V.G, below). The agents seized 145 dogs and puppies and on May 19, 2022, the U.S. Department of Justice ("DOJ") filed a Complaint for Declaratory and Injunctive Relief against Envigo, along with an *ex parte* motion for a TRO.  Two days later, on Saturday, May 21, 2022, a federal judge granted a TRO, concluding that "the Government has put forward a clear showing of irreparable harm" by clearly demonstrating that "Envigo has been operating and continues to operate in a manner that flagrantly disregards numerous health protocols, placing the health of animals in serious danger and risk of death."  Faced with a finding of "repeated non-compliance with inspectors' violation reports and with the AWA, as well as the substantial,

documented risk of irreparable harm in the absence of the prompt injunctive relief," the Company quickly changed course.  On June 13, 2022, only months after touting the Cumberland Facility as an important part of its "strong" global footprint, and telling the Virginia Senate in early February that the Company remained committed to operating the facility in compliance with the AWA and "the highest animal welfare standards," the Company announced the closing of the Cumberland facility, leading Inotiv's stock to drop further.

17.    Then, on November 17, 2022, before the market opened, Inotiv filed a Form 8-K with the SEC (the "November 17, 2022 8-K"), stating that, on November 16, 2022, the Company "became aware that the U.S. Attorney's Office for the Southern District of Florida ('USAO-SDFL') has criminally charged employees of the Company's principal supplier of non-human primates ('NHPs'), along with two Cambodian officials, with conspiring to illegally import NHPs into the United States from December 2017 through January 2022 and in connection with seven specific imports between July 2018 and December 2021."  This announcement followed the November 16, 2022 unsealing of documents in a criminal proceeding in the U.S. District Court for Southern District of Florida, *United States of America v. Omaliss Keo, et al*., No. 1:21-cr-20340-KMW (S.D. Fla.).

18.    When the truth of the matters that had been concealed from investors was revealed to the market through a series of partial corrective disclosures, Inotiv's stock price fell in response to that news.  As alleged herein, the price of Inotiv's stock collapsed by nearly 88%, from a price of $55.55 per share just prior to the first partial corrective disclosure to a closing price of $6.82 per share at the end of the Class Period.

19.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities when the truth was revealed, Lead Plaintiff and other members of the Class (defined below) suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

20.     The claims asserted in this action arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n & 78t(a)) and SEC Rules 10b-5 and 14a-9 promulgated thereunder (17 C.F.R. § 240.10b-5 & 17 C.F.R. § 240.14a-9).  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this District under Section 27 of the Exchange Act.  The Company's corporate headquarters are located within this District, the Company conducts substantial business in this District, and many of the Company's acts and practices complained of herein occurred in substantial part in this District.

22.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the national securities exchanges.

## III.     THE PARTIES

### A.     <u>Lead Plaintiff</u>

23.     Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System ("Lead Plaintiff" or "Oklahoma Police") is a public pension fund and sophisticated institutional investor that manages the public pension for municipal police officers in the state of Oklahoma. Oklahoma Police covers 4,920 active members, 3,088 retirees, 862 beneficiaries, and 132 disabled members and, as of September 30, 2022, had nearly $2.9 billion in assets under management.  As

12

set forth in the certification filed herewith, Oklahoma Police purchased shares of Inotiv common stock during the Class Period, owned shares entitling it to vote on matters necessary to effectuate the acquisition of Envigo at a special meeting of Inotiv shareholders on November 4, 2021, and suffered damages as a result of the violations of the federal securities laws alleged herein.

      **B.**    **Defendants**

24.    Defendant Inotiv, Inc. ("Inotiv") is an Indiana corporation headquartered at 2701 Kent Avenue, West Lafayette, Indiana.  Inotiv's common stock is listed and traded on the NASDAQ exchange under the ticker symbol "NOTV."

25.    Defendant Robert W. Leasure, Jr. ("Leasure") is Inotiv's CEO and President and is a member of the Board of Directors ("Board").  Leasure has served in this capacity since January 2019.  Leasure's biography on the Inotiv website indicates that he also serves as the managing partner and president of an entity called LS Associates, LLC that, over the last 16 years has "worked with over 300 companies in various industries and served clients in the United States and internationally."

26.    Defendant Beth A. Taylor ("Taylor") is Inotiv's Chief Financial Officer and Senior Vice President of Finance.  Taylor has served in this capacity since March 2020.  Prior to working for Inotiv, Defendant Taylor worked for eight years at biopharmaceutical company Endocyte, Inc., where she held the roles of Corporate Controller, Vice President of Finance, and Chief Accounting Officer.

27.    Defendant John E. Sagartz, DVM, Ph.D., DACVP ("Sagartz") is Inotiv's Chief Strategy Officer and a member of the Board.  Sagartz has served in this capacity since November 2018.  Sagartz holds a bachelor's degree and Doctor of Veterinary Medicine from Kansas State University and a Ph.D. from The Ohio State University.  Prior to joining the Company, Sagartz worked at major pharmaceutical companies in positions that involved preclinical research and

development, and served as the CEO and Chief Strategy Officer at a Missouri-based CRO called Seventh Wave Laboratories that was acquired by the Company (then BASi) in July 2018.

28.     Defendant Carmen Wilbourn ("Wilbourn") is Vice President of North American Operations with the Company. Defendant Wilbourn joined Envigo in May 2021 and had oversight responsibility for 11 of its sites, including the Cumberland Facility, with approximately 500 people reporting up through her. In January 2022, Defendant Wilbourn's responsibilities were changed to focus on the Company's canine and rabbit facilities in North America. As of June 2022, Defendant Wilbourn worked primarily out of the Cumberland Facility and had done so for several months. Prior to working for Envigo, Wilbourn worked for 29 years at a CRO called Covance before that company was acquired by Envigo. Her positions during her tenure at Covance included Director of Operations, Regional Director of Operations, and Executive Director of Global Operations.

29.     Defendants Leasure and Taylor are collectively referred to as the "Control Defendants."

30.     Because of the Control Defendants' positions at the highest levels of corporate management at the Company and participation in the due diligence process described herein, they had access to adverse undisclosed information about the Company's business operations and practices via eyewitness observation and receipt of information during the Due Diligence Tour, internal corporate records and documents, conversations and contact with other Envigo and Inotiv corporate officers and employees, attendance at meetings, and via reports and other information provided to them in the ordinary course of business. Each of the Control Defendants, by virtue of his or her high-level position, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential information concerning the Company and its

business, operations, and practices, including matters related to USDA inspections and other inspections or audits of the Cumberland Facility, as well as the existence of grand jury subpoenas received in connection with an ongoing federal criminal investigation into the illegal smuggling of non-human primates into the United States that implicated the Company, either directly through Envigo and/or OBRC (as a potential criminal co-conspirator), or the Company's leading supplier of non-human primates.  Their positions of control and authority as officers enabled the Control Defendants to control the content of the Company's SEC filings, press releases, and other public statements of the Company during the Class Period.

31.     Accordingly, each of the Control Defendants bears responsibility for the accuracy of the public reports of financial and other information and the Company's press releases and other communications detailed herein and are primarily liable for the misrepresentations and omissions contained therein.  Moreover, the Control Defendants had continuous and systematic contacts with the United States and Indiana through the Company's conduct of its business and its West Lafayette, Indiana corporate headquarters.   During the Class Period, each of the Control Defendants personally made, signed, and/or substantially participated in the preparation of the Company's false statements—including participation on investor conference calls or providing legislative testimony on behalf of the Company—and/or engaged in conduct that made it necessary or inevitable that material misrepresentations would be made to investors on the basis of that conduct.

32.     The Control Defendants also prepared, reviewed, signed, and/or disseminated the false and misleading Proxy.

33.     Accordingly, each of the Control Defendants bears responsibility for the accuracy of the contents of the Proxy and are primarily liable for the negligent misrepresentations and omissions contained therein.

## IV.     BACKGROUND

### A.     The Company and Its Business

34.     Inotiv, along with its subsidiaries, purport to comprise a leading CRO with facilities in the United States, United Kingdom, Europe, and Israel, specializing in nonclinical and analytical drug discovery and development services that also manufactures scientific instruments for life sciences research that are sold to pharmaceutical companies, universities, government research centers, and medical research institutions.

35.     As a result of the November 2021 Envigo acquisition, the Company's business also includes "breeding, importing and selling research-quality animal models for use in laboratory tests," as well as the manufacture and distribution of standard and custom diets, bedding and enrichment products, and the provision of other services associated with these products, making the Company a global leader in the production and sale of research models.

36.     Following the Envigo acquisition, Inotiv operates with two business segments, the DSA segment and the RMS segment.

37.     The DSA segment provides preclinical research services on a contract basis directly to biopharma and pharmaceutical companies, as well as certain research products.  The DSA segment provides clients with various services necessary to take a drug candidate through the early development process, such as screening and pharmacological testing, nonclinical safety testing, formulation development, regulatory compliance, and quality control testing.  The DSA segment also assists clients with the identification, screening, and selection of lead compounds for drug

16

development and "regulated and non-regulated (Good Laboratory Practice ('GLP') and non-GLP) safety assessment services."

38.    The RMS segment is comprised of the former Envigo businesses of research models, research model services, and Teklad brand animal diet, bedding, and enrichment products. The business acquired in the OBRC acquisition is also part of the RMS segment. Research animal production by the RMS segment includes the commercial production and sale of small research models (*e.g.*, various varieties of purpose-bred rats, mice, and other rodents), large research models (including but not limited to non-human primates and beagle dogs), and the production and sale of certain biological products. The RMS segment also provides research model services that include genetically engineered models and services ("GEMS"), which include contract breeding and other services associated with genetically engineered research animals, care of client-owned animal colonies, and health monitoring and diagnostic services related to research animals. The Company's Teklad branded products include specialized animal diets and other products that are purported to "enhance the welfare of research animals."

39.    Defendants have described the Envigo acquisition as a transformative event for the Company. Indeed, the Envigo businesses that comprise the RMS segment account for the vast majority of the Company's revenues. In communications to Inotiv's investors prior to the Envigo acquisition, including a September 21, 2021 investor presentation slide deck (the "September 21 Investor Presentation," described herein), Defendants indicated that, based on nine months of financial results for the period ending June 30, 2021, Envigo would account for more than 74% of the companies' combined revenues ($212 million of the combined $286 million) and would constitute 80% of pro forma adjusted earnings before interest, taxes, depreciation, and amortization ("adjusted EBIDTA"). This continued during the Class Period. When the Company announced

quarterly earnings for the period ended March 31, 2022 on May 13, 2022 (the last earnings announcement during the Class Period), the RMS segment accounted for more than 72% of total quarterly revenues ($101.2 million out of $140.3 million total revenues). The September 21 Investor Presentation slide deck further communicated to Inotiv investors that, prior to the acquisition, large research models (*i.e.*, canines, primates, and rabbits) accounted for 47% of Envigo's revenues.

### B.    Inotiv's Acquisition of Envigo

40.    Under Defendant Leasure's leadership as CEO, Inotiv has pursued a strategy of seeking to grow through strategic acquisitions. The acquisition of Envigo was central to that strategy. In addition to being "transformational" to the Company due to the relative size of Envigo and the resulting proportion of the Company's business attributable to the RMS segment, Envigo also provided Inotiv with a unique opportunity to expand its services and provide further vertical integration of the Company's CRO services and products business. Among other things, the acquisition of Envigo provides Inotiv with access to an in-house supply of research animals including "large" animals (a category that includes beagle dogs and non-human primates) that have been increasingly in demand to support research in the biotech industry.

41.    Inotiv first began to explore strategic opportunities with Envigo as early as November 19, 2019. At that time, Defendant Leasure first met with Scott Cragg ("Cragg"), who was then a member of the Envigo Board (and who is currently a member of the Inotiv Board, having joined in November 2021). The meeting was arranged as part of Leasure's ongoing effort to "evaluate strategic opportunities." At the time, Cragg was the Envigo Board designee of his firm, Jermyn Street Associates ("Jermyn Street"), which was a major investor in Envigo; Cragg has been a member of the Envigo Board as Jermyn Street's designee since November 2021.

42.     Nearly a year-and-a-half after Defendant Leasure's initial outreach, starting in late
April 2021, Leasure and Cragg began to discuss each other's businesses and determine whether
there were ways that Inotiv and Envigo could potentially work together.  During April and May
2021, discussions between Inotiv and Envigo continued and, on May 21, 2021, the companies
entered into a mutual non-disclosure agreement.  Shortly thereafter, due diligence activities began.

43.     The first step in the extensive due diligence process was an "Envigo Corporate
Overview" presentation provided to Defendant Leasure by Envigo's then-CEO Hardy on May 24,
2021 that included "more details about the Envigo business."  The Envigo Corporate Overview
was followed by "consistent calls every week" from June-September 2021 in which Envigo
representatives "followed up regarding business matters, due diligence, agreements, closing issues
and post-closing operations."

44.     As discussions continued, Defendants Leasure and Sagartz met with Envigo
representatives on at least two occasions—a June 17, 2021 meeting in New York City and a June
27-28, 2021 meeting in Indianapolis—to discuss "multiple aspects of Envigo" and its business, as
well as various matters that led the Inotiv team to leave the Indianapolis meeting "with additional
due diligence related follow-up questions."  Other due diligence activities included investigations
conducted by the companies' financial advisors, including the due diligence conducted by Inotiv's
advisors that began on August 4, 2021.

45.     As the financial particulars of the transaction were worked on in July 2021,
Defendants Leasure, Sagartz, and Wilbourn, along with other Inotiv and Envigo executives,
embarked on the Due Diligence Tour, visiting 17 of the 22 Envigo sites from July 20, 2021 to
August 20, 2021.  These visits included the Cumberland Facility and Envigo's primate facility in
Alice, Texas.  According to CWs 1 and 2 (described below), site visits during the Due Diligence

Tour would entail half day to full day visits at each Envigo facility, during which time Inotiv personnel would be given an extensive tour of the facilities and engage in information gathering discussions with Envigo personnel at the site.  As described by CW2, Defendant Leasure asked questions of Envigo personnel and was otherwise directly involved in gathering information about the Envigo sites.  Other Inotiv personnel and/or Inotiv advisors also visited Envigo facilities to compile information for Inotiv and its leadership, including Defendants Leasure, Taylor, and Sagartz, as part of the due diligence process.

46.    Following the due diligence process, Inotiv and its advisors met to discuss due diligence issues including "various legal, financial, technical and operational issues related to the potential transaction."  As a result of the concerns raised in those discussions, Inotiv negotiated a reduced purchase price for Envigo, from $500 million to $485 million.  The reason for the $15 million decrease in Inotiv's valuation of Envigo following the due diligence process was not explained beyond a reference to the elimination of certain representations and warranties without any reference to particular legal, financial, or operational issues that may have been identified.

47.    On September 21, 2021, Defendants and Envigo announced the proposed merger in which Inotiv would acquire Envigo for a total of $485 million, comprised of $200 million in cash and 9,365,173 Inotiv common shares then valued at $285 million.  Then, on September 24, 2021, Inotiv filed a Preliminary Proxy Statement in connection with certain matters to be approved by Inotiv's shareholders in order to effectuate the transaction.  The Definitive Proxy Statement was filed on October 5, 2021, advising shareholders that they had until the close of business on November 4, 2021 to vote or designate their proxies on those matters.  Holders of the Company's common shares at the close of business on October 4, 2021 were eligible to vote.

48.     The Company also incorporated several documents into its Proxy by reference, including its Annual Report on Form 10-K for the year ended September 30, 2020; the information specifically incorporated by reference into Inotiv's Annual Report from its Definitive Proxy Statement on Schedule 14A from its 2021 annual meeting of shareholders; Inotiv's Quarterly Reports on Form 10-Q for the fiscal quarters ended December 21, 2020, March 31, 2021, and June 30, 2021; and Inotiv's Current Reports on Form 8-K filed on September 16, 2020, September 18, 2020, December 21, 2020, January 4, 2021, February 9, 2021, February 16, 2021, March 9, 2021, March 19, 2021, April 19, 2021, April 20,2021, April 21, 2021, May 5, 2021, May 6, 2021, June 2, 2021, August 10, 2021, August 11, 2021, September 14, 2021, two filed on September 21, 2021, September 27, 2021, September 28, 2021 and October 4, 2021 and Forms 8-K/A filed on September 21, 2021 and October 1, 2021.  The Proxy also included four annexes: Annex A (the Articles Amendment); Annex B (the Opinion of Jefferies LLC); Annex C (the Amended and Restated Inotiv, Inc. 2018 Equity Incentive Plan); and Annex D (the Unaudited Special Purpose Combined Statements of Direct Revenues and Direct Expenses of Envigo).

49.     The specific proposals for the shareholder vote  included: "(1) a proposal to approve an amendment to the Second Amended and Restated Articles of Incorporation to increase the number of authorized shares of the Company to 75,000,000 shares, consisting of 74,000,000 Common Shares and 1,000,000 Preferred Shares (the "Authorized Share Increase Proposal"); (2) a proposal to approve the issuance of Common Shares pursuant to the Merger Agreement, pursuant to NASDAQ Rule 5635(a) (the "Merger Share Issuance Proposal"); (3)  a proposal to approve an amendment to the 2018 Equity Incentive Plan to increase the number of Common Shares available for awards thereunder by 1,500,000 shares and to make corresponding changes to certain limitations in the Plan; (4) a proposal to approve the issuance of Common Shares issuable upon

conversion of the Company's 3.25% Convertible Senior Notes due 2027, pursuant to NASDAQ Rule 5635(a); and (5) a proposal to approve one or more adjournments of the Special Meeting, if necessary or appropriate, to permit solicitation of additional votes if there are insufficient votes to approve the Authorized Share Increase Proposal, or the Merger Share Issuance Proposal."

50.    On October 21, 2021, Inotiv issued an update on Form 8-K, signed by Defendant Taylor, with supplemental disclosures.

51.    On November 4, 2021, Inotiv's shareholders approved the four resolutions needed to effectuate the Envigo acquisition with near unanimous approval. The proposals were approved by votes ranging from 95% in favor to over 99% in favor.

52.    On November 5, 2021, with the necessary shareholder approvals in hand, Inotiv and Envigo closed the transaction. The closing of the transaction was announced by a press release issued shortly after 1:30 p.m. and via a Form 8-K filed with the SEC later that day.

### C.    The Regulatory Environment Governing the Company's Business

53.    As a CRO engaged in animal experimentation and as a breeder of research animals in the RMS segment, the Company is subject to a strict statutory and regulatory regime governing multiple aspects of animal welfare. As Inotiv acknowledged in its annual report on Form 10-K filed on December 21, 2021 (the "2021 Form 10-K"), the Animal Welfare Act ("AWA") and associated animal care regulations, which govern the care and use of "regulated species" (*i.e.*, animals other than rats, mice, and birds), "require producers and users of regulated species to provide veterinary care and to utilize specific husbandry practices such as cage size, shipping conditions, sanitation and environmental enrichment to assure the welfare of these animals." The Company also acknowledged that additional regulations and standards apply to facilities using certain live animals in research funded by the U.S. Public Health Service.

54.     Inotiv also stated in the 2021 Form 10-K that the Envigo RMS business in the U.S. is "subject to licensing and registration requirement standards set by the [USDA] . . . for the care and use of regulated species."  Further, "Envigo's import and export of animals and its operations in foreign countries are subject to international agreements and conventions, as well as a variety of national, regional, and local laws and regulations, which establish the standards for the humane treatment, care, handling and transport of animals by dealers and research facilities."  To ensure compliance with these regulatory obligations, the 2021 Form 10-K states that "Envigo has established quality assurance procedures and functions . . . [that purportedly] operate [] independently from those individuals that manage RMS production."

55.     Congress enacted the AWA, in part, to "insure that animals intended for use in research facilities … are provided humane care and treatment."  7 U.S.C. § 2131(1); *Lesser v. Espy*, 34 F.3d 1301, 1302 (7th Cir. 1994) (Congress enacted AWA to expand regulation of animals used in scientific research).  The AWA imposes "minimum requirements" for handling, housing, feeding, watering, sanitation, and adequate veterinary care, among other requirements.  7 U.S.C. § 2143(a)(2)(A).  Through the statute, Congress authorized the Secretary of Agriculture to promulgate rules and regulations "as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151.  The AWA requires licensed research animal dealers such as Envigo to comply in every respect with the regulations and standards that outline the minimum requirements of the Act.

56.     Within the USDA, the Animal and Plant Health Inspection Service ("APHIS")[2] Animal Care unit "establishes acceptable standards of humane care and treatment for regulated

---

[2] Because APHIS is a component of the USDA, the two terms are used interchangeably herein when discussing the inspection process and related regulatory framework.

animals and monitors and achieves compliance through inspections, enforcement, education, and cooperative efforts" under the AWA. 7 C.F.R. § 371.7.

57.     USDA/APHIS personnel perform several types of AWA inspections of licensed facilities, including "routine" inspections and "focused" inspections.[3]  Routine inspections are periodic, unannounced inspections that cover every aspect of a facility that is regulated under the AWA to ensure the facility's compliance with federal standards and regulations.  According to the APHIS website: "[d]uring routine inspections, USDA reviews the premises, records, husbandry practices, program of veterinary care and animal handling procedures to ensure the animals are receiving humane care."  "Focused" inspections are unannounced inspections with the purpose of either reinspection or partial inspection for direct or specific noncompliant items ("NCI" or "NCIs") that had been identified in a routine inspection, or a partial inspection to follow up on a public complaint concerning animal welfare.  Inspections to follow up on a public complaint involving animal welfare may qualify as either a routine or a focused inspection.

58.     Upon completion of an inspection, the USDA inspector will conduct an exit briefing with senior facility staff.  If inspectors discover conditions or records that are not in compliance with applicable regulations, they will set deadlines for the NCIs to be corrected.  At some point after the deadline, a re-inspection will take place.  The timing of the re-inspection depends on a number of risk factors, including the nature of the NCI and the overall compliance history of the facility.  A finding of one or more NCIs during an inspection is typically not the end of the inspection/investigative process—the USDA provides licensees with opportunities to address a deficiency and cure the problem.  For any "Direct" NCI that is not corrected at the time

---

[3] *See* APHIS Animal Welfare Inspection Guide, USDA, at 3-23 (revised November 2021), https://www.aphis.usda.gov/animal_welfare/downloads/Animal-Care-Inspection-Guide.pdf (last visited Nov. 14, 2022) ("APHIS Animal Welfare Inspection Guide").

of the inspection, the APHIS Animal Welfare Inspection Guide requires inspectors to set a correction deadline that "should never exceed 14 days," with conditions showing "egregious Direct noncompliance," requiring a "very short, e.g., 1 day" correction deadline, with reinspection to occur within a short time "to verify the correction and ensure animal welfare." For any repeat noncompliance items identified, USDA inspectors do not provide a new correction date; no additional time is given unless, in special circumstances, an extension is provided by the APHIS Animal Welfare Operations leadership. When inspectors identify areas of noncompliance that "have, or are likely to have, a serious impact on the welfare of animals," inspectors are required to conduct a reinspection within 45 days. In cases of unrelieved animal suffering, USDA inspectors may confiscate animals or arrange for their placement elsewhere.

59.      Should USDA inspectors identify serious violations of the AWA during an inspection, USDA may take action to ensure compliance beyond requiring certain corrective actions through the inspection process. These actions include the issuance of a "Letter of Information" to informally document AWA noncompliance and advise the recipient that more stringent action may be taken for continued noncompliance, or an "Official Warning Letter" that provides official warning of an alleged violation of the AWA and notice that the USDA may seek a civil or criminal penalty for future noncompliance. Pursuant to 7 U.S.C.A. § 2149(a), the USDA may also act to temporarily suspend or revoke an entity's license, or pursuant to 7 U.S.C.A. § 2149(b), the USDA may issue civil penalties of up to $10,000 per violation, per day of offense.

60.      In 2019, the USDA issued Envigo a "Class A" license under the AWA to breed and sell dogs at the Cumberland Facility.[4]  Accordingly, the Cumberland Facility was subject to

---

[4] AWA license 32-A-0774. A "Class A" licensee is anyone meeting the definition of "dealer" whose business consists only of animals acquired for the sole purpose of maintaining or enhancing the breeding colony and animals that are bred and raised on the premises. *See* APHIS Animal Welfare Inspection Guide at 4-21.

USDA/APHIS inspection for compliance with applicable law.  At all relevant times, including after Inotiv acquired Envigo, the license for the Cumberland Facility remained in the name of Envigo.

