# **EXHIBIT C**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): September 21, 2021

# INOTIV, INC.

(Exact name of registrant as specified in
its charter)

| Indiana | 0-23357 | 35-1345024 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 2701 KENT AVENUE WEST LAFAYETTE, INDIANA | 47906-1382 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:(765) 463-4527

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act(17CFR240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act(17CFR240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act(17CFR240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbols | Name of exchange on which registered |
|---|---|---|
| Common Shares | NOTV | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

On September 21, 2021, Inotiv, Inc. (the "Company" or "Inotiv") entered into a definitive agreement and plan of merger (the "Merger Agreement") pursuant to which it agreed, subject to certain closing conditions, to acquire Envigo RMS Holding Corp. ("Envigo") by merger of Envigo with a newly formed, wholly owned subsidiary of ours (the "Envigo Acquisition").

Under the terms and conditions of the Merger Agreement, the aggregate consideration to be paid to the holders of outstanding equity interests in Envigo in the merger will consist of cash consideration of $200 million, and 9,365,173 Inotiv common shares, which shares had an aggregate market value of approximately $285.0 million based on the volume weighted average sales price of such shares as traded on the NASDAQ Capital Market calculated for the 20-trading day period ending on September 20, 2021. The mix of cash and stock consideration is subject to adjustment as provided in the Merger Agreement. It is anticipated that, upon completion of the Envigo Acquisition, our current shareholders will own approximately 64% of our outstanding common shares and the former stockholders of Envigo will own, in the aggregate, approximately 36% of our outstanding common shares.

Consummation of the Envigo Acquisition is subject to certain conditions set forth in the Merger Agreement, including the approval of the Merger Agreement and the merger by the Envigo stockholders, certain approvals by our shareholders, as described below, performance by the parties of their material covenants under the Merger Agreement, accuracy of representations and warranties set forth in the Merger Agreement, the absence of a material adverse effect (as defined in the Merger Agreement) with respect to either party, the expiration of applicable waiting periods under applicable antitrust laws, and other customary closing conditions. Because the number of common shares to be issued in the Envigo Acquisition would exceed 20% of our outstanding common shares, NASDAQ Listing Standard 5635(a) requires that we obtain shareholder approval prior to issuing the shares in the merger. In addition, the number of shares to be issued in the Envigo Acquisition would exceed the number of authorized shares we have available for issuance under our articles of incorporation. The Merger Agreement requires us to call a special meeting of our shareholders and to submit to our shareholders at the special meeting proposals to (i) amend our articles of incorporation to increase the number of our authorized shares to an amount that would be sufficient to allow the consummation of the merger and (ii) approve the issuance of the common shares to be issued pursuant to the Merger Agreement. The consummation of the merger is conditioned on the approval of both of these proposals by our shareholders.

The Merger Agreement provides that, at the effective time of the merger, our board of directors will be expanded from five to seven members and will consist of our Chief Executive Officer, our Chief Strategy Officer, two of our existing independent directors, one director designated by each of Jermyn Street Associates LLC and Savanna Holdings LLC (collectively, the "Nominating Holders") and one director nominated by us and approved by the Nominating Holders. After consummation of the merger, if it is consummated, pursuant to the terms of a shareholders agreement among us, the Nominating Holders and certain other Envigo shareholders, each Nominating Holder will have the right to designate a one member of our board and to approve the director who succeeds the mutually approved director (who may be the same mutually approved director) for as long as they continue to hold 5% or more of our outstanding common shares. The parties to the shareholders agreement will also agree to certain voting provisions and restrictions on transfer of the shares they receive in the merger and receive certain registration rights with respect thereto.

The Merger Agreement may be terminated prior to the consummation of the Envigo Acquisition by mutual agreement of the parties, by either party if the other party breaches its obligations under the Merger Agreement, or by either party if the transaction has not been consummated on or prior to the end date set forth in the Merger Agreement (which date is subject to extension as described therein), or any governmental authority has issued an order making the transaction illegal or otherwise prohibiting its consummation.

This description of the Merger Agreement is qualified in its entirety by reference to the terms of the Merger Agreement, the form of which is attached as Exhibit 2.1 to this current report on Form 8-K.