**V.    THE CONCEALMENT OF SHOCKING ANIMAL WELFARE CONDITIONS AT THE CUMBERLAND FACILITY AND A CRIMINAL SUBPOENA REGARDING THE IMPORTATION OF NON-HUMAN PRIMATES**

**A.    <u>July 2021 USDA Inspection of the Cumberland Facility Finds Extensive Animal Welfare Violations</u>**

61.    On July 20-21, 2021, before the Class Period but during Inotiv's due diligence process, agents from the USDA's APHIS animal care unit conducted a routine, unannounced inspection of the Cumberland Facility, as well as a companion "focused" inspection (the "July 2021 Inspection").  During the July 2021 Inspection, USDA inspectors found a total of 5,035 beagle dogs living at the Cumberland Facility, of which 3,021 were adult dogs and 2,014 were puppies.

62.    USDA inspectors identified dozens of violations of the AWA that fell within six major categories: (a) failure to provide adequate veterinary care; (b) failure to provide uncontaminated, palatable, and nutritive food in sufficient quantity; (c) failure to keep dogs safe; (d) exposing dogs to unsanitary and unsafe conditions; (e) failure to employ a sufficient number of qualified employees to care for the number of dogs housed at the Cumberland Facility; and (f) the failure to make and retain accurate and complete records.

63.    Within those broad categories, the July 2021 Inspection identified seven types of "Direct" violations—or Direct NCIs in USDA regulatory parlance—and three "Critical" NCIs, each of which was comprised of multiple examples of Envigo's failure to meet applicable animal welfare standards for the beagles at the Cumberland Facility.  As defined in the APHIS Animal Welfare Inspection Guide, "Critical" NCIs include, among other things, conditions that have "a

serious or severe adverse effect on the health and well-being of the animal." The USDA defines "Direct" NCIs as "a Critical noncompliance that is **currently (at the time of the inspection) having a serious or severe adverse** effect on the health and well-being of the animal." (Boldface in original.)[5] The severity of a particular violation does not determine whether an NCI is deemed "Critical" or "Direct" —"[t]he determining factor for a Direct is whether it has **current** serious or severe adverse impact at the time of the inspection." (Boldface in original.)

64.     The "Direct" violations identified during the July 2021 Inspection included:

- Failure to maintain a program of veterinary care that includes daily observations of animals to assess their health and well-being pursuant to 9 C.F.R. § 2.40(b)(3). USDA inspectors found numerous animals to have untreated conditions that required immediate veterinary care, including cases where dogs had obvious skin, eye, and ear problems, as well as severe dental problems.

- Failure to handle animals in a manner to avoid trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort under 9 C.F.R. § 2.131(b)(1). In addition to finding a listless puppy covered in dried excreta that had been trapped in a pan underneath the cage in which its mother and litter mates were living, USDA inspectors found 13 nursing adult female beagles housed in individual cages with a total of 78 puppies who had been deliberately denied food for 42 hours. The nursing mother dogs, or "dams," were observed to have been attempting desperately to reach food that was being kept just out of reach outside of their cages where the dogs could see and smell it.

- Temperatures in multiple animal housing areas greatly exceeded the 85-degree limit set forth in 9 C.F.R. 3.3(a). UDSA inspectors documented numerous instances in which rooms that contained hundreds of dogs measured temperatures in excess of 85 degrees for periods of more than five hours, with multiple measurements exceeding 90 degrees. Envigo personnel indicated to inspectors that temperatures were typically monitored once a day at approximately 7:00 a.m., which is several hours earlier than the hottest part of the day, and earlier than when USDA inspectors measured the excessive temperatures. The USDA directed Envigo to provide "additional / alternate cooling mechanisms" beyond the fans that were installed to ensure temperature compliance.

- Failure to have floors constructed in a manner that protects dogs' feet and legs from injury pursuant to 9 C.F.R. § 3.6(a)(2)(x). USDA inspectors documented multiple instances in which puppies were kept in kennels where the floor consisted of a raised metal grate with openings that were so large that the puppies' feet fell

---

[5] Unless otherwise specified herein, all emphasis is added.

through the openings.  In two rooms where approximately 200 puppies were housed with their mothers, puppies' feet were observed to have fallen through the flooring up to their shoulders.  Similar issues were found at other locations, and one adult female beagle was found with her front paw caught in the grate flooring suffering from dehydration and injuries to her toes that required immediate veterinary care.

- Nursing dams and their puppies were being kept in excessively small enclosures that failed to meet the requirements of 9 C.F.R. § 3.6(c)(1)(ii).  USDA inspectors found 62 nursing dams and 393 puppies in the whelping building that were housed in cages that did not provide the minimum amount of floor space.  Notably, nursing dams (each measuring approximately 25-28 inches from the nose to the base of her tail) and up to nine puppies were kept in enclosures that measured 33 by 36 inches.

- Multiple violations of the feeding requirements set forth in 9 C.F.R. § 3.9.  In addition to USDA inspectors observing that 13 litters of 6-week-old puppies were kept with dams who had been denied food for 42 hours that was resulting in hunger and harm to the puppies, inspectors also found that food located in self-feeders and a feed silo was "contaminated with a variety of live insects" including "small black worm-type insects," live beetle-type insects, and flies.

- Inadequate staffing at the Cumberland Facility pursuant to 9 C.F.R. § 3.12.  USDA inspectors determined that there were not sufficient employees to recognize when dogs require veterinary care.  Many violations noted in other categories, including dogs that were found trapped and requiring care, had not been identified by animal care staff.  The USDA also noted that there was only one attending veterinarian employed to oversee the care of more than 5,000 dogs at the facility; the veterinarian also was tasked with assisting in research projects.

65.    The "Critical" violations identified during the July 2021 Inspection included:

- Inadequate documentation of veterinary care pursuant to 9 C.F.R. § 2.40(b)(2).  Among other things, Envigo's records indicated that over 300 puppy deaths were attributed to unknown causes, with no steps taken to determine the causes of those deaths to prevent similar deaths in the future and, in certain instances, the attending veterinarian had not been notified of puppy deaths.

- Failure to meet the minimum requirements for primary enclosures in order to prevent injury to dogs pursuant to 9 C.F.R. § 3.6(a)(2)(ii).  Envigo's records indicated that 71 dogs had been injured with a body part had been pulled through the wire mesh wall of a kennel and bitten by a dog in an adjacent kennel; all of those dogs had been euthanized regardless of the injuries sustained.

- Failure to separate fighting or incompatible dogs pursuant to 9 C.F.R. § 3.7.  Envigo's records showed two female dogs were found dead from fight wounds in March 2021, with another female dog killed by her cage mate in May 2021.  Other records indicated that dozens of dogs had sustained fight wounds between January 1 and July 22, 2021.

66.    The July 2021 Inspection also found a number of other disturbing unsanitary conditions at the Cumberland Facility that were, in many instances, evidence of obvious failures to care for the beagles housed there.  Among other things, USDA inspectors found waste gutters under the flooring that "contained a large accumulation of feces, urine, standing water, insects (both dead and alive) and uneaten food," with a resulting "overpowering ammonia and fecal odor that emanates from below the kennels."  There was a similar accumulation of waste, insects, and food found underneath the raised kennel floors and "organic matter and debris surrounding the inside access points to the drains and against the walls of the rooms" that an Envigo employee attributed to a pump that had remained broken for six days, allowing for the accumulation of waste.  USDA inspectors also noted an "extensive, widespread pest problem throughout all animal-housing buildings at the facility," including spiders in housing areas, ants and "black hairy worm-type insects and live black beetles" in feeders and dog food, and flies throughout the facility.

67.    The July 2021 Inspection also noted numerous recordkeeping violations (including inadequate documentation of animal injury, death, and other veterinary care issues), as well as several "widespread problems" with animal housing pursuant to 9 C.F.R. 3.1(c)(1) that indicated a failure to maintain primary enclosures, dog toys, and dog-contact surfaces.  The USDA found that 90% of plastic hanging doors in three buildings had badly chewed edges with dirt and grime embedded in the edge, with certain flaps chewed so badly that they were completely missing and/or had damaged or missing metal flashing around the doors.  While dog toys such as "rubber 'Kongs' and plastic dumbbells" were provided, approximately 75% of them were "severely worn" with pieces of rubber found present in the waste trough located under the metal grate flooring.

68.     For the violations identified in the July 2021 Inspection, USDA inspectors gave Envigo the opportunity to address the problems.  USDA inspectors set deadlines ranging from July 23, 2021 to August 31, 2021 within which Envigo was directed to take corrective actions.

69.     As alleged herein, Defendants concealed the findings of the July 2021 Inspection from Inotiv's investors, falsely denied the seriousness of the USDA's findings of noncompliance, and/or misrepresented the Company's responses to the USDA's findings.

### B.     The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection in October 2021

70.     USDA inspectors returned to the Cumberland Facility on October 25, 2021 to conduct a "focused" inspection of the facility (the "October 2021 Inspection").  According to the APHIS Animal Welfare Inspection Guide, a "focused" inspection is an unannounced inspection to reinspect for any "Direct NCIs" that had been previously identified, any other specific NCI or NCIs that had been cited on the previous inspection, or any partial inspections of a facility to address certain matters or to follow up on a public complaint concerning animal welfare.

71.     During the October 2021 Inspection, USDA inspectors found a total of 4,929 beagle dogs living at the Cumberland Facility, of which 3,283 were adult dogs and 1,646 were puppies.

72.     During the October 2021 Inspection, USDA inspectors found a total of 14 different AWA violations and determined that Envigo had failed to correct 11 different areas of noncompliance, six of which were among the most serious "Direct" and "Critical" violations. USDA inspectors also found a new "Direct" violation of 9 C.F.R. § 2.40(a)(2) (a failure of the attending veterinarian to oversee veterinary care) in which Envigo staff had treated underweight dogs with an antibiotic medication that had not been prescribed by the attending veterinarian.

73.     The "Repeat" violations found during the October 2021 Inspection included:

- Inadequate documentation of veterinary care pursuant to 9 C.F.R. § 2.40(b)(2). USDA inspectors found an adult female beagle with an obvious eye problem that

had been diagnosed three weeks earlier during a physical exam but appeared to have been left untreated.

- Continued failure to maintain a program of veterinary care that includes daily observations of animals to assess their health and well-being pursuant to 9 C.F.R. § 2.40(b)(3). USDA inspectors observed three dogs with obvious, serious medical conditions that had not been identified or treated prior to the inspection, including conditions that were "easy to visualize from a distance."

- Recordkeeping violations governed by 9 C.F.R. § 2.75(a)(1), including that the Cumberland Facility continued not to have complete acquisition or disposition records for their animals, including with respect to the documentation of a potentially "missing female puppy" and a lack of documentation to identify a puppy that was found in a drain under an enclosure on October 13, 2021 and died that day.

- Ongoing failure to handle animals in a manner to avoid trauma, physical harm, or unnecessary discomfort under 9 C.F.R. § 2.131(b)(1). These findings included the incident involving the puppy found trapped in a drain that later died. USDA inspectors noted that the Manager of Operations at the Cumberland Facility indicated that a new type of flooring had been laid on top of the pre-existing kennel grates in an effort to enhance puppy safety. The flooring cover apparently shifted and exposed a gap in the old floor into which the newborn puppy fell.

- Insufficient cleaning of animal housing facilities in violation of 9 C.F.R. 3.1(c)(3). USDA inspectors found ongoing issues with "brown dirt/grime" buildup on the cement walls of multiple enclosures. The buildup of dirt and debris on the walls indicated to inspectors that "it is evident that the facility is not spot-cleaning or sanitizing effectively to prevent accumulations or to reduce disease hazards."

- Continued failure to have floors constructed in a manner that protects dogs' feet and legs from injury pursuant to 9 C.F.R. § 3.6(a)(2)(x). USDA inspectors observed that puppies continued to be found with feet and legs allowed to pass through floor openings. While Envigo had agreed to address the issue, including with cardboard cage liners as a temporary measure—and received an extension of time within which to comply—there remained cages with raised mesh or slatted flooring in place without the temporary cardboard liners or a "heavy butcher-type paper" covering used in other enclosures.

- Ongoing issues with the failure to separate fighting or incompatible dogs as required by 9 C.F.R. § 3.7. USDA inspectors wrote, "[e]ven though this facility continues to have compatibility problems in their group housed animals, there has been no action taken by the facility to proactively identify and potentially house separately those dogs that are incompatible or have an aggressive disposition." USDA inspectors noted that facility records showed that a female dog housed with nine other dogs of the same age was found dead due to "evisceration" because her "littermates had chewed on" her. USDA inspectors also observed other dogs housed together with scabs, puncture wounds, scrapes, and hair loss as a result of

fighting with each other, as well as other dogs who had been treated for fight wounds. Inspectors noted that there remained "no systematic pro-active attempt to identify incompatible animals through behavioral observation."

- Continued problems with cleaning and sanitation issues in primary enclosures governed by 9 C.F.R. § 3.11(a). USDA inspectors found ongoing "general sanitation problems with cleaning of enclosures, waste gutters, and odor control." Inspectors found enclosures with "old, dried, and moldy feces" present and a housing unit for an adult male beagle that contained "at least nine to ten piles of feces in the outdoor portion" that prevented the dog from accessing the outside without stepping in his own waste. The presence of mold on the feces indicated that the enclosures were not being cleaned, at a minimum, on a daily basis. Other portions of the facility contained "accumulations of waste and an overpowering fecal odor that emanates from below the kennels" due to, among other things, waste gutters being filled with piles of waste up to 5-6 inches high. USDA inspectors found that "several gutters throughout the facility still had accumulations of feces and urine siting under the kennels" due to limited flushing of the gutters once every other day due to water supply issues.

- Ongoing issues with inadequate pest control pursuant to 9 C.F.R. § 3.11(d). USDA inspectors noted that there still were large numbers of dead flies and spiders throughout the facility. While Envigo claimed to have changed pest control providers, the USDA noted that the failure to clear dead pests made it impossible to monitor the effectiveness of the pest control program.

- Inadequate staffing pursuant to 9 C.F.R. § 3.12 continued to be an issue at the Cumberland Facility. There were 32 employees at the facility, only 17 of whom were staff members directly responsible for all husbandry, daily observation, and medical treatment for nearly 5,000 dogs. As a result, USDA inspectors found dogs with medical conditions requiring treatment that "should have been found by staff during their daily observations," dogs not receiving prescribed dental cleanings to address gum diseases, and other failures of basic husbandry (*e.g.*, cleaning kennels daily to remove feces, cleaning contact surfaces, general housekeeping, and cleaning away dead pests). While Envigo brought in temporary visiting veterinarians to conduct exams after the last inspection, it had not completed all of the necessary procedures that had been identified; there still was only one full-time veterinarian to oversee the daily medical care of all of the animals.

- Repeat veterinary care recordkeeping violations pursuant to 9 C.F.R. § 3.13(b). USDA inspectors found that records of animal deaths, necropsies (including any findings and analyses conducted), and exam findings related to euthanasia cases continued to be deficient.

74.    For the violations identified in the October 2021 Inspection, USDA inspectors reminded Envigo of its AWA obligations and again gave Envigo the opportunity to address certain

problems.  For certain conditions, USDA inspectors set deadlines ranging from November 5, 2021 to November 8, 2021 within which Envigo was directed to take corrective actions.

75.    According to the report of the October 2021 Inspection, USDA inspectors conducted an "exit briefing" with several Company personnel including the Site Director, Manager of Operations, and the "Vice President for North American Operations" (Defendant Wilbourn).  The report also notes that a "Chief Operating Officer" was present at the exit briefing.  Depending on the date of the exit briefing, which is not provided in the report, the "Chief Operating Officer" would have referred to Envigo's Chief Operating Officer James Harkness ("Harkness") or Defendant Sagartz.

76.    As alleged herein, Defendants concealed the findings of the October 2021 Inspection from Inotiv's investors, falsely denied the seriousness of the USDA's findings of noncompliance, and/or misrepresented the Company's responses to the USDA's findings.

**C.    The USDA Finds Continuing and New Animal Welfare Violations at the Cumberland Facility in November 2021**

77.    USDA inspectors returned to the Cumberland Facility on November 16, 2021 to conduct a periodic routine inspection (the "November 2021 Inspection").  The November 2021 Inspection occurred less than two weeks after the closing of Inotiv's acquisition of Envigo.  USDA inspectors found a total of 4,652 beagle dogs living at the Cumberland Facility, of which 2,719 were adult dogs and 1,933 were puppies.

78.    During the November 2021 Inspection, USDA inspectors found 26 categories of AWA violations, including ten "Direct Repeat" violations, four new "Direct" violations, and five other "Repeat" violations.

79.    The "Direct Repeat" violations found by the UDSA included:

- Ongoing failures of the attending veterinarian to oversee veterinary care pursuant to 9 C.F.R. § 2.40(a)(2).  USDA inspectors found that the attending veterinarian

was not properly exercising authority over the medical care and euthanasia of dogs performed by staff members. Staff members trained and authorized to conduct euthanasia were not following approved procedures, including by euthanizing dogs without the use of anesthesia prior to the procedure.

- Continued issues with dogs not receiving necessary veterinary care, including for documented conditions as required by 9 C.F.R. § 2.40(b)(2). USDA inspectors found 30 dogs with severe dental disease diagnosed as early as August 2021 that had not received care to address the issue, with 12 of the dogs also requiring veterinary treatment for concurrent conditions of the ears, eyes, feet, skin, haircoat, or other poor body condition.

- Ongoing failure to maintain a program of veterinary care that includes daily observations of animals to assess their health and well-being pursuant to 9 C.F.R. § 2.40(b)(3). USDA inspectors found a total of 34 dogs with medical conditions that were not identified or treated.

- Violations of animal handling regulations, 9 C.F.R. § 2.131(b)(1), continued. Similar to previously identified issues with dogs being housed in improperly high temperature conditions during the summer, USDA inspectors found numerous dogs left cold and shivering. Among other things, "21 puppies were found to be handled in a manner that they were damp, shivering, and cold in building G3." This occurred in the same building where, according to the Company's records, 25 puppies had been found dead due to cold exposure over the previous eight weeks. The enclosures where the puppies were living had been cleaned with cold water and not dried before the puppies were returned. In the enclosures where heat lamps were present, they were not plugged in at the time of the inspection—and, when inspectors returned on November 19, 2021, there were still no heat lamps installed in locations where there had been none.

- Primary animal enclosures continued to fail to protect dogs from injury due to fighting and/or injuries caused by dogs in adjacent enclosures pursuant to 9 C.F.R. § 3.6(a)(2)(ii).

- Flooring continued to be dangerous to dogs in violation of 9 C.F.R. § 3.6(a)(2)(x). USDA inspectors observed that the facility continued to use raised slatted flooring that had previously been identified as dangerous. During the inspection, six dogs "were found actively stuck in the flooring" and Company records indicated that at least nine other dogs had become entrapped in the floor between August 1 and November 3, 2021, several of which required treatment for lameness and wounds. Multiple puppies as young as 6-7 weeks of age continued to be housed on the same flooring and inspectors observed the feet and toes of several puppies pass through the floor openings; butcher paper laid by the Company over the existing floor "is not a sufficient correction" because the paper easily became torn, "resulting in exposure of the dangerous flooring within minutes of paper being put into the enclosure."

- Dog fighting continued to be a problem, in violation of the compatible grouping requirements of 9 C.F.R. § 3.7. USDA inspectors found that "[t]he facility continues to have severe compatibility problems amongst the adult dogs and puppies," with inspectors witnessing "numerous serious dog fights" and dogs with injuries from recent fights.

- Continuing violations of the animal feeding requirements set forth in 9 C.F.R. § 9(a) were noted. USDA inspectors found that food being fed to nursing dogs was not wholesome or palatable: "[e]very feeder checked" in areas housing 85 adult dogs and 488 puppies was found to contain food that was "wet, caked, and/or moldy," with two feeders containing large number of live maggots.

- Ongoing issues with cleaning, sanitization, housekeeping, and pest control pursuant to 9 C.F.R. § 3.11(d). USDA inspectors found that pest control activities were not effective due to the finding of "insect infestations . . . in multiple buildings," with various flies, maggots, and worms found.

- There were continuing issues with the Company's meeting of staffing requirements under 9 C.F.R. § 3.12. USDA inspectors found that the 21 full-time and three part-time employees responsible for animal husbandry and daily observation for 4,652 dogs and puppies were insufficient and "not adequate to perform the tasks required such as daily observations, medical treatments, cleaning and sanitization, and facility maintenance as documented on this and previous reports."

80. The "Repeat" violations were:

- Recordkeeping that continued to be deficient pursuant to 9 C.F.R. § 2.75(a)(1). Problems continued with the adequacy of recordkeeping for animal acquisitions and dispositions, including incomplete and inaccurate records "for at least 937 dogs and puppies."

- Multiple other ongoing categories of failure to maintain animal housing facilities pursuant to 9 C.F.R. §§ 3.1(c)(1) and (c)(3) were found. USDA inspectors found continuing problems with the maintenance of primary enclosures, dog toys, and contact surfaces that were chewed, broken, rusted, insufficiently cleaned, or in disrepair.

- Ongoing issues with cleaning, sanitization, housekeeping, and pest control pursuant to 9 C.F.R. §§ 3.11(a), 3.11(b)(2). USDA inspectors noted a continuing "general sanitation problem" with the cleaning of waste from under primary enclosures as often as is necessary to prevent the accumulation of feces and food waste and to reduce disease hazards, odors, and pests, observing that many rooms had a buildup of "moldy accumulations of spilled feed and excreta" in pits that were "several inches high and created areas of standing liquid" and had turned "white, brown, or black with mold" with numerous sewer flies and "white thread-like 'worms'" observed. Water receptacles also were not being adequately cleaned and maintained. Among other things, the Company's records indicated that the

minimum two-week frequency for sanitation was not being met; many rooms were sanitized "as infrequently as every 3-4 weeks, while some have no documentation of being sanitized at all during October and November."

- Recurring issues with the documentation of medical records for the dogs at the facility as required by 9 C.F.R. § 3.13(b)(2).

81.     The "Direct" violations included:

- Gaps in flooring and fencing remained, in violation of 9 C.F.R. § 3.1(a).  USDA inspectors found that approximately 75% of enclosures had flooring that was not cut to the same size and shape as the enclosure walls, resulting in gaps of up to two inches wide into which inspectors observed dogs stepping and falling.  Inspectors noted that the Company's records indicated at least ten additional dogs and puppies had been significantly injured by improperly constructed and maintained enclosures between September 2 and November 2, 2021.  Multiple other repeat violations were observed involving damaged or unrepaired fencing, access doors, sharp edges, unsecured wall and floor panels, and broken waterers and self-feeders.

- Dogs continued to be housed in improperly small spaces in violation of 9 C.F.R. § 3.6(c)(1)(i).  USDA inspectors found that a total of 742 young dogs and weaned puppies were not provided with the minimum space required by the AWA. These included the finding that 53 puppies were housed in enclosures that measured only 47 inches x 49 inches that housed as many as nine puppies each.  Also, a total of 539 young dogs were kept in enclosures that measured between 39.5 to 39.7 square feet, each housing 11 dogs each, when minimum enclosures for those dogs should have been at least 58.9 square feet.

- Food was found to be inaccessible to all animals in violation of 9 C.F.R. § 3.9(b). USDA inspectors found that self-feeders were not accessible to all animals. Inspectors also found that feeders were located in a manner that failed to minimize contamination, and not being cleaned or sanitized adequately.

- Veterinary care for dogs did not meet the standards of 9 C.F.R. § 3.13(a)(2).  USDA inspectors found that "[a] complete hands-on physical examination has not been completed within the last 12 months for approximately 10% the dogs over a year old for which records were evaluated."

82.     USDA inspectors found numerous additional AWA violations during the

November 2021 inspection, including violations of 9 C.F.R. §§ 3.1(e), 3.2(d), and 3.3(d).  These

violations included (a) the failure to store food and bedding supplies properly to protect against

spoilage, contamination, or vermin infestation; (b) housing facilities in disrepair that included

missing door flaps or door flaps that had been chewed and/or damaged and thus could not protect

dogs from the elements; and (c) doors that were left open, allowing cold air to enter at a time that "overnight temperatures fell to the low 20s and 30s Fahrenheit." USDA inspectors also found, under 9 C.F.R. § 3.11(c), inadequate cleaning, sanitization, housekeeping, and pest control, including several instances in which the buildings at the Cumberland Facility were "not being kept clean and free of accumulations of trash, junk, waste products, and discarded matters." The Cumberland Facility had ventilation fans that were "covered in a thick layer of dust, grime and debris with numerous dead bugs and spider webs forming inside the fan housings" and drainage pit covers that were covered "with an excessive layer of accumulated hair, dirt, debris, and other waste products."

83.    The Cumberland Facility's program of veterinary care ("PVC") for dogs was missing required elements, including the frequency of regularly scheduled visits, and was not signed as required pursuant to 9 C.F.R. § 3.13(a). This requirement is important to ensure both the clear communication of expectations and the involvement of the attending veterinarian. Further, the facility did not maintain all required components of the identity of each animal on its medical records, in violation of 9 C.F.R. § 3.13(b)(1).