We have received commitments from a group of lenders and from Jefferies LLC to provide $275.0 million of secured and unsecured financing to pay the cash portion of the merger consideration and related transaction expenses and to provide us with additional liquidity following the completion of the Envigo Acquisition. The commitments are subject to certain conditions set forth therein, including the accuracy of certain representations and warranties made by Envigo in the Merger Agreement and to be made by us in the documents governing the financing, the execution of definitive agreements, consummation of the Envigo Acquisition, delivery of customary closing documents and the absence of any material adverse effect (as defined in the Merger Agreement).

**Item 7.01 Regulation FD Disclosure.**

On September 21, 2021, the Company issued a press release announcing the execution of the Envigo Merger Agreement and an investor presentation relating to its acquisition of Envigo, which is posted on the Company's website at www.inotivco.com. Copies of the press release and investor presentation are attached to this Current Report on Form 8-K as Exhibits 99.1 and 99.2, respectively, and are incorporated herein by reference. The information set forth in this Item 7.01 and Exhibits 99.1 and 99.2 shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or incorporated by reference in any filing under the Securities Act or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

(d)   Exhibits

The following exhibits are being filed as part of this report:

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated September 21, 2021 among Inotiv, Inc., an Indiana corporation, certain merger subsidiaries, Envigo RMS Holding Corp. and Shareholder Representative Services LLC |
| 99.1 | Press release dated September 21, 2021 |
| 99.2 | Investor Presentation dated September 21, 2021 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Inotiv, Inc.**

Date: September 21, 2021

By:/s/ Beth A. Taylor
Beth A. Taylor
Chief Financial Officer Vice President – Finance

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

DOLPHIN MERGER SUB, LLC, as Merger Sub LLC,

DOLPHIN MERGECO, INC., as Merger Sub,

INOTIV, INC., as Parent,

ENVIGO RMS HOLDING CORP., as the Company,

AND

SHAREHOLDER REPRESENTATIVE SERVICES LLC, as the Securityholder Representative

Dated September 21, 2021

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Article I. | DEFINITIONS | 2 |
| Article II. | THE MERGERS | 21 |
| Section 2.1. | The Mergers | 21 |
| Section 2.2. | Closing | 21 |
| Section 2.3. | Effective Time and Second Effective Time | 21 |
| Section 2.4. | Effects of the Mergers | 22 |
| Section 2.5. | Organizational Documents | 22 |
| Section 2.6. | Directors and Officers | 23 |
| Article III. | EFFECT OF THE MERGERS ON CAPITAL STOCK; PAYMENTS AT CLOSING | 23 |
| Section 3.1. | Effect of the First Merger on Capital Stock | 23 |
| Section 3.2. | Effect of the Second Merger on Capital Stock | 24 |
| Section 3.3. | Payments at Closing | 24 |
| Section 3.4. | Post-Closing Adjustments | 26 |
| Section 3.5. | Withholding | 29 |
| Section 3.6. | Tax Treatment | 29 |
| Section 3.7. | Dissenting Shares | 29 |
| Section 3.8. | Treatment of Company Options | 30 |
| Section 3.9. | Letter of Transmittal; Procedures for Surrender | 31 |
| Section 3.10. | Lost, Stolen or Destroyed Certificates | 32 |
| Section 3.11. | Paying Agent | 32 |
| Section 3.12. | Expense Fund Amount Deposit | 32 |
| Section 3.13. | Private Placement | 33 |
| Article IV. | REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY GROUP | 33 |
| Section 4.1. | Organization and Good Standing; Ownership of Equity Interests | 33 |
| Section 4.2. | Capitalization | 34 |
| Section 4.3. | Subsidiaries | 34 |
| Section 4.4. | Intellectual Property | 35 |
| Section 4.5. | Material Contracts | 36 |
| Section 4.6. | Title; Equipment; Condition of Fixed Assets | 38 |
| Section 4.7. | Compliance with Legal Requirements | 38 |
| Section 4.8. | Employee Matters | 41 |
| Section 4.9. | Employee Benefits | 42 |
| Section 4.10. | Certain Liabilities | 44 |
| Section 4.11. | Legal Proceedings | 44 |
| Section 4.12. | Authority; Binding Nature of Agreement | 44 |
| Section 4.13. | Non-Contravention; Required Consents | 45 |
| Section 4.14. | Financial Statements | 45 |
| Section 4.15. | Taxes | 46 |