84.    For the violations identified in the November 2021 Inspection, USDA inspectors reminded Envigo of its AWA obligations and again gave Envigo the opportunity to address certain problems. For certain conditions, USDA inspectors set deadlines ranging from February 10, 2022 to April 1, 2022 within which Envigo was directed to take corrective actions.

85.    According to a report of the November 2021 Inspection, on December 17, 2021, USDA inspectors conducted an "exit briefing" with several Company personnel including the "Manager of Operations" and the "Vice President for North American Operations" (Defendant Wilbourn).

86.     As alleged herein, Defendants concealed the findings of the November 2021 Inspection from Inotiv's investors, falsely denied the seriousness of the USDA's findings of noncompliance, and/or misrepresented the Company's responses to the USDA's findings.

### D.     The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection in March 2022

87.     USDA inspectors returned to the Cumberland Facility on March 8, 2022 to conduct a focused inspection (the "March 2022 Inspection").  The March 2022 Inspection found a total of five AWA violations, including two "Direct Repeat" violations and three "Repeat" violations.

88.     The "Direct Repeat" violations included:

- Ongoing problems with slatted flooring in violation of 9 C.F.R. § 3.6(a)(2)(x). According to USDA inspectors, inadequate flooring had "been identified on previous inspections to be dangerous because dogs have been found by inspectors with feet / toes stuck in the flooring."  USDA inspectors continued to find dogs "actively stuck in the flooring" and the Company's medical records indicated that "at least 12 additional dogs have been entrapped in the floor during the period of 11/18/21 to 3/8/22" and sustained injuries as a result.

- Ongoing issues with the failure to address compatible grouping of animals pursuant to 9 C.F.R. § 3.7.  USDA inspectors found that 97 dogs had received body or extremity injuries due to fighting, some of which were severe.  The Company's medical records indicated that 59 dogs had injuries attributed to fighting, including lacerations, bite wounds, bruised and damaged extremities, ear damage, or tail damage.  Eight dogs had been euthanized as a result of their injuries.  There were an additional 38 dogs treated for injuries of unknown causes, most of which were tail injuries and lacerations to ears.

89.     The "Repeat" violations included:

- Recurring issues with the adequacy of veterinary care pursuant to 9 C.F.R. § 2.40(b)(3).  USDA inspectors found a 7-month-old male beagle with wounds to the right ear that were not identified or treated by the Company.

- Continued problems with animal housing facilities governed by 9 C.F.R. § 3.1(a). USDA inspectors found that "[t]he facility continues to have construction and maintenance issues regarding enclosure design, stability and protecting the animals from injury."  Inspectors noted the ongoing use of flooring that was suspended above a waste gutter, with gaps of up to two inches found along the front and/or sides of the enclosures that were large enough to entrap dogs' feet or legs.  Indeed, "[t]hroughout the inspection, at least 130 enclosures had these gaps present and

dogs were seen with toes in the gaps." Other issues were identified with poorly supported flooring, gaps in chain link fences, rusted wall sections that had broken off and left sharp points at floor level, and chain link fences that were unsupported and would permit dogs to push their way underneath and into the adjacent enclosure.

- Ongoing problems with maintaining self-feeders in compliance with 9 C.F.R. § 3.9(b). USDA inspectors continued to observe self-feeders that were not adequately cleaned or cared for to prevent molding, deterioration, and caking of feed. In one building, "[w]et food with varying amounts of mold continues to be a problem," with multiple feeders having some moldy food present.

90.    As alleged herein, Defendants continued to conceal and/or falsely deny the USDA's findings of ongoing violations at the Cumberland Facility from Inotiv's investors.

### E.    The USDA Finds Continuing Animal Welfare Violations at the Cumberland Facility During a Focused Inspection on May 3, 2022

91.    USDA inspectors returned to the Cumberland Facility on May 3, 2022 to conduct a limited focused inspection (the May 2022 Inspection). At the time of the May 2022 Inspection, the USDA found a total of 3,113 beagles at the Cumberland Facility, including 2,891 adult dogs and 222 puppies. The primary focus of the May 2022 Inspection involved the recurring issue of dangerous flooring that continued to entrap and injure animals. The USDA first documented this issue during the July 2021 Inspection.

92.    The inspectors found repeat violations of 9 C.F.R. § 3.6(a)(2)(x) regarding the use of "heavy gauge rubber or plastic-coated metal flooring with rectangular openings that are approximately 1/2 inch by 2.5 inches," that had "been identified on previous inspections to be dangerous because dogs have been found by inspectors with feet / toes stuck in the flooring." Specifically, inspectors found two dogs "actively stuck in the flooring to the point that the facility representative had to remove one of them from the flooring."

93.    The report of the May 2022 Inspection noted that it had been "conducted with the Manager of Operations and the Vice President of North American Operations" (Defendant

Wilbourn), and that an "exit interview" had been conducted with those personnel from the Company, as well as the Attending Veterinarian, Regional Quality Manager, Institutional Official/Chief Operating Officer, and Global Director of Quality Assurance.

### F.    Defendants' Knowledge of Conditions at the Cumberland Facility

94.    Through the due diligence process, including site visits in July and August 2021, and continuing through the Class Period, Defendants learned or would have learned of significant concerns regarding Envigo's compliance with the legal and regulatory frameworks governing the treatment of animals bred and/or imported for research purposes, including but not limited to the inhumane treatment of animals housed at Envigo facilities.  Among other things, Defendants Leasure, Sagartz, and Wilbourn personally witnessed and/or were informed of the shocking and inhumane treatment of beagles at the Cumberland Facility that was observed and documented by USDA inspectors on July 20-21, 2021 and knew or were reckless in not knowing of the continuing nature of these serious violations throughout the Class Period.

95.    The conditions at the Cumberland Facility described in the USDA's inspection reports would have been obvious to anyone on the Due Diligence Tour, including Defendants Leasure, Sagartz, and Wilbourn.  The violations documented by the USDA included conditions such as overpowering odor from visibly accumulated animal waste and other unclean conditions, dogs fighting and injured due to fighting, dogs kept in overcrowded enclosures, facilities that were in obvious states of disrepair, and a facility that was understaffed and unable to provide adequate care for the thousands of dogs living there.  The due diligence process also would have alerted Defendants to the risk of animal welfare violations at the Cumberland Facility given that, in August 2017 (when the facility was owned by a company acquired by Envigo in 2019), the USDA had issued similar findings of animal neglect and poor conditions during a routine inspection of the facility.

G. **Federal and State Agents Raid the Cumberland Facility and Obtain a Temporary Restraining Order Against Envigo That Ultimately Led to the Closure of the Cumberland Facility**

96.     Two weeks after the last focused inspection of the Cumberland Facility, and after a ten-month period starting in July 2021 in which the Cumberland Facility was cited for over 60 violations of the AWA, federal and state law enforcement officials executed a federal search and seizure warrant at the Cumberland Facility starting on May 18, 2022.

97.     During the first day of the raid, on May 18, 2022, government agents observed numerous ongoing failures to comply with the AWA, including 145 dogs and puppies found to be in "acute distress" and needing immediate veterinary care.  Those dogs were seized to provide them with care to address life-threatening illnesses or injuries.  Agents also discovered a piece of paper titled "necropsy" with the chilling single sentence: "unknown—pup eat[e]n—only has a head left" and found other failures to address violations outlined in USDA inspection reports for the Cumberland Facility.

98.     Immediately thereafter, on May 19, 2022, the U.S. Attorney's Office and the DOJ Environment & Natural Resources Division, Wildlife & Marine Resources Section, filed a Complaint for Declaratory and Injunctive Relief against Envigo and a motion for a temporary restraining order in the action styled as *United States of America v. Envigo RMS, LLC*, No. 6:22-cv-00028-NKM (W.D. Va.) (the "DOJ Action").

99.     On Saturday, May 21, 2022, U.S. District Judge Norman K. Moon of the Western District of Virginia issued a Temporary Restraining Order, granting the government's motion on an *ex parte* basis.  Later that day, Judge Moon issued an Amended Temporary Restraining Order (the "Amended TRO").  The Amended TRO states, "[t]his Court now concludes that the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act, and that an immediate temporary restraining order must

41

issue to put a halt to such violations pending further proceedings."  Judge Moon concluded that "the Government has put forward a clear showing of irreparable harm" by clearly demonstrating that "Envigo has been operating and continues to operate in a manner that flagrantly disregards numerous health protocols, placing the health of animals in serious danger and risk of death."  In support of that conclusion, the Court noted that "USDA inspection records documented dozens of instances in which dogs were euthanized rather than provided medical care when they had an injury, no matter how substantial or minor," and that while 145 beagles had been seized due to the immediate risk to their health, "many more beagles still face inadequate food and water, veterinary care, and the other torturous conditions described."  Judge Moon further pointed to dogs being stuck in unsafe enclosures and flooring on May 18, 2022, consistent with conditions first observed in the July 2021 Inspection.  Moreover, in finding that an *ex parte* order was warranted, the Court noted that prior notice to Envigo was not warranted due to "Envigo's repeated non-compliance with inspectors' violation reports and with the AWA, as well as the substantial, documented risk of irreparable harm in the absence of prompt injunctive relief."

100.    The Amended TRO ordered Envigo's compliance with 17 matters, including compliance with specific AWA requirements that Envigo had consistently failed to meet according to USDA inspection reports.  These included ensuring that only compatible dogs are housed together pursuant to 9 C.F.R. § 3.7; ensuring that every beagle is provided with sufficient uncontaminated, wholesome, palatable food pursuant to 9 C.F.R. § 3.9 (including the installation of enough food receptacles so that every weaned puppy in an enclosure can access food at the same time); compliance with the requirement for flooring provided in 9 C.F.R. § 3.6(a)(2)(x); installation of solid partitions between adjacent enclosures as required by 9 C.F.R. § 3.1(a); providing contact information for the attending veterinarian as well as a compliant program of

veterinary care, as well as other compliance with medical recordkeeping requirements pursuant to 9 C.F.R. § 3.13; documentation of dogs or puppies found to have injuries attributable to or consistent with a fight or wounds of unknown causes; and having a licensed veterinarian conduct necropsies and document the cause of any animal death. Envigo was also ordered to cease "disposing of any beagle" by transfer from the Cumberland Facility or euthanasia without the consent of the government or court order and to "cease breeding, selling, or otherwise dealing in beagles at the Cumberland Facility, until in full compliance with this order."

101. The execution of the search warrant continued after entry of the Amended TRO, with officials continuing their work through May 22, 2022. The reports of the government officials who assisted in the execution of the warrant—in the form of sworn declarations filed in the DOJ Action—provide a grim account of conditions at the Cumberland Facility that were consistent with, if not substantially identical to, the reports of USDA inspections carried out prior to and during the Class Period. These conditions persisted notwithstanding Defendants' claims of having made significant investments to improve conditions at the facility.

102. One of these accounts comes from the declaration of Dr. Samantha Moffitt, DVM ("Dr. Moffitt"). Dr. Moffitt is a veterinarian with a Bachelor of Science in Animal Science from Purdue University and a Doctor of Veterinary Medicine from Ross University who practices emergency veterinary medicine and serves on the Virginia Animal Fighting Task Force to assist law enforcement in responding to animal cruelty, animal fighting, and large-scale investigations in the Commonwealth of Virginia. Dr. Moffit was designated as the Lead Veterinarian assisting the federal government's efforts in executing the search warrant at the Cumberland Facility for four days. Dr. Moffitt submitted declarations in support of the government's motions for a temporary restraining order and preliminary injunction in the DOJ Action.

103.    In her position as Lead Veterinarian, Dr. Moffitt was tasked with making the final determination as to whether a beagle was in "acute distress" and required immediate veterinary care to promptly alleviate a life-threatening illness or injury or any suffering.  According to the declaration Dr. Moffitt provided in support of the government's motion for preliminary injunction, during the execution of the warrant from May 18-22, 2022, she determined that a total of 446 beagles were in "acute distress."  Dr. Moffitt provided examples of her findings, in certain cases with photographic evidence, including:

- Many cases of beagles suffering from severe dental disease that required teeth to be extracted.  According to Dr. Moffitt, the young ages of the dogs and the severity of the conditions indicated that the severe dental problems were "due to poor nutrition and/or the failure to take prophylactic steps to prevent the dogs from reaching this level of disease at this age."



- Dogs with broken and silver-stained teeth that were likely the result of the dogs chewing on the metal kennel bars, which Dr. Moffit "personally observed at the Cumberland Facility."  Dr. Moffitt attributed these behaviors to "stress, anxiety and boredom, which is unsurprising given the overcrowded conditions at the Cumberland Facility and the lack of opportunities for the beagles to exercise."

- Many beagles suffered from "severe pododermatitis or inflammation of the skin on the paw pads and between the digits" and "exhibited outward signs of pain, like retracting their legs when the paws were touched."  Dr. Moffitt indicated that such symptoms would take several days to be visible and are "likely due to the beagles' paws coming into regular contact with dirty flooring."  Dr. Moffitt further noted that many enclosures contained four or more beagles, with certain single enclosures containing as many as ten beagle dogs.  Insufficient cleaning of the crowded enclosures "reduces the beagles' ability to get out of their own urine and feces."

- Dogs and weaned puppies had to walk on raised slatted flooring in indoor or outdoor portions of enclosures that the USDA had previously determined to be dangerous to the beagles. When some beagles were placed on the ground outside of their enclosure, "they looked like they were ice skating and seemed not to know how to walk properly, as if they were not accustomed to walking on solid ground." Dr. Moffitt further observed that rubber mats placed in certain enclosures in an attempt to cover gaps in the flooring had folded over, creating a risk that a puppy could become "trapped under them at or trapped in the flooring."

- Dr. Moffitt also observed dogs with infected and/or fresh puncture wounds and ear injuries that were indicative of dogs fighting—and, in fact observed dogs "fighting cagemates and fighting with beagles in adjacent enclosures." According to Dr. Moffitt, beagles at the Cumberland Facility likely were fighting "due to the overcrowded enclosure conditions, boredom, the way the beagles are being fed [including through the use of feeders that allowed for only one animal to eat at a time], and stress." The fight injuries that Dr. Moffitt observed included a female beagle with "severe, infected, and shredded ear pinna—the outer portion of the ear" and two puncture wounds, and another beagle with "wounds on both ears with a chunk missing from the right ear."

 

- Although pregnant and nursing females have increased nutritional needs and require additional calories, Dr. Moffitt observed "several thin pregnant females including with vertebral processes and ribs easily palpable," as well as "a nursing female with 8 puppies who was thin with vertebral process and ribs easily palpable."

- Beagles were observed with distended bellies indicating that they had worms. Dr. Moffitt observed a thin, 10-week-old puppy with a distended abdomen and ravenous appetite that indicated that the puppy needed to be dewormed. According to Dr. Moffitt, a common way for dogs to become infected with worms is by eating the feces of infected dogs—something that Dr. Moffitt observed happening at the Cumberland Facility.

45

104.    Another declaration filed in the DOJ Action (on June 10, 2022 in support of the DOJ's motion for preliminary injunction) was provided by Amy Katherine Taylor ("Ms. Taylor"), an investigator in the Animal Law Unit of the Virginia Office of the Attorney General.  Ms. Taylor investigates animal crimes in the Commonwealth of Virginia and serves on the Virginia Animal Fighting Task Force.  Ms. Taylor served as the "lead building and enclosure assessor" assisting in the execution of the search warrant from May 18, 2022 to May 22, 2022.  In that capacity, Ms. Taylor led a team of law enforcement and animal control officers that conducted evaluations of the individual buildings and enclosures at the Cumberland Facility.  According to her declaration, Ms. Taylor personally viewed every building and every enclosure that contained beagles at the Cumberland Facility.

105.    Ms. Taylor's observations included:

- Enclosures "with numerous animals in them," including "enclosures that contained nine or more dogs," with five specific enclosures housing ten dogs.  Ms. Taylor's declaration included the following photo showing the conditions in those cages:



- In the same buildings where there were "overcrowded enclosures," Ms. Taylor also observed that there were empty enclosures, with one building having "at least 20

empty enclosures in one building." In the building where nursing mothers and their puppies were housed, Ms. Taylor observed that approximately 25% of the enclosures (approximately 30 in total) were empty. Another 40-80 empty enclosures were observed in the building that housed breeding male beagles.

- "[T]here were empty enclosures that contained dried feces as well as old bedding and shavings," indicating that the enclosures had not been thoroughly cleaned and sanitized after the dogs were removed.

- Each enclosure had only one food receptacle, which allowed for only one dog to access food at a time. As a result, multiple beagles were observed "exhibiting behavior indicative or resource guarding in front of the feeders," including dominant beagles growling at others when they approached the feeder. A photo provided in Ms. Taylor's declaration shows a beagle eating from the single feeder at the lower portion of the picture.



- Each enclosure contained only one watering system. As with the feeders, dogs were observed guarding the watering systems. In certain locations, the watering systems were placed "only a few inches off the ground of the enclosure, so that dogs could only access water by licking the dirty floor of the enclosure." Certain "lickit" watering systems could not be accessed by puppies who could not lick the system hard enough to access water; Ms. Taylor observed that, when she released water from the "lickit" system, "puppies began to vigorously drink water from the lickit system as if they had not been able to access water in a very long time."

- "The odor was extremely strong in the buildings." Pests were found throughout the buildings including cockroaches, flies, and moths, and "a large buildup of rodent feces" was observed in various buildings. Ms. Taylor also observed that "even in those enclosures that had been cleaned in in the morning by employees continued to have feces on the walls and floors."

- While temperatures in the buildings were "hot and muggy," Ms. Taylor did not observe any air conditioning units visible during the initial walk-through of the Cumberland Facility on May 18, 2022. While air conditioning units were observed being installed in the building that contained mothers and their puppies on May 20, 2022, Ms. Taylor did not observe air conditioning in every building.

- The "guillotine door" on each enclosure had to be manually opened and shut to allow the dogs in and out of the enclosures. Many of those doors "had dirt and filth build up, and many other guillotine doors were chewed on the bottom." Other "transition doors" in the enclosures contained rust or sharp edges that could harm the beagles. In addition, transition doors and feeders were found to have a "buildup of grime and filth."

- In the building that housed nursing mothers and their babies, the "guillotine doors" that allowed access to the outdoors were shut so that nursing mothers had no access to the outside. The building was "very hot and humid" and puppies were observed pulling themselves out of whelping bins to lay on the floor of the enclosure in an attempt to cool down.

- Flooring of enclosures were made of grates that allowed for the feet and toes of beagles to slip through. In the building that housed nursing mothers and their babies, black rubber mats were placed on top of the grated floor. In more than 12 separate enclosures, the black mats had shifted away in a way that exposed the grated flooring underneath. Ms. Taylor provided the following photo:



- There were several additional problems with the flooring.  Ms. Taylor personally had to assist six dogs to get their toes and feet out of a grate and observed other dogs maneuver themselves out after slipping through the grates.  In a few instances, she observed larger beagles slip into gaps with their entire leg in the gap in the flooring before maneuvering themselves out.  Portions of flooring in the enclosures had "larger gaps where the flooring was worn or chewed," where plastic coating of metal bars of the floors was chewed off and rust was coming off metal bars.  In other places, the flooring did not reach the kennel walls, creating gaps where puppies and dogs could get their feet stuck.  Other floors bent under the weight of the dog, creating gaps and access to the waste pit below the enclosure.

- Enclosures were observed with cobwebs, rat and mice droppings, insects, and dead cockroaches present.  In certain buildings, black mold was observed on the ceilings.

- Contaminated food was observed.  Ms. Taylor observed "bugs crawling and flying out of the moldy food."  In the whelping building housing nursing mothers and puppies, some food receptacles had no lids, and the food inside those receptacles had "moisture, filth, bugs, hair, dirt, and feces in it."  Taylor provided the following photo:

49



- Ms. Taylor also personally found two neonate puppies inside of food receptacles, which was not only dangerous to the neonates, it was dangerous to nursing mothers if the food were to become contaminated with feces from the neonate.

- Enclosures were not being sufficiently cleaned. Envigo employees cleaned enclosures with power washers that splashed dirty water into feeders. Although the enclosures were power washed, no employees went through the building to spot clean the enclosures. In the building housing nursing mothers and puppies, employees would only power wash the top side of the black rubber mats that were on top of the flooring; they did not ever remove the rubber mats to clean the underside of the mat or the grated metal flooring. The underside of the mats still had dirt, grime, and feces on them even after the power washing.

- There was fighting between dogs in the same enclosure, including fighting over access to the single feeder. Fighting tended to occur in enclosures with four or more dogs. As Ms. Taylor stated, "I saw such rampant fighting that I constantly had to stop my work assessing the enclosures to open the doors and physically intervene to stop the fighting."

- Fighting was also observed between dogs in adjacent enclosures. Dogs would stand on their hind legs to fight through the gaps in the fences. Once fighting began between beagles in adjacent enclosures, Ms. Taylor observed that beagles within the same enclosure would begin to fight.

106.    In addition to describing her observations of conditions at the Cumberland Facility during the execution of the search warrant between May 18-22, 2022, Ms. Taylor's declaration also addresses a return visit she made to the Cumberland Facility on June 8, 2022 to check for

50

Envigo's compliance with the Amended TRO. Ms. Taylor spent approximately five hours at the Cumberland Facility and walked through each of the buildings housing beagles. According to Ms. Taylor's declaration, she again observed enclosures that housed as many as ten dogs when there were empty enclosures available at the facility. Ms. Taylor described other conditions at the Cumberland Facility (some of which involved longstanding, recurring problems), including:

- Temperatures in housing areas that exceeded 85 degrees, including recorded temperatures of 90 degrees and "in the high 80s inside certain buildings." After Ms. Taylor pointed out the high temperatures to the Company's employees, she observed the employees placing fans in the buildings with enclosures and spraying water on interior walkways. Although "some movable air-conditioning units" were observed, "they were not always in use." The air conditioning unit in the building housing nursing mothers and puppies was not turned on.

- A "guillotine door containing very sharp edges" was observed, and Ms. Taylor told employees not to keep beagles in that enclosure due to the risk of injury. Other doors with sharp or chewed edges were observed, and there was "a crooked guillotine door with missing screws."

- Some enclosures had new black mats installed over the grated flooring, in both the indoor and outdoor portions of the enclosures. The mats were not porous and allowed for the pooling of liquids, including urine and feces, forcing beagles to stand, sleep, or lie in their own excreta. Moreover, some of the mats were installed in a way that continued to leave gaps of up to 2 inches between the edge of the mat and the wall, creating the risk that a beagle's foot could get stuck and become injured. Black mats installed in exterior edges were in sunlight. Ms. Taylor stated that she "touched a stack of black rubber mats outside one of the buildings and the black mats were so hot that I felt like I had been burned and snatched my hand back."

- The whelping building containing nursing and pregnant mothers had the same black rubber mats with small holes that were observed while executing the search warrant. Ms. Taylor observed those mats being chewed, filthy, or rolled back to reveal portions of the flooring underneath.

- There were beagles that continued to have veterinary issues, including beagles with bite wounds and other injuries, and a beagle with only one ear. There was "white-yellow foamy vomit" present, "indicative of a dog being overheated," and puppies that were lethargic. When Ms. Taylor observed a beagle that was favoring one leg, an Envigo staff member removed the beagle from the enclosure and set the beagle on the ground to see if it could move. "When the dog flattened to the ground, the employee placed the beagle back into its enclosure rather than further assessing the condition of the dog."

- Dogs being aggressive to each other and fighting within their enclosures were observed, in an apparent violation of the requirement in the Amended TRO that only compatible dogs be housed together.

- Puppies were not being provided with potable water as required by the Amended TRO. While "some plastic water bowls had been placed inside enclosures containing puppies," there were water bowls containing no water. Small puppies were also housed in enclosures with only "lickit" water systems that were difficult for such puppies to use without any water bowls provided in the enclosure.

- Every beagle was not being provided with "uncontaminated, wholesome, palatable food" as required by the Amended TRO. Food receptacles continued to lack lids or had broken lids. Ms. Taylor personally observed "bugs flying out" of certain receptacles and was told that employees only clean or sanitize food receptacles once every 14 days and, in the meantime, place new food on top of old food.

- Some enclosures that contained food bowls with kibble had bowls that could be turned over by the beagles, exposing the food to feces left on the mats. Ms. Taylor provided a photo:



107.    On June 13, 2022, Envigo filed a response in opposition to the DOJ's motion for preliminary injunction. In that brief, the Company revealed for the first time publicly that it had "repeatedly expressed to counsel for the United States its willingness to close its Cumberland, Virginia facility once it is permitted to do so." The Company also stated that it did not oppose 11

of the 13 requests in the government's motion for preliminary injunction (opposing only the 11th and 12th requests insofar as they might preclude the transfer or sale of beagles from the Cumberland Facility), effectively conceding the government's case.  This was a dramatic reversal for the Company, which had previously sought to downplay or deny the seriousness of the AWA violations at the Cumberland Facility and had publicly maintained that the Company intended to bring the Cumberland Facility into compliance.