| | | | |
|---|---|---|---|
| Section 4.16. | Permits | | 48 |
| Section 4.17. | Absence of Certain Changes | | 49 |
| Section 4.18. | Real Property | | 49 |
| Section 4.19. | Environmental Matters | | 50 |
| Section 4.20. | Insurance | | 51 |
| Section 4.21. | Transactions with Related Parties | | 51 |
| Section 4.22. | Customers and Suppliers | | 51 |
| Section 4.23. | Privacy and Security | | 52 |
| Section 4.24. | No Brokers or Finders | | 53 |
| Section 4.25. | No Additional Representations and Warranties | | 53 |
| Article V. | REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUBs | | 54 |
| Section 5.1. | Organization; Standing and Power; Organizational Documents | | 54 |
| Section 5.2. | Capital Structure | | 54 |
| Section 5.3. | Authority; Binding Nature of Agreement | | 55 |
| Section 5.4. | Non-Contravention; Consents | | 55 |
| Section 5.5. | SEC Filings | | 56 |
| Section 5.6. | Taxes | | 57 |
| Section 5.7. | No Brokers or Finders | | 58 |
| Section 5.8. | Registration and Listing | | 58 |
| Section 5.9. | Parent Stock | | 58 |
| Section 5.10. | Financing | | 59 |
| Section 5.11. | No Prior Operations of Merger Subs | | 60 |
| Section 5.12. | Additional Representations and Warranties | | 60 |
| Article VI. | COVENANTS OF THE PARTIES | | 60 |
| Section 6.1. | Conduct of the Business of the Company Group Prior to Closing | | 60 |
| Section 6.2. | Conduct of the Business of Parent Prior to Closing | | 63 |
| Section 6.3. | Cooperation; Financial Information | | 64 |
| Section 6.4. | Parent Special Meeting | | 69 |
| Section 6.5. | Directors and Officers of Parent at the Effective Time | | 71 |
| Section 6.6. | Access to Information | | 71 |
| Section 6.7. | Confidentiality | | 72 |
| Section 6.8. | Press Releases | | 73 |
| Section 6.9. | Company No Solicitation | | 73 |
| Section 6.10. | Efforts | | 74 |
| Section 6.11. | Preservation of Records | | 76 |
| Section 6.12. | 280G | | 76 |
| Section 6.13. | [Reserved] | | 77 |
| Section 6.14. | [Termination of Certain Agreements | | 77 |
| Section 6.15. | Stockholder Written Consent; Information Statement | | 77 |
| Section 6.16. | Director and Officer Indemnification and Insurance | | 78 |
| Section 6.17. | Merger Sub and Merger Sub LLC | | 79 |
| Section 6.18. | Employee Benefits | | 80 |
| Section 6.19. | NASDAQ Listing | | 80 |
| Article VII. | TAX MATTERS. | | 80 |
| Section 7.1. | Straddle Period Tax Allocation | | 80 |

| | | |
|---|---|---:|
| Section 7.2. | Tax Refund | 80 |
| Section 7.3. | Transfer Taxes | 81 |
| Section 7.4. | Reorganization Status of the Mergers | 81 |
| Article VIII. | [RESERVED] | 81 |
| Article IX. | CONDITIONS TO CLOSING; CLOSING | 81 |
| Section 9.1. | Conditions to Each Party's Obligation | 81 |
| Section 9.2. | Conditions to Obligations of Parent and Merger Subs | 82 |
| Section 9.3. | Conditions to Obligations of the Company | 82 |
| Section 9.4. | Deliveries by Parent and Merger Subs | 83 |
| Section 9.5. | Deliveries by the Company and Securityholders | 84 |
| Article X. | TERMINATION | 84 |
| Section 10.1. | Termination | 84 |
| Section 10.2. | Procedure Upon Termination | 86 |
| Section 10.3. | Effect of Termination | 86 |
| Article XI. | MISCELLANEOUS | 86 |
| Section 11.1. | Governing Law | 86 |
| Section 11.2. | Jurisdiction; Court Proceedings; Waiver of Jury Trial | 87 |
| Section 11.3. | Notices | 87 |
| Section 11.4. | Assignment | 88 |
| Section 11.5. | No Third-Party Beneficiaries | 89 |
| Section 11.6. | [Reserved] | 89 |
| Section 11.7. | Severability | 89 |
| Section 11.8. | Specific Performance | 89 |
| Section 11.9. | Entire Agreement | 90 |
| Section 11.10. | Waiver | 90 |
| Section 11.11. | Amendments | 90 |
| Section 11.12. | Counterparts | 90 |
| Section 11.13. | Interpretation of Agreement | 90 |
| Section 11.14. | Expenses | 92 |
| Section 11.15. | Securityholder Representative | 92 |
| Section 11.16. | Conflicts of Interest; Privilege | 95 |
| Section 11.17. | No Recourse | 96 |