108.    Also on June 13, 2022, the U.S. District Court for the Western District of Virginia held a hearing on the DOJ's motion for preliminary injunction.  According to a Memorandum Opinion issued by Judge Moon on June 17, 2022 in connection with his entry of a preliminary injunction order, "Defendant's own Chief Strategy Officer [Defendant Sagartz] testified [at the June 13, 2022 hearing] that he 'can't argue with a USDA inspection report that identifies areas that are identified to be out of compliance.'"  Judge Moon's Memorandum Opinion also noted that, to convince the court that Envigo should be permitted to sell beagles to fulfill existing contractual orders for dogs,  the Company offered "expert" testimony stating that the dogs produced at Cumberland were "exceedingly important to domestic pharmaceutical discovery and development," that the Cumberland Facility in particular "has historically produced up to 25 percent of the domestic supply of beagles for research," and that the existing supply of research animals was insufficient to meet the current needs of research institutions.

109.    Later, on the evening of June 13, 2022, Inotiv issued a press release announcing that it would be closing the Cumberland Facility and another facility in Virginia that bred rodents.  In that press release, Defendant Leasure stated the Company had decided to shut down the Cumberland Facility rather than make "[t]he required investments to improve the facility."

### H. **Federal Criminal Subpoenas to Envigo and OBRC Related to an Ongoing Criminal Investigation into the Importation of Non-Human Primates**

110.   The importation of non-human primates for research purposes is highly regulated under international and United States law pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES," to which the United States is a party)[6], as well as the Endangered Species Act ("ESA"), 16 U.S.C. 1583, *et seq*., the Lacey Act, 16 U.S.C. §§ 3371-78[7], regulations promulgated by the U.S. Department of the Interior and/or the U.S. Fish and Wildlife Service to implement CITES and the ESA, and other statutes and regulations.  Inotiv uses non-human primates in connection with its CRO business and, after the acquisition of Envigo and its Alice, Texas-based primate facility, participates in the importation of non-human primates, including from countries in Southeast Asia.   The Company became further involved in the international primate trade through its January 2022 acquisition of OBRC.

111.   The importation of non-human primates is critical to the Company's business. Early-stage drug development, including the development of biological therapies such as monoclonal antibodies, depends on the use of non-human primates to assess the safety of drug candidates given that primates are the closest animal models to humans.   In recent years, supplies of non-human primates have been limited for various reasons, including due to impacts of the COVID-19 pandemic.   Defendants have acknowledged these facts and have stated that the Company "depends on a limited international source of supply for certain products such as non-human primates."

---

[6] Long-tailed macaques are a protected species under Appendix II of CITES, meaning a party looking to import this species must possess a valid CITES export permit from the country of export.

[7] The Lacey Act, first enacted in 1900 and later significantly amended in 1981, is the country's oldest wildlife protection statute.  The Lacey Act makes it unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States.  16 U.S.C. § 3372(a)(1).

112.    Since approximately 2019, the federal government, through the United States Attorney's Office of the Southern District of Florida and United States Fish & Wildlife Service, has been conducting an ongoing criminal investigation into the importation of non-human primates from certain countries in Southeast Asia.

113.    The existence of a federal criminal investigation into the importation of non-human primates has been a matter of public record since as early as June 22, 2021, with the unsealing of a criminal proceeding against an executive with primate importer OBRC in the U.S. District Court for the Southern District of Florida, *United States of America v. Gary Tucker*, No. 1:21-cr-20263-WPD (S.D. Fla.) (the "Tucker Matter").

114.    Further details surrounding the investigation emerged when a plea agreement and joint factual statement were filed in the Tucker Matter on August 4, 2021.  In that plea deal, OBRC executive Gary Tucker ("Tucker") agreed to plead guilty to a charge of making false statements to special agents of the U.S. Fish & Wildlife Service during an interview conducted on July 11, 2019, in violation of 18 U.S.C. § 1001(a)(2).  As stated in the joint factual statement filed in the Tucker Matter on August 4, 2021, the false statements made by Mr. Tucker occurred in the context of an interview "conducted in Washington, D.C. in connection with an on-going criminal investigation being handled in the Miami Division of the Southern District of Florida."  As the joint factual statement further indicated, investigators had asked Mr. Tucker "about his involvement in the procurement of long-tailed macaques [a small non-human primate regularly employed in scientific research to develop, among other things, pharmaceuticals in the United States and abroad] from Southeast Asia."  In addition, a press release issued by the DOJ on August 4, 2021 regarding Mr. Tucker's guilty plea referenced the criminal investigation into "international trafficking of primates into the United States" and described Mr. Tucker's false statements as having involved

55

matters that were "material to the on-going investigation into the trafficking of the primates, whose possession, sale, export and import is highly regulated by the international community and the United States . . . ." *See* https://www.justice.gov/usao-sdfl/pr/man-convicted-lying-federal-agents-during-international-wildlife-trafficking (last visited Nov. 14, 2022).

115.    On October 13, 2021, Tucker was sentenced to a three-year term of probation, with a special condition of home confinement for a period of three months, and a criminal fine of $5,000.  In an October 14, 2021 press release announcing the sentencing, the DOJ stated that Tucker had been convicted of making false statements to federal investigators "during a criminal investigation of international trafficking of primates into the United States" and concerned Tucker's responses to questions "about potential illegal trafficking of wildlife" that involved "the procurement and importation to the U.S. of long-tailed macaques—small non-human primates regularly employed in scientific research—from Southeast Asia."    *See* https://www.justice.gov/usao-sdfl/pr/man-sentenced-lying-federal-agents-during-international-wildlife-trafficking (last visited Nov. 14, 2022).

116.    On June 15, 2021, Envigo received a grand jury subpoena issued by the DOJ in Southern District of Florida.  Similarly, on June 16, 2021, OBRC received a grand jury subpoena issued by the DOJ in Southern District of Florida; it was the second subpoena to OBRC following one that had been received by OBRC in 2019.  The Envigo and OBRC subpoenas required the production of documents and information in connection with the government's ongoing investigation into the importation of non-human primates from certain countries in Asia. According to a later disclosure made by the Company regarding the Envigo subpoena in February 2022 (described herein), the Company claims to have cooperated with the DOJ in response to the subpoena.  According to a later disclosure made by the Company in May 2022 (described herein),

the Company claimed that it was cooperating with the government in response to both the Envigo and OBRC subpoenas.

117.    On November 16, 2022, concurrent with the unsealing of the docket in *United States of America v. Omaliss Keo, et al*., No. 1:21-cr-20340-KMW (S.D. Fla.) (the "Federal Criminal Matter") the U.S. Attorney's Office for the Southern District of Florida announced that they had charged eight members of an international primate smuggling ring with multiple felonies for their roles in bringing wild-caught long-tailed macaques into the United States from December 2017 through January 2022.  The individuals charged in the Federal Criminal Matter are alleged to have "laundered" wild and endangered animals through Cambodian entities in order to falsely claim that the animals were captive bred.  Defendants facing these felony charges include two officials of the Cambodian government, the owner and founder of a major primate supply organization (and the Company's largest primate provider), that company's general manager, and four of its employees.[8]  In the November 17, 2022 8-K, the Company describes Vanny as its "principal supplier of non-human primates."

118.    Significantly, the Superseding Indictment in the Federal Criminal Matter refers to a U.S. corporate participant in the primate smuggling scheme as "Unindicted Co-Conspirator 2" ("UCC-2").  UCC-2 is described in the Superseding Indictment as "a company formed under the laws of the State of Texas, with its listed place of business in Alice, Texas, which engaged in the importation and sale of non-human primates, including long-tailed macaques."  Based on this

---

[8] The Defendants in the Federal Criminal Matter include: James Man Sang Lau, Founder/Owner of Vanny Resources Holdings, Ltd. and Vanny Bio Research (Cambodia) Corporation Ltd., Dickson Lau, General Manager of Operations for Vanny Resources Holdings Ltd., Sunny Chan, Deputy General Manager of Operations for Vanny Group, Raphael Cheung Man, Public Relations and Export Manager for Vanny Bio Research (Cambodia) Corporation Ltd., Sarah Yeung, Finance Officer of Vanny Group, and Hing Ip Chung, General Manager of Vanny Bio Research (Cambodia) Corporation Ltd.  Vanny Resources Holding, Ltd., Vanny Bio Research (Cambodia) Corporation Ltd., and Vanny Group are collectively referred to herein as ("Vanny").

description, OBRC, which is based in Alice, Texas and was "formed under" Texas law, likely is UCC-2.

119.    Defendants learned about or would have learned about the pending criminal investigation, the subpoena to Envigo, and Envigo's cooperation with and production of documents to the DOJ during the due diligence process, including but not limited to Defendants' visit to the Envigo primate facility in Alice, Texas during the Due Diligence Tour.  Defendants also likely would have learned through the Envigo due diligence process that a critical "principal supplier" of non-human primates to the Company, Vanny, also was enmeshed in the federal criminal investigation.  Additionally, Defendants learned or would have learned about the subpoena to OBRC and OBRC's involvement in the illegal primate smuggling scheme as a potential co-conspirator through due diligence activities leading up to the acquisition of OBRC in January 2022, or through the process by which the OBRC acquisition and/or the Tucker Assignment (described at n. 8 herein) were negotiated and concluded.  Moreover, issues with respect to the supply of research primates were of particular concern for Defendants and a key justification for the Envigo and OBRC acquisitions.  Access to a supply of non-human primates was among the leading justifications for the Envigo acquisition that Defendant Leasure noted when he spoke at the Jefferies London Healthcare Virtual Conference on November 16, 2021.  Defendants expressed similar sentiments when announcing the acquisition of OBRC on January 27, 2022.

120.    As alleged herein, Defendants concealed the existence of the Envigo subpoena and/or Envigo's involvement in an ongoing criminal investigation into the importation of primates from Inotiv's investors until February 16, 2022.  Defendants also concealed the OBRC subpoena and/or OBRC's involvement in an ongoing criminal investigation of primates from Inotiv's

investors until May 16, 2022 – and further concealed that OBRC was implicated as a potential co-conspirator with the Company's "principal supplier of non-human primates" in the ongoing federal criminal investigation into the importation of non-human primates.

## VI.    LEAD PLAINTIFF'S INVESTIGATION AND CONFIDENTIAL SOURCES

### A.    Confidential Witnesses[9]

#### 1.    Confidential Witness 1

121.    Confidential Witness 1 ("CW1") reported to the Director of Estates, Facilities, and EHS at Envigo from 2019 until April 2022.  CW1's duties entailed supporting all of Envigo's locations, which included U.S. locations including the Cumberland Facility and the Alice, Texas primate facility.

122.    Matters at the Cumberland Facility took up approximately 10% of CW1's time and, on approximately four occasions, CW1 visited the Cumberland Facility in person.  CW1 states that, when visiting the Cumberland Facility, they observed the same conditions as those described in the USDA inspection reports.  CW1 states that they observed a strong smell of dog urine and feces throughout the facility; they recalled that the smell was so strong that it would stay on one's clothing after leaving the facility.  CW1 was aware that a flushing system below the dog enclosures would frequently become clogged and back up.  CW1 also understood that there was only one attending veterinarian at the Cumberland Facility (who CW1 understood had requested to work remotely during the COVID-19 pandemic), compared to six at the Alice, Texas facility.  According to CW1, the conditions at the Cumberland Facility were impossible to miss.  Indeed, CW1 states that there is no way that Inotiv personnel who visited the Cumberland Facility during the 2021 due diligence process would have not seen the poor condition of the dogs and the facilities at that time.

---

[9] Pronouns "they" and "their" are used in connection with the Confidential Witnesses allegations herein.

123.    CW1 was aware that, even before the USDA inspections in 2021, the Cumberland Facility had been subject to inspections and audits conducted by AAALAC (the Association for Assessment and Accreditation of Laboratory Animal Care, a private, non-profit organization that promotes the humane treatment of animals in scientific research), the Commonwealth of Virginia, and Envigo clients.  Those audits and inspections disclosed multiple deficiencies in the care of dogs at the Cumberland Facility, with CW1 recalling that audits conducted by Envigo clients revealed multiple deficiencies—perhaps most critical among them was a lack of human contact with the dogs.  CW1 understood that it was a customer requirement that the dogs have frequent contact with humans; the lack of human contact led to complaints that the Cumberland Facility dogs were difficult to work with.

124.    While CW1 believes that leadership at the Cumberland Facility was given instructions and policies to address health and safety issue at the site, but leadership did not provide the staff with the training required to follow those policies and procedures.  CW1 is also aware that staffing was a problem at the Cumberland Facility.  The work was difficult and the environment was loud and dirty, making it difficult to attract employees given the relatively low wages that Envigo was willing to pay.  According to CW1, the Cumberland Facility competed with food service and similar entry-level employers for employees and could not attract other Envigo employees to relocate there given the remote location of the site.

125.    CW1 also recalls events leading up to Inotiv's acquisition of Envigo.  CW1 was part of a team that was tasked to gather all environmental health and safety documents, permits, and reports for the Envigo sites in North America (including the Cumberland Facility and the Alice, Texas facility) for a presentation for the "investors," which CW1 understood to mean Inotiv.

CW1 put together a large volume of documents for that purpose. CW1 also was aware that Inotiv had a third-party entity conduct a "Tier 1 environmental assessment" of Envigo.

126. CW1 recalls having observed Inotiv personnel at the Alice, Texas primate facility on at least two occasions in 2021. Each time, the Inotiv personnel spent the entire day at the location and toured the facility. CW1 recalls that Defendants Leasure and Sagartz were present at the first Inotiv visit to the Alice, Texas primate facility and a different individual was with Defendant Leasure at the second visit. CW1 recalls being told by their supervisor, Envigo's director of facilities, that Inotiv personnel had visited all of the Envigo sites worldwide.

127. CW1 also believes that the ongoing federal criminal investigation into the importation of non-human primates was "general knowledge" and a topic of "water cooler" discussion among management-level employees at Envigo at the Alice, Texas primate facility starting in approximately early 2019-2020; there was an awareness of the criminal matter involving OBRC executive Tucker at the time.

128. CW1 recalls that, shortly before the Company announced the acquisition of OBRC, there was an afternoon "leadership meeting" with 30-40 people present in a conference room at the Alice, Texas primate facility, followed by a dinner event. Defendant Leasure was present at the leadership meeting and the dinner, as was then-OBRC executive Tucker.[10] According to CW1, there was general knowledge among the attendees of Tucker's previous guilty plea and October 2021 sentencing in the Tucker Matter. According to CW1, it was understood that Tucker would

---

[10] On January 27, 2022, Inotiv announced the acquisition of OBRC through a press release and 8-K filing with the SEC. Section 4.7 of the Stock Purchase Agreement—referred to therein as the "Tucker Assignment"—detailed that OBRC had agreed to transfer to Gary Tucker three percent (3%) of the Purchase Price.

not be continuing in his position with OBRC after the Inotiv acquisition, at least in part due to the Tucker Matter.[11]

### 2.    Confidential Witness 2

129.    Confidential Witness 2 ("CW2") was employed by Envigo as the manager of operations for an Envigo facility in St. Louis, Missouri from December 2020 through March 2022. CW2 recalls participating in the due diligence process prior to Inotiv's acquisition of Envigo.

130.    CW2 recalls that a group of Inotiv executives, including Defendant Leasure, visited the Envigo St. Louis site sometime during July or August 2021.  CW2 also recalls that Defendant Wilbourn was among the Envigo executives present during the visit.  CW2 was present during the site visit and attended meetings with the Inotiv personnel at which the Inotiv personnel asked questions about the facility's operations.  CW2 recalls being asked by Defendant Leasure about financial matters relevant to their position at Envigo, including profit and loss information for the site and whether CW2 reviewed those matters on a monthly basis.  Other members of the Inotiv executive team, including Scott Daniels (Senior Vice President Drug Metabolism & Pharmacokinetics), asked other Envigo personnel at the site questions about scientific and intellectual property matters.

131.    CW2 further recalls that the Inotiv team was given a tour of the St. Louis facility, including the office space, laboratories, and animal housing areas.  CW2 estimates that the Inotiv team was on site for approximately four hours.

132.    CW2 recalls learning about the conditions at the Cumberland Facility through internal Envigo communications at some point that they believe took place shortly after the July 2021 Inspection.  According to CW2, initial comments from Envigo management were focused

---

[11] Indeed, Tucker's profile on the social networking site LinkedIn indicates that his tenure at OBRC ended in January 2022, concurrent with the acquisition of OBRC by Inotiv.

on reminding employees of their own safety and security. CW2 recalls Envigo management was concerned about certain animal rights organizations taking action against Envigo. After the issues at the Cumberland Facility became known, Envigo's then leadership, including Harkness and Wilbourn, addressed Envigo's employees and indicated that there would be an internal inquiry and a town hall meeting on the subject for Envigo employees with an opportunity to ask questions and receive answers from management. According to CW2, a town hall meeting of this type would have been an unusual event for Envigo. CW2 states that that meeting did not take place before CW2 left the Company and, based on their discussions with Envigo/Inotiv employees with whom they remain in contact, that presentation has not taken place.

### 3.    Confidential Witness 3

133.    Confidential Witness 3 ("CW3") held a variety of positions as a scientist and researcher at Envigo and a predecessor entity in Indianapolis, Indiana from 2015 through December 2021. In context of CW3's position with the Company, CW3 was primarily responsible for working with customers on their research projects. While the majority of projects on which CW3 worked involved small animals such as mice and rats, in 2021 CW3 recalls working with a startup company customer that was conducting a study that required the use of dogs. According to CW3, the study lasted approximately eight months and required CW3 to travel to Envigo's Cumberland Facility.

134.    While working on the project, CW3 worked at the Cumberland Facility for four days in approximately March 2021 and was able to observe conditions at the site and the condition of the dogs living there.

135.    CW3 observed several empty dog feeders and that openings in kennel floor grates were large enough for puppies to slip through them. While CW3 recalls seeing newer grates at the facility with smaller openings, they had not been installed.

136.    As part of the study on which CW3 worked, dogs needed to be shipped off the site. Because of low staffing, CW3 was needed to assist with veterinary checks of the dogs before they were loaded into large shipping containers used to transport the dogs. CW3 recalls that the feet of all of the dogs were covered in feces. According to CW3, the feces was so thick that it became stuck to the walls of the containers when the dogs put their feet on them.

137.    According to CW3, the health and temperament of dogs were important considerations for Envigo's customers. One of the biggest issues that CW3 observed with the dogs at the Cumberland Facility was their lack of socialization that made them difficult to work with. CW3 observed older adult dogs that were not socialized, including dogs that would be frightened when CW3 would retrieve the dogs from their cages in order to perform veterinary checks. CW3 also was aware of dogs in their study that needed to be kept separate from other dogs due to their aggression. With respect to dogs not meeting customers' instructions for the animals' health, CW3 recalls that the customer for whom the study was performed had wanted to be able to adopt the dogs out after the study was complete. However, only one dog in the study was able to be adopted because the dogs in the study had teeth that were in such bad condition that they could not be adopted.

138.    CW3 also was aware of other problems with the health of dogs at the Cumberland Facility. Among these was a "genetic abnormality" present in the colony of beagles called "wet paw" that caused excessive sweat and irritation on the animals' paws. As a result of "wet paw," dogs would suffer from irritation on their feet that was exacerbated by poor flooring. CW3 was aware that there were customers who would not purchase dogs from the Cumberland Facility because of the issues with "wet paw" among the dogs.

139.    While CW3 has not read the USDA reports of inspections of the Cumberland Facility, CW3 is familiar with what was found through conversations with a colleague who worked at the Cumberland Facility. According to CW3, the USDA is—unlike animal activists such as PETA—unbiased and its inspection reports would have accurately reflected the conditions at the Cumberland Facility. According to CW3, the USDA findings accurately reflected the conditions at the Cumberland Facility and are consistent with CW3's observations working at the Cumberland Facility.

140.    CW3 was also aware of serious problems with the attending veterinarian at the Cumberland Facility, Dr. Dawn Gau ("Gau"), through discussions with colleagues at the Cumberland Facility and as a result of working directly with Dr. Gau on the study that involved the use of beagles. According to CW3, there had been numerous complaints about Dr. Gau's practices and behavior. CW3 recalls that part of the study they worked on with dogs from Cumberland required Dr. Gau to perform biopsies on the dogs. According to CW3, Dr. Gau did not use proper anesthesia during the procedures and dogs woke up during the surgery. CW3 also recalls that Dr. Gau had told them of other instances in which dogs woke up during surgical procedures. CW3 was aware that numerous complaints about Dr. Gau had been made to Dr. Helmut Ehall, Envigo's Senior Vice President of Veterinary Services, and CW3 was personally present when certain of those complaints were made. CW3 does not believe that anything was done about the situation with Dr. Gau. According to CW3, the Company did not act on the complaints made against Dr. Gau because the Company was unwilling to remove her from her position because finding a replacement veterinarian would be too much of a challenge.

141.    CW3 also recalls that unlike other Envigo facilities, there were no written Standard Operating Procedures ("SOP") in place at the Cumberland Facility for some of the most sensitive

and high-risk procedures being performed on dogs.  CW3 indicates that the lack of SOPs likely contributed to poor conditions at the site.

142.    CW3 also recalls learning from the site director at the Cumberland Facility that "investors" visited the Cumberland Facility sometime during the summer of 2021.  CW3 was not told the identity of the "investors," but assumes that it was representatives from Inotiv.  CW3 believes that the "investors" would have seen the site in the same condition as CW3 found it.

### 4.    Confidential Witness 4

143.    Confidential Witness 4 ("CW4") was a Talent Acquisition Specialist at Envigo in Indianapolis, Indiana from March 2021 through March 2022.  Part of CW4's duties involved recruiting and hiring employees for the "large animal site" located in Cumberland, Virginia.  CW4 recalls recruiting for dog handlers and other staff positions; the recruiting and hiring for professional positions was conducted at "corporate Human Resources."

144.    According to CW4, the Cumberland Facility was a "revolving door."  Although CW4 was responsible for the recruiting and hiring of "non-exempt" employees throughout Envigo's U.S. facilities, recruiting new employees to work at the Cumberland Facility took up approximately 20% to 30% of CW4's time.  CW4 states that the positions were low paying and the working conditions were difficult, which CW4 believes contributed to the high turnover at the Cumberland Facility.  CW4 recalls that employees would often remain only six months to a year at the Cumberland Facility, with certain new hires lasting only a week.  According to CW4, they were not surprised by the news reports about conditions at the Cumberland Facility, although the magnitude of the problems was surprising to CW4.  CW4 believed that high turnover of employees contributed to the problems at the Cumberland Facility.

145.    While CW4 did not have any prior indication of problems at the Cumberland Facility, CW4 recalls that, shortly before the conditions at the site became public knowledge, they

were asked by Envigo management to gather personnel information about several employees that worked at the Cumberland Facility, including background and social media investigations conducted by Envigo prior to the employees' hiring.   According to CW4, social media investigations of prospective employees' social media activity were typically conducted during the interview process in an attempt to identify potential "bad actors" or "extremists" with ties to animal rights groups such as PETA.

### B.   Allegations of Serious Animal Welfare Problems at the Cumberland Facility Would Have Been Known to Defendants Through the Due Diligence Process Based on Reports of Previous Animal Welfare Violations There

146.   In July 2019, an animal welfare group called Showing Animals Respect & Kindness ("SHARK") released drone video footage of the Cumberland Facility, which was then owned by a predecessor of Envigo's called Covance Research Products ("Covance").   According to a July 11, 2019 posting on the SHARK website, SHARK used drones to gain "an unprecedented view of the miserable conditions to which the beagles at Covance are subjected."   *See* https://www.sharkonline.org/index.php/past-shark-updates/1900-shark-s-drone-video-exposes-labcorp-beagle-breeding-facility (last visited Nov. 14, 2022).   In addition to posting the video, SHARK posted the text of a letter that it sent to Labcorp, the parent company of Covance.  The letter states, "our drone filmed overcrowded cages filled with stressed dogs, cages littered with feces, and dogs suffering from stereotypic behaviors."   SHARK further wrote that the filming occurred "on multiple days," meaning that the issues observed represented a "present and ongoing crisis."