**AGREEMENT AND PLAN OF MERGER**

THIS AGREEMENT AND PLAN OF MERGER (this "<u>Agreement</u>") is being entered into effective as of September 21, 2021 (the "<u>Effective Date</u>"), by and among Inotiv, Inc., an Indiana corporation ("<u>Parent</u>"), Dolphin MergeCo, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("<u>Merger Sub</u>"), Dolphin Merger Sub, LLC, an Indiana limited liability company and a wholly owned subsidiary of Parent ("<u>Merger Sub LLC</u>" and together with Merger Sub, "<u>Merger Subs</u>"), Envigo RMS Holding Corp., a Delaware corporation (the "<u>Company</u>"), and Shareholder Representative Services LLC, solely in its capacity as the securityholder representative, agent and attorney-in-fact of the Securityholders (the "<u>Securityholder Representative</u>" and together with the Company, the "<u>Company Parties</u>").

**RECITALS:**

WHEREAS, the parties intend for Parent to acquire the Company, on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, in furtherance of such acquisition of the Company by Parent, and on the terms and subject to the conditions set forth in this Agreement and in accordance with the Delaware General Corporation Law (as may be amended from time to time, the "<u>Delaware Law</u>"), Merger Sub shall be merged with and into the Company (the "<u>First Merger</u>"), with the Company surviving the First Merger as a wholly owned subsidiary of Parent, and each outstanding share of the Company Stock will be converted into the right to receive the Per Share Merger Consideration and each In-the-Money Option will be entitled to receive the Company Option Consideration;

WHEREAS, immediately following the First Merger, and on the terms and subject to the conditions set forth in this Agreement and in accordance with the Delaware Law and the Indiana Uniform Business Organization Transactions Act (as may be amended from time to time, the "<u>Indiana Act</u>"), the Company shall be merged with and into Merger Sub LLC (the "<u>Second Merger</u>" and, together with the First Merger, the "<u>Mergers</u>"), with Merger Sub LLC surviving the Second Merger as a wholly owned subsidiary of Parent;

WHEREAS, the Board of Directors of the Company (the "<u>Company Board</u>") has, by resolutions, duly adopted: (a) determined that it is in the best interests of the Company and the holders of shares of the Company Stock, and declared it advisable, to enter into this Agreement with Parent and Merger Subs; (b) approved the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, including the First Merger; and (c) resolved, subject to the terms and conditions set forth in this Agreement, to recommend approval of the First Merger and adoption and approval of this Agreement by the stockholders of the Company;

WHEREAS, the Boards of Directors of Parent (the "<u>Parent Board</u>") and Merger Sub and the Board of Managers of Merger Sub LLC have each: (a) determined that it is in the best interests of Parent, Merger Sub, and Merger Sub LLC, as applicable, and their respective stockholders and sole member, as applicable, and declared it advisable, to enter into this Agreement; and (b) approved the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, including the Mergers;

WHEREAS, for U.S. federal income Tax purposes, the parties intend that the First Merger and Second Merger will, taken together, qualify as a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement be, and is hereby, adopted as a plan of reorganization within the meaning of Section 368(a) of the Code; and WHEREAS, the parties desire to make certain representations, warranties, covenants, and agreements in connection with the Mergers and the other transactions contemplated by this Agreement and also to prescribe certain terms and conditions to the Mergers to provide for the acquisition of the Company Group's business of providing research-quality animals for use in laboratory tests, as well as standard and custom laboratory animal diets and bedding and other associated services, including specialized surgical modifications such as cannulation, implants, and the creation of surgically derived disease state models, contract breeding, contract colony management, health monitoring, quarantine, cryopreservation, rederivation and revitalization services, antibody development and production, as well as various support services, for contract research organizations, biopharmaceutical companies, universities, governments and other research organizations (collectively, the "<u>Business</u>"), and wish to provide for the Mergers and certain related transactions, on the terms and subject to the conditions and other provisions set forth in this Agreement.