147.   The SHARK video footage has been viewed over 120,000 times on YouTube and was picked up by media outlets.  On July 23, 2019, Kerri O'Brien ("O'Brien"), a reporter at the Richmond, Virginia television station WRIC published a report, which appears on the WRIC website, "'Truly Barbaric': Viral video of dogs warehoused for research raising concerns."   *See*

https://www.wric.com/news/truly-barbaric-viral-video-of-dogs-warehoused-for-research-raising-concerns/ (last visited Nov. 14, 2022). O'Brien's article quotes a SHARK investigator, Stuart Chaifetz ("Chaifetz"), who participated in the drone surveillance of the Cumberland Facility as stating, "[t]he first thing you notice is the endless crying and wailing and barking. Terribly, terribly sad." Chaifetz further described the conditions found by SHARK, "[t]hese cages were filthy there were feces and urine all over it. We actually filmed one dog eating, you know, some of it." The article also noted that the SHARK video "highlights aggressive dogs," with SHARK investigator Chaifetz adding, "[w]hen you saw this almost 'Lord of the Flies' situation where you had so many dogs packed together, these conditions were truly barbaric." O'Brien also noted that Covance had sold the Cumberland Facility to Envigo in July 2019 and that Envigo did not respond to requests for comment.

148.    O'Brien continued to report on developments related to the Cumberland Facility. On October 29, 2019, she reported for WRIC TV and published a report on the WRIC website, "Inspection report at facility that warehouses dogs for research draws concern." *See* https://www.wric.com/news/taking-action/inspection-report-at-facility-that-warehouses-dogs-for-research-draws-concern/ (last visited Nov. 14, 2022). O'Brien's TV report featured visuals from the 2019 SHARK drone video and other video and photographs from the Cumberland Facility showing dogs in rusty, filthy cages, sick and injured dogs, and insect-infested dog food. While O'Brien noted that the then-most recent USDA inspection of the Cumberland Facility in August 2019 had given the facility "the all clear," O'Brien reported that WRIC had received a copy of an August 2017 USDA inspection report that had been obtained by PETA through a Freedom of Information Act request that included images that "show dogs and puppies, some sick and hurt. All of the animals confined to rusty wire cages, many sitting in their own filth," as well as

inspectors' findings that there were "bugs crawling through the dogs' food."  O'Brien's reporting includes a quote from veterinarian Alka Chandra ("Chandra"), who serves a PETA vice president for laboratory investigation cases, stating that "[t]here were inches of feces piled up" and other shocking conditions that included rusting facilities and "puppies and dogs with ripped open pads on their feet … from the broken wire cages."  Dr. Chandra further described a dog with an "'orange sized' mass on her mammary gland" for which there was "no indication that she had been given any veterinary care."

149.    On February 5, 2020, O'Brien reported for WRIC TV and published another report on the WRIC website, "Virginia could end the breeding of cats and dogs for the purpose of experiments." *See* https://www.wric.com/news/taking-action/virginia-could-end-the-breeding-of-cats-and-dogs-for-the-purpose-of-experiments/ (last visited Nov. 14, 2022).  O'Brien's TV report again featured visuals from the 2019 SHARK drone video and other video and photographs from the Cumberland Facility showed sick and injured dogs and broken wire cages.  O'Brien's report noted that Virginia legislators had proposed legislation that would "essentially shutter the controversial dog breeding facility in Cumberland," which O'Brien noted then housed "more than 2,000 puppies and adult dogs."

150.    Similarly, on February 6, 2020, SHARK published an article on its website, "SHARK's Drone Video Spurs Anti-Dog Breeding/Experimentation legislation in Virginia." *See* https://sharkonline.org/index.php/past-shark-updates/1947-shark-s-drone-video-spurs-anti-dog-breeding-experimentation-legislation-in-virginia (last visited Nov. 14, 2022).  In that article, SHARK noted that its drone video of the Cumberland Facility "has been watched more than 100,000 times, and was covered on the news inside VA," leading to the introduction of bipartisan legislation in Virginia "to ban the breeding of cats and dogs for the purpose of experiments."

151.   During the 2020 Virginia legislative session, Virginia State Senators Jennifer Boysko (D-Fairfax) and Bill Stanley (R-Franklin) introduced legislation that would prohibit the raising and breeding of dogs or cats for use in labs doing research or testing.  The Senators acknowledged that the conditions at the Cumberland Facility were a driving force behind the legislation.  While the 2020 legislation was ultimately unsuccessful—in part due to an amendment offered by then-Governor Ralph Northam that a Virginia news publication stated "would inadvertently put the Cumberland compound out of business"—similar legislation, sometimes referred to as "the beagle bill," was approved after unanimous votes in the Virginia legislature in March 2022.  Under this new law, commercial breeders of research animals will no longer be exempt from Virginia's animal welfare laws and must comply with the same requirements as other commercial breeders, and any Virginia facility that breeds cats or dogs for research will be prohibited from selling animals for two years if USDA inspectors document a single serious animal welfare violation or three lesser violations.

152.   The SHARK 2019 drone footage of the Cumberland Facility and Virginia state legislators' concerns about the Cumberland Facility were also referenced in an October 1, 2020 article in the publication Virginia Mercury written by Kate Masters, *Animal Rights Activists question Virginia Tech's Dog Purchases*.  Kate Masters' article was republished on the website of TV station NBC12 in Richmond, Virginia on October 2, 2020.  The article states that PETA had called on Virginia Tech to "stop purchasing beagles from Envigo, a controversial dog breeding facility in Cumberland that's been the subject of recent legislative debate" and referenced the 2019 SHARK drone video (with a link to the SHARK website) and the failed effort in 2020 to ban breeding dogs and cats for experimentation in Virginia.

153.    The SHARK video of the Cumberland Facility, discussions of that video, extensive investigative reporting concerning the conditions at the Cumberland Facility by media in the nearby state capitol, and the debate in the Virginia legislature over research animal breeding—which was prompted by outrage over the conditions at the Cumberland Facility—would have been uncovered through basic due diligence about Envigo and its operations at the Cumberland Facility.

C.    **Virginia Passes "Beagle Bills" in Response to Outrage Over the Cumberland Facility**

154.    After Virginia legislators' unsuccessful attempt to pass legislation in 2020 that would expand state oversight over research animal breeding facilities like the Cumberland Facility, there continued to be concern among the public and Virginia lawmakers over the treatment of animals housed at sites like the Cumberland Facility.  When the 2022 legislative session opened in January 2022, Senators Boysko and Stanley, along with other members of the legislature, introduced a series of bills, sometimes referred to as the "beagle bills" (given that they were spurred by concern about the dogs at the Cumberland Facility) that sought to, among other things, bring commercial research animal breeders under the state's animal cruelty laws, require that breeders put up animals for adoption before euthanizing them, and impose various recordkeeping requirements.  In addition, any Virginia facility that breeds cats or dogs for research will be prohibited from selling animals for two years if USDA inspectors document a single serious animal welfare violation or three lesser violations.

155.    The "beagle bills" were approved by unanimous votes in both houses of the Virginia legislature in early March 2022, and Governor Glenn Youngkin signed the bills into law on April 4, 2022.  The laws will take effect on July 1, 2023.

156.    The "beagle bills" became law notwithstanding Defendants' efforts to thwart them through a major lobbying effort.  According to a statement posted on Twitter by an organization

71

called the Virginia Coalition for Beagle Protection ("VCBP") on February 27, 2022, "Envigo's CEO/President/Director Robert Leasure (compensation $1,306,233), was recently in Richmond to 'crisis manage' the #beagle protection bills with high-dollar influential lobbying firm McGuireWoods and @SenDaveMarsden. Hmm." The previous day, VCBP had tweeted that "Envigo has retained high-priced influential lobbying firm McGuireWoods to try and kill or amend the bills to be meaningless, even though the bills, if passed, would require such simple things." Lobbyist registration forms filed with the Virginia Conflict of Interest and Ethics Advisory Council confirm that McGuireWoods (through an entity called McGuireWoods Consulting LLC) was retained by Envigo from 2020-2022; the lobbying disclosure forms did not change to reflect retention by Inotiv in 2022, after it acquired Envigo.

### D. Humane Society Report of Animal Suffering During Testing Performed at an Inotiv Research Facility in Indiana

157. On April 21, 2022, the Humane Society of the United States ("HSUS") issued a report, "Undercover investigation reveals animal suffering in toxicology laboratory," that it described as based on the findings of an undercover investigator who "spent seven months inside Inotiv" and witnessed the use of animals in toxicology studies at an Indiana research facility. While the report made reference to issues at the Cumberland Facility as part of a general "Background on Inotiv" section, the focus of the HSUS report addressed animal suffering and alleged AWA violations that occurred during the process of toxicology testing that was performed to measure the amount of a drug candidate that an animal can tolerate before suffering from adverse effects. The report's findings were used to support HSUS's organizational position that animal testing should be abandoned in favor of other "high-tech realms."

158. The HSUS report notes that Inotiv was using beagles in certain of the experiments that the investigator observed, including to test a purportedly non-addictive painkiller, a new

medication for Cushing's disease, a cancer drug that reportedly caused diabetes, and a drug for hepatitis B. According to the HSUS, "[b]eagles are the dog of choice for use in laboratory testing because they are friendly and submissive." The report noted that the beagles used at Inotiv had been purchased "from Marshall Farms, a facility in upstate New York that has more than 20,000 dogs at any one time." Inotiv researchers preferred the Marshall Farms dogs to the ones raised at the Cumberland Facility because, according to one Inotiv employee, "the beagles from that facility [the Cumberland Facility] 'suck' because they are frightened and unsocialized." The comments from the Inotiv employee quoted in the HSUS report are consistent with the understanding of CW1, who indicates that Envigo's customers had complained about dogs from the Cumberland Facility not being easy to work with due to a lack of sufficient human contact.

159.    The HSUS report also describes research performed on non-human primates including cynomolgus macaque monkeys (a species native to southeast Asia) that had been "shipped to Inotiv in a trailer that appeared to lack temperature control" in stacked wooden crates. According to the HSUS, the monkeys had been shipped via a carrier that had recently been involved in a crash in Pennsylvania in which research primates, also shipped in wooden crates, had been thrown out of a trailer pulled by a pickup truck and thrown onto the highway.

## VII.  DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF FACTS THAT THE COMPANY WAS REQUIRED TO DISCLOSE

160.    During the Class Period, Defendants made false and misleading statements and material omissions of fact that artificially inflated the price of Inotiv's stock.

### A.    September 21, 2021 Business Combination Conference Call, Investor Presentation, and Merger Agreement

161.    On September 21, 2021, the Company hosted a business combination conference call for investors ("September 21 Call") to announce Inotiv's acquisition of Envigo. Defendants

Leasure, Taylor, and Sagartz participated in the September 21 Call. During the September 21 Call, a number of false and misleading statements were communicated to the investing public. For purposes of the September 21 Call, the Company issued also provided a transaction announcement investor presentation (the "September 21 Investor Presentation"), a slide deck that addressed Inotiv's acquisition of Envigo and included a number of false and misleading statements. The September 21 Investor Presentation identifies Defendants Leasure, Taylor, and Sagartz as presenters. A copy of the September 21 Investor Presentation was also filed with the SEC on September 21, 2021 as an exhibit to a Form 8-K that was signed by Defendant Taylor (the "September 21 8-K"). A copy of the Agreement and Plan of Merger for the Envigo acquisition (the "Merger Agreement") was also an exhibit to the September 21 8-K. The September 21 8-K was incorporated by reference in the Proxy.

162.    During the September 21 Call, Defendant Leasure stated that Inotiv "*see[s] Envigo is a best-in-class provider of high-quality research models and services.*"

163.    During the September 21 Call, Defendant Leasure also stated that Envigo's "*dedication to quality*" made it an "excellent cultural fit for Inotiv."

164.    Hardy, who was then-CEO of Envigo also participated in the September 21 Call. During his presentation time, Hardy stated that Envigo provides "*high-quality research-grade laboratory animals*." Defendants Leasure, Taylor, and Sagartz did not correct Hardy's statement.

165.    The September 21 Investor Presentation included a statement describing Envigo RMS Holding Corp as a "*leading provider of high-quality research models and services*."

166.    The September 21 Investor Presentation also included a statement describing that Envigo "was formed and has grown to focus on *research models and service ("RMS") excellence in core markets*."

167.    The September 21 Investor Presentation also included a statement that "***Envigo has strategically positioned itself as a leader in research models services in key research locations***." This slide of the September 21 Investor Presentation included a map featuring the Cumberland Facility and Envigo's Alice, Texas facility as one of its RMS locations.

168.    The September 21 Investor Presentation also described Envigo's ability to provide customers with certain animals capable of meeting researchers' requirements for models with genetic consistency, stating that Envigo "***supplies customers with genetically consistent research models time after time***."

169.    The Merger Agreement included statements asserting that, other than certain matters purportedly identified in disclosure schedules (which were not filed with the SEC as exhibits to the Merger Agreement), Envigo was in full compliance with applicable legal obligations.  This included but was not limited to statements that Envigo "***is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement, including*** the Food, Drug and Safety Laws, the applicable regulations promulgated thereunder, and ***applicable guidance standards and policies issued by any Governmental Authority***," and that Envigo "***has not been the recipient of any of the following***: . . . (ii) establishment ***inspection reports with findings of material deficiencies***, (iii) warning letters, and (iv) ***other documents that assert any lack of compliance in any material respect with any applicable Legal Requirements or regulatory requirements*** . . . ."

170.    Investment analyst reaction to the acquisition announced in the September 21 Call, the September 21 Investor Presentation, and the Merger Agreement was unambiguously positive, in large part due to Envigo's supply of research quality large research animals, which includes beagle dogs and non-human primates.  On September 22, 2021, analysts Matt G. Hewitt and Lucas

75

Baranowski of the firm Craig-Hallum Capital Group LLC ("Craig-Hallum") published a report, "Inotiv Makes Its Largest Acquisition Yet, Solidifying Access To Models And Widening The Competitive Moat. Reiterating BUY Rating And Raising Price Target to $57." Craig-Hallum's first reaction to the acquisition was that it believed Envigo would provide Inotiv with "**Better Access to Animals**" (boldface in original), noting that due to increases in research and development in the "pharma/biotech" industry, "access to animals to conduct studies (particularly large animals) was a key concern for customers." Craig-Hallum concluded that, "[b]y purchasing Envigo, Inotiv is able to lock in supply across many species, thereby eliminating this risk." In addition to its analysis, the Craig-Hallum report reproduced pages from the September 21 Investor Presentation, including slides showing that large models (a category that includes non-human primates, canines, and rabbits) would constitute 32% of revenues for the combined company. The Craig-Hallum report also listed three areas of risks related to an investment in Inotiv: acquisition risk, financing risk, and risks due to Inotiv's use of "live animals to test the safety and effectiveness of experimental drugs." The risks identified by Craig-Hallum did not include risks related to Envigo's operations at the Cumberland Facility or its involvement in the importation of non-human primates. Indeed, the risks identified were no different than the ones Craig-Hallum had identified in earlier reports on Inotiv.

171.     The statements in ¶¶ 162-170 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the following reasons:

      a.  Representations regarding the research-grade, high-quality nature of Envigo animals failed to disclose that, in fact, the beagles from the Cumberland Facility were viewed as low-quality dogs. This representation failed to provide the material context that, as one Inotiv employee described, "the beagles from that facility [the Cumberland Facility] 'suck' because they are frightened and unsocialized." The following details evidence that the research models out of the Cumberland Facility were not research-grade, high-quality models:

i.  During the July 2021 Inspection and at the time of the execution of the federal search warrant between May 18-20, 2022, USDA inspectors observed numerous instances in which temperatures in animal housing areas exceeded the 85 degree legal limit, (ii) during the November 2021 Inspection, UDSA inspectors had found dogs shivering and cold, with heat lamps not turned on, and records indicating that at least 25 dogs had died from cold exposure at the Cumberland Facility, and (iii) that USDA inspectors had found that Envigo only monitored once per day, at 7:00 a.m., before the heat of the day;

ii.  On multiple occasions and in numerous respects, USDA inspectors had found evidence of insufficient cleaning and sanitization practices, including but not limited to the fact that during the October 2021 Inspection USDA inspectors found that, "it is evident that the facility is not spot-cleaning or sanitizing effectively to prevent accumulations or to reduce disease hazards";

iii.  USDA inspectors found that dogs did not have sufficient access to food and water, including (a) nursing dams who had been deliberately denied food for 42 hours, with food left outside of their cages and just beyond their reach, and (b) multiple dogs being kept in cages with feeders that limited access to one animal at a time, resulting in guarding behaviors and other aggression;

iv.  USDA inspectors found repeated and continuous violations of the AWA in connection with flooring in animal housing areas that contained gaps that entrapped and injured dogs and puppies, and that USDA inspectors had directed the Company to make changes to the flooring in order to ensure compliance with the law; and

v.  USDA inspectors found, during the November 2021 Inspection, that the Company was failing to store food and bedding supplies properly to protect against spoilage, contamination, or vermin infestation including feeding containers that were infested with insects including live black hairy worm-type insects and live black beetles were present in the metal self-feeders that contained dogs' sole source of dog food.

b.  Representations that Envigo supplies customers with "genetically consistent research models time after time" failed to disclose materially adverse information, including the fact that USDA inspectors had determined that the Company was out of AWA compliance by not sufficiently maintaining records of dogs' pedigree information and health histories, including but not limited to the inadequate documentation of animal injuries, deaths, and other veterinary care issues such as what, if any treatments an animal may have received, the failure to account for dogs that were deemed "missing," as well as the failure to maintain health and medical history information for hundreds of dogs that had been euthanized at the Cumberland Facility.  These materially adverse facts are

further supplemented by CW3's statements regarding the genetic abnormality of "wet paw" that presented throughout the research model colony at the Cumberland Facility (*see* ¶ 138, above).

c.   Representations that Envigo was in compliance with applicable legal obligations, not acting in violation of the law, and not in receipt of any inspection reports with findings of material deficiencies or other documents asserting lack of compliance legal or regulatory requirements failed to disclose that (i) the USDA had identified numerous instances of significant failures to comply with the AWA in the July 2021 Inspection (*see* ¶¶ 61-69, above); and (ii) on June 15, 2021, Envigo had received and was producing documents in response to a grand jury subpoena in an ongoing federal criminal investigation into the importation of non-human primates (*see* ¶ 116, above).   These materially adverse facts are further supplemented by CW1's statements indicating that there was an awareness of the Tucker Matter at the Envigo Alice, Texas primate facility (*see* ¶¶ 127-128, above).

### B.   October 5, 2021 Proxy Statement

172.   On October 5, 2021, the Company filed its Definitive Proxy Statement on Schedule 14A with the SEC (the "Proxy").  The Proxy was filed by Inotiv and includes correspondence to Inotiv's shareholders signed by Defendant Leasure and Defendant Taylor.

173.   In the Summary Term Sheet, the Company described Envigo was providing "***research-quality animals***" for use in laboratory tests.

174.   The Summary Term Sheet also includes a note that the Board considered various factors in determining whether to approve the Merger Agreement, including, "***taking into account the results of Inotiv's due diligence review of Envigo . . . .***"

175.   In the "Risk Factors" section of the Proxy, under a sub-section with the heading "Legal and Regulatory Risk Factors," the Proxy provided a boilerplate statement that that the Company's "[f]ailure to comply with applicable governmental regulations could harm our business," and further stated as follows:

Envigo is subject to a variety of governmental regulations, particularly in the United States, Europe, and the United Kingdom, relating to animal welfare and the conduct of our business, including the . . . U.S. USDA Animal Welfare Regulations.  Our facilities are therefore subject to routine formal inspections by regulatory and supervisory

authorities, including the U.S. FDA, the U.S. USDA . . .  as well as by representatives from customer companies.

**Envigo expends significant resources on compliance efforts**. Regulations and guidance worldwide concerning the production and use of laboratory animals for research purposes continue to be updated. . . . Similarly, guidance has been and continues to be developed for other areas that impact the biomedical research community on both a national and international basis, including transportation, import and export requirements of biological materials, and animal housing and welfare. Certain of our customers may require us to comply with any new guidance or our implementation as a condition to being awarded contracts. Conforming to new guidelines may result in increased costs attributable to adding or upgrading facilities, the addition of personnel to address new processes and increased administrative burden.

176.     In the "Proposal 2" section of the Proxy, the Company included the following statements about Envigo:

Its operations are located in close proximity to its customers, enabling Envigo to provide consistent customer service **with a high degree of focus on animal welfare**.

Envigo's small animal research models are bred and maintained in controlled environments, which are designed to ensure that the models are free of specific viral and bacterial agents, and other contaminants that can disrupt research operations and distort research results.

177.     The statements in ¶¶ 173-176 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.

178.     In addition, representations stating that Inotiv's acquisition of Envigo took into account Inotiv's due diligence review of Envigo failed to disclose the material context of what would have been discovered by Defendants Leasure, Sagartz, and Wilbourn during the Due Diligence Tour relative to the status of AWA noncompliance at the Cumberland Facility.  As CW1 stated, the conditions at the Cumberland Facility were impossible to miss and there is no way that Inotiv personnel who visited the Cumberland Facility during the 2021 due diligence process would have not seen the poor condition of the dogs and the facilities at that time.

79

179.    Further, representations as to the controlled environments in which small animal research models are bred and maintained omits materially adverse language regarding Envigo's large animal business, including but not limited to the fact that large animals at the Cumberland Facility were not bred and maintained in a controlled environment, as described herein at ¶ 171.

### C.    November 5, 2021 Merger Closing Press Release

180.    On November 5, 2021, the Company issued a press release ("November 5 Press Release") to announce the Company had completed its purchase of Envigo.  Defendant Taylor, who was listed as the "Company Contact" on the November 5 Press Release, also signed the Form 8-K filed with the SEC to which the press release was attached.

181.    In the November 5 Press Release, the Company stated that with Inotiv and Envigo combined, drug developers and researchers will receive "***access to a wide range of high-quality small and large research models for basic research and drug discovery and development***."

182.    The statement in ¶ 181 was false and misleading when made, and omitted to state material facts necessary to make the statement not misleading for the same reasons set forth above in ¶ 171.

### D.    November 5, 2021—Ongoing Publication of Cumberland Facility Fact Sheet

183.    Upon closing of the acquisition of Envigo on November 5, 2021 and continuing throughout the Class Period (and, indeed, through the date of the filing of this Amended Complaint), the Company provided specific information regarding the Cumberland Facility on an Envigo-branded website in a document entitled, "Site Statistics, Envigo research products—Cumberland, VA canines."  *See* https://insights.envigo.com/hubfs/resources/data-sheets/product-sheet_site-statistics-for-canines.pdf (last visited Nov. 14, 2022) (the "Cumberland Fact Sheet").

184.    The Cumberland Fact Sheet describes the Cumberland Facility and a number of specific conditions purported to be maintained there, suggesting compliance with the AWA and applicable regulations.  These statements include:

- Representations regarding temperatures maintained in areas where dogs reside, specifically that "[t]he *temperature in the general colony (sheltered) is 55-85ºF; whelping (indoor) is 68-82ºF*.  . . . Temperature in the whelping building is monitored remotely *on a continuous basis* through alarms.  . . .  Temperature is *continuously monitored* by a security company . . . ."

- Representations regarding sanitation practices, including that "*[g]eneral housing is pressure washed with 180º water and detergent every two weeks*.  *Whelping caging is hand scrubbed daily*," and "[t]he *feed bin storage area is cleaned weekly*."

- Representations regarding the feeding of dogs, including that, "*[a]ll dogs are fed* an open formula Purina Diet *ad libitum* [meaning, "as much or as often as necessary or desired"].  Whelping and puppies less than 8 weeks of age are fed a Purina Laboratory Canine Gestation/Lactation Diet. *Feed is primarily stored in bulk bins*."

- Representations regarding caging of dogs, including that, "[c]aging in general housing is suspended galvanized wire runs with plastic-coated rod flooring.  In whelping, caging is suspended plastic or stainless steel walled caging with plastic-coated rod flooring and stainless steel mesh overlay."

- Representations regarding bedding for the dogs, including that "*[p]olyethylene tubs [for whelping dams] are changed as needed and cleaned daily*," and that "[s]havings are stored in sealed plastic wrapping on pallets in a dedicated storage building," while "[c]orrugated paper lining is stored on pallets in whelping building storage areas."

- Representations regarding the maintenance of breeding records, including that "pedigree and *health history information* is maintained in the AS400 system," a computerized database.