Section 3.13.    Private Placement. Parent intends to issue the Parent Stock in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 506 of Regulation D under the Securities Act, or Section 4(a)(2) of the Securities Act, and in reliance on exemptions from the registration or qualification requirements of state securities or "blue sky" laws. Parent will not be required to issue any Parent Common Shares to any Stockholder, and no such Stockholder will be entitled to receive any shares of Parent Stock unless Parent has received a completed Investor Questionnaire in respect of such Stockholder confirming that such Stockholder is an "accredited investor" for the purposes of, and within the meaning of Rule 501(a) of, Regulation D under the Securities Act. Stockholders who are not Company Accredited Investors will be entitled to receive from Parent the portion of the consideration otherwise payable to such holder hereunder in Parent Stock solely in cash in lieu of such Parent Stock which shall be calculated and determined in good-faith by Parent and, prior to Closing, the Company, and after Closing, the Securityholder Representative.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY GROUP

Except as set forth in the Company Disclosure Schedules, the Company hereby represents and warrants to Parent and Merger Subs, as of the date hereof (other than those representations and warranties provided as of a specific date):

Section 4.1.    Organization and Good Standing; Ownership of Equity Interests.

(a)    The Company is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware. The Company has all corporate power and authority, and possesses all governmental licenses, permits, authorizations and approvals, necessary to enable it to own or lease and to operate its properties and assets and carry on the Business as currently and previously conducted, except such power, authority, licenses, permits, authorizations and approvals the absence of which would not have, or would not reasonably be expected to have a Material Adverse Effect. The Company is duly qualified to conduct its business as a foreign entity and is in good standing under the Legal Requirements of the jurisdictions listed on Schedule 4.1 of the Company Disclosure Schedules, which are all of the jurisdictions in which the ownership, leasing or holding, or the character, of its properties or assets or in which the transaction of its business requires such license or qualification, other than in such jurisdictions where the failure to so qualify or be in good standing would not result, individually or in the aggregate, in a Material Adverse Effect. The Company has made available to Parent a true and correct copy of the of the Organizational Documents of the Company as in effect on the date of this Agreement. Such Organizational Documents have not been further amended and are in full force and effect and the Company is not in material violation of any of the provisions of its Organizational Documents.

(b)    Except with respect to the dissolution of dormant Subsidiaries, no resolution has been passed, no step taken has been taken and no legal proceedings have been started or threatened in respect of the winding-up or dissolution (or any local law equivalent) of the Company or any of its Subsidiaries, or for the appointment of a liquidator, receiver, administrator or administrative receiver (or similar officer in any jurisdiction) over any or all of the assets of the Company or any of its Subsidiaries.

    (xiii)  any Contract requiring payments or distributions to any Securityholder of the Company Group, or any relative or Affiliate of any such Person; and

    (xiv)  all Contracts with Top Customers and Top Suppliers.

  (b)  As of the Effective Date, the Company Group has made available to Parent true and complete copies of all written Material Contracts and each amendment, supplement, waiver, or modification thereto. The Company Group does not have any oral contracts or agreements that would constitute a Material Contract. All of the Material Contracts identified on, or required to be identified on Schedule 4.5(a) of the Company Disclosure Schedules are legal, valid, binding and enforceable in accordance with their respective terms with respect to the Company Group, and to the Company's Knowledge, with respect to each other party to such Material Contracts, and are in full force and effect and shall continue to be in full force and effect on identical terms following the consummation of the transactions contemplated hereby, subject to any required consents and neither the Company Group nor, to the Company's Knowledge, any other party thereto, has breached any provision of, or is in default under the terms of, nor does any condition exist which, with or without notice or lapse of time, or both, would cause the Company Group or any other party to be in default under any of the Material Contracts or would constitute a breach or default or permit termination, modification or acceleration under any such Material Contract. The Company Group has not (i) received any written notice of cancellation or termination or change in pricing (other than in the ordinary course of business) of any such Material Contract or (ii) during the two (2) years prior to the Closing Date, obtained or granted any material waiver of or under any provision of any such Material Contract except for routine waivers granted or sought in the ordinary course of business. Except for the Consents set forth on Schedule 4.13(a) of the Company Disclosure Schedules, the consummation of the transactions contemplated by this Agreement shall not afford any other party the right to terminate or modify any Material Contract.