185.    The statements in the Cumberland Fact Sheet were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose material adverse facts.  In particular:

a.    Representations regarding the temperatures maintained in housing areas failed to disclose that, as alleged herein, (i) during the July 2021 Inspection and at the time of the execution of the federal search warrant between May 18-20, 2022, USDA

inspectors observed numerous instances in which temperatures in animal housing areas exceeded the 85 degree legal limit, (ii) during the November 2021 Inspection, UDSA inspectors had found dogs shivering and cold, with heat lamps not turned on, and records indicating that at least 25 dogs had died from cold exposure at the Cumberland Facility, and (iii) that USDA inspectors had found that Envigo only monitored once per day, at 7:00 a.m., before the heat of the day;

b. Representations regarding sanitization practices failed to disclose that, as alleged herein, on multiple occasions and in numerous respects, USDA inspectors had found evidence of insufficient cleaning and sanitization practices, including but not limited to the fact that during the October 2021 Inspection USDA inspectors found that, "it is evident that the facility is not spot-cleaning or sanitizing effectively to prevent accumulations or to reduce disease hazards";

c. Representations regarding the feeding of dogs failed to disclose that, as alleged herein, USDA inspectors found that dogs did not have sufficient access to food and water, including (i) nursing dams who had been deliberately denied food for 42 hours, with food left outside of their cages and just beyond their reach, and (ii) multiple dogs being kept in cages with feeders that limited access to one animal at a time, resulting in guarding behaviors and other aggression;

d. Representations regarding caging and flooring failed to disclose that, as alleged herein, USDA inspectors found repeated and continuous violations of the AWA in connection with flooring in animal housing areas that contained gaps that entrapped and injured dogs and puppies, and that USDA inspectors had directed the Company to make changes to the flooring in order to ensure compliance with the law;

e. Representations regarding the maintenance of bedding material failed to disclose that, as alleged herein, USDA inspectors found, during the November 2021 Inspection, that the Company was failing to store food and bedding supplies properly to protect against spoilage, contamination, or vermin infestation; and

f. Representations regarding the maintenance of animals' "health history information" failed to disclose that, as alleged herein, on multiple occasions and in multiple respects, USDA inspectors had determined that the Company was not sufficiently maintaining records of dogs' health histories, including but not limited to the inadequate documentation of animal injuries, deaths, and other veterinary care issues such as what, if any treatments an animal may have received, the failure to account for dogs that were deemed "missing," as well as the failure to maintain health and medical history information for hundreds of dogs that had been euthanized at the Cumberland Facility.

E.   **November 5, 2021—Ongoing Publication of Non-Human Primate Fact Sheets**

186.   Upon closing of the acquisition of Envigo on November 5, 2021 and continuing throughout the Class Period (and, indeed, through the date of the filing of this Amended

Complaint), the Company provided specific information regarding the non-human primates that it offered for sale on an Envigo-branded public website. This information included a document entitled "Access high quality on our nonhuman Primates" (the "High Quality Fact Sheet," *see* https://insights.envigo.com/hubfs/Cross%20selling%20docs/Product%20sheet_Access%20high %20quality%20on%20our%20nonhuman%20primates.pdf (last visited Nov. 14, 2022)) and document entitled "Assure future availability of nonhuman primates (the "Future Availability Fact Sheet, *see* https://insights.envigo.com/hubfs/resources/data-sheets/product-sheet_buy-and-board.pdf (last visited Nov. 14, 2022), collectively with the High Quality Fact Sheet, the "Primate Fact Sheets").

187. The High Quality Fact Sheet describes the Company as a trusted and experienced source of these valuable research models, with the ability to provide customers with "quality" non-human primates (or "NHPs") given Envigo's position as "the world's largest and most trusted sources of NHPs." The High Quality Fact Sheet further stated, "[w]ith an extensive supply of rhesus and cynomolgus models, along with more than 35 years of expertise breeding, importing and quarantining NHPs, Envigo is well positioned even in today's constrained supply market."

188. The High Quality Fact Sheet further states that the Company works "with the only high-quality breeding farm partners in Mauritius, China, Vietnam and Cambodia," with a global veterinary group that "routinely conducts extensive audits of each farm to ensure supplier facilities are well maintained, the animals are well-cared for and healthy, and the export facilities are of high quality."

189. The Future Availability Fact Sheet describes, among other things, an "Envigo Buy and Board program" that purportedly provides clients with an ability to "procure high-quality nonhuman primates (NHPs) that meet your specifications when and where you need them." The

Future Availability Fact Sheet states: "We are the world's largest and most trusted source of nonhuman primates. We are very selective in our breeding farm partners so that we provide only high-quality animals to meet your study requirements. Plus, our extensive audit program conducted by our global veterinary group ensures supplier facilities are well maintained, the animals are well-cared for and healthy, and the export facilities are high-quality and reliable."

190.    The statements in the Primate Fact Sheets were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose material adverse facts. In particular, the Primate Fact Sheets did not disclose that, as alleged herein, Envigo had been served with a criminal subpoena in June 2021 in connection with an ongoing federal investigation into the importation of non-human primates from Asia. Further, the Primate Fact Sheets were false and misleading because they did not disclose that the Company's "principal supplier of non-human primates," Vanny, was a subject of the ongoing federal investigation into the importation of non-human primates.

**F.      November 11, 2021 Statement on PETA Report**

191.    On November 11, 2021, the Company released a statement (the "November 11 Statement") responding to a series of communications critical of the Cumberland Facility issued by PETA on November 9, 2021. The November 11 Statement was issued anonymously under the Envigo logo and titled, "Envigo Statement on PETA Report."

192.    The November 11 Statement sought to effectively deny the issues raised by PETA in its November 9 communications, which included the publication of video purportedly taken from inside the Cumberland Facility featuring, among other things, dogs confined to small spaces without stimulation, non-veterinarians performing medical procedures on dogs, a dog being euthanized without anesthesia, dogs being left in their cage while the cage was being pressure washed, puppies entrapped in gaps between the floor and the wall of the cage, and numerous dead

puppies. The PETA video also included what were purported to be recordings of statements made by Envigo employees at the Cumberland Facility, including one who described defiance of USDA instructions regarding the feeding of dogs and another employee who referred to the USDA inspection process as "a damn game you gotta play to satisfy them because of the bullshit they [USDA] can make happen."

193.    The November 11 Statement, which effectively denied PETA's criticisms of the Cumberland Facility and bristled at the notion that video and photographs had been taken by "an infiltrator," stated as follows:

> On November 9, 2021, PETA issued several communications claiming to have placed an infiltrator within Envigo's canine breeding facility in Cumberland, Virginia. It also published news and social media releases including edited video footage purportedly captured by this individual.
>
> PETA has made several accusations regarding our canine breeding facility and some of our staff. ***Many of these allegations we know to be misleading and lacking important context***. However, any allegations towards our staff or our company are taken seriously, and ***we have launched an investigation to assess whether any improper actions occurred within the facility***.
>
> Envigo has recently participated in two separate USDA inspections at our Cumberland site. ***We are incorporating the feedback from these visits into operational enhancements already underway***. As part of our mission for continuous improvement, the company has invested more than $3 million over the past five years in ***extensive upgrades and facility improvements to our Cumberland location***, which include a new outdoor play area, a new heating system, upgrading enclosure panels, new digital radiography equipment, and upgrades to whelping (birthing) enclosures. ***The highest quality of animal welfare is a core value of our company and is central to our business***.
>
> Our mission at Envigo is to help our customers realize the full potential of their scientific and medical research, which ultimately contributes to significant improvements in the lives of both humans and animals. The use of animals in this critical research is essential for developing lifesaving medicines, medical devices and biologics, such as vaccines. For example, Envigo's animals played an integral role in the development of advanced pacemakers for heart patients as well as in critical research into Parkinson's disease and multiple sclerosis (MS).
>
> ***We remain steadfast in our commitment to advancing this important work and operating to the highest professional standards***.

194.    The November 11 Statement was picked up and reported on by media outlets, including, on November 12, 2021, when Richmond, Virginia television station WRIC quoted from the November 11 Statement in a report that was one in a series of investigative reports about the Cumberland Facility: "In a statement to 8News, Envigo said, 'Many of these allegations we know to be misleading and lacking important context.'  However, the company goes on to say it's 'launched an investigation to assess whether any improper actions occurred within the facility.'" *See* Kerri O'Brien, *New undercover video inside a Virginia dog breeding facility causing alarm* (Nov. 12, 2021), https://www.wric.com/news/taking-action/new-undercover-video-inside-a-virginia-dog-breeding-facility-causing-alarm/ (last visited Nov. 14, 2022).

195.    The statements in ¶¶ 192-193 and the statement provided to WRIC described in ¶ 194 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.

### G.     November 16, 2021 Statement on USDA Inspections

196.    In response to the USDA's release of its report of the July 2021 Inspection on November 15, 2021, the Company issued a statement on November 16, 2021 (the "November 16 Statement").  The November 16 Statement was issued anonymously under the Envigo logo and titled, "Envigo Statement on USDA Inspections November 16, 2021."

197.    The November 16 Statement, which downplayed the seriousness of the USDA's findings, did not address the long—and still ongoing—history of similar problems at the Cumberland Facility, and provided excuses for certain of the USDA's findings, stated as follows:

> Envigo has recently participated in two separate USDA inspections at our Cumberland site. While the USDA inspections reflected that we have improvements to make, we had previously initiated and are ***continuing to take the necessary corrective actions for all issues outlined in the reports***. We appreciate the information provided, take the feedback seriously, and recognize the improvements we are ***making are an ongoing effort***.

As part of our mission for continuous improvement, the company has invested more than $3 million over the past five years in ***extensive upgrades and facility improvements to our Cumberland location***, which include a new outdoor play area, a new heating system, upgrading enclosure panels, new digital radiography equipment, and upgrades to whelping (birthing) enclosures. ***The highest quality of animal welfare is a core value of our company and is central to our business***.

The initial inspection visit took place in July and temperatures at that time of year in this part of Virginia are naturally high. Our team is conducting due diligence on installing a cooling system, but in the meantime, we have added additional fans and cooling/misting options. We anticipate moving forward with a new cooling system in 2022. The insect issue has been a challenge as our operations are in a rural area. We acknowledge we need to be more diligent in ensuring our food storage areas are as pest-free as possible. We recently changed the contractor we utilize for pest control and are working with the new contractor to rectify the problem.

In response to the medical issues raised in the inspections, we continue to strive to do better. ***After the USDA visited our facility, we immediately began to address the concerns and develop treatment programs for all animals identified***. ***We do not neglect our animals and are committed to ensuring any sick animal receives the proper care they deserve***.

Our mission at Envigo is to help our customers realize the full potential of their scientific and medical research, which ultimately contributes to significant improvements in the lives of both humans and animals. We remain steadfast in our commitment to advancing science and operating to the highest professional and welfare standards.

198.    The statements in the November 16 Statement were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.   The statements in the November 16 Statement were also false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the further reasons that USDA inspectors had continued to find, during the October 2021 Inspection and the November 2021 Inspection, that the Company was not taking sufficient corrective actions to address the USDA's findings and was not providing the "highest quality of animal welfare," through the persistence of serious "Repeat" and "Direct Repeat" violations of the AWA and new AWA violations demonstrating an ongoing failure to

provide for the health and wellbeing of the beagle dogs and puppies at the Cumberland Facility as detailed at ¶¶ 70-86, above.

**H.**    **November 16, 2021 Presentation to the Jefferies London Healthcare Virtual Conference**

199.    On November 16, 2021 Defendant Leasure participated in a virtual conference, the Jefferies London Healthcare Virtual Conference, held by the investment firm Jefferies (the "Jefferies Conference").  According to a transcript of the Jefferies Conference, Defendant Taylor also was present on behalf of the Company.

200.    During the Jefferies Conference, Defendant Leasure spoke to investors about the Company, its history, and its business prospects.  As part of his presentation, Defendant Leasure discussed the "transformative" recent acquisition of Envigo and touted the benefits of Envigo's business as addressing "some of the risk we had to our business model, our growth, our continuing acquisition strategy."

201.    Notably, Defendant Leasure stated that, "[o]ne of the key things is what are we going to do for supply chain in our access to research models, which is becoming more and more of a problem and more is like limiting resource."  Leasure continued, "if I looked at the current status of non-human primates trying to cut off their supply of non-human primates to the US, that may demand somewhat exceed the supply in the US [sic].  So that was a concern that we did not have a significant source that we could rely upon.  So we started looking at our options and Envigo was . . . [a company that] would add significant value to us in terms of being able to drive this as research models and some accretive earnings."  Leasure further stated that Envigo, "does breeding, it does boarding, it does contract breeding and boarding, and then roughly sell research models," which provides the Company "access to resources that we did not have," including "access to all the research models."  Leasure emphasized this point as an advantage over the Company's

competitors, noting that, other than Charles River, "we're the only CRO that has access to all the research models," which provided a "real competitive advantage right now with the supply and demand chain where it is today."  Leasure also indicated that the Company intended to "eventually brand everything under the Inotiv name."

202.    The statements made at the Jefferies Conference were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the following reasons:

a.    Statements regarding the acquisition of Envigo's research model business and the particular advantages to the Company in terms of having a source of access to research models failed to disclose that the Company's access to a source of beagle dogs, the preferred breed for research purposes, was threatened by the serious and ongoing AWA violations at the Cumberland Facility for the reasons described at ¶ 171 herein.

b.    Statements regarding the acquisition of Envigo's research model business and the particular advantages to the Company in terms of having a source of access to non-human primates—research animals for which demand exceeded supply—failed to disclose that Envigo had received a grand jury subpoena as part of an ongoing criminal investigation into the importation of non-human primates.

c.    The statement regarding the Company's intent to "eventually brand everything under the Inotiv name" was materially false and misleading and failed to disclose the fact that the Company did not—and appears to have taken no steps to—rebrand the Cumberland Facility as an Inotiv facility.  Among other things, the Company did not change the name of the entity on the Cumberland Facility's USDA registration (which continued to indicate Envigo through the DOJ Action and the closure of the Cumberland Facility described herein), issued public statements under an Envigo logo, and had Defendant Wilbourn testify before the Virginia Senate in February 2022 as a representative of Envigo, not Inotiv.

**I.    January 27, 2022 Press Release Announcing the Acquisition of OBRC**

203.    On January 27, 2022, the Company issued a press release ("January 27 Press Release") to announce the acquisition of OBRC.  The January 27 Press release was attached to a Form 8-K filed by the Company with the SEC on January 31, 2022.  Defendant Taylor signed the

Form 8-K to which the January 27 Press Release was attached.  The press release listed Defendant Taylor as "Company Contact."

204.    In the Inotiv press release, the then-Chief Operating Officer for Inotiv's RMS business, Harkness, touted the Company's earlier acquisition of Envigo's primate business, including the Alice, Texas primate facility, calling Envigo "*a leader in primate welfare and supply for decades*."  Harkness further stated that the acquisition of OBRC and its Alice, Texas facility would further "*accelerate growth, provide scale, and ensure that client needs are met with the highest level of animal welfare*."  Defendant Leasure also stated in the press release that "[t]he combination of OBRC with Inotiv's existing facilities will *provide increased access to critical research models* and expanded facilities," adding that Inotiv would listen and respond to clients by "leverage[ing] the facilities and personnel at OBRC to ensure that the *highest level of service*, animal welfare, and *enhanced supply chain logistics are provided to our clients*."

205.    The statements in the January 27 Press Release were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 202 regarding the failure to disclose the June 2021 subpoena to Envigo regarding the importation of non-human primates.  The statements in the January 27 Press Release were also false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because the January 27 Press Release did not disclose that OBRC had itself received a grand jury subpoena on June 16, 2021 in connection with the ongoing federal criminal investigation into the importation of non-human primates—the same investigation in which OBRC executive Tucker had previously pled guilty to a charge of making false statements to federal investigators, which (as described by CW1) led to the Company's decision not to retain Mr. Tucker following the OBRC acquisition.  The January 27 Press release also failed to disclose

that the Company's "principal supplier of non-human primates" was implicated in the ongoing criminal investigation, creating a material risk that the Company could face significant disruptions in its supply of critical non-human primates that would harm its business and financial prospects.

**J.    February 3, 2022 Testimony Before Virginia Senate Subcommittee**

206.    On February 3, 2022, Defendant Wilbourn testified before the Virginia Senate Agriculture, Conservation and Natural Resources Committee's Companion Animals Subcommittee (the "Virginia Senate Hearing"). Video of the Virginia Senate Hearing was posted on the Virginia Senate's public website. The Virginia Senate Hearing was called to address proposed state legislation that would, among other things, impose state animal welfare inspection requirements and other regulations on the breeders of research animals. The legislative proposals were introduced, in large part, due to outrage over conditions at the Cumberland Facility that began following release of the SHARK drone footage of the Cumberland Facility taken in July 2019, when the Cumberland Facility was owned by Envigo's predecessor, Covance.

207.    Defendant Wilbourn testified as a representative of Envigo. During her testimony before the Virginia Senate Hearing, Wilbourn stated that she was "the Vice President of North American operations in Envigo," which Wilbourn described as the "second largest breeder of animals in research and the second largest breeder of canines for research." Wilbourn testified that she is "responsible for ensuring the proper and lawful operations of our facilities in North America, including the canine facility in Cumberland." Wilbourn further stated that, "*we at Envigo and I personally take that responsibility* [for ensuring proper and lawful operations] *seriously and maintain a commitment to the highest animal welfare standards*."

208.    Defendant Wilbourn testified regarding the results of the July 2021 Inspection and October 2021 Inspection, stating that "*we were deeply disappointed in the results of our USDA inspection for Cumberland in July and October of this year*." Wilbourn further testified that, just

like what had occurred following an "unfavorable" 2017 USDA inspection of the Cumberland Facility that occurred "prior to Envigo's ownership" (after which the violations were corrected and the facility received a series of "clean inspections with no noncompliant items identified in 2018 and 2019"), the Company was "*working hard to fix the current issues and [has] already taken many steps towards doing so*."

209.    On two occasions during her Virginia Senate Hearing testimony, Wilbourn minimized the seriousness of the systemic and ongoing violations identified by the USDA, calling them "*temporary lapses*" that Wilbourn blamed solely on the COVID-19 pandemic. First, in describing the cause of the violations identified by the USDA, Wilbourn stated that a combination of more dogs (due to decreased demand from customers) and fewer workers onsite "led to some *temporary lapses and challenges in the quality of animal care that we've always offered and are committed to offering*." Near the end of her testimony, Defendant Wilbourn again downplayed the systemic and ongoing nature of these violations, emphasizing, "*[t]he temporary lapse in providing the level of care we are used to providing, caused by COVID and our desire not to euthanize hundreds of dogs, is just that: temporary. We are doing everything we can to make sure that the animals in our charge are well cared for*."

210.    Defendant Wilbourn also sought to defend Envigo's failure to remedy the violations identified in the July 2021 Inspection and claimed that the Company acted "immediately" to address the "specific problems identified" by the USDA. Wilbourn testified: "*Although we acted swiftly*, many of the corrective actions take some time and several months to implement and see the results. That's why the second inspection report that was released last Friday from an inspection in October 2021—just three months after the first, in July—still identified problems that had not been fully addressed, but *showed improvement*." Moreover, Wilbourn provided

examples of the "all hands on deck exercise" claimed to have been undertaken by the Company to take "***numerous measures to address the specific animal welfare issues identified***" by the USDA, including completing "***over 2,700 veterinary exams***" and "***almost 2,000 dental exams***," as well as the implementation of "***procedures to better track animals in need of veterinary support***," "***increased cleaning efforts***," and "***the physical plant has been upgraded by improving flooring and cages***."   Defendant Wilbourn then showed members of the Virginia Senate present at the Virginia Senate Hearing images purporting to show, among other things, the "***great condition of the dogs***," as well as the conditions of "some of the housing that our animals are in."   With respect to animal housing, Wilbourn pointed out "boarding" being used to address problems with "gaps in flooring" identified by the USDA, while noting that "grid flooring" is still being used in all areas to allow "***urine and fecal material [to] go through the grids***."   Wilbourn also noted that "we are changing all of our galvanized chain link [enclosures] to stainless steel [panels]," stating that the Company would "ready to place an order mid-February to finish the site."   Defendant Wilbourn also touted the Company's purported improvement of cleaning of the dogs' living areas, describing a "***rough hose every day***" of cages, as well as "***full sanitization with hydrogen peroxide cleansers to disinfect on a regular basis***."   Prior to concluding, Defendant Wilbourn noted that "over the past few years, Envigo has invested more than $3 million to improve the Cumberland Facility, including canine housing, heaters," and other equipment, adding that "this year, we've been given $5 million to invest in the facility" to make additional improvements.

211.    On February 3, 2022, news of Defendant Wilbourn's testimony was picked up and reported out to the general public by media that included news station WRIC Richmond.   In its news report, WRIC focused on the fact that Wilbourn had blamed the COVID-19 pandemic for the AWA violations at the Cumberland Facility: "Envigo, the troubled dog breeding and research

facility in Cumberland County is blaming COVID-19 for its multiple animal welfare violations. Their response comes as Virginia lawmakers pursue bills to crack down on Envigo." *See* Kerri O'Brien, *Medical research dog breeding facility blames COVID-19 for dozens of disturbing animal welfare violations* (Feb. 3, 2022), https://www.wric.com/news/taking-action/envigo-blames-covid-19-for-dozens-of-animal-welfare-violations-as-bills-move-forward/ (last visited Nov. 14, 2022).

212.    The statements made by Defendant Wilbourn at the Virginia Senate Hearing in ¶¶ 207-211, including with respect to the Company's purported commitment to the highest animal welfare standards and descriptions of the USDA's findings as "temporary lapses" were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.

213.    Additionally, the statements made by Defendant Wilbourn at the Virginia Senate Hearing in ¶¶ 207-211 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because the USDA had found multiple instances of ongoing and serious AWA violations at the Cumberland Facility that persisted through the November 2021 Inspection that, as described at ¶ 85 herein, had been disclosed to Defendant Wilbourn by USDA inspectors during an exit briefing on December 17, 2021. Defendant Wilbourn's testimony at the Virginia Senate Hearing did not address *any* of the USDA's findings from the November 2021 Inspection, which as described at ¶¶ 77-84 herein, indicated that the ongoing and serious nature of the AWA violations at the Cumberland Facility, including but not limited to persistent violations of veterinary care standards, violations regarding the condition of flooring, animal housing and feeding requirements, and recordkeeping violations that indicated

that the AWA violations at the Cumberland Facility were not "temporary lapses" that were temporally limited in nature.

214.    Moreover, the statements made by Defendant Wilbourn at the Virginia Senate Hearing set forth in ¶ 210—the purported corrective actions—were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because those statements either were directly contradicted by or otherwise failed to disclose specific findings from the most recent inspection of the Cumberland Facility, the November 2021 Inspection (of which Defendant Wilbourn was informed, *see* ¶ 85), and/or addressed issues that the USDA would soon discover to constitute ongoing AWA violations during the March 2022 Inspection (*see* ¶¶ 87-90), including:

a.    Statements regarding increased dental exams conducted failed to disclose that, during the November 2021 Inspection, USDA inspectors found "Direct Repeat" animal welfare violations due to dogs that had "severe dental disease" and had not received adequate care;

b.    Statements regarding the increased number of veterinary exams conducted failed to disclose that, during the November 2021 Inspection, USDA inspectors found a "Direct" violation due to the fact that no physical exams had been performed "within the last 12 months for approximately 10% of the dogs over a year old";

c.    Statements regarding the purported improvement of tracking animals in need of veterinary support failed to disclose that, during the November 2021 Inspection, USDA inspectors continued to find "Direct Repeat" and "Repeat" violations of recordkeeping requirements, including but not limited to finding dogs that "had medical conditions that were not identified or treated by the facility prior to the inspection," as well as 937 dogs and puppies for whom records were "incomplete and inaccurate";

d.    Statements regarding the purported improvement in flooring failed to disclose that USDA inspectors found a "Direct" violation of the AWA during the November 2021 Inspection insofar as "[a]pproximately 75% of enclosures have flooring which is not cut to the same size and shape as the enclosure walls resulting in large gaps between the floor and the fencing," leading to entrapment and significant injuries;

e.    Statements regarding the purported improvement in flooring was further false and misleading given that, during the March 2022 Inspection, which took place approximately one month after the Virginia Senate Hearing, USDA inspectors

continued to find "Direct Repeat" and "Repeat" violations of the AWA related to flooring that "has been identified on previous inspections to be dangerous because dogs have been found by inspectors with feet / toes stuck in the flooring," including that dogs continued to be found stuck in the flooring;

f. Statements regarding the cleaning and sanitization of cages, as well as the ability of waste to "go through the grids" in the flooring, failed to disclose that, during the November 2021 Inspection, USDA inspectors found numerous cleaning and sanitization violations, including "Repeat" violations showing that the "facility continues to have a general sanitation problem with cleaning waste from under primary enclosures as often as necessary to prevent the accumulation of feces and food waste," noting "white, moldy accumulations of spilled feed and excreta . . . that were several inches high and created areas of standing liquid" and also finding cleaning and sanitization to be insufficient due to facility records showing "many rooms are sanitized as infrequently as every 3-4 weeks while some have no documentation of being sanitized at all during October and November"; and

g. The statement concerning the "great condition of the dogs" failed to disclose that, during the November 2021 Inspection, USDA inspectors continued to, among other things, "witness[] numerous serious dog fights" and "f[ind] dogs with injuries from recent fights," as well as dogs that continued to exhibit untreated "traumatic wounds" and other serious medical conditions; USDA inspectors would continue to observe dogs with undiscovered and untreated injuries and find multiple dogs with serious wounds and injuries (including "injuries attributed to a fight") during the March 2022 Inspection.