  Section 4.6.  Title; Equipment; Condition of Fixed Assets. Except as would not be expected to be material to the Company and its Subsidiaries, taken as a whole, and except for intellectual property matters, which are covered by Section 4.4: (a) the assets and rights of the Company Group include all of the assets and rights of the Company Group used in the conduct of the Business as conducted as of August 31, 2021, subject only to such changes as have occurred in the ordinary course of business; (b) the Company Group has good and marketable title to all the items of tangible personal property owned or held for use in the Business by the Company Group, free and clear of all Liens, other than Permitted Liens; (c) the Company Group holds good and transferable interests in all such tangible personal property that is physically located at the premises on which the Company Group has a leasehold interest, owns real property, or conducts the Business; (d) all of the fixed assets necessary for the conduct of the Business are in good operating condition and repair, ordinary wear and tear excepted, and are adequate to conduct the Business as currently conducted; and (e) as of the Closing, after giving effect to the transactions contemplated hereby, the Company Group will own, possess, licenses, lease or otherwise have control of all assets (including pursuant to Contracts) necessary for the conduct of the Business substantially in the manner conducted immediately prior to the Closing.

  Section 4.7.  Compliance with Legal Requirements.

  (a)  Except as would not be material to the Company and its Subsidiaries, taken as a whole, or as set forth in Schedule 4.7(a) of the Company Disclosure Schedules, the Company Group is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement, including the Food, Drug and Safety Laws, the applicable regulations promulgated thereunder, and applicable guidance standards and policies issued by any Governmental Authority.

(b) To the extent the Company Group is participating in any research or clinical trials project, such research or clinical trials project is performed in compliance in all material respects with applicable Healthcare Legal Requirements.

(c) Except as set forth in Schedule 4.7(c) of the Company Disclosure Schedules, the Company Group has not been the recipient of any of the following: (i) reports of FDA Form 483 inspection observations, (ii) establishment inspection reports with findings of material deficiencies, (iii) warning letters, and (iv) other documents that assert any lack of compliance in any material respect with any applicable Legal Requirements or regulatory requirements, in each case to the extent received since June 3, 2019, by the Company Group or any of its Affiliates from the FDA or any other Governmental Authority relating to any product or item provided by or service performed by the Company Group and/or arising out of the conduct of the Business.

(d) Since June 3, 2019, the Company Group has not nor to the Company's Knowledge, any of their respective Employees, nor to the Company's Knowledge, its Representatives or any other Person associated with or acting on behalf of the Company Group have, directly or indirectly, (i) used any funds for unlawful contributions, gifts, entertainment or other unlawful payments relating to political activity, or failed to disclose fully any such contributions in violation of applicable Legal Requirement; (ii) given, offered, promised, conspired or authorized to give, any money or thing of value to any foreign or domestic government official or employee (including officials or employees of state-owned or controlled businesses and institutions), any foreign or domestic political party or campaign official, candidate for foreign political office, officials or employees of public international organizations, or any other Person acting on behalf of the foregoing (each, a "Government Official"), for the purpose of influencing an act or decision of the Government Official, or inducing the Government Official to use his or her influence or position to affect any government act or decision relating in any way to the business of the Company or its Subsidiaries; or (iii) given, offered, promised, conspired or authorized to give, any money or thing of value to any Person (Government Official or private party) in violation of the U.S. Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the U.S. Foreign Corrupt Practices Act of 1977; the U.S. Travel Act, 18 U.S.C. § 1952; the U.K. Bribery Act 2010; any applicable Legal Requirement enacted in connection with the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions; or any other applicable Legal Requirement or regulation of any foreign or domestic jurisdiction relating to bribery or corruption (collectively, "Anti-Corruption Laws"). To the Company's Knowledge, the Company Group has not received any communication from a Governmental Authority that alleges that the Company Group, or any of its Employees or Representatives, or any other Person associated with or acting on behalf of the Company Group, is or may be in violation of, or has, or may have, any material unresolved liability under, any Anti-Corruption Law. There have been no intentionally false or fictitious entries made in the Company Group's books and records relating to any illegal payment or secret or unrecorded fund, and the Company Group has not established or maintained any such secret or unrecorded fund.