215.    Further, the statements made by Defendant Wilbourn at the Virginia Senate Hearing set forth in ¶ 209, blaming the COVID-19 pandemic for the Company's repeated AWA violations, were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because those statements were directly contradicted by CW4's statement that Envigo was, in fact, able to hire employees at the Cumberland Facility.  As CW4 stated, it was not the Company's inability to hire employees in the first instance, but its subsequent inability to retain employees and prevent a high turnover rate, that CW4 believed contributed to the problems at the Cumberland Facility (*see* ¶ 144, above).

### K.    February 16, 2022 Q1 2022 Form 10-Q

216.    On February 16, 2022, the Company issued its quarterly report on Form 10-Q for Q1 2022 with the SEC ("Q1 2022 Form 10-Q").  Defendants Leasure and Taylor signed the Q4 2022 Form 10-Q.

217.    In the Q1 2022 Form 10-Q, the Company stated the following: "During the period from July through December 2021, one of Envigo's U.S. facilities was inspected on several occasions by the [USDA].  USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations.  Envigo formally appealed certain of the findings.  USDA has indicated it intends to conduct a formal investigation.  The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation.  As of December 31, 2021, no investigation has been initiated."

218.    With respect to the Company's RMS segment, the Q1 2022 Form 10-Q noted that the segment "***breeds, imports and sells research-quality animal models*** . . . ."

219.    The Q1 2022 Form 10-Q also included, for the first time, a representation regarding the ongoing federal criminal investigation into the importation of non-human primates.  On this issue, the Q1 2022 Form 10-Q stated: "[o]n June 15, 2021, Envigo Global Services, Inc., a subsidiary of the Company acquired in the Envigo acquisition, was served with a grand jury subpoena issued by the Department of Justice in Miami, Florida requiring the production of documents related to the importation into the United States of live non-human primates originating from or transiting through China, Cambodia and/or Vietnam from April 1, 2014 through March 28, 2019.  The Company is cooperating with the Department of Justice."

220.    The statements in ¶¶ 217 and 218 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.

221.    Additionally, the statements in ¶¶ 217 and 218 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because the USDA continued to find ongoing violations during the November 2021 Inspection that led to—and were found to persist at—both the March 2022 Inspection and the May 18, 2022 raid of the Cumberland Facility.  Specifically, as alleged herein at ¶¶ 87-90, the March 2022 Inspection found a total of five AWA violations, including two "Direct Repeat" violations and three "Repeat" violations.  As alleged herein in ¶¶ 96-109, government agents and investigators assisting with the May 18 raid discovered numerous ongoing failures to comply with the AWA consistent with conditions first observed in the July 2021 Inspection.

222.    The statements in ¶ 219 regarding the ongoing federal criminal investigation into the importation of non-human primates were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because the statements fail to disclose that: (a) OBRC, which Inotiv had acquired on January 27, 2022, also had received a grand jury subpoena in June 2021 in connection with the same federal criminal investigation; (b) the Company's "principal supplier of non-human primates" was a focus of the ongoing criminal investigation, creating a material risk that the Company could face significant disruptions in its supply of critical research models that would harm its business and financial prospects; and (c) OBRC had participated as a co-conspirator in an unlawful primate smuggling scheme with the Company's "principal supplier of non-human primates."

L.    **Q2 2022 Earnings Call**

223.    On May 13, 2022, the Company held a Q2 2022 Earnings Call ("Q2 2022 Call").

Defendants Leasure, Taylor, and Sagartz participated in the Q2 2022 Call.

224.    During the Q2 2022 Call, Leasure stated the following:

Moving to our RMS segment. The integration and optimization of the recently acquired Research Model and Services businesses are proceeding. ***These businesses contribute $101.2 million of incremental revenue this quarter, well ahead of the run rate when we announced the acquisitions. We have begun investing across the organization to improve facilities in animal welfare and streamline operations. We are also investing in locations to expand capacity in the U.S. and in Europe. By adding capacity and resources, we anticipate supporting growth in services and consolidating 2 existing RMS locations and the recently acquired RSI business into these sites by calendar year-end. These investments are also part of our plans to enhance RMS margins and improve facilities. The examples of facility improvements we are making to enhance animal welfare, including investments in water systems, air quality, electrical upgrades and enhancements, improved sewer systems, housing and veterinary care facilities***. At the end of January, we announced the purchase of OBRC, a nonhuman, primate importer and quarantine facility located near our existing facility in Alice, Texas. This acquisition provides an opportunity to further expand our services and address client needs at a time when the industry demand is outstripping supply.

225.    As to the status of filling open jobs at Envigo, Leasure also stated, "Some of the scientific positions, ***the veterinary positions***, the pathology positions, some of the higher-level positions, ***I think we've done a very nice job of filling some of those roles***."

226.    The statements in ¶¶ 224-225 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 171.

227.    The statements in ¶ 224 regarding the OBRC acquisition and its ability to "further expand our services and address client needs at a time when industry demand is outstripping supply" is also false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because Defendant Leasure failed to disclose that: (a) OBRC,

99

which Inotiv had acquired on January 27, 2022, also had received a grand jury subpoena in June 2021 in connection with the same federal criminal investigation; (b) the Company's "principal supplier of non-human primates" was a focus of the ongoing criminal investigation, creating a material risk that the Company could face significant disruptions in its supply of critical research models that would harm its business and financial prospects; and (c) OBRC had participated as a co-conspirator in an unlawful primate smuggling scheme with the Company's "principal supplier of non-human primates.

**M.    May 16, 2022, Q2 2022 10-Q**

228.    On May 16, 2022, Inotiv filed its quarterly report on Form 10-Q for the period ending March 31, 2022 (the "Q2 2022 10-Q").  The Q2 2022 10-Q was signed by Defendants Leasure and Taylor.

229.    The Q2 2022 Form 10-Q also included a representation regarding the ongoing federal criminal investigation into the importation of non-human primates that, for the first time, indicated that OBRC had also received a grand jury subpoena in June 2021.  On this issue, the Q2 2022 Form 10-Q stated, *inter alia*: "[o]n January 27, 2022, EGSI acquired OBRC, which owns and operates a primate quarantine and holding facility located near Alice, Texas.  In 2019, OBRC received grand jury subpoenas requested by the USAO requiring the production of documents and information related to its importation of NHPs into the United States.  On June 16, 2021, OBRC received a grand jury subpoena requested by the USAO requiring the production of documents related to the procurement of NHPs from foreign suppliers for the period January 1, 2018 through June 1, 2021.

230.    The statements in ¶ 229 regarding the ongoing federal criminal investigation into the importation of non-human primates were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because they failed to disclose that

that: (a) the Company's "principal supplier of non-human primates" was a focus of the ongoing federal criminal investigation into the importation of non-human primates, creating a material risk that the Company could face significant disruptions in its supply of critical research models that would harm its business and financial prospects; and (b) OBRC had participated as a co-conspirator in an unlawful primate smuggling scheme with the Company's "principal supplier of non-human primates.

### N.     **August 10, 2022 Earnings Call**

231.     On August 10, 2022, the Company held a Q3 2022 Earnings Call ("Q3 2022 Call"). Defendants Leasure, Taylor, and Sagartz participated in the Q3 2022 Call.

232.     During the Q3 2022 Call, analyst David Howard Windley of Jefferies LLC asked Defendant Leasure to "elaborate on what you're seeing in kind of both the demand side and the supply side of your nonhuman primate business."  As part of his response to that question, Leasure stated the following: "It's been a market where the -- historically, the demand has been outstripping our supply.  And we still see that today.  I think that right now, we're trying to evaluate what 2023 is going to look like.  It looks like that is going to -- that could continue.  We don't see the supply increasing any at this time. But a lot of that has to do with what's taking place in Asia, China, Cambodia. And sometimes, it's hard to get that information directly over the phone."

233.     The statements in ¶ 232 regarding the supply of non-human primates were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 227:

### O.     **August 12, 2022, Q3 2022 10-Q**

234.     On August 12, 2022, Inotiv filed its quarterly report on Form 10-Q for the period ending June 30, 2022 (the "Q3 2022 10-Q").  The Q2 2022 10-Q was signed by Defendants Leasure and Taylor.

235.    The Q3 2022 10-Q included representations regarding the ongoing federal criminal investigation into the importation of non-human primates that were substantially similar to the representations made in the Q1 2022 10-Q and Q2 2022 10-Q regarding the June 2021 grand jury subpoenas to Envigo and OBRC in connection with the ongoing federal criminal investigation into the importation of non-human primates.  Among other things, the Q3 2022 10-Q stated: "[o]n June 15, 2021, Envigo Global Services, Inc. ("EGSI"), a subsidiary of the Company acquired in the Envigo acquisition, received a grand jury subpoena requested by the U.S. Attorney's Office for the Southern District of Florida ("USAO-FL") for the production of documents related to the procurement of non-human primates ("NHPs") from foreign suppliers for the period January 1, 2018 through June 1, 2021.  The subpoena relates to an earlier grand jury subpoena requested by the USAO-FL and received by EGSI's predecessor entity, Covance Research Products, in April 2019."  The Q3 2022 10-Q also stated that, "[o] n 2019, OBRC received grand jury subpoenas requested by the USAO-FL requiring the production of documents and information related to its importation of NHPs into the United States. On June 16, 2021, OBRC received a grand jury subpoena requested by the USAO-FL requiring the production of documents related to the procurement of NHPs from foreign suppliers for the period January 1, 2018 through June 1, 2021."

236.    The statements in ¶ 235 regarding the ongoing federal criminal investigation into the importation of non-human primates were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 227.

## VIII.  EVENTS FOLLOWING THE REVELATION OF TRUTH ABOUT THE CUMBERLAND FACILITY

237.    On June 24, 2022, the Company announced that Harkness, the Company's Chief Operating Officer, Research Models & Services, would be retiring from the Company, effective

on September 30, 2022.  Prior to Inotiv's acquisition of Envigo, Harkness had served as Chief Operating Officer of Envigo.  During the due diligence process prior to the acquisition, Harkness participated in a meeting with Defendants Leasure and Sagartz in New York to provide a "corporate overview" of Envigo that covered multiple aspects of Envigo's business, including assets, strategy, operations, financial position, marketing and business development, and commercial agreements.  Harkness also participated in the Due Diligence Tour with Defendants Leasure, Sagartz, and Wilbourn.  Harkness had also stated, in connection with the OBRC acquisition, that the company "believe[s] the acquisition of OBRC's Alice, Texas, facility, and its proximity to our existing facility, will accelerate growth, provide scale, and ensure that client needs are met with the highest level of animal welfare."

238.    On July 14, 2022, the Company and the DOJ filed a settlement agreement, in the form of a proposed Consent Decree, in the DOJ Action (the "DOJ Settlement").  As part of the DOJ Settlement, Envigo agreed to "permanently refrain from any activity requiring an AWA license" at the Cumberland Facility.  The parties to the DOJ Settlement also filed a proposed Transfer Plan that would provide for the safe, humane, and efficient transfer of the approximately 4,000 beagles that remained housed at the Cumberland Facility that would be coordinated by the Humane Society of the United States.

239.    On July 15, 2022, Judge Moon of the Western District of Virginia approved of the DOJ Settlement and entered the Consent Decree.  Under the terms of the Transfer Plan approved by the court upon entry of the Consent Decree, the approximately 4,000 beagles remaining at the Cumberland Facility were transferred from the facility and put up for adoption.  According to an October 17, 2022 article published in the Washington Post, the scope of the animal rescue operation was unprecedented, with a HSUS representative quoted as saying: "[t]here's been

nothing, ever like this.  Just the sheer volume of dogs, or really any animal."  *See* Lizzie Johnson, *Profit, pain and puppies: Inside the rescue of nearly 4,000 beagles* (Oct. 17, 2022), https://www.washingtonpost.com/dc-md-va/2022/10/17/beagles-envigo-rescue-humane-society/ (last visited Nov. 14, 2022).

240.    In addition to the ongoing federal criminal investigation into the importation of non-human primates, animal welfare activists continued to investigate issues surrounding this business—including the Company's importation of primates for research purposes—and put pressure on federal officials to act.  On September 21, 2022, PETA issued a press release on its website, "Beagle Abuser Illegally Imported 1,000+ Monkeys on Unlicensed Airlines, PETA Uncovers."  According to PETA, which has been investigating the circumstances in which primates are imported for use in research, PETA uncovered evidence that, "within the past month a monkey importer owned by laboratory supplier Inotiv—the same company that owns Envigo and its notorious beagle-breeding facility, which is being closed down—has transported more than 1,000 endangered monkeys into the U.S. on two airlines that weren't registered with the [USDA] in apparent violation of the [AWA]."  This included a September 1, 2022 flight in which "hundreds of long-tailed macaques" were flown from Asia to Houston and a previous flight on August 9, 2022 that "imported nearly 1,000 monkeys for a second Inotiv-owned facility in Texas."  PETA urged the USDA to "revoke Inotiv's monkey-breeding licenses."  As a PETA senior vice president stated, "Inotiv couldn't take care of the beagles it bred and sold to laboratories, so it's no surprise that the company apparently paid airlines that were illegally transporting monkeys."

241.    On November 17, 2022, before the market opened, the Company revealed to investors that key employees of its principal supplier of non-human primates had been indicted on multiple felony counts in connection with their involvement in an international primate smuggling

ring.  As stated in the November 17, 2022 8-K, on November 16, 2022, the Company "became aware that the U.S. Attorney's Office for the Southern District of Florida ('USAO-SDFL') has criminally charged employees of the Company's principal supplier of non-human primates ('NHPs'), along with two Cambodian officials, with conspiring to illegally import NHPs into the United States from December 2017 through January 2022 and in connection with seven specific imports between July 2018 and December 2021."  This announcement followed the November 16, 2022 unsealing of documents in the Federal Criminal Matter, including an indictment and superseding indictment that refer to a corporate participant in the primate smuggling ring, "Unindicted Co-Conspirator 2," which, as alleged herein, likely refers to OBRC.

## IX.    ADDITIONAL ALLEGATIONS OF SCIENTER—FOR PURPOSES OF LEAD PLAINTIFF'S SECTION 10(b) AND RELATED SECTION 20(a) CLAIMS ONLY

242.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and/or knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the ongoing AWA violations at the Cumberland Facility and the existence of criminal subpoenas to Envigo and OBRC in connection with the importation of non-human primates, knew or recklessly disregarded that, contrary to Inotiv's representations to the investing public, Envigo's animal welfare practices, compliance with applicable regulations, and/or the risk to the Company's principal source of non-human primates put the Company at risk of financial and reputational harm.

243.    As alleged herein, Defendants Leasure, Sagartz, and Wilbourn participated in the Due Diligence Tour, personally visiting Envigo's U.S. facilities including the Cumberland Facility and the Alice, Texas primate facility.  According to the Proxy, between July 20, 2021 and August 20, 2021, Leasure and Sagartz "visited Envigo locations in Missouri, Virginia, Maryland, Pennsylvania, Texas, San Francisco, Indiana, Wisconsin, The Netherlands and England" during the "initial" phase of the Due Diligence Tour.  Moreover, as noted by CW1, Inotiv representatives visited all of Envigo's facilities during the due diligence process.  CW1 confirms that Defendants Leasure and Sagartz visited the Alice, Texas primate facility, and CW2 describes how Defendant Leasure was an active participant who asked questions during the Due Diligence Tour.  Defendant Wilbourn, who then served as Envigo's Vice President of North American Operations, was present at the visits made by Inotiv personnel or otherwise knew of the conditions at Envigo's facilities at the time of the due diligence process and during the Class Period.  As described in the USDA reports of inspections of the Cumberland Facility prior to and during the Class Period, the declarations of individuals who participated in the execution of the federal search warrant between May 18-20, 2022, and CW1, the overcrowded and filthy conditions at the Cumberland Facility would have been impossible to miss.  Defendants Leasure, Sagartz, and Wilbourn therefore knew, or were reckless in not knowing, of facts concerning the serious AWA violations at the Cumberland Facility that were concealed from investors during the Class Period.  Similarly, Defendants Leasure, Sagartz, and Wilbourn would have been apprised of the existence of a grand jury subpoena concerning the importation of non-human primates—and Envigo's efforts to produce documents in compliance with that subpoena—in connection with a visit to the Alice, Texas, primate facility or otherwise during the due diligence process.  Also, Defendant Leasure (if not other Defendants) would have been apprised of the existence of a grand jury subpoena to

OBRC concerning the importation of non-human primates through the process of acquiring OBRC and entering into the Tucker Assignment, including but not limited to Leasure's attendance at the "leadership meeting" and dinner prior to the announcement of the OBRC acquisition, as described by CW1.

244.    A strong inference of scienter is also established by the fact that the misconduct alleged herein related to Envigo's and Inotiv's core business operations, including but not limited to the production or importation of research animals.  The Company's RMS segment—which comprises the Envigo businesses acquired by the Company—accounts for approximately three quarters of the Company's revenues.  Thus, the RMS segment's business was of crucial importance to the Company and facts concerning those critical operations would have been known to Inotiv's executive officers, including Defendants Leasure, Taylor, and Sagartz.

245.    The importance of operations at the Cumberland Facility to Inotiv was further demonstrated by matters addressed in the Declaration of Defendant Sagartz submitted in opposition to the DOJ's motion for preliminary injunction on June 13, 2022.  These facts included, but are not limited to, the fact that the Cumberland Facility historically "has produced up to 25 percent of the beagle dogs used domestically in the development of new medicines."  According to Sagartz, the use of "purpose-bred beagle dogs" produced at the Cumberland Facility was "essential for biomedical research and the development of lifesaving drugs and medical devices," and was specifically "instrumental to evaluating the efficacy and safety of novel medicines, including those designed to treat various cancers and autoimmune disorders amongst other conditions."

246.    In addition, as alleged herein, Defendants Leasure, Taylor, and Sagartz represented the Company during investor conference calls and were therefore held out as being knowledgeable

sources of information regarding the Company and its operations, including the matters alleged to have comprised the misrepresentations and omissions alleged herein.

247.    On June 24, 2022, the Company abruptly announced that Harkness, the Chief Operating Officer of the RMS segment that is comprised of the acquired Envigo businesses (including the Cumberland Facility and the Alice, Texas primate facility) and OBRC, would be retiring effective September 30, 2022.    According to his profile on the professional social networking site LinkedIn, Harkness received his undergraduate degree in 1988 and therefore likely is in his mid-50s.  Prior to Inotiv's acquisition of Envigo, Harkness had served as Chief Operating Officer of Envigo and participated in the due diligence process prior to the Inotiv acquisition. Harkness also had touted the OBRC acquisition in Company's January 27 Press Release.

248.    After Inotiv acquired Envigo and continuing throughout the Class Period, Defendants continued to use the name Envigo for certain of the Company's facilities and operations.  Among other things, the Company continued to maintain the USDA registration for the Cumberland Facility under Envigo's name, issued public statements regarding the Cumberland Facility under the Envigo logo, and had Defendant Wilburn testify before the Virginia Senate as a representative of Envigo, not Inotiv.  These actions had the effect of helping to conceal the ongoing AWA violations and other inhumane conditions at the Cumberland Facility from Inotiv's investors.  Among other things, searches for "Inotiv" USDA licenses or inspection reports on the USDA website would not return any results for the Cumberland Facility or the Alice, Texas primate facility, and news alerts set up through an aggregator service (*e.g*., Google News or a subscription service) to notify someone of company news about Inotiv likely would not provide alerts for articles addressing Envigo unless the particular report included a reference to Inotiv.

## X.    VIOLATIONS OF SEC RULES REGARDING DISCLOSURES IN PUBLIC FILINGS

249.    SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings.  In failing to disclose material information about the SEC investigation and related risks, Defendants violated these rules and regulations.

250.    SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

251.    Item 303(b)(2)(ii) of Regulation S-K requires that the MD&A section of a company's periodic filings with the SEC, among other things:

> Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

252.    Section 303(a) provides: "The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.  This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations."

253.    Item 103(a) of Regulation S-K, 17 C.F.R. § 229.103(a), governing the disclosure of legal proceedings, requires an issuer to disclose in its periodic SEC filings "proceedings known to be contemplated by governmental authorities," as follows:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its

subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

254.    Item 105 of Regulation S-K, 17 C.F.R. § 229.105, which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make [a securities] investment in the registrant or offering speculative or risky." Item 105 requires the issuer to "[e]xplain how each risk affects the registrant or the securities" and requires that the "discussion must be organized logically with relevant headings and each risk factor should be set forth under a subcaption that adequately describes the risk." Item 1A to Part I of the General Instruction instructs issuers about disclosing the risk factors in Forms 10-K, while Item 1A to Part II, which apply to Forms 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§ 249.310) in response to Items 1A. to Part [I] of Form 10-K."

255.    Defendants violated the affirmative disclosure duties imposed by Items 303, 103, and 105 by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (a) that, on June 15, 2021, Envigo had received a grand jury subpoena in connection with an ongoing criminal investigation into the importation of non-human primates; (b) that, as a result of the federal criminal investigation, Inotiv was exposed to risks and/or uncertainty that the investigation could result in federal law enforcement or other regulatory bodies taking criminal or civil actions that could result in significant costs and expenses, including potential sanctions, penalties or reputational damage to the Company; (c) that USDA inspectors had found serious and ongoing violations of the AWA and animal welfare regulations at the Cumberland Facility that had not been remedied sufficiently; (d) that, as a result of the USDA finding those serious and ongoing violations, Inotiv was exposed

to risks and/or other uncertainty that the USDA inspection process was likely to result in law enforcement bodies taking criminal or civil actions that could result in significant costs and expenses, including potential sanctions, penalties, and reputational damage to the Company; and (e) that the criminal investigation and USDA proceedings at the Cumberland Facility could adversely affect the Company's financial results. It was not until February 16, 2022 that the Company disclosed the June 2021 subpoena to Envigo in the criminal primate investigation and the USDA's intent "to conduct a formal investigation" of the Cumberland Facility, not until May 16, 2022 that the Company disclosed the OBRC subpoena in the criminal primate investigation, not until May 20, 2022 that the Company acknowledged the severity of violations at the Cumberland Facility that resulted in a raid on the Cumberland Facility and the May 21, 2022 entry of a temporary restraining order, and the potential harm resulting therefrom, including penalties, costs, and reputational injury, and not until November 17, 2022 that the Company disclosed that "employees of the Company's principal supplier of non-human primates" had been indicted in the Federal Criminal Matter, which further revealed that the Company, through OBRC, was an unindicted co-conspirator in connection with the criminal conduct alleged in the Federal Criminal Matter. The failure to disclosure this material information, therefore, violated the disclosure obligations imposed by Items 303, 103, and 105. Defendants falsely led investors to believe that the Company was not exposed to any risk other than those already disclosed.

## XI.   LOSS CAUSATION AND ECONOMIC LOSS

256.   During the Class Period, Defendants deceived the market and engaged in a course of conduct that artificially inflated the price of Inotiv's stock and operated as a fraud or deceit on the acquirers of the Company's stock. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. Throughout the Class Period, the market price of Inotiv's stock was artificially inflated as a direct result of

Defendants' materially false and misleading statements and material omissions. Those statements were materially false and misleading because, as alleged herein, they failed to disclose a number of material issues, including Envigo's serious noncompliance with the AWA and applicable regulations at the Cumberland Facility and Envigo's and OBRC's receipt of criminal subpoenas in connection with an ongoing federal investigation concerning the importation of non-human primates that focused on (among others) "the Company's principal supplier of non-human primates." As a result, Lead Plaintiff and other members of the Class purchased Inotiv stock at artificially inflated prices, causing them to suffer the damages complained of herein.

257.    In addition, Defendants made false and misleading statements and omissions in the proxy materials, as detailed herein. The proxy materials were an essential link in the acquisition of Envigo by Inotiv. The proxy materials were rendered false and misleading by their statements and omissions concerning, *inter alia*, the quality of Envigo's animals, focus on animal welfare, and the due diligence review of Envigo while failing to disclose the flagrant legal and regulatory violations at Envigo revealed to Defendants through the Due Diligence Tour. Defendants' false and misleading statements and omissions induced proxy voters to approve matters necessary for the acquisition of Envigo.

258.    As detailed above, as the truth of the matters Defendants concealed from Inotiv's investors was revealed, the price of the Company's stock declined as the prior artificial inflation came out of the stock price. The decline in Inotiv's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants'

fraudulent conduct. The economic loss, *i.e.*, damages, suffered by the Lead Plaintiff and other Class members was a direct result of Defendants' fraudulent conduct, including Defendants' concealment of serious noncompliance with the AWA and applicable regulations at the Cumberland Facility and Envigo's and OBRC's receipt of criminal subpoenas in connection with an ongoing federal investigation concerning the importation of non-human primates that focused on (among others) "the Company's principal supplier of non-human primates," the resulting artificial inflation of the Company's stock price, and the subsequent significant decline in the value of the Company's stock when the Defendants' prior misrepresentations, omissions, and other fraudulent conduct was revealed.