(e) The Company Group is, and has at all times since June 3, 2019, been, in material compliance in with all applicable Sanctions and Export Controls. The Company Group has not, nor has any director or officer of the Company Group, nor to the Company's Knowledge, any Affiliate, employee, Representative, or any other Person associated with or acting on behalf of the Company Group, is a Sanctioned Person, nor has the Company Group had any direct or, to the Company's Knowledge, indirect dealings with any Sanctioned Person or in any Sanctioned Country since June 3, 2019, in violation of applicable Sanctions. The Company Group obtained all licenses, permits, and authorizations required to comply with Sanctions and Export Controls.

The parties hereto have caused this Agreement and Plan of Merger to be executed as of the date first set forth above.

**COMPANY**:

ENVIGO RMS HOLDING CORP.

By: /s/ Adrian Hardy

Name: Adrian Hardy

Title: Chief Executive Officer

**SECURITYHOLDER REPRESENTATIVE:**

SHAREHOLDER REPRESENTATIVE SERVICES LLC

By: /s/ Sam Riffe

Name: Sam Riffe

Title: Managing Director

[Signature Page to Agreement and Plan of Merger]

Ex. C at 13

**PARENT**:

INOTIV, INC.

By: /s/ Robert Leasure Jr.

Name: Robert Leasure Jr.

Title: President and Chief Executive Officer

**MERGER SUB:**

**DOLPHIN MERGECO, INC.**

By: /s/ Robert Leasure Jr.

Name: Robert Leasure Jr.

Title: President and Chief Executive Officer

**MERGER SUB LLC:**

**DOLPHIN MERGER SUB, LLC**

By: /s/ Robert Leasure Jr.

Name: Robert Leasure Jr.

Title: President and Chief Executive Officer

[Signature Page to Agreement and Plan of Merger]

Exhibit 99.1

 

**Inotiv, Inc. and Envigo Propose to Join Forces to Enhance Research and Drug Discovery Solutions**

*-- Expected to establish a leading global provider of a full spectrum of pre-clinical solutions --*

*-- Expected to be immediately accretive to Inotiv earnings and margins before synergies --*

*-- Expected to enhance scale, broaden customer base and create significant cross-selling opportunities --*

**WEST LAFAYETTE, Ind. and INDIANAPOLIS, Ind.; Sept. 21, 2021 (GLOBE NEWSWIRE) – Inotiv, Inc. (NASDAQ:NOTV) (or "Inotiv")**, a leading contract research organization (CRO) specializing in nonclinical and analytical drug discovery and development services, and Envigo RMS Holding Corp. (or "Envigo"), a leading global provider of research models and services, today jointly announced that they have entered into an agreement for Inotiv to purchase Envigo. Upon consummation of the acquisition, which is subject to customary closing conditions, the combined company will enable drug developers to access products and services for the entirety of discovery and nonclinical development within one organization. Transaction consideration consists of $200 million of cash and 9,365,173 Inotiv common shares, subject to certain adjustments at closing. Inotiv has received committed debt financing to fund the cash portion of the transaction. Based upon the closing price of Inotiv common stock on Monday, September 20, 2021, the transaction values Envigo at an enterprise value of approximately $545 million, and the combined company at an enterprise value of approximately $1.2 billion.

Upon closing of the transaction, Inotiv shareholders are expected to own approximately 64 percent and Envigo shareholders are expected to own approximately 36 percent of the combined company on a fully diluted basis.

"Evolving complexity in the disease research space is creating additional demand for research models, and continued innovation in biopharma is increasing demand for specialty and disease-specific models," said Inotiv President and CEO, Robert Leasure, Jr. "The complementary nature of Inotiv and Envigo is expected to accelerate the movement of innovative drugs and medical devices through the discovery and preclinical phases of development. Supported by deep, in-house expertise and scientific capabilities, we're building a comprehensive contract pharmaceutical research solutions provider with a full spectrum of discovery and nonclinical services and research models into a unique, one-stop-shop, discovery-to-approval solution for drug developers."

"Envigo has a long history and broad expertise supplying critical research models and services to the scientific community," said Envigo CEO, Adrian Hardy. "Our diverse client base of CROs, pharmaceutical, government and academic institutions and Inotiv's biopharma clients will be able to utilize leading research models and services from Envigo, including genetically engineered models and services (GEMS), contract breeding services, Teklad laboratory animal diets, surgical services, custom antibody services, and large and small research models."