259.    Defendants' misconduct was revealed to the market in a series of partial corrective disclosures. Each disclosure only partially revealed the truth regarding the Cumberland Facility and criminal subpoena in the federal primate investigation, and Defendants continued to misrepresent and/or conceal the truth regarding those matters Envigo until the end of the Class Period.

260.    On November 15, 2021, the USDA posted the reports from the July 2021 Inspection on its website. After those reports were made available, PETA issued a press release on its website that included links to copies of the two July 2021 Inspection reports and described the findings therein, which prompted press coverage of the Cumberland Facility. In response to this news, which only partially revealed Defendants' fraud through disclosure of the USDA's documented concerns about conditions at the Cumberland Facility from the July 2021 Inspection that the Company had been given an opportunity to cure, the price of the Company's stock fell by $2.80 per share, a decline of 5.04%, to close at $52.75 per share.

261.     On February 16, 2022, Inotiv filed its quarterly report on Form 10-Q for the period ending December 31, 2021 (the "Q1 2022 10-Q").  In the Q1 2022 10-Q, the Company disclosed, for the first time, two material matters involving Envigo under the heading, "Government Investigations."  First, Inotiv stated that, during the period from July through December 2021, the USDA had inspected "one of Envigo's U.S. facilities" on several occasions—referring to but not specifying the Cumberland Facility—and "issued inspection reports with findings of non-compliance."  While the Company stated that it had appealed certain (but not all) of those findings of noncompliance, it also revealed that the "USDA has indicated [that] it intends to conduct a formal investigation" that "could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation."  Second, the Company disclosed that eight months earlier, on June 15, 2021, Envigo received a grand jury subpoena issued by the DOJ "requiring the production of documents related to the importation into the United States of live non-human primates" from Asia and that the Company was "cooperating with the Department of Justice."  On this news, the price of the Company's stock fell by $4.73 per share, a decline of 16.7%, to close at $23.59 per share, on high trading volume.  As the market continued to absorb this news, the price of Inotiv's stock continued to fall, declining by another $3.30 per share, or nearly 14%, to close at $20.29 per share on February 17, 2022, with Bloomberg News reporting, in a February 17, 2022 article entitled, "Inotiv Extends Drop After Reporting Subpoena for Primate Imports," that the two-day stock price decline was attributed, in part, to the Company's "disclos[ure] that [a] recently bought unit received a grand jury subpoena from Miami prosecutors investigating imports of primates from Asia."  Moreover, an analyst report published on February 17, 2022 by research analyst Frank Takkinen of Lake Street Capital Markets ("Lake Street") attributed Inotiv's stock price decline to

114

factors that included "new risks added to the 10-Q related to one of Envigo's research model facilities [the Cumberland Facility] being non-compliant" and "a DOJ investigation of NHP suppliers." The Lake Street report indicates that the Company was downplaying the significance of the USDA's findings at the Cumberland Facility and overstating the Company's response, noting that, "[i]n speaking with management, the center at risk is a small, non-core center producing minimal revenue (single digit millions) and is not profitable. We expect the needed changes have been made (or are in process) and the facility will regain compliance in the near-term." With respect to the Company's announcement of the grand jury subpoena, while Lake Street suggested that it may have been part of a broader inquiry, it "hesitate[d] to draw any conclusions" and acknowledged that the news could "carry negative repercussions" for the Company even if, per Lake Street's speculation, it was unlikely for the government to "significantly disrupt[] a 50% supplier of preclinical scientific research models."

262.    On May 20, 2022, after markets closed, the Company announced that, *inter alia*: (a) on May 18, 2022, the DOJ and other federal and state law enforcement agencies executed a search and seizure warrant (approved by the U.S. District Court for the Western District of Virginia on May 13, 2022) at the Cumberland Facility; and (b) on May 19, 2022, the DOJ filed a civil complaint against Envigo in the U.S. District Court for the Western District of Virginia alleging violations of the Animal Welfare Act at the Cumberland Facility. The Company's announcement also stated that the Company was "in the process of reviewing the matters set forth in the complaint and at this time cannot reasonably estimate the associated costs." Then, on Saturday, May 21, 2022, Judge Moon of the U.S. District Court for the Western District of Virginia issued the Amended TRO concluding, *inter alia*, that "the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act and that an

immediate temporary restraining order must issue to put a halt to such violations" and that "Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meets its obligations under AWA's implementing regulations to provide adequate veterinary care."   In response to this news, the price of the Company's stock fell by $5.19 per share, a decline of 28.3%, to close at $13.14 per share on May 23, 2022, the next trading day, on very high trading volume.

263.   On June 13, 2022, after markets closed, the Company issued a press release announcing that it would be closing two Envigo facilities in Virginia, including the Cumberland Facility.   In the press release, Defendant Leasure acknowledged the longstanding problems at the Cumberland Facility and stated that the Company had decided to close the facility rather than make "[t]he required investments to improve the facility."   On June 14, 2022, before the market opened, securities analyst Frank Takkinen of Lake Street issued a report stating that it had lowered its price target for Inotiv stock from $75 per share to $50 per share, parroting the Company's announcements of the night before and stating that the Company's decision "should be well-received by investors" in part due to the "recently increased" costs of the investments needed to bring the Cumberland Facility into compliance.   On this news, Inotiv's stock price declined by $0.25 per share, a decline of 1.92%, to close at $12.78 per share.

264.   On November 17, 2022, before the market opened, Inotiv filed a Form 8-K with the SEC announcing that, "[o]n November 16, 2022, Inotiv, Inc. (the "Company") became aware that the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL") has criminally charged employees of the Company's principal supplier of non-human primates ("NHPs"), along with two Cambodian officials, with conspiring to illegally import NHPs into the United States from December 2017 through January 2022 and in connection with seven specific imports between July 2018 and December 2021."   The 8-K further noted the June 2021 subpoenas to Envigo and

OBRC that had previously been disclosed and further claimed that "[t]he Company has been fully cooperating, and will continue to cooperate, with USAO-SDFL."  On this news, the price of Inotiv's stock plummeted by nearly 57%, closing at $6.82 per share on November 17, 2022, down $9.03 per share from the prior day's closing price of $15.85 per share.  According to news reports available on the financial information service Bloomberg on November 18, 2020, securities analysts expressed grave concern about the Company's business and financial position as a result of the indictments in the Federal Criminal Matter.  Specifically, a story appearing on Bloomberg that was produced by the news service, "The Fly," reported that Lake Street analyst Frank Takkinen ("Takkinen") had downgraded Inotiv from a "buy" to a "hold," reducing Lake Street's price target from $60 per share to just $7.  According to Takkinen, if any of the indicted individuals are found guilty, it could disrupt Inotiv's supply of primates with negative impacts on 2023 financial projections—a potential "worst case scenario" where primate supplies are cut off entirely could call into question Inotiv's ability to service its debt.  Also, Bloomberg reporter Bre Bradham wrote on November 18, 2022 that Inotiv's stock price was continuing to fall after the 57% drop on the previous day, noting that Jefferies analyst David Windley had cut his price target for the Company's stock from $27 to $10 per share due to the fact that "NHPs are a significant driver of growth in NOTV's business, an area of high demand and constrained supply."  Inotiv's stock price continued to fall on November 18, 2022, losing another 15.7% in value to close at $5.75 per share.

## XII.    *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

265.    Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine.  The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

(a)    The Company's stock was actively traded on the NASDAQ;

(b)    The market price of the Company's stock reacted promptly to the dissemination of public information regarding the Company;

(c)    The Company's stock was followed by several financial analysts who issued a total of 64 reports regarding the Company during the Class Period, including those cited herein.  Thus, the Company's stock reflected the effect of information disseminated into the market;

(d)    The average weekly trading volume for the Company's stock during the Class Period was approximately 5.2% of the shares outstanding for the weeks in the Class Period;

(e)    The Company's market capitalization ranged from $1.45 billion (in November 2021) to $303.45 million (in May 2022) during the Class Period and, as of the end of the Class Period, the Company had more than 25.59 million shares outstanding.

266.    Throughout the Class Period, market participants consistently followed the Company, including securities analysts and the business press.  The market relied on the Company's public statements to accurately present the Company's performance, prospects, and compliance with applicable federal laws.  During this period, the Defendants continued to pump materially false information into the marketplace regarding the Envigo acquisition, including but not limited to failure to disclose material information regarding the serious animal welfare violations at the Cumberland Facility and the existence of a grand jury subpoenas to Envigo and OBRC regarding the importation of non-human primates that focused on (among others) "the Company's principal supplier of non-human primates."  Analysts promptly reviewed and analyzed this information and assimilated the information into the price of the Company's securities.

267.    As a result of Defendants' misconduct (including the misstatements and omissions), the market price for Inotiv common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied on the misrepresentations and omissions for which Defendants are each responsible.

268.    Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Inotiv common stock at artificially inflated prices and the subsequent decline in the price of those securities when, *inter alia*: (a) the grand jury subpoena to Envigo regarding the importation of non-human primates; (b) the serious animal welfare violations at the Cumberland Facility; and (c) the fact that OBRC was an unindicted co-conspirator in a criminal matter in which six executives and employees from "the Company's principal supplier of non-human primates" were indicted were disclosed.

269.    Lead Plaintiff and other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated on omissions of material fact which there was a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding the serious noncompliance with the AWA and applicable regulations at the Cumberland Facility and Envigo's receipt of a criminal subpoena in connection with an ongoing federal investigation concerning the importation of non-human primates, which was material information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

270. Had Lead Plaintiff and other members of the Class known of the material adverse information regarding (a) the serious noncompliance with the AWA and applicable regulations at the Cumberland Facility and (b) Envigo's and OBRC's receipt of criminal subpoenas in connection with an ongoing federal investigation concerning the importation of non-human primates that focused on (among others) the "the Company's principal supplier of non-human primates," that had not been disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased Inotiv common stock at artificially inflated prices.

## XIII.  NO SAFE HARBOR

271. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. None of the specific statements alleged herein are forward looking.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made.

272. To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Moreover, to the extent that the statutory safe harbor does apply to any forward-looking statement, these statements were actionable because, at the time any forward-looking statement was made, the particular speaker knew that the particular forward-looking statement was false or misleading or the forward-looking statement was authorized or approved by an executive officer of Inotiv who knew that those statements were false or misleading when made.

## XIV.  CLASS ACTION ALLEGATIONS

273. Lead Plaintiff brings this action as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who (a) purchased or otherwise acquired Inotiv stock during the Class Period and were damaged

thereby or (b) held Inotiv shares as of the record date of October 4, 2021 and were entitled to vote on the resolutions necessary to effectuate the acquisition of Envigo at the November 4, 2021 special meeting of Inotiv shareholders (the "Class"). Excluded from the Class are: (a) Defendants; (b) members of the immediate families of the Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director, or controlling person of Inotiv; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

274.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members of the Class at a minimum. Indeed, on June 30, 2021, right before the start of the Class Period, Inotiv had more than 15.91 million shares of common stock outstanding. As of April 26, 2022, Inotiv had more than 25.51 million shares of common stock outstanding.

275.   Members of the Class may be identified from records maintained by Inotiv or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

276.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.

277.   Lead Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

278.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

279.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relativity small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

280.    Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Inotiv securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

281.    Lead Plaintiff and the putative Class are also entitled to the *Affiliated Ute* presumption of reliance due to the Defendants' material omissions as alleged above, which information Lead Plaintiff would have wanted to know and which would have caused investors to have avoided purchasing shares of Inotiv common stock at the prices they traded at during the Class Period.

282.    Defendants failed to disclose the true nature of the conditions within the Company, including at the Cumberland Facility that failed to meet AWA requirements as determined by USDA inspectors, as well as Envigo's receipt of a criminal subpoena in June 2021 concerning an ongoing federal criminal investigation into the importation of non-human primates, and the material risks of those matters, throughout the Class Period. In fact, Defendants took steps to

conceal these matters, including when they provided direct responses to the release of information concerning the July 2021 Inspection, continued to publish the Cumberland Fact Sheet and the Primate Fact Sheet, and continued to use the name Envigo instead of Inotiv after the acquisition when providing public statements about the Cumberland Facility.

## XV.    CLAIMS BROUGHT PURSUANT TO SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

283.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  During the Class Period, Defendants disseminated or approved the false and misleading statements and material omissions set forth above and summarized below, which they knew of recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Defendants acted with scienter in making materially false and misleading statements and concealing from investors the truth regarding, *inter alia*, the extensive and ongoing findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility, the June 2021 subpoenas to Envigo and OBRC in the ongoing federal investigation into the importation of non-human primates, the fact that OBRC was participating as a co-conspirator with individuals and entities engaged in the illegal smuggling of primates from Asia, and that the Company's "principal supplier of non-human primates" was also a subject of the ongoing federal criminal investigation into the unlawful importation of non-human primates, threatening the Company's access to these critically important research models.

284.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances in which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and members of the Class in connection with their purchases or acquisitions of Inotiv stock during the Class Period. As detailed herein, Defendants' public statements included, but were not limited to, false and misleading representations and omissions regarding the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates.

285.    Defendants acted individually and in concert, directly and indirectly, by use or means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit on Lead Plaintiff and members of the Class; made various false and/or misleading statements of material facts and omitted to state material facts that were required to be disclosed; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and members of the Class, regarding, among other things, events that had materially adverse effects on the Company's business including but not limited to the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates; (b) artificially inflate, distort, and/or maintain the market price of Inotiv common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Inotiv common stock during the Class Period at artificially inflated and/or distorted prices.

286.    As described above, Defendants had a duty to disclose adverse facts regarding Envigo, including *inter alia*, the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates at the time the Envigo acquisition was announced, when the Proxy was filed, before the shareholder vote and the merger closed, and throughout the Class Period.

287.    Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false and misleading as a result of intervening events including but not limited to following multiple USDA inspections of the Cumberland Facility that continued to find serious and recurring violations of the AWA and related regulations that led to a governmental raid to execute a search and seizure warrant at the Cumberland Facility and the ultimate closure of the Cumberland Facility.

288.    Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in or were made during: (a) the September 21 Call, September 21 Investor Presentation, and Merger Agreement; (b) the Proxy; (c) November 5 Press Release; (d) the Cumberland Fact Sheet; (e) the Primate Fact Sheets; (f) the November 11 Statement; (g) the November 16 Statement; (h) the Jefferies Conference; (i) the January 27 Press Release; (j) the Virginia Senate Hearing; (k) the Q1 2022 Form 10-Q; (l) the Q2 2022 Call; (m) the Q2 2022 10-Q; (n) the Q3 2022 Call; and (o) the Q2 2022 10-Q. These statements were materially false and misleading and/or omitted material information

because, among other things, they failed to disclose the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates. They also failed to correct and update prior misrepresentations and omissions that had become misleading by intervening events.

289.     As described above, Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them. Specifically, Defendants Leasure, Sagartz, and Wilbourn knew or were reckless in not knowing of the extensive findings of regulatory noncompliance and inhumane treatment of beagles at the Cumberland Facility during USDA inspections of the Cumberland Facility and the risk that Envigo would become enmeshed in an ongoing federal criminal investigation into the importation of non-human primates based on, *inter alia*, their participation in the due diligence process and Due Diligence Tour. Defendant Taylor knew or was reckless in not knowing of these matters based on her position within the Company and as otherwise alleged herein.

290.     As a result of Defendants' conduct, the price of Inotiv stock was artificially inflated during the Class Period.

291.     Lead Plaintiff and members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Inotiv stock. Lead Plaintiff and members of the Class would not have purchased or otherwise acquired Inotiv stock at the prices they paid, or at all, if they had been aware that the market price had been artificially

and falsely inflated by Defendants' materially false and misleading statements and/or omissions of material facts.

292.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their purchases or acquisitions of Inotiv stock during the Class Period.

**COUNT I**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

293.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

294.   This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants.

295.   Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

296.   Defendants made materially false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

297.   Defendants made materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Inotiv securities during the Class Period.

298.    Defendants intended to and did, as alleged herein, (a) deceive the investing public, including Lead Plaintiff and members of the Class; (b) artificially inflate and maintain the price of Inotiv's stock; and (c) cause Lead Plaintiff and members of the Class to purchase Inotiv stock at greater prices than they would have absent the artificial inflation.

299.    Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

300.    In ignorance of the materially false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or omissions or upon the integrity of the market price for Inotiv's stock, Lead Plaintiff and other members of the Class purchased Inotiv stock at artificially inflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have sold Inotiv stock at such artificially inflated prices. By selling Inotiv stock at these artificially inflated and artificially maintained prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

301.    By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against Defendants Leasure and Taylor)

302.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

303.    As alleged above, Inotiv violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of Inotiv stock.

304.    Defendants Leasure and Taylor acted as controlling persons of Inotiv within the meaning of Section 20(a) of the Exchange Act as alleged herein.

305.    By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, intimate knowledge of the Company's actual performance, and their power to control public statements about Inotiv, Defendants Leasure and Taylor had the power and ability to control the actions of Inotiv and its employees.

306.    By reason of this conduct, and by virtue of their position as control persons, Defendants Leasure and Taylor are liable under Section 20(a) of the Exchange Act.

## XVI.    CLAIMS BROUGHT PURSUANT TO SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

307.    The claims in Counts III and IV below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims").  The Proxy Claims are brought on behalf of investors who held Inotiv stock on the Record Date of November 4, 2021 and were entitled to vote on matters necessary to effectuate the acquisition of Envigo.  The Proxy Claims are based solely on negligence.  They are not based on any knowing or reckless conduct by or on behalf of Defendants,

and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness with respect to the allegations supporting these non-fraud claims.

308.    The basis of the Proxy Claims is that Defendants' statements issued to solicit shareholder approval of matters necessary to effectuate the acquisition of Envigo, including the Proxy and documents incorporated into the Proxy contained misstatements and/or omissions of material facts.

309.    Defendants' proxy solicitations included all statements which served to color the market's view of the Envigo acquisition and encourage Inotiv shareholders to vote in favor of the matters necessary to effectuate the acquisition.   These statements included the following (collectively, the "Proxy Solicitations"): (a) the September 21 Investor Presentation, set forth above at ¶¶ 156-163 ; (b) the Merger Agreement, set forth above at ¶ 164 ; and the Proxy, set forth above at ¶¶ 167-174.

310.    All of the Proxy Solicitations were materially false and misleading.

311.    Specifically, the Proxy Solicitations failed to disclose and/or misrepresented that the following highly material information prior to the shareholder vote on November 4, 2021:

a.    The USDA had found multiple "Direct" and "Critical" violations of the AWA evidencing the inhumane treatment of beagles housed at the Cumberland Facility during the July 2021 Inspection, set forth above at ¶¶ 61-69.

b.    Upon returning the Cumberland Facility to conduct a focused inspection during the October 2021 Inspection, USDA inspectors continued to find serious and recurring AWA violations, set forth above at ¶¶ 70-75; and

c.   Envigo had received and was producing documents in response to a grand jury subpoena received in June 2021 in connection with an ongoing federal criminal investigation into the importation of non-human primates from Asia.

d.   The highly material information that was withheld from Inotiv shareholders was never publicly disclosed to Inotiv shareholders before the November 4, 2021 vote on matters to effectuate the acquisition of Envigo.  This information was material to investors because, among other reasons: (a) if the merger would be approved, Envigo and its RMS business would account for approximately three-quarters of the combined company's revenues; (b) large animal models, including beagles and non-human primates, accounted for approximately 47% of Envigo's revenues; (c) beagles are a preferred breed of canine for research purposes for Inotiv and other potential CRO customers; (d) Envigo supplied approximately 25% of research beagles to the market; (e) non-human primates are critical research models that were in short supply and in high demand; and (f) access to a supply of non-human primates and other large research models was among the primary justifications for Inotiv's acquisition of Envigo.

312.   Moreover, Defendants were under a continuing duty to update and/or correct these material omissions by disclosing the relevant facts, as well as to update and/or correct any false or misleading statements regarding Envigo that they made in the Proxy Solicitations.  In violation of these duties, Defendants never disclosed any of the omitted facts before the shareholder vote.

313.   The false statements and omissions as set forth above proximately caused foreseeable losses to Lead Plaintiff and members of the Class, as the risks concealed by these false and misleading statements and omissions were revealed through a series of partial corrective disclosures, causing Inotiv stock to fall from $55.55 per share at the close of trading on November

12, 2021, the last trading day preceding the first partial corrective disclosure, to a closing price of $12.78 per share on June 14, 2022, as set forth more fully above at ¶¶ 256-264.

## COUNT III
### Violations of Section 14(a) of the Exchange Act
### (Against Defendants Inotiv, Leasure, and Taylor)

314.     Lead Plaintiff repeats and realleges the allegations in ¶¶ 1-159 , 165-166, 169-179, 238-240, 249-255, and 257-282, as if fully set forth herein.  For the purposes of this Section 14(a) claim, Plaintiffs do not allege that any Defendant acted with fraudulent intent.  This Count is predicated upon the negligence of Defendants Inotiv, Leasure, and Taylor in connection with soliciting Inotiv shareholders' approval of matters required to be approved in order to effectuate the Envigo acquisition.

315.     Defendants Inotiv, Leasure, and Taylor prepared, reviewed, and/or disseminated the false and misleading Proxy which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

316.     As stated herein, and in particular in ¶¶ 162-169 and 172-176, the Proxy and certain documents incorporated by reference therein contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and the Proxy was an essential link in the consummation of the Envigo acquisition.

317.     The written communications made by Defendants Inotiv, Leasure, and Taylor described herein constitute violations of Rule 14a-9 and Section 14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

318.     As a direct result of Defendants Inotiv's, Leasure's, and Taylor's negligent preparation, review, and/or dissemination of the false and/or misleading Proxy, members of the

Class were deprived of their right to be presented with accurate proxy materials while asked to vote on matters necessary to effectuate the Envigo acquisition, were caused to vote in favor of the matters necessary to effectuate the Envigo acquisition, and were caused to approve the acquisition of Envigo for more than the true value of Envigo.

319.    At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants Inotiv, Leasure, and Taylor were aware of and/or had access to the true facts concerning the process involved in acquiring Envigo and Envigo's true value.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy that Defendants Inotiv, Leasure, and Taylor used to obtain shareholder approval of and thereby consummate the Envigo acquisition, Lead Plaintiffs and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the value Inotiv shareholders received and Envigo's true value at the time of the acquisition) in an amount to be determined at trial.

320.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Envigo acquisition. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

321.    By reason of the misconduct detailed herein, the Defendants Inotiv, Leasure, and Taylor are liable under Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT IV
### Violations of Section 20(a) of the Exchange Act
### (Against Defendants Leasure and Taylor)

322.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

323.    As alleged above, Defendants Leasure and Taylor violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with soliciting the approval of Inotiv's shareholders for the Envigo acquisition.

324.    Defendants Leasure and Taylor acted as controlling persons of Inotiv within the meaning of Section 20(a) of the Exchange Act as alleged herein.

325.    By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, intimate knowledge of the Company's actual performance, and their power to control public statements about Inotiv, Defendants Leasure and Taylor had the power and ability to control the actions of Inotiv and its employees.

326.    By reason of this conduct, and by virtue of their position as control persons, Defendants Leasure and Taylor are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment as follows:

     a.    Determining that this action is a proper class action, certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's Counsel as Class Counsel;

     b.    Awarding compensatory damages and any other available damages and/or remedies in favor of Lead Plaintiff and other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

c.  Awarding Lead Plaintiff and the Class their reasonable fees, costs, and expenses incurred in this action, including counsel fees and expert fees; and

d.  Awarding such other and further relief as the Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands a trial by jury.

DATED: November 23, 2022                **BERMAN TABACCO**

*/s/ Steven J. Buttacavoli*
Patrick T. Egan (*pro hac vice*)
Steven J. Buttacavoli (*pro hac vice*)
Christina L. Gregg (*pro hac vice*)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com
         sbuttacavoli@bermantabacco.com
         cgregg@bermantabacco.com

*Counsel for Oklahoma Police Pension and Retirement System and Lead Counsel for the Proposed Class*

and

**COHEN & MALAD, LLP**
Scott D. Gilchrist, No. 16720-53
Richard E. Shevitz, No. 12007-49
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 214-0321
Facsimile: (317) 636-2593
Email: sgilchrist@cohenandmalad.com
         rshevitz@cohenandmalad.com

*Liaison Counsel for the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 23rd day of November, 2022, a true and correct copy of the foregoing document was served on all counsel of record through the Court's CM/ECF system.

Dated: November 23, 2022

*/s/ Steven J. Buttacavoli_____*
Steven J. Buttacavoli