**Benefits of the Merger**

The expected benefits of the merger include the following:

- Create a unique, full-spectrum provider of drug discovery and non-clinical development services along with a leading research model products platform

- Expand combined customer base to ~3,000 customers across pharma, biotech, and academia with significant opportunity for cross-selling

- Strengthen Inotiv's operational presence in North America and add several locations in Western Europe to bolster the combined company's global service delivery

- Enhance scale with unaudited pro forma combined revenue of $286 million during the nine months ended June 30, 2021

- Maintains financial momentum for both companies. Inotiv's revenue grew 33% to $60 million for the nine months ended June 30, 2021, from $45 million during the same period in 2020. Envigo's revenue grew 22% to $141 million during the six months ended June 30, 2021, from $115 million during the six months ended June 30, 2020.

- Create shareholder value with expected immediate earnings and margin accretion (prior to potential synergies)

- Delivers potential cost and revenue synergies through SG&A cost savings and cross-selling existing clients across a broader platform of services and products

**Additional Transaction Details**

- The transaction values Envigo at an enterprise value of approximately $545 million. For the nine months ended June 30, 2021, Envigo generated unaudited pro forma revenue of approximately $212 million.

- Transaction consideration consists of $200 million of cash and 9,365,173 Inotiv common shares, subject to certain adjustments at closing. Inotiv has received committed debt financing to fund the cash portion of the transaction.

- The combined company, under the leadership of Robert Leasure, Jr. as President and CEO, expects to retain existing executive-level leadership and staff after transaction close.

- The transaction is expected to close in the fourth calendar quarter of 2021 subject to, among other things, required regulatory approval, certain approvals by the Inotiv shareholders to permit the issuance of the common shares in connection with the transaction, approval of the merger agreement and merger by Envigo stockholders and other customary closing conditions.

**Transaction Advisors**

Jefferies LLC is serving as exclusive financial advisor to Inotiv and Ice Miller LLP is serving as Inotiv's legal advisor. Cahill Gordon and Reindel LLP is serving as Envigo's legal advisor.

A Current Report on Form 8-K containing further details regarding the proposed transaction will be filed by Inotiv and made available on the U.S. Securities and Exchange Commission's EDGAR website.

**Conference Call**

Inotiv and Envigo will hold a conference call to discuss the business combination on Tuesday September 21, 2021, at 10:00 a.m. ET.

To access the conference call by phone, please dial:

- US toll-free: 877-407-9753
- International: 201-493-6739

The webcast and accompanying presentation can be accessed on the Company's website: https://www.inotivco.com/investors/investor-information/

**About Inotiv**
Inotiv, Inc. is a leading contract research organization specializing in nonclinical and analytical drug discovery and development services. The Company focuses on developing innovative services supporting its clients' discovery and development objectives for improved decision-making and accelerated goal attainment. The Company's products focus on increasing efficiency, improving data, and reducing the cost of taking new drugs to market. Visit inotivco.com for more information about the Company.

**About Envigo**
Envigo provides a broad range of standard research models to the pharmaceutical and biotechnology industries, government, academia, and other life science organizations. The company has over 1,200 devoted employees in more than 20 locations across North America and Europe.

As the largest organization that is solely dedicated to providing research models and related products and services, we are committed to helping researchers realize the full potential of their critical R&D projects as we fulfill our mission to work together to build a healthier and safer world. Visit envigo.com for more information about the Company.

*This release may contain forward-looking statements that are subject to risks and uncertainties including, but not limited to, the satisfaction of the conditions to the consummation of the merger, which may not be satisfied, risks and uncertainties related to changes in the market and demand for our products and services, the development, marketing and sales of products and services, changes in technology, industry and regulatory standards, the timing of acquisitions and the successful closing, integration and business and financial impact thereof, the impact of the COVID-19 pandemic on the economy, demand for our services and products and our operations, including the measures taken by governmental authorities to address the pandemic, which may precipitate or exacerbate other risks and/or uncertainties, expansion and related efforts, and various other market and operating risks, including those detailed in the Company's filings with the U.S. Securities and Exchange Commission.*

| | |
|---|---|
| **COMPANY CONTACT**: | **INVESTOR RELATIONS CONTACTS**: |
| Inotiv, Inc. | The Equity Group Inc. |
| Beth A. Taylor, Chief Financial Officer | Kalle Ahl, CFA |
| 765-497-8381 | 212-836-9614 |
| btaylor@inotivco.com | kahl@equityny.com |
| | |
| | Devin Sullivan |
| | 212-836-9608 |
| | dsullivan@equityny.com |

Ex. C at 19