**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| In re: INOTIV, INC. SECURITIES LITIGATION | Case No. 4:22-cv-00045-PPS-JEM |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S
<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

ISSUE STATEMENT ................................................................................................. vii

I.    INTRODUCTION ...........................................................................................1

II.   FACTUAL BACKGROUND ..........................................................................3

III.  ARGUMENT ...................................................................................................5

    A.  Pleading Standards .................................................................................5

    B.  The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions ............................................6

        1.  The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions Regarding the Cumberland Facility.................................................................7

        2.  The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions Regarding the NHP Business .........................................................................12

        3.  Defendants' Arguments Regarding Falsity and Materiality Fail ...............15

           a)  The FAC Alleges a Duty to Disclose....................................................15

           b)  Inotiv's Risk Disclosures Did Not Sufficiently Caution Investors Regarding the Concealed Information .................................................18

           c)  None of the Alleged Misrepresentations or Omissions are "Puffery" or Non-Actionable Statements of Opinion ..........................................19

           d)  The Cumberland Facility was Material to Investors...........................22

           e)  If any Statements Were Forward Looking, They are Not Protected....22

    C.  The FAC's §10(b) Allegations Give Rise to a Strong Inference of Scienter...23

        1.  The FAC's Uncontested Scienter Allegations Individually and Collectively Support a Strong Inference of Scienter ................................25

           a)  Defendants' own statements and actions demonstrate knowledge or reckless disregard of materially adverse nonpublic information .........25

           b)  Departure of Chief Operating Officer Harkness ..................................27

i

2.   Defendants' Limited Challenges to Certain Scienter Allegations Fail ......28

    a)   Allegations of CWs Support Scienter ................................................28

    b)   The Matters Alleged to Have Been Misrepresented and Omitted
        Involve "Core Operations" of the Company ....................................30

    c)   Defendants' Stock Purchases Do Not Defeat Scienter ....................32

    d)   Receipt of Subpoenas Supports an Inference of Scienter ................33

D.   The FAC Properly Pleads Loss Causation ........................................................34

E.   The FAC Properly Pleads a Section 14(a) Claim ............................................39

F.   The FAC Sufficiently Alleges Control Person Liability ..................................40

CONCLUSION ................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Ackerman v. Schwartz*,
  947 F.2d 841 (7th Cir. 1991) .......................................................................... 16

*Allison v. Oak St. Health, Inc.*,
  2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .................................................. 17

*Amgen v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)............................................................................................ 5

*AnchorBank, FSB v. Hofer*,
  649 F.3d 610 (7th Cir. 2011) ..................................................................... 5, 25

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) .......................................................................... 6

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002).......................................................................... 16

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F.Supp.2d 683 (E.D. Mich. 2010)........................................................... 34

*City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Est. Tr., Inc.*,
  635 F. Supp. 2d 783 (N.D. Ill. 2009) .............................................................. 6

*City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ........................................... 20, 29

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
  587 F. Supp. 3d 56 (S.D.N.Y. 2022)............................................................. 25

*Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*,
  114 F. Supp. 3d 633 (N.D. Ill. 2015) ............................................................ 27

*Desai v. Gen. Growth Properties, Inc.*,
  654 F.Supp.2d 836 (N.D. Ill. 2009) .............................................................. 31

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................ 34, 36, 40

*Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ......................................................................... 20

*Forman v. Meridian Bioscience, Inc.*,
  367 F. Supp. 3d 674 (S.D. Ohio 2019) ........................................................... 9

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ......................................................................... 27

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ............................................................ 22

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ......................................... 21, 34

*Gate Ent. Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ............................................................... 16

*Greengrass v. Int'l Monetary Sys. Ltd.*,
    776 F.3d 481 (7th Cir. 2015) ................................................................................... 17

*Grimes v. Navigant Consulting, Inc.*,
    185 F. Supp. 2d 906 (N.D. Ill. 2002) ....................................................................... 22

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*,
    2022 WL 1642221 (N.D. Ill. May 24, 2022) ........................................................... 16

*Hedick v. Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ............................................... 25, 36, 38

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ............................................................................. 28, 29

*Holwill v. AbbVie Inc.*,
    2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ........................................................... 37

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ..................................................................... 29

*In re BHP Billiton Ltd. Sec. Litig.*,
    276 F. Supp. 3d 65 (S.D.N.Y. 2017) ....................................................................... 18

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ..................................................................... 34

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................... 34

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) .................................................................................... 38

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. Nov. 1, 2007) ........................................................ 28

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ................................................................................... 20

*In re Supreme Indus., Inc. Sec. Litig.*,
    2018 WL 2364931 (N.D. Ind. May 23, 2018) ................................................... 21, 33

*In re the Boeing Co. Aircraft Sec. Litig.*,
    2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ..................................................... 34, 36

*In re Tyco Int'l, Ltd.*,
    2004 WL 2348315 (D.N.H. Oct. 14, 2004) ............................................................. 37

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................... 27

*Jones v. Corus Bankshares, Inc.*,
    701 F. Supp. 2d 1014 (N.D. Ill. 2010) .................................................................... 31

*Klein v. Altria Group, Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ...................................................................... 39

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .................................................................................... 36

*Lorenzo v. Sec. & Exch. Comm'n*,
    139 S.Ct. 1094 (2019) ............................................................................................... 9

*Macovski v. Groupon, Inc.*,
   553 F. Supp. 3d 460 (N.D. Ill. 2021) ........................................................... 40
*Makor Issues & Rts., Ltd. v. Tellabs Inc. (Tellabs III)*,
   513 F.3d 702 (7th Cir. 2008) ...................................................... 23, 28, 29
*Makor Issues & Rts., Ltd. v. Tellabs, Inc. (Tellabs I)*,
   437 F.3d 588 (7th Cir. 2006) ...................................................................... 19
*Marwil v. Ent & Imler CPA Grp., PC*,
   2004 WL 2750255 (S.D. Ind. Nov. 24, 2004) .......................................... 9
*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...................................................................................... 6
*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)........................................................ 18
*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ........................................................ 36, 38
*Miller v. Apropos Tech, Inc.*,
   2003 WL 1733558 (N.D. Ill. Mar. 31, 2003).............................................. 6
*Miller v. Material Scis. Corp.*,
   9 F. Supp. 2d 925 (N.D. Ill. 1998) ........................................................... 26
*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .................................................................... 16
*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...................................................................... 20
*Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)......................................................... 24
*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................. 20, 21
*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)....................................................... 20
*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
   895 F.3d 933 (7th Cir. 2018) .................................................................... 32
*Pierrelouis v. Gogo, Inc.*,
   2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) ........................ 8, 14, 23, 33
*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
   679 F.3d 952 (7th Cir. 2012) .................................................................... 28
*Plumbers & Pipefitters Loc. Union v. Zimmer*,
   673 F. Supp. 2d 718 (S.D. Ind. 2009) ................................................ 28, 31
*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) .................................................................... 12
*Ray v. Citigroup Glob. Mkts., Inc.*,
   482 F.3d 991 (7th Cir. 2007) .................................................................... 36
*Rubinstein v. Gonzalez*,
   241 F. Supp. 3d 841 (N.D. Ill. 2017) ................................................. 23, 24

*Shah v. Zimmer Biomet Holdings, Inc.*,
   2020 WL 5627171 (N.D. Ind. Sept. 18, 2020) ........................................................ 17
*Shah v. Zimmer Biomet Holdings, Inc.*,
   348 F. Supp. 3d 821 (N.D. Ind. 2018) ............................................... 23, 24, 28, 29
*Shapiro v. TG Therapeutics, Inc.*,
   2022 WL 16555585 (S.D.N.Y. Oct. 31, 2022) ...................................................... 15
*Société Générale Sec. Servs GbmH v. Caterpillar, Inc.*,
   2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ........................................................ 31
*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) .................................................................... 31
*Tellabs, Inc. v. Makor Issues & Rts., Ltd. (Tellabs II)*,
   551 U.S. 308 (2007) ................................................................................................ 24
*Trahan v. Interactive Intel. Grp., Inc.*,
   308 F. Supp. 3d 977 (S.D. Ind. 2018) ................................................................... 40
*Transcontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007) ................................................................................ 36
*United States Sec. & Exch. Comm'n v. Kameli*,
   2020 WL 2542154 (N.D. Ill. May 19, 2020) ........................................................ 40
*United Union Roofers, Waterproofers & Allied Workers Loc. Union No. 8 v. Great Lakes
   Dredge & Dock Corp.*,
   2014 WL 12780549 (N.D. Ill. Oct. 21, 2014) ....................................................... 29
*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) .................................................................... 33
*Wade v. WellPoint, Inc.*,
   892 F. Supp. 2d 1102 (S.D. Ind. 2012) ................................................................. 37
*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ....................................................................... 34
*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .............................................................................. 37

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................. 23

**Rules**

Fed. R. Civ. P. 15(a)(2) .................................................................................................. 40
Fed. R. Civ. P. 8 ............................................................................................................. 34

**Regulations**

17 C.F.R. § 229.10(a)(2) ................................................................................................. 40
17 C.F.R. § 229.103 ........................................................................................................ 17
17 C.F.R. § 229.105 ........................................................................................................ 17
17 C.F.R. § 229.303 ........................................................................................................ 17

## ISSUE STATEMENT

Pursuant to Local Rule 7-1(e)(2)(B), Lead Plaintiff states that the issues raised by Defendants' motion to dismiss include whether Lead Plaintiff's First Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 53) adequately states claims for violations of the federal securities laws in accordance with, as applicable, Federal Rule of Civil Procedure 8(a), Federal Rule of Civil Procedure 9(b), Federal Rule of Civil Procedure 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), including the following issues and sub issues:

1.    Whether the FAC adequately alleges claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")?

    a.    Whether the FAC adequately alleges that Defendants made materially false or misleading statements or material omissions during the Class Period?

    b.    Whether the FAC adequately alleges facts giving risk to a strong inference of Defendants' scienter?

    c.    Whether the FAC adequately alleges loss causation?

2.    Whether the FAC adequately alleges claims against Defendants Inotiv, Leasure, and Taylor under Section 14(a) Exchange Act?

    a.    Whether the FAC adequately alleges that Defendants Inotiv, Leasure, and Taylor made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading?

    b.    Whether the FAC adequately alleges loss causation?

3.    Whether the FAC adequately alleges claims for control person liability against Defendants Leasure and Taylor under Section 20(a) of the Exchange Act?

## I.    INTRODUCTION

This case centers on Defendants' scheme to mislead investors about two key acquisitions, Envigo and Orient Bio Resource Center ("OBRC"), that were purportedly designed to expand dramatically Inotiv's access to quality research animals (known as models) that are vital to Inotiv's core business.[1]  As a contract research organization ("CRO"), Inotiv relies on live animals to test the safety and effectiveness of drugs and products. Envigo was heralded as a "transformational" acquisition as it provided Inotiv with a new and lucrative line of business: breeding, importing, and selling research models, including "large" models such as beagles and non-human primates ("NHPs").  OBRC was a leading importer of NHPs, models that were increasingly in high demand and short supply.  Defendants trumpeted the deals to investors as providing Inotiv with a stable and consistent source of research-quality models.  In reality, the acquisitions added to rather than reduced Inotiv's risk through undisclosed rampant animal welfare problems and entanglement in a primate smuggling ring that eventually triggered dramatic losses to Inotiv shareholders.

Lead Plaintiff's case concerns Defendants' efforts to mislead and conceal the truth from investors.  Defendants' misrepresentations and omissions fall within two general categories.  ***First***, Defendants concealed the widespread, severe, and ongoing Animal Welfare Act ("AWA") violations at the Company's Cumberland, Virginia dog breeding facility ("Cumberland Facility") that were identified by USDA inspectors starting in July 2021—at roughly the same time that Inotiv's executives toured the facility during the extensive due diligence process prior to the Envigo acquisition. The USDA continued to find blatant and unresolved issues with the condition of the Cumberland Facility and the beagles housed there in four subsequent inspections, and it was

---

[1] Unless otherwise specified herein, capitalized terms have the meanings as defined in Lead Plaintiff's First Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 53, the "FAC").  References herein to "¶_" are to paragraphs in the FAC.

clear that the Company was taking little to no action to address the animal welfare crisis. The ongoing, unresolved harm eventually resulted in a federal and state law enforcement raid in May 2022, and the subsequent shuttering of the Cumberland Facility. ***Second***, Defendants concealed that Inotiv's principal supplier of NHPs was the target of an ongoing federal criminal investigation into the illegal smuggling of those critical and scarce models (the "Criminal Investigation") and that Envigo and OBRC had received grand jury subpoenas in June 2021 as part of the Criminal Investigation. Far from providing stable sources of research quality models, the acquisitions saddled Inotiv with a large-scale facility full of thousands of sick and aggressive beagles and NHP importers who were in the crosshairs of a criminal conspiracy investigation.

Eventually, through a series of corrective disclosures, the market learned of the impact of the Cumberland Facility violations, the risks of the Criminal Investigation, and the impact both would have on Inotiv's core business. As the truth was revealed, Inotiv's stock price collapsed by nearly 88%, from a price of $55.55 per share just prior to the first partial corrective disclosure, to a price of $6.82 per share at the end of the Class Period. Indeed, Inotiv's stock price has not recovered and is currently trading at less than $5.00 per share.

Now, in an effort to escape liability, Defendants filed a motion to dismiss and a supporting brief (ECF No. 68, "Def. Br.") that fundamentally miscasts Lead Plaintiff's allegations, re-writes history, and takes a blunderbuss approach to legal arguments that ignore the FAC's well pled allegations regarding the elements of materiality, falsity, loss causation, and, as they pertain to the §10(b) claims, scienter. Defendants' arguments are riddled with premature factual disputes inappropriate on a motion to dismiss and otherwise fail to articulate a legitimate basis upon which the Court should dismiss the FAC. Significantly, Defendants fail to expressly challenge several alleged misrepresentations and ignore their own description of a comprehensive due diligence

process prior to the Envigo acquisition.  In short, contrary to Defendants' arguments, the FAC carefully tracks each alleged misstatement and omission concerning the Cumberland Facility and NHP issues that had a strong material impact on Inotiv's business and stock price.  Defendants misled investors about those issues, made only vague, boilerplate risk disclosures about regulations and routine inspections that did not warn of then-existing USDA inspection findings or the Criminal Investigation, and knew, or were reckless in not knowing, of the material impact of their misstatements and omissions to investors.  In the end, the market's strong reaction to the truth belies Defendants' arguments.  Defendants' Motion to Dismiss must be denied.

## II.   FACTUAL BACKGROUND

Inotiv is a CRO specializing in nonclinical and analytical drug discovery and development services.  ¶34.  In recent years, Inotiv has pursued a strategy of seeking to grow through strategic acquisitions.  ¶40.  As part of this strategy, Inotiv acquired two providers of critically important large research models including beagles and NHPs.  ¶¶1, 35-40, 47, 50-51, 119, 203-04.  Beagles are a preferred breed for use in research due to the dogs' typically docile demeanor, and NHPs are a critical research model (as they are the animals closest to humans) that have been increasingly in demand and in short supply.  ¶¶8-9, 40, 111, 123, 158.

Defendants called the November 5, 2021 acquisition of Envigo "transformational" because it created an entirely new line of business, "breeding, importing and selling research-quality animal models for use in laboratory tests," and provided the company with the vast majority— approximately three quarters—of its revenue.  ¶¶1, 7, 9 35-40.  Then, in January 2022, Inotiv acquired OBRC, a leading importer of NHPs that was celebrated as, among other things, providing Inotiv's customers with "increased access to critical research models" in a supply-constrained environment.  ¶¶1, 8, 38, 118, 201, 204, 224.

Although Defendants touted Envigo as a leading source of research quality large models

and a company with a commitment to the highest degree of animal welfare, in reality and unbeknownst to investors, USDA inspectors had identified serious AWA violations and stunning animal cruelty at Envigo's Cumberland Facility in July 2021. The finding of these conditions coincided with Inotiv's due diligence on Envigo, with Defendants Leasure, Sagartz, and Wilbourn present onsite at roughly the same time. ¶¶61-69. The FAC details how beagles were kept in conditions of severe neglect in violation of the AWA, which resulted in aggressive and unhealthy dogs unsuitable for use in research. *Id.* USDA inspectors would continue to find the same and similar violations again and again in at least four subsequent inspections that took place over a ten-month period. ¶¶70-93; *see also* Def. Ex. Z at 1-28.[2] After news of the conditions at the Cumberland Facility began to emerge, Defendants went to great lengths to downplay and trivialize the inspection findings and claim vague cooperation. But eventually, in May 2022, federal and state agents executing a search and seizure warrant raided the Cumberland Facility and the U.S. District Court for the Western District of Virginia granted an injunction due to the Company's "repeated non-compliance with inspectors' violation reports and with the AWA, as well as the substantial, documented risk of irreparable harm in the absence of prompt injunctive relief." ¶¶96-108. Ultimately, Inotiv shuttered the entire Cumberland Facility. ¶¶16, 263.

Defendants similarly touted the Envigo acquisition and the January 2022 acquisition of OBRC as providing Inotiv with better access to NHPs, critical research models that had been in short supply since the start of the COVID-19 pandemic. ¶¶8-9, 14, 170, 186-190, 201. However, Defendants concealed from investors the fact that the Company's "principal supplier" of NHPs was the focus of the Criminal Investigation and that Envigo and OBRC had received grand jury

---

[2] As used herein, references to "Def. Ex. _" refer to documents filed as Exhibits to the Declaration of Carrie M. Stickel in support of Defendants' Motion to Dismiss Plaintiff's First Amended Class Action Complaint (ECF Nos. 69-1 – 69-29). Page numbers cite to the pages identified by Defendants on the lower right corner of each page.

subpoenas in connection with that investigation in June 2021. ¶¶1, 3, 10, 14, 30, 120, 266.  On November 16, 2022, six executives from Inotiv's NHP supplier and two officials of the Cambodian government were indicted on felony charges in connection with an international primate smuggling ring in which OBRC was identified as an unindicted co-conspirator, and an OBRC executive (who was present at a meeting with Defendant Leasure and personally received a payment in connection with Inotiv's purchase of OBRC) pled guilty to making false statements to federal investigators.  ¶¶1, 3, 117-18, 128, 241.  Defendants knew of or would have known of the Criminal Investigation through their due diligence of Envigo and OBRC.  ¶¶119-20, 128, 242-44.

Despite the material risks associated with the acquisitions of Envigo and OBRC regarding serious regulatory noncompliance and their principal supplier of NHPs being implicated in a criminal investigation that threatened the supply of those critical models, Defendants repeatedly provided false and misleading information to the market through materially misleading statements and the omission of material facts about Envigo and OBRC that artificially inflated the price of Inotiv's stock.  When the truth of those misrepresentations and omissions was revealed through a series of partial corrective disclosures (Section III.D, *infra*), Inotiv's stock price declined sharply and Lead Plaintiff and members of the Class were damaged thereby.

## III.    ARGUMENT

### A.    Pleading Standards

To state a claim under §10(b) and Rule 10b-5, a plaintiff must allege (1) defendants made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which plaintiffs reasonably relied; (5) economic loss; and (6) loss causation.  *See*, *e.g.*, *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459-460 (2013); *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011).

To state a claim under §14(a), a plaintiff must allege that (1) the proxy contained a material misrepresentation or omission which (2) caused plaintiff's injury, and that (3) the proxy was an essential link in the transaction. *See City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Est. Tr., Inc.*, 635 F. Supp. 2d 783, 790 (N.D. Ill. 2009). There is no scienter element for a §14(a) claim; a §14(a) claim requires only "negligence." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) (misrepresentation or omission violates §14(a) "even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials").

To withstand a Rule 12(b)(6) motion, a plaintiff "need only allege enough facts to state a claim [for] relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38, 45 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotation marks omitted). In evaluating the plausibility of a complaint's allegations, "the Court accepts as true all facts and allegations in the complaint and makes all reasonable inferences in the plaintiff's favor." *Miller v. Apropos Tech, Inc.*, 2003 WL 1733558, at *3 (N.D. Ill. Mar. 31, 2003).

### B.    The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions

Defendants, who devote the majority of their brief to falsity and materiality arguments, incredibly assert that the FAC "does not adequately allege a material misrepresentation or omission." Def. Br. at 1; *see id.* at 10. Even a cursory review of the FAC reveals the disingenuousness of this argument. The FAC details, in 75 paragraphs, statements made over a period of eleven months that Lead Plaintiff alleges to have been materially false and misleading. ¶¶161-236. With respect to the §14(a) claim, the FAC alleges material misrepresentations and omissions in the Proxy and documents incorporated by reference therein. ¶¶47-48, 161, 165-69, 172-176. In broad terms, the misrepresentations and omissions fall within two principal categories: (1) undisclosed ongoing AWA violations at the Cumberland Facility (¶¶161-69, 173-

6

76, 181, 184, 193, 197, 200-01, 207-10, 217-18, 224-25, 232, 235); and (2) the undisclosed fact that the Company's principal supplier of NHPs was enmeshed in a Criminal Investigation implicating the NHP supply chain and that Envigo and OBRC had received grand jury subpoenas in that proceeding (¶¶169, 187-89, 200-01, 204, 219, 224, 229, 235). The FAC also specifies why each such statement is materially false and/or misleading and/or omits material information. *See* ¶¶171, 177-179, 182, 185, 190, 195, 198, 202, 205, 212-15, 220-22, 226-27, 230, 233, 236.

### 1. The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions Regarding the Cumberland Facility

The FAC alleges that Defendants made numerous material misrepresentations and omissions about the severe and ongoing AWA violations at the Cumberland Facility, including that Defendants concealed from investors the repeated findings of serious AWA noncompliance found in USDA inspections that began in July 2021 and continued through May 2022 that made the beagles raised there unsuitable for research purposes.[3] The large-scale Cumberland Facility was material because it was the second largest breeder of research beagles, supplying the market with approximately 25% those important models, and was part of the category of "large" models that accounted for nearly half of Envigo's revenues prior to the Inotiv acquisition and nearly a third of total revenues for the combined Company, and otherwise was a key component of the Company's largest business segment by far. ¶¶39, 171, 207, 245, 311.

Significantly, Defendants do not contest, and thus concede, that certain alleged misrepresentations and omissions in the FAC are actionable, including but not limited to the entire Cumberland Fact Sheet available on a Company website on and after November 5, 2021. ¶¶183-85. The Court *must* deny Defendants' motion to dismiss in its entirety to the extent that the FAC

---

[3] The FAC alleges that the Envigo beagles were unsuitable for research because of their aggression and difficulties interacting with humans due to their inhumane treatment at the Cumberland Facility. ¶¶61-69, 123, 137, 171(a).

sufficiently pleads a *single* actionable false and misleading statement or material omission. *See*

*Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *10 (N.D. Ill. Apr. 26, 2021) ("The Seventh

Circuit has explained that '[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal

dismissals of parts of claims; the question at this stage is simply whether the complaint includes

factual allegations that state a plausible claim for relief.'") (citation omitted). The Cumberland

Fact Sheet misled investors about conditions at Cumberland, falsely claiming that, *inter alia*,

temperatures in dogs' living areas were "continuously monitored" to remain within specific

temperature ranges and other representations about sanitation and cleaning practices, feeding,

caging, bedding, and the Company's maintenance of pedigree and health history information.

¶¶183-84. As alleged, these statements were materially false and misleading and omitted material

information because, starting in July 2021, USDA inspectors repeatedly found AWA deficiencies

that were *directly contrary* to the representations in the Cumberland Fact Sheet. ¶185.

Additionally, the FAC alleges numerous misrepresentations and omissions regarding the

Cumberland Facility beginning with the September 21, 2021 announcement of the Envigo

acquisition, including:

- Defendant Leasure touting Envigo as "a best-in-class provider of high-quality research models" with a "dedication to quality" that would benefit Inotiv, and concurring that Envigo provided "high-quality research-grade laboratory animals" (¶¶161-64);[4]

- Presentation slides referring to Envigo as a "leading provider of high-quality research models and services," and showing the Cumberland Facility among the critical facilities to be acquired that made Envigo "a leader in research models services in key research

---

[4] The falsity of statements regarding the "quality" or "research quality" of Envigo's models is supported by, among other things, Confidential Witnesses ("CWs"), all of whom are former employees of the Company employed at relevant times. *See* Section C.2.a., *infra*. Defendants also raise an inappropriate factual challenge to a quote from the HSUS Report that addresses how Cumberland beagles did not meet research requirements. ¶158; *see also* ¶8 (alleging that researchers prefer beagles for their docile demeanor). Defendants' principal dispute regarding the HSUS Report concerns its time frame. Def. Br. at 15. The FAC alleges that the report was published on April 21, 2022 after a seven month investigation. ¶157. HSUS indicated, when it released its report, that its source was inside Inotiv "[f]rom August 2021 to March 2022," establishing a clear connection to the Class Period. *See* Humane Society Legislative Fund, *Undercover Investigation Shows Plight of Dogs, Other Animals at Indiana Testing Facility* (Apr. 2022), https://hslf.org/press-release/2022/04/undercover-investigation-shows-plight-dogs-other-animals-indiana-testing.

locations" and touting Envigo's ability to "suppl[y] customers with genetically consistent research models time after time" (¶¶165-68);[5]

- Assertions in a Merger Agreement filed as an attachment to an Inotiv 8-K that Envigo was in full legal compliance and not under investigation, including that it "is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement" or "guidance standards and policies" of any governmental authority, and had not received any "inspection reports with findings of material deficiencies" (¶¶161, 169).[6]

Investment analysts reacted favorably to Defendants' statements of September 21, 2021, viewed Envigo as providing Inotiv with "**Better Access to Animals,**" and saw no new or different risks from the Envigo acquisition based on Defendants' representations. ¶170.[7]

The FAC alleges that Defendants continued to make similar misrepresentations and

---

[5] Representations that Envigo supplied customers with "genetically consistent research models" were materially false and misleading and omitted material information due to the fact that USDA inspectors identified multiple recordkeeping violations indicating that Envigo was not, in fact, keeping track of puppies born at the Cumberland Facility in a manner that could ensure the accuracy of animals' genetic/breeding histories, as well as the fact that there was a genetic abnormality known as "wet paw" present in the beagle colony that was exacerbated by the serious flooring violations documented by the USDA. ¶171(b); *see also* Def. Ex. Z at 2-5 (USDA report describing improper recordkeeping, identification, and documentation of animal births observed in July 2021), 33-34 (continued incomplete recordkeeping of animal births and litter information). Defendants' arguments (Def. Br. at 17 n.11) miss the point of these allegations and do not support dismissal of the FAC.

[6] The FAC also alleges that Envigo was not in full legal compliance because, among other things, it had received "inspection reports with findings of material deficiencies" or other documentation of lack of compliance with regulatory requirements (*i.e.*, the July 2021 Inspection and ongoing AWA noncompliance). Defendants' attempt to escape liability by pointing the finger at Envigo must fail. Def. Br. at 17-18. Unlike in *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 691 (S.D. Ohio 2019), where the plaintiff had not alleged that the defendant "vouched for, adopted, or re-stated Magellan's warranties to it," Defendants here did exactly that when Inotiv filed the Merger Agreement as an exhibit to a Form 8-K and incorporated that filing by reference in the Proxy for the specific purpose of persuading Inotiv shareholders to vote in favor of measures needed to effectuate the acquisition. ¶161. Moreover, the Supreme Court has unambiguously held that even for statements that may not have been "made" by a defendant, liability under Section 10(b) and Rule 10b-5 attaches when, as here, a defendant disseminates false and misleading information to investors. *See Lorenzo v. Sec. & Exch. Comm'n*, 139 S.Ct. 1094, 1099-1101 (2019). Further, Defendants' assertions as to *their* assessment of materiality of disclosure schedules omitted from the Merger Agreement turns on an issue of fact inappropriate for a motion to dismiss.

[7] Contrary to Defendants' repeated assertions that the FAC pleads "fraud-by-hindsight," the FAC plainly alleges that USDA inspectors identified the core of AWA violations at the Cumberland Facility in *July 2021*—prior to the start of the Class Period—at which time or shortly thereafter Envigo representatives were informed of the inspectors' findings at an "exit briefing" and given deadlines from July 23 to August 31, 2021 to correct the violations. ¶¶58, 61-69. *See also* Def. Ex. Z. Moreover, to support the falsity of later statements and the ongoing uncorrected nature of the violations, the FAC alleges that USDA inspectors continued to cite the Company in October 2021, November 2021, March 2022, and May 2022. ¶¶70-106. Misrepresentations and omissions of then-existing facts and circumstances such as those alleged here are not, by definition, fraud-by-hindsight. *See Marwil v. Ent & Imler CPA Grp., PC*, 2004 WL 2750255, at *5 (S.D. Ind. Nov. 24, 2004) (plaintiff's pleading of "a factual basis for believing that the defendant knew or was reckless in not knowing about misleading representations or omissions at the time the actions allegedly occurred, prior to any later disclosure" does not constitute fraud by hindsight).

omissions during the Class Period, including in the October 5, 2021 Proxy[8] and November 5, 2021

Press Release (¶¶172-82), which included, *inter alia*, allegedly false and misleading statements

regarding Envigo's "research-quality animals" (¶173), "high-quality small and large research

models for basic research and drug discovery and development" (¶181), and "high degree of focus

on animal welfare" (¶176) that continued to be materially false and misleading and omit material

information for the same reasons. ¶¶177-79, 182.[9]

Starting in November 2021, Defendants continued to conceal the truth about the

Cumberland Facility and responded to criticism of the facility by denying and/or downplaying

suggestions that the Company was engaging in serious AWA violations and otherwise falsely

claiming that the Company was taking all "necessary corrective actions for all issues" identified

by USDA inspectors. ¶¶191-98. These alleged misrepresentations and omissions include:

- A November 11, 2021 statement responding to animal rights activists' criticisms of the Cumberland Facility that effectively denied the activists' allegations and misleadingly noted that the Company had "participated in" two still undisclosed USDA inspections at which inspectors had provided only "feedback" that was purportedly being incorporated by the Company, and again touting that "[t]he highest quality animal welfare is a core value of our company and is central to our business" and that the company "remain[ed] steadfast in [its] commitment" to animal welfare. ¶¶191-94.

- A November 16, 2021 statement responding to activists' release of July 2021 Inspection reports that again effectively denied and/or sought to downplay inspectors' findings and claimed that the Company was "tak[ing] the necessary corrective actions for all issues outlined in the reports" and "making an ongoing effort" to address "feedback" from inspectors, while again touting a purported commitment to "[t]he highest quality of animal welfare [that] is a core value of our company and is central to our business." ¶¶196-98.

The false and misleading nature of these statements is further supported by the fact that

---

[8] For the §14(a) claim, the September 21 Investor Presentation and Merger Agreement addressed above are included, along with the Proxy itself, within the Proxy Solicitations that are the focus of that separate claim. *See* ¶¶307-321.

[9] Defendants mischaracterize the FAC's allegation that the Board "[took] into account the results of Inotiv's due diligence review of Envigo" in determining whether to approve the Envigo acquisition (¶¶174, 178). It is not Lead Plaintiff's contention that Inotiv's Board "disregarded or ignored" (Def. Br. at 18 n.13) any aspect of the due diligence review described in the Proxy. Rather, this supports the allegation that Defendants omitted material information from investors that was learned through the extensive due diligence review of Envigo, including but not limited to the Due Diligence Tour (as well as Defendants' scienter for purposes of the §10(b) claim). ¶¶174, 178.

USDA inspectors *again* found serious AWA violations in October 2021 (the results of which remained undisclosed at the time) that persisted through the November 2021 Inspection—*which began on the same day* as the November 16 Statement.  ¶¶70-85, 197-98.[10]

Defendants continued to make false and misleading statements and material omissions, including Defendant Wilbourn's February 3, 2022 testimony at the Virginia Senate Hearing, where Wilbourn downplayed USDA inspectors' findings and provided assurance that the Company was "working hard to fix the current issues and [has] already taken many steps towards doing so" and was "doing everything we can" to ensure the compliant operation of the Cumberland Facility. ¶¶206-11.  Wilbourn also:

- Minimized and denied the continuing nature of the serious AWA violations as mere "temporary lapses" due to the pandemic that, according to Wilbourn, the Company had acted "immediately" and "swiftly" to address.  ¶¶208-12.

- Testified that the Company was focused on the "highest animal welfare standards" and was "working hard to fix" the issues identified by the USDA.  ¶¶207-08.

 Wilbourn's testimony was false and misleading and omitted material facts for the same reasons that Defendants' prior statements were false and misleading (¶212), and also because it concealed the fact that USDA inspectors *again* found substantially similar ongoing AWA violations during the November 2021 Inspection—which Defendant Wilbourn knew of no later than the December 17, 2021 exit briefing (¶85) and were far more extensive than what was eventually disclosed (*see* n.10)—which contradicted Wilbourn's statements about the Company's

---

[10] In fact, according to a recent investigative article published by Reuters on March 9, 2023, USDA inspectors' findings that were reported to Inotiv after the November 2021 Inspection were even *worse* than what was reflected in the inspection report that was eventually made public.  As reported by Reuters, USDA inspectors' initial report documented *107 pages* of details regarding AWA violations from the November 2021 Inspection.  *See* Sarah N. Lynch and Rachel Levy, *Exclusive: US probe of dog breeder scrutinizes why USDA left thousands of beagles to suffer*, Reuters (Mar. 9, 2023), https://www.reuters.com/legal/us-probe-beagle-breeder-envigo-scrutinizes-top-animal-welfare-officials-inaction-2023-03-09/.  According to Reuters, "after lawyers for Envigo contacted [the APHIS Deputy Administrator]," the agency's leadership ordered the inspection team to cut its report to a mere 22 pages.  A copy of the initial report linked within the Reuters article confirms that Defendant Wilbourn was present at the December 17, 2021 exit briefing at which the USDA's more extensive findings were communicated to the Company.

purported corrective actions, and belied her claims that such violations were temporary and her suggestion that the Company was correcting those issues.  ¶¶212-14.[11]

The FAC also alleges that Defendants made additional false and misleading statements and material omissions regarding the Cumberland Facility in a quarterly SEC filing filed on February 16, 2022 and during a quarterly earnings call on May 13, 2022.  ¶¶216-227.  Specifically, the FAC alleges that, in those statements, Defendants again misrepresented that animal models bred and sold by the RMS segment (which included Cumberland beagles) were "research-quality" and failed to disclose that AWA violations persisted at the Cumberland Facility as shown by inspections that occurred just weeks prior to or after Defendants' statements.

### 2. The FAC Sufficiently Alleges Defendants' Materially False and Misleading Statements and/or Material Omissions Regarding the NHP Business

 The FAC alleges that Defendants made false and misleading statements and material omissions regarding the NHP-related businesses acquired from Envigo and OBRC, including that Defendants concealed that the Company's principal supplier of NHPs was the focus of an ongoing criminal investigation into the unlawful importation of those critical research models that posed a material risk to the Company,[12] and that Envigo and OBRC had received criminal subpoenas as

---

[11] Defendants erroneously contend that Wilbourn's testimony could not have been false or misleading based on the results of the November 2021 Inspection.  Def. Br. at 20 n.16.  This ignores allegations regarding the timing of the November 2021 Inspection, deadlines set for the Company's compliance, and Wilbourn's participation in the December 17, 2021 exit briefing.  ¶¶77-85.  Similarly, Defendants' suggestion that the results of the March and May 2022 Inspections cannot support the falsity of Wilbourn's testimony (Def. Br. at 20 n.16) makes no sense.  The fact that USDA inspectors later found the same or substantially identical AWA violations unquestionably renders statements concerning remedial efforts purportedly undertaken false and misleading given that those inspections confirmed that the Company had not done what was required of it.  *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 984 (8th Cir. 2012) (plaintiffs sufficiently pled statements about regulatory compliance were false and misleading where noncompliance continued despite "repeated warnings" from FDA regarding their violations).

[12] Defendants implausibly contend that the FAC does not sufficiently link the Company's principal supplier of NHPs to the Criminal Investigation.  Def. Br. at 21-22.  This is not only belied by the ultimate indictment of six executives from the Company's Asia-based "principal supplier" of NHPs (¶17), it ignores allegations regarding the history of the Criminal Investigation (¶¶110-20), including but not limited to the fact that OBRC had engaged in conduct sufficient

part of that investigation in June 2021 and were producing documents in response thereto.[13]
Access to a supply of NHPs—from a "limited international source of supply"—is vitally important
to Inotiv's business and was a material consideration supporting Inotiv's acquisition of Envigo and
the sole justification for the acquisition of OBRC.  ¶¶8-9, 14-15, 38-40, 110-11, 119, 170, 201.
Moreover, as a seller of NHPs, supply constraints made NHPs unbelievably valuable, with prices
for each animal more than tripling to as much as $35,000 per animal.  ¶8.[14]

Defendants do not contest, and thus concede, that certain of the alleged misrepresentations
and omissions regarding NHPs are actionable.  These include misrepresentations and omissions in
the two Primate Fact Sheets, which were continuously available on a Company website starting
on November 5, 2021.  ¶¶186-89.  The Primate Fact Sheets, which speak to the "high quality" and
"future availability" of the Company's NHPs state that the Company is "the world's largest and
most trusted source" of "high-quality" NHPs and tout the Company's ability to "procure high-
quality" NHPs from "high-quality breeding farm partners."  ¶¶186-89.   Defendants also do not
challenge the following statements made by Leasure during the Jefferies Conference:

- That the Company has "an extensive supply of rhesus and cynomolgus models" (¶187);

- That the Company "routinely conducts extensive audits of each farm to ensure supplier
  facilities are well maintained, the animals are well-cared for and healthy, and the export

---

for it to have been identified as an unindicted co-conspirator in the smuggling ring (¶118) and the fact that the Criminal
Investigation and its scope were known to or would have been known to Defendants through due diligence efforts and
Leasure's and Inotiv's connections to the individual, Gary Tucker, who was, at the time, the only person charged with
and convicted of offenses related to the Criminal Investigation (¶¶112-119, 126-28).

[13] Defendants' due diligence of Envigo—which included two visits to the Envigo primate facility in Texas prior to the
Class Period—revealed or would have revealed the pending Criminal Investigation, subpoena to Envigo, and Envigo's
production of documents to the DOJ, as well as the government's focus on Vanny, the principal NHP supplier.  ¶¶119,
126; *see also* ¶¶112-115 (describing the history of the Criminal Investigation that Defendants would have learned
about, or were reckless in not learning about, through the due diligence process before the Envigo acquisition).

[14] Inotiv's NHP business is part of the RMS segment—its largest and most valuable—that included "large research
models," a category that also included canines (*i.e.*, the research beagles discussed above).  The RMS segment
accounted for more nearly three quarters of the Company's revenues and 80% of pro forma adjusted EBITDA (¶¶7,
39); large research models alone accounted for more than 47% of Envigo's pre-acquisition revenues and was estimated
to account for nearly a third of combined Envigo/Inotiv revenues (¶¶39, 170).

facilities are of high quality" (¶188);

- That the Company is "very selective in our breeding farm partners," carries out an "extensive audit program" of supplier facilities, and can provide clients with the ability to "procure … [NHPs] when and where you need them" (¶189); and

- That the Company acquired Envigo to address, among other things, "a concern that we did not have a significant source [of NHPs] that we could rely upon," which provided a unique "competitive advantage" in that "we're the only CRO that has access to all the research models" (¶201).[15]

As noted above, because the Defendants do not challenge these statements, the Court *must* deny Defendants' motion to dismiss in its entirety. *See Pierrelouis*, 2021 WL 1608342, at *10. Nevertheless, all of the FAC's alleged misstatements and omissions are actionable.

Defendants' misrepresentations and omissions regarding NHP matters began on September 21, 2021 in connection with the announcement of the Envigo acquisition and continued through the OBRC acquisition and throughout the Class Period, including:

- Representations concerning the Company's full legal compliance (including but not limited to its not acting in violation of the law and not being in receipt of any documents asserting lack of compliance with legal or regulatory requirements), which failed to disclose the June 2021 grand jury subpoena to Envigo (and, after January 2022, the subpoena to OBRC) and the fact that the Company's principal supplier of NHPS was a focus of the Criminal Investigation (¶¶169, 171);

- Representations in the Primate Fact Sheets touting that the Company is "the world's largest and most trusted source" of "high-quality" NHPs and can "procure high-quality" NHPs from "high-quality breeding farm partners" (¶¶186-89);

- Leasure's statements at the November 16, 2021 Jefferies Conference that the Envigo acquisition had addressed "some of the risk we had to our business model" with respect to "supply chain in our access to research models, which is becoming more and more of a problem and is like a limiting resource"—with specific reference to NHPs as being a concern addressed through the acquisition, which put the Company in a unique position of being "the only CRO that has access to all the research models," which was a "real

---

[15] Although Defendants challenge certain of Leasure's statements at the Jefferies Conference—*e.g.*, Def. Br. at 16 (Cumberland Facility compliance), 21-22 (statements concerning product quality and leading position), 24 n.25 (puffery, Section B.3.c., *infra*), 25 (statements of opinion, Section B.3.c., *infra*)—they *do not directly challenge* the sufficiency of allegations concerning Leasure's representations that the Envigo acquisition eliminated risk by providing supply chain access to NHPs, which were recognized to be a critical resource in short supply, and put Inotiv in a unique position among CROs due to its "access to all the research models."

competitive advantage right now with the supply and demand chain where it is today" (¶¶199-201);

- In announcing the OBRC acquisition on January 27, 2022, Defendants further touted that the Envigo acquisition made the company "a leader in primate welfare and supply" and stated that the acquisition of OBRC would "accelerate growth, provide scale, and ensure that client needs are met with the highest level of animal welfare" (¶204);

- Defendant Leasure's statement on January 27, 2022 that acquiring OBRC would "provide increased access to critical research models" and "the highest level of service, animal welfare, and enhanced supply chain logistics" (*Id.*);

- Defendant Leasure's May 13, 2022 statement to assure investors that the purchase of OBRC had protected Inotiv from industry-wide NHP supply constraints as it "provides an opportunity to further expand our services and address client needs at a time when the industry demand is outstripping supply" (¶224);[16] and

- Defendant Leasure's August 10, 2022 response to a direct analyst question about "what you are seeing in . . . the supply side of your [NHP] business," in which Leasure specifically referred to suppliers in Cambodia (the country from which two government officials were indicted in the Criminal Investigation) and noted that "it's hard to get that information directly over the phone" (¶232).[17]

### 3. Defendants' Arguments Regarding Falsity and Materiality Fail

Defendants' patchwork of arguments attacking the alleged false and misleading statements and material omissions all fail.

#### a) The FAC Alleges a Duty to Disclose

Contrary to Defendants' arguments (Def. Br. at 11-14), the FAC alleges bases upon which Defendants had a duty to disclose the allegedly concealed information.  First, the FAC alleges that

---

[16] Defendants similarly made false and misleading statements and material omissions regarding NHPs—including the failure to disclose grand jury subpoenas to Envigo and OBRC and the focus of the Criminal Investigation on the Company's "principal supplier" of NHPs—in statements made on February 16, 2022 (the Q1 2022 Form 10-Q, ¶¶216-19, 222), May 16, 2022 (the Q2 2022 10-Q, ¶¶228-30), and August 12, 2022 (the Q3 2022 Form 10-Q, ¶¶234-36).

[17] Defendants contend that Lead Plaintiff lacks standing to assert claims based on the last two alleged misrepresentations, which were made after its last purchase of Inotiv stock on May 26, 2022.  Def. Br. at 22 n.21. Because those statements continued to omit the same information concealed from investors throughout the Class Period (*i.e.*, that the Criminal Investigation focused on the Company's principal NHP supplier), it *would not alter* the Class definition or the Class Period here given that the FAC alleges that the truth was not fully revealed regarding the NHP misrepresentations and omissions until November 17, 2022.  Moreover, "[l]ead plaintiffs need not have standing to sue for every claim on every day of the class period."  *Shapiro v. TG Therapeutics, Inc.*, 2022 WL 16555585, at *4 (S.D.N.Y. Oct. 31, 2022) (citation omitted).

Defendants' statements regarding the Envigo and OBRC acquisitions, the RMS segment, and the Cumberland Facility and/or the NHP business were rendered false and misleading by the failure to disclose the serious AWA violations that existed at the Cumberland Facility prior to and during the Class Period, the June 2021 grand jury subpoenas to Envigo and OBRC in the Criminal Investigation, and the Criminal Investigation's focus on the Company's principal supplier of NHPs. *See* Section III.B, *supra*. "[U]pon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002). *See also Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir. 1991) (under Rule 10b-5 even the lack of an independent duty "does not excuse a material lie"). Here, a reasonable investor would have understood Defendants' representations to mean that the acquisitions of Envigo and OBRC were *reducing and not increasing* risks to the Company. *See*, *e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) ("a reasonable investor would consider the potential effects of [investigations] on the overall economic health of the company as significantly altering the total mix of information made available") (citation and internal quotation marks omitted); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (statements regarding potential investigations and subpoenas were misleading "because the inference is available that a reasonable investor could have read them to mean that [defendant] was not already in receipt of just such a request for information").[18]

Second, Defendants violated the affirmative disclosure duties imposed by Regulation S-K

---

[18] Defendants' authority is inapposite. *See Heavy & Gen. Laborers' Loc. 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022) (unlike here, where Envigo and OBRC received grand jury subpoenas several months earlier, a CFPB investigation did not, "on its own" trigger a duty to disclose); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13 (S.D.N.Y. 2016) (defendants had not made statements regarding the subject matter of an investigation that were "rendered materially misleading by omitting information about the investigation").

Items 303 (17 C.F.R. § 229.303)[19], 103 (17 C.F.R. § 229.103)[20], and 105 (17 C.F.R. § 229.105)[21]

by failing to disclose, among other things, the following material information in the Proxy and

Forms 10-Q and 10-K (including those incorporated by reference in the Proxy):

    (a) that, in June 2021, Envigo and OBRC received grand jury subpoenas in the Criminal Investigation;

    (b) that, as a result of the Criminal Investigation and its focus on the Company's principal NHP supplier, Inotiv was exposed to risk that federal law enforcement could take actions that could result in significant costs and expenses or harm to the Company, including potential penalties or reputational damage to the Company, as well as cessation of NHP imports;

    (c) that USDA inspectors had found serious and ongoing AWA violations at the Cumberland Facility that had not been remedied sufficiently;

    (d) that, as a result of the USDA findings, the ongoing violations, and the Company's inadequate response, Inotiv was exposed to present and mounting risks that the inspection process was likely to result in civil or criminal actions that could result in significant costs and expenses and reputational damage to the Company; and

    (e) that the Criminal Investigation and AWA violations at the Cumberland Facility could adversely affect the Company's financial results.

While the truth of the AWA violations at the Cumberland Facility began to emerge starting

on November 15, 2021 (which the Company promptly denied, see above), it was not until February

16, 2022 that the Company first disclosed the June 2021 subpoena to Envigo, not until May 20,

2022 that the Company acknowledged the severity of violations at the Cumberland Facility that

resulted in a raid on the Cumberland Facility, and not until November 17, 2022 that the Company

disclosed that the Criminal Investigation resulted in indictments of "employees of the Company's

principal supplier" of NHPs, which further revealed that recently-acquired OBRC was an

---

[19] *See Shah v. Zimmer Biomet Holdings, Inc.*, 2020 WL 5627171, at *2 (N.D. Ind. Sept. 18, 2020) (Item 303 requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations").

[20] *See Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 483 (7th Cir. 2015) (Item 103 requires companies to describe material legal proceedings, including the principal parties and facts giving rise to the proceedings).

[21] *See Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *8 (N.D. Ill. Feb. 10, 2023) (Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky").

unindicted co-conspirator in the primate smuggling ring described in the Federal Criminal Matter. The failure to disclose this material information therefore violated the disclosure obligations imposed by Items 303, 103, and 105; Defendants falsely led investors to believe that the Company was not exposed to any material risks other than those already disclosed.

### b) Inotiv's Risk Disclosures Did Not Sufficiently Caution Investors Regarding the Concealed Information

Defendants raise factual arguments that investors were sufficiently warned of all material risks concerning the Cumberland Facility and the NHP business by pointing to certain boilerplate risk disclosures made by the Company. Def. Br. at 12-14. Those disclosures, however, only generically speak to the fact that the Company is "subject to a variety of governmental regulations," its facilities are "subject to routine formal inspections," and that a failure to comply could harm the Company's business. *Id.* Fatal to Defendants' argument, the Company's generic risk disclosures did not address then-existent, specific risks associated with (1) the USDA inspections of the Cumberland Facility and the repeated findings of serious non-compliance with the AWA; and (2) the grand jury subpoenas to Envigo and OBRC and the risk that the Criminal Investigation was focused on the Company's "principal supplier" of NHPs. Thus, Defendants cannot contend that investors were informed of *those risks*; indeed, the FAC pleads that certain of these and similar representations were, in fact, false and misleading.[22]

---

[22] *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017) (generic risk disclosures that failed to address known facts, including that certain facilities "may not comply with our standards," were insufficient when the company knew that standards were not being applied); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583-84 (S.D.N.Y. 2016) (disclosures that the company was subject to scrutiny that "has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas" were insufficient as they "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation"). While the Inotiv 10-K filed on December 21, 2021 includes language addressing the Cumberland Facility, it said nothing about the risks from the Criminal Investigation, and the FAC alleges that certain information about the Cumberland Facility had already begun to enter the market on November 15, 2021. Moreover, the FAC further alleges that Defendants issued a statement on November 16, 2021 effectively denying the USDA's findings and the Company continued to publish the Cumberland Fact Sheet throughout the Class Period (which Defendants do not contest alleges actionable misstatements and omissions).

18

**c) None of the Alleged Misrepresentations or Omissions are "Puffery" or Non-Actionable Statements of Opinion**

Defendants wrongly contend that certain alleged misrepresentations or portions thereof cherry-picked from the FAC are "puffery." Def. Br. at 24-25. This argument miscasts the FAC's allegations, ignores the context of those statements, and advances an attack on materiality grounded in fact-based contentions as to which courts should proceed cautiously on a motion to dismiss because "[t]he crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 596 (7th Cir. 2006), *as modified on denial of reh'g* (July 10, 2006), *vacated and remanded*, 551 U.S. 308 (2007). The FAC alleges why the alleged false and misleading statements and material omissions constituted consequential facts about the acquired beagle breeding and NHP businesses. *See* Section III.B, *supra*.

Contrary to Defendants' characterizations, the portions of the statements that they identify do not constitute puffery.[23] The FAC alleges that Defendants failed to comply with AWA requirements as detailed in reports of USDA inspections of the Cumberland Facility prior to and during the Class Period and in declarations of individuals who executed a federal search warrant in May 2022. ¶¶95, 243. The FAC also alleges that Defendants concealed the Company's connection to an ongoing criminal investigation into the importation of NHPs from Inotiv investors. ¶¶110-120. Viewing the statements "in the context of the 'total mix' of information,"

---

[23] Moreover, Defendants do not challenge, and thus concede, that other portions of the challenged misrepresentations and omissions are actionable. *See e.g.*, ¶¶161-170 (multiple statements made on September 21, 2021), ¶¶173-176 (Proxy statements); ¶¶186-88 (statements in the High Quality Fact Sheet concerning the Company's long experience, "extensive supply" of NHPs, being "well-positioned even in today's constrained supply market," and conducting of "extensive audits of each [NHP] farm"); ¶189 (statements in the Future Availability Fact Sheet about being "selective in our breeding farm partners" and "extensive audit program"); ¶193 (multiple statements falsely denying criticisms of the Cumberland Facility); ¶¶200-01, 204 (various statements touting purported benefits of the Envigo acquisition including that it addressed risk to the company though, among other things, providing supply to large models); ¶¶206-210 (numerous statements in Defendant Wilbourn's Virginia Senate testimony).

statements regarding research model quality and suggesting compliance with animal welfare standards are material given the regulatory environment in which Inotiv operates. *See City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (statement that company was working to meet "highest level of compliance and quality" was not puffery as a matter of law); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that inventory was "in good shape" or "under control" were not puffery). Given that many of these statements were made in the context of the acquisition of Envigo, these statements were not only material to the market, but also material to how shareholders would vote on the matters necessary to effectuate the Envigo acquisition.[24]

Likewise, contrary to Defendants' argument, certain statements regarding how Defendants were responding to USDA-identified AWA violations are not inactionable opinions. First, although Defendants rely on *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 178 (2015), that case addresses claims brought under §11 of the Securities Act; the Seventh Circuit has yet to clarify whether *Omnicare* applies to §10(b) or §14(a) allegations. Even assuming *Omnicare* applies—and that the challenged statements are opinions—Defendants' statements are still actionable. *Omnicare* states that "whether an omission makes an expression of opinion misleading always depends on context." 575 U.S. at 190. Critically, "*Omnicare* nevertheless provides that an opinion statement can still be actionable as misleading in three ways: (1) the speaker did not hold the belief professed; (2) the opinion statement contained supporting

---

[24] Defendants' reliance on *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018), is misplaced. Unlike here, the plaintiff in *Ong* did not allege a failure to undertake quality and food safety programs, "but merely quibble[d] with Chipotle's execution of those programs and procedures." *Id.* at 232. Defendants also mistakenly rely on *Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) and *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017). Neither case involves statements offered in the context of an acquisition. Moreover, in *Stratasys*, the court held that statements of a printer's "unmatched speed" and quality were nonverifiable, unlike here where the FAC alleges that Envigo's beagles did not meet researchers' requirements and other statements concerning Envigo and OBRC that were not only verifiable but within the scope of Defendants' due diligence prior to those acquisitions.

facts which were untrue; or (3) the statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when 'those facts conflict with what a reasonable investor would take from the statement itself[.]'" *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *14 (N.D. Ill. Apr. 18, 2022) (citation omitted). Even statements that are "literally true can still be actionable under §10(b) as misleading if they are susceptible to another interpretation by a reasonable investor." *Id.* at *11 (citation omitted).

Here, each of the challenged statements contains untrue supporting facts and/or omits material facts about the Company's AWA noncompliance, rendering the statements misleading.[25] For example, the statement by Leasure that "we see Envigo as a best-in-class provider of high-quality research models and services" (1) is untrue given the reality of conditions at the Cumberland Facility that Leasure saw on the Due Diligence Tour and that were documented by the USDA, (2) contains an untrue supporting fact regarding the research quality of the Cumberland beagles based on their aggression and unsuitable behavior, and (3) is materially misleading in the context of a conference call where a reasonable investor would expect statements to convey a speaker's basis for holding that view. *See Omnicare*, 575 U.S. at 188 (a reasonable investor may "understand an opinion statement to convey facts about how the speaker has formed the opinion"). Further, these statements were made in controlled settings where the speaker had ample familiarity with the subject matter prior to offering the statements, in contrast to *Supreme Industries*, which contrasted a prepared statement to an unscripted, "off-the-cuff" statement not at issue here. *See In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *12 (N.D. Ind. May 23, 2018).

---

[25] Defendants cherry-pick a handful of portions of larger statements as supposed non-actionable opinions and do not claim the entirety of those statements to be opinions. Def. Br. at 25-26. The statement at ¶163 was given during the Company's business combination conference call announcing the acquisition of Envigo. The statements at ¶¶193-94 were from a longer statement in response to activists' criticisms of the Cumberland Facility. The statements at ¶¶210 and 225 are only portions of Defendant Wilbourn's during testimony before the Virginia Senate Hearing.

### d) The Cumberland Facility was Material to Investors

Defendants incredibly suggest that the alleged misrepresentations and omissions regarding the Cumberland Facility were not material to investors. Def Br. at 26-27. In addition to raising a factual dispute that is not appropriate on a motion to dismiss, Defendants' sole support for this argument comes from a June 13, 2021 press release in which Inotiv sought to assure investors that closure of the troubled Cumberland Facility would be a positive for the company by claiming, among other things, that the facility comprised "less than 1% of our total Inotiv revenue." *See* ¶263; Def. Ex. M at 4. This assertion is unverifiable based on the Company's prior disclosures of RMS segment and large model revenues, which did not break out revenues by facility or large model species and is otherwise inconsistent with the FAC's allegations concerning the materiality of the Cumberland Facility to investors (*see* Section III.B, *supra*). Moreover, the market's strong negative reaction to news about the Cumberland Facility (*see* Section III.D, *infra*) belies Defendants' argument that the issue was not material to investors.[26] Further, the Company's own extensive response to the negative publicity surrounding release of the July 2021 USDA inspection reports—including but not limited to Leasure's personal participation in lobbying efforts and retention of influential Virginia lobbyists (¶156) and Wilbourn's assertion that the Company was engaged in an "all hands on deck exercise" (¶210)—demonstrates the materiality of the issues.

### e) If any Statements Were Forward Looking, They are Not Protected

Defendants' arguments that certain portions of alleged misrepresentations and omissions are protected "forward-looking" statements (Def. Br. at 27-28) misstate the FAC's allegations and fail as a matter of law. Other than a statement concerning the Company's intent to rebrand

---

[26] *See*, *e.g.*, *Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 912-13 (N.D. Ill. 2002) ("in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock…") (citation omitted); *Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 347 (E.D. Pa. 2014) (stock "drop subsequent to disclosure strongly suggests that the withheld and/or misrepresented information was material information to investors").

Envigo's operations under Inotiv's name, Defendants did not specify which portions of the three statements they reference to be forward looking.[27]   Regardless, the PSLRA "safe harbor" requires any statement identified as forward looking to be (as Defendants' acknowledge) accompanied by "meaningful" cautionary language.   *See*, *e.g.*, *Pierrelouis*, 2021 WL 1608342, at *9-11 (meaningful cautionary language must do more than warn of potential problems; defendants cannot "imply[] that no such problems were on the horizon even if a precipice was in sight" or fail to acknowledge that a particular risk has already transpired) (citations omitted).   For the same reasons that the allegedly omitted information was not disclosed to investors, *see* Section III.B.2, *supra*, Defendants did not provide sufficiently cautionary language to invoke the safe harbor.

### C.    The FAC's §10(b) Allegations Give Rise to a Strong Inference of Scienter

To plead scienter to sustain a §10(b) claim, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   *See* 15 U.S.C. § 78u-4(b)(2)(A).   The requisite state of mind—an intent to deceive—may be shown where, as here, it is alleged that the defendant "either knew the statement was false or was reckless in disregarding a substantial risk that it was false."   *See Makor Issues & Rts., Ltd. v. Tellabs Inc. (Tellabs III)*, 513 F.3d 702, 704 (7th Cir. 2008); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 842 (N.D. Ind. 2018) (same).   In the Seventh Circuit, scienter can be established by proving that the defendant acted with a "reckless disregard of the truth."   *See e.g.*, *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 854 (N.D. Ill. 2017).

In considering allegations of scienter, "the court's job is not to scrutinize each allegation

---

[27] Defendants miscast the allegations regarding Leasure's statement on the intent to "rebrand" all operations under the Inotiv name.  In addition to being false and misleading, the statement provides support for Defendants' scienter to the extent that keeping the Envigo brand on certain risky or problematic operations (*i.e.*, the Cumberland Facility and NHP importing) shows an attempt to conceal those matters from Inotiv's investors.  ¶202.c.  Also, Defendants' assertion regarding "causation" for this statement is incorrect.  The truth of Inotiv's connection to conditions at the Cumberland Facility was revealed to the market through, among other things, Inotiv's May 20, 2022 announcement of the raid on the Cumberland Facility and DOJ Action (in which *Envigo* was the named defendant).

in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd. (Tellabs II)*, 551 U.S. 308, 326 (2007).  While the Court must consider a defendant's *plausible* opposing inferences, any "tie . . . goes to the plaintiff."  *Okla. Firefighters Pens. & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) (alteration in original) (citation omitted); *see also Shah*, 348 F. Supp. 3d at 842-43.  The "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs II*, 551 U.S. at 326.  Indeed, scienter may be inferred from "circumstantial evidence of conscious misbehavior or recklessness."  *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 850 (N.D. Ill. 2017).

Under this approach, the FAC clearly pleads a strong inference of scienter by setting forth a host of detailed allegations supporting a strong inference of scienter, nearly all of which are ignored by Defendants.  Significantly, Defendants do not contest that their knowledge and/or recklessness is shown by allegations of: (1) the involvement of Leasure, Sagartz, and Wilbourn in an extensive due diligence process prior to the acquisition of Envigo (¶¶11-14, 45, 119, 243); (2) Leasure's involvement in the OBRC acquisition, including his attendance at a "leadership meeting" in Texas where he learned or would have learned of OBRC's being embroiled in the Criminal Investigation focused on the Company's principal NHP supplier (¶¶128, 243); (3) Wilbourn's and Sagartz's participation in "exit briefings" with USDA inspectors following inspections of the Cumberland Facility at which they were advised of undisclosed material adverse facts (¶¶58, 75, 85, 93); (4) the fact that Defendants knew or likely knew of the ongoing Criminal Investigation and the sordid history of animal welfare problems at the Cumberland Facility through the due diligence process and/or leadership of the Company (¶¶110-20, 146-159); (5) Envigo and OBRC responding to subpoenas in the Criminal Investigation (¶¶116-20); (6) Leasure's personal

participation in Virginia lobbying efforts to "crisis manage" following public outrage over conditions at the Cumberland Facility (¶156); (7) Wilbourn's testimony before the Virginia Senate regarding her responsibility for the Cumberland Facility and awareness of conditions there (¶¶206-10); and (8) the fact that Leasure, Taylor, and Sagartz represented the Company during investor conference calls and were held out as knowledgeable sources of information regarding the Company and its operations (¶246).[28]

Defendants' brief addresses only *two* of the myriad scienter allegations in the FAC: (1) a fundamentally flawed attack on CW allegations (Def. Br. at 30-32); and (2) a spurious argument regarding the core operations doctrine (Def. Br. at 32-33). Defendants also advance an additional argument that purported insider stock purchases by certain Defendants undercut scienter. Def. Br. at 29. Defendants' arguments not only fail to tip the balance of inferences in their favor, they utterly fail to defeat the whole factual picture of Defendants' scienter painted by the FAC. *See AnchorBank*, 649 F.3d at 617 (plaintiffs adequately pled scienter, noting that "while the competing explanations regarding scienter and reliance could be useful to the trier of fact, they are insufficient in this case to justify dismissal for failure to state a claim on which relief can be granted").

    **1. The FAC's Uncontested Scienter Allegations Individually and Collectively Support a Strong Inference of Scienter**

        **a) Defendants' own statements and actions demonstrate knowledge or reckless disregard of materially adverse nonpublic information**

Defendants ignore the FAC's allegations that Leasure and Sagartz had direct knowledge of or recklessly disregarded conditions at the Cumberland Facility and the Criminal Investigation

---

[28] Speaking on behalf of the Company supports the inference of scienter. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 100 (S.D.N.Y. 2022) (participation in investor calls supported scienter); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *17 (N.D. Ill. Aug. 11, 2021) (a court may "readily and reasonabl[y] infer" from defendants' discussion of certain issues that they "made it [their] business to look into" these issues") (citation and internal quotation marks omitted).

after personally participating in an extensive due diligence process and Due Diligence Tour prior to the Envigo acquisition. ¶11-14, 43-46. *Based on details provided by Defendants in the Proxy*, Defendants Leasure and Sagartz personally visited 17 of Envigo's 22 sites from July 20, 2021 to August 20, 2021, including the Cumberland Facility and Texas primate facility. ¶¶11-14, 45, 243. Critically, Leasure and Sagartz visited Cumberland at the same time that inspectors found serious AWA violations to be rampant. As detailed in USDA inspection reports from prior to and during the Class Period and the declarations of individuals who participated in the execution of the federal search warrant in May 2022, the filthy conditions and aggressive dogs would have been impossible to miss. ¶¶95, 243. *See e.g. Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 928-29 (N.D. Ill. 1998) ("[d]eliberately ignoring 'red flags' … can constitute the sort of recklessness necessary to support § 10(b) liability"). Similarly, Defendants learned or would have learned through the due diligence process and Leasure's and Sagartz's visits to the Envigo facility in Texas that Envigo had received a subpoena in June 2021 in the Criminal Investigation and that the investigation was focused on the Company's principal supplier of critical NHPs. ¶¶12, 14, 127-28.

On February 3, 2022, Defendant Wilbourn—who participated in the due diligence process as an Envigo employee—testified at the Virginia Senate Hearing regarding the Cumberland Facility. ¶¶206-210. Wilbourn testified that she was personally responsible for "ensuring the proper and lawful operations" of the Cumberland Facility (¶207) and stated that the Company's "senior management, including me, has been onsite frequently … to address the challenges as rapidly as possible" (Def. Ex. R at 5-6). Further, Defendant Leasure traveled to Richmond, Virginia to lobby, "crisis manage," and retain high powered lobbyists in an effort to thwart Virginia "beagle bills" prompted by the AWA violations at the Cumberland Facility. ¶156. These facts further demonstrate that Wilbourn and Leasure had personal knowledge of the non-compliant

26

conditions at the Cumberland Facility. *See Constr. Workers Pension Fund-Lake Cnty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 661 (N.D. Ill. 2015) (scienter sufficiently pled where CEO attended a meeting where relevant matters were discussed).

Similarly, where Defendants Leasure and Sagartz received extensive business information from Envigo during the due diligence process and visited Envigo's Texas Facility during the Diligence Tour, the only plausible inference is that they knew of or were reckless in not knowing of the then-recent June 2021 subpoena to Envigo and critical import-related risks facing the NHP business from the Criminal Investigation, the acquisition of which Leasure stated was a major factor in the Envigo acquisition. ¶¶7-9, 11-12, 14, 43-46, 110-19, 200-01. In June 2021, both Envigo and OBRC received subpoenas regarding the DOJ's criminal investigation into the importation of NHPs. ¶116. The subpoenas required the production of documents and the Company later claimed to have cooperated with the DOJ in response to the subpoenas. *Id.* It is reasonable to infer Defendants' scienter on this fact alone because receipt of the subpoenas and understanding the nature of the Criminal Investigation transformed any hypothetical risks as to NHPs into realized risks requiring full, public disclosure. *See* Section III.C.1.e, *infra*.

### b) Departure of Chief Operating Officer Harkness

On June 24, 2022, Inotiv announced that Jim Harkness, Chief Operating Officer ("COO") of the RMS segment (including the Cumberland Facility and Texas primate facility) would be abruptly "retiring" from the Company. ¶¶237, 247. Prior to the acquisition of Envigo, Harkness served as Envigo's COO and was essential to the due diligence process. ¶237. The sudden departure of a key executive who had been involved in matters at the heart of the alleged fraudulent conduct supports a strong inference of scienter. *See Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011) (retirement supported inference of scienter in holistic analysis); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (proximity of a departure to disclosure

of misconduct "adds one more piece to the scienter puzzle") (citation and internal quotation marks omitted); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. Nov. 1, 2007) (departures "add to the overall pleading of circumstantial evidence of fraud").

### 2. Defendants' Limited Challenges to Certain Scienter Allegations Fail

#### a) Allegations of CWs Support Scienter

Defendants seek to minimize the significance of the CW allegations, discount the corroborating nature of those allegations, and erroneously suggest that the CW allegations add nothing to the scienter analysis. Def. Br. at 30-32. At a minimum, however, as Defendants concede, the CW allegations provide "confirmation" of other scienter allegations with respect to Defendants' participation in the due diligence process. *Id.* In fact, the FAC's CW allegations go further than that and provide additional support for a strong inference of scienter.[29]

Contrary to Defendants' argument, the Seventh Circuit has recognized that statements from CWs can support a strong inference of scienter where, as here, the CWs are described in a manner to show that they "were in a position to know at first hand the facts to which they are prepared to testify." *Tellabs III*, 513 F.3d at 712. Further, where, as here, multiple sources corroborate the CW allegations, the inference of scienter is strengthened. *Id.* at 711-12 (distinguishing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) as addressing circumstances where, unlike here, "[t]here was no basis other than the confidential sources" to support scienter). Indeed, as this Court has recognized, "a presumption to disregard confidential witness allegations was squarely rejected

---

[29] Defendants' authority regarding the CW allegations is wholly inapposite. Indeed, only one case cited by Defendants, *Zimmer*, includes an analysis of CW allegations. However, unlike here where the CW allegations corroborate other scienter allegations and where there are a myriad of allegations supporting the strong inference of scienter, plaintiffs in *Zimmer* relied *primarily* on CW to support scienter. *See Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009), *aff'd sub nom. Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952 (7th Cir. 2012). Defendants also erroneously cite *Zimmer* to argue that CW allegations must indicate "actual knowledge by the defendant," (Def. Br. at 30) but that only addresses a standard applicable to forward-looking statements, which are not at issue here.

by the Seventh Circuit in *Tellabs III*, and district courts, including this one, have credited confidential witnesses when sufficient detail as to the basis for their knowledge is alleged." *Shah*, 348 F. Supp. 3d at 844 (citing *Tellabs III*, 513 F.3d at 712).[30]

The FAC describes each confidential witness, all of whom are former employees of the Company whose tenures fell within the Class Period and the due diligence period leading up to the acquisition of Envigo, with sufficient particularity to support the probability that persons in their positions would possess the information alleged. ¶¶121, 129, 133, 143. The FAC describes the confidential witnesses by providing details including each witness's dates of employment and job duties. ¶¶121-122, 129, 133, 143. The CWs' accounts corroborate the fact that Defendants knew of or recklessly disregarded both the non-compliant conditions at the Cumberland Facility and the Criminal Investigation. Thus, contrary to Defendants' suggestion, the sufficiently detailed and corroborating CW allegations are unlike *Higginbotham* and consistent with *Tellabs III* and *Shah* by serving as supplemental support for the FAC's allegations of a strong inference of scienter.

Specifically, the CW allegations support a strong inference of scienter regarding Defendants' knowledge and/or recklessness as to the matters concealed from investors by corroborating and supplementing the description of the Due Diligence Tour in the Proxy. For example, CW2 recalls that a group of Inotiv executives, including Leasure, visited the Envigo site in St. Louis for approximately four hours in July or August 2021, during which time Leasure and the Inotiv team toured the facility and asked detailed questions. ¶¶130-31. Similarly, CW1 recalls that Leasure conducted two full-day visits to the Envigo primate facility in Texas, with Sagartz

---

[30] *See also United Union Roofers, Waterproofers & Allied Workers Loc. Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 2014 WL 12780549, at *3 (N.D. Ill. Oct. 21, 2014) (plaintiff's confidential witness statements supported a cogent inference of scienter); *City of Sterling Heights*, 2013 WL 566805, at *17 (court may rely on confidential witness allegations if plaintiffs provide "job title, duration of employment …, and a description of employee responsibilities" for each confidential witness); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 283 (S.D.N.Y. 2010) (*Higginbotham* "severely limited" by *Tellabs III*).

participating once.  ¶¶125-26.  Defendants do not contend that these and other allegations of CW1 and CW2, describing extensive site visits at which Leasure, Sagartz, and other Inotiv personnel obtained detailed information about Envigo's operations, present an unusual picture of a typical of site visit on the Diligence Tour; the most plausible inference is that visits to the Cumberland Facility and Texas primate facility were similarly involved.

The allegations from CW1 and CW3 provide further support for the inference that it would have been impossible for Inotiv personnel visiting the Cumberland Facility during the Due Diligence Tour to have left the facility without knowledge of the non-compliant conditions at the facility.  ¶¶122, 133-42.  Likewise, facts attributed to CW1 support a strong inference of scienter regarding Defendants' knowledge and/or recklessness regarding the Criminal Investigation and related risks involving the importation of NHPs.  In addition to observing Inotiv personnel at Envigo's Texas primate facility on at least two occasions in 2021, (¶¶126, 243), CW1 further understood that the Criminal Investigation was "general knowledge" among management-level Envigo employees at that time, as was similar awareness of the Tucker Matter.  ¶¶127-28.  CW1 describes additional bases upon which Leasure (if not other Defendants) learned or would have learned of grand jury subpoenas to Envigo and OBRC and other aspects of the Criminal Investigation, including through Leasure's participation in a "leadership meeting" at Envigo's Texas facility prior to the OBRC acquisition, at which the then-convicted Tucker was present; attendees were aware of Tucker's guilty plea and sentencing.  ¶¶128, 243.

### b)  The Matters Alleged to Have Been Misrepresented and Omitted Involve "Core Operations" of the Company

Defendants do not dispute that the alleged misrepresentations and omissions regarding the NHP business concern Inotiv's "core operations" for purposes of scienter.  However, Defendants erroneously contend that the Cumberland Facility did not fall within the Company's core

operations. Def. Br. at 32-33. Under the core operations doctrine, "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1028 (N.D. Ill. 2010). A strong inference of scienter may be credited where, as here, it is "almost inconceivable that an individual defendant would be unaware of the matters at issue." *Id.* at 1029 (*quoting Desai v. Gen. Growth Properties, Inc.*, 654 F.Supp.2d 836, 860 (N.D. Ill. 2009)).

The facts alleged to have been misrepresented and omitted unquestionably support a strong inference of scienter under the core operations doctrine because they pertain to business-critical operations, including animal husbandry, research model quality control, and the production and importation of necessary research models.[31] ¶244-45. Inotiv specializes in drug discovery and development services that, following the Envigo acquisition, included "breeding, importing and selling research-quality animal models for use in laboratory tests." ¶¶34-35. Moreover, Defendants told investors that access to an in-house supply of large research models, a category of animals that included research beagles and NHPs, was a primary justification for the acquisition of Envigo and OBRC. ¶¶14, 39-40, 121, 170, 181. Thus, as the RMS segment's business—the largest component of Inotiv's revenues, by far (¶39)—was of critical importance to the Company, the clear inference is that it is "almost inconceivable" that facts concerning those critical operations would not have been known to Inotiv's executive officers, including Defendants Leasure, Taylor, and Sagartz. *See Corus Bankshares, Inc.*, 701 F. Supp. 2d at 1028-29 (defendant's "intimate involvement" gave rise to strong inference that he was aware of company's financial troubles under

---

[31] Defendants' authority is easily distinguished. *See Zimmer*, 673 F. Supp. 2d at 725 (plaintiff did not allege that the products at issue were critical to defendant's core operations); *Société Générale Sec. Servs GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018) (the court did not engage in any analysis of whether Defendant company's tax position was a core operation and asserted a conclusion on whether defendants believed certain opinions); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 851 (N.D. Ill. 2003) (addressing accounting violations and forward-looking statements not at issue here).

core operations doctrine). Moreover, in minimizing the initial USDA findings in November 2021, the Company itself described the issues at Cumberland as involving "a core value of our company [that] is central to our business." ¶¶197-98.[32]

Although Inotiv's RMS segment accounts for approximately three quarters of the Company's revenue, with large models (beagles, NHPs, and rabbits) having accounted for nearly half of Envigo's pre-acquisition revenue (¶39), Defendants seek to downplay this fact by arguing that the Cumberland Facility accounted for "1% of Inotiv's total revenue and was a net loss for the Company." Def. Br. at 32. Defendants' inappropriate factual argument fails for the same reason as it does for materiality (see III.B.3, supra): the unsupported 1% figure was not previously disclosed to investors and was only used to downplay the impact of the Cumberland Facility's closure that was necessitated by settlement of the DOJ Action. The Seventh Circuit has indicated that the core operations inference applies where the practices "are a significant part of [a company]'s financial picture." Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp., 895 F.3d 933, 937 (7th Cir. 2018). Accordingly, the necessity of proper animal husbandry and regulatory compliance in the large model business is not only critical to Inotiv's core business (both as a seller and user of research beagles), but essential to the Company's reputation and financial picture for purposes of contributing to the strong inference of scienter.

### c) Defendants' Stock Purchases Do Not Defeat Scienter

While the FAC does not contain any allegations regarding Defendants' stock ownership or sales, Defendants attempt to conjure up an inference against scienter through the inverse of a

---

[32] The importance of the Cumberland Facility to Inotiv is further demonstrated by the sworn declaration of Defendant Sagartz filed in the DOJ Action on June 13, 2022. These facts include, but are not limited to: (i) the Cumberland Facility "has produced up to 25 percent of the beagle dogs used domestically in the development of new medicines"(¶245); (ii) use of "purpose-bred beagle dogs" from the Cumberland Facility was "essential for biomedical research and the development of lifesaving drugs and medical devices" (id.); and (iii) such "purpose-bred" dogs were "instrumental to evaluating the efficacy and safety of novel medicines"–purposes that were part of Inotiv's mission as a CRO. ¶¶5, 34, 40, 110, 201, 245. This also supports the FAC's allegations of materiality.

suspicious stock sale by pointing to Class Period stock purchases by Leasure, Taylor, and Sagartz. However, just as a suspicious stock sale is not necessary to support a strong inference of scienter, a miniscule purchase of stock by Defendants does not, by itself, defeat scienter. Here, Defendants conveniently failed to note how much stock Defendants purchased on February 17-18, 2022: Leasure purchased 5,000 shares to increase his holdings by a mere 1.8% percent; Sagartz purchased 2,506 shares, increasing his total holdings by *less than 0.4%*; and Taylor purchased 5,000 shares, a less than 6.4% increase in her stock holdings. *See* Def. Exhibit J. Minor purchases of this sort are insufficient to undercut the FAC's other allegations of scienter. *See Pierrelouis*, 2021 WL 1608342, *8 (finding that stock purchases that were "not massive in comparison with [defendant's] other stock holdings" did not undercut allegations of scienter, also noting that plaintiff was under no obligation to establish a motive for defendants' alleged deceit).[33]

### d)  Receipt of Subpoenas Supports an Inference of Scienter

Defendants erroneously contend that the FAC does not allege that "Defendants (or anyone else)" knew that subpoenas in the Criminal Investigation would result in the indictments in the Federal Criminal Matter. Def. Br. at 31-32. The FAC alleges that Envigo and OBRC received grand jury subpoenas in the Criminal Investigation in June 2021 and had been producing documents in response thereto. ¶116. If Defendants' own representations regarding due diligence are to be believed, it is inconceivable that they did not know or would not have learned that Envigo and OBRC received grand jury subpoenas in June 2021 regarding an issue critical to those acquisitions and that the companies were producing documents to the government—and that the

---

[33] Defendants erroneously rely on *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 666-67 (N.D. Ill. 2020), which found that insider stock purchases tipped the scienter analysis in defendants' favor only where plaintiffs' other "allegations do not support a strong inference of scienter" and, unlike here, "Plaintiffs do not plead particular facts about the diligence process" to show Defendants' awareness of matters. *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *11 (N.D. Ind. May 23, 2018) also does not support Defendants' argument because, unlike here, plaintiff relied on insider stock sales to support its scienter allegations.

investigation was focused on Vanny, the companies' principal supplier of NHPs.  Indeed, many federal courts have found that, like here, receipt of and response to a subpoena supports the inference of scienter.  *See, e.g.*, *Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014) (receipt of DOJ subpoena can be "one more piece of puzzle" in a series of circumstances adding up to a strong inference of scienter).[34]

### D.     The FAC Properly Pleads Loss Causation

To plead loss causation, a complaint need only allege a "'short and plain statement' … provid[ing] the defendant with 'fair notice'" of the plaintiff's loss-causation theory; pleading loss causation is "not meant to impose a great burden upon a plaintiff."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (citation omitted).  *See also id.* at 336 (noting that allegations of loss causation are governed by the notice pleading standard of Fed. R. Civ. P. 8).  *See also Fryman*, 2022 WL 1136577 at *32 (same) (citations omitted).  "While ***proving*** loss causation is often a complex and fact-intensive exercise that typically requires expert testimony, . . . ***pleading*** loss causation requires no proof, just plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants."  *In re the Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, *28 (N.D. Ill. Aug. 23, 2022) (emphasis in original) (citation omitted).  The FAC meets this easily met pleading standard.

The FAC alleges that, during the Class Period, the Company's stock price was artificially inflated by Defendants' material omissions and misrepresentations.  *See* Sections I, II, III.B.  The

---

[34] *See also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (agreeing that the existence of an investigation may be considered by court as part of its analysis) (citation omitted); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F.Supp.2d 683, 713 n. 8 (E.D. Mich. 2010) (attaching relevance to the existence of government investigations); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 148, 168 (S.D.N.Y. 2008) (including an investigation by the DOJ as one of the elements in the scienter analysis).

FAC further alleges that the artificial inflation came out of Inotiv's stock price in a series of partial corrective disclosures directly tied to the alleged false and misleading statements and omissions concerning the serious AWA noncompliance at the Cumberland Facility and the direct and imminent threat to the Company's NHP business from the Criminal Investigation. ¶¶256-64. With respect to the misrepresentations and omissions regarding the Cumberland Facility, the FAC alleges that the truth was first partially revealed after release of the USDA's reports of the July 2021 Inspection on November 15, 2021, which caused Inotiv's stock price to fall by $2.80 per share, or more than 5%. ¶260. Then, following news of the raid on the Cumberland Facility and entry of the Amended TRO, Inotiv's stock suffered a sharp decline of $5.19 per share (more than 28%). ¶262. With respect to the misrepresentations and omissions regarding the threat to the NHP business, the FAC alleges that the truth was first partially revealed by the February 16, 2022 announcement that Envigo (but not OBRC) had received a criminal subpoena *eight months earlier*, in June 2021, which—as the financial news service Bloomberg observed at the time—caused a two-day decline in the price of the Company's stock of $8.03 per share, or more than 28%. ¶261.[35] Then, after Inotiv disclosed that "employees of the Company's principal supplier" of NHPs and two Cambodian government officials had been criminally charged with "conspiring to illegally import NHPs into the United States," Inotiv's stock price plummeted by $9.03 per share, nearly 57%, to close at $6.82 per share on November 17, 2022. ¶264. These allegations are unquestionably sufficient to plead loss causation.

Ignoring the well pled allegations, Defendants' fact-based loss causation arguments fail for several reasons. First, Defendants assert a fundamentally flawed standard, arguing that corrective disclosures must be a mirror image of the alleged misrepresentation or an outright admission of

---

[35] Lead Plaintiff also alleges that the February 16, 2022 disclosures were, in part, also partially corrective with respect to Defendants' omissions and misrepresentations regarding the Cumberland Facility.

fraud.  *See* Def. Br. at 34.[36]  That is not the law.  *See*, *e.g.*, *Boeing*, 2022 WL 3595058 at *28 ("corrective disclosures need not . . . be a 'mirror image' of previous misstatements" and "a disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions") (citation omitted).[37]  Second, Defendants present specious factual arguments that must be disregarded at the pleading stage.  *See Hedick*, 2021 WL 3566602, at *17 ("challenges to the purported disclosures—when information entered the market and dissipated the effect of prior misstatements …, and whether certain statements were corrective disclosures … are matters to be resolved at a later stage of the case").

    <u>November 15, 2021 Partial Corrective Disclosure</u>.  Defendants *do not challenge* that the partial corrective disclosure on November 15, 2021 revealed information to the market that was previously concealed by Defendants.  *See id*. at 34-35.  This is fatal to Defendants' position.  *See*, *e.g.*, *Boeing*, 2022 WL 3595058 at *28.  Rather, Defendants raise a premature factual dispute regarding movement in the price of Inotiv stock *after* November 15, 2021.  Def. Br. at 34-35.  Defendants' arguments ignore the market reaction to corrective information on November 15, 2021 and raise factual questions about fluctuations in the price of Inotiv's stock in the four day period after the alleged corrective disclosure, ignoring Defendants' false and misleading

---

[36] Defendants' authority is inapposite.  *See Ray v. Citigroup Glob. Mkts., Inc*., 482 F.3d 991, 995-96 (7th Cir. 2007) (addressing issues of proof and sufficiency of evidence at *summary judgment* where stock had "already collapsed" prior to the first corrective disclosure); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174-75 (2d Cir. 2005) (finding that, unlike here, there was no allegation that stock price decline was caused by disclosure of matters misrepresented or omitted); *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (unlike here, stock price declines were due to news unrelated to the alleged fraud); *Transcontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (quoting *Dura* but finding that, unlike here, information revealed concerned unconnected conduct that occurred later than alleged misrepresentations).

[37] *See also Hedick*, 2021 WL 3566602, at *17 ("courts around the country have found that plaintiffs may satisfy the loss causation pleading requirement 'without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline'") (citations omitted).

statements of November 16, 2021 downplaying the USDA's findings (¶197).[38]  Indeed, denial of misconduct may itself result in artificial inflation that may be corrected by a later corrective disclosure.  *See*, *e.g.*, *In re Tyco Int'l, Ltd*., 2004 WL 2348315, at \*14 (D.N.H. Oct. 14, 2004) (loss causation sufficiently pled where the "stock price declined in part because investors concluded that they could no longer credit the company's denials of accounting misconduct").[39]

February 16, 2022 Partial Corrective Disclosure.  Defendants erroneously contend that the February 16, 2022 partial corrective disclosure did not reveal new information to the market about either the June 2021 subpoena to Envigo or the ongoing AWA violations at the Cumberland Facility.  Def. Br. at 35-36.  Again, Defendants raise improper factual arguments and ignore the FAC's allegations.[40]  The FAC alleges that when the Company first disclosed the Envigo subpoena, Inotiv's stock price fell sharply as a result, with Bloomberg News and an analyst directly attributing a two-day decline in Inotiv's stock price to disclosure of the subpoena.  ¶261; *see also* ¶219.  The FAC also alleges that this stock price decline was also caused, in part, by further disclosures regarding the Cumberland Facility, including—as an analyst observed—that there had

---

[38] In a footnote, Defendants erroneously suggest that a purported lack of stock price decline following the November 11 Statement responding to animal rights activists undermines loss causation. Def. Br. at 35 n.36.  This ignores that the November 11 Statement is alleged to have been false and misleading by omitting material information about still-undisclosed USDA inspections.  ¶¶193-95.  Defendants also incorrectly suggest that allegations of pre-class period conditions at the Cumberland Facility—which support allegations of scienter—undermine loss causation.  These arguments present factual disputes and a form of "truth on the market" defense that are inappropriate at this stage of the litigation and cannot support dismissal of the FAC; indeed, Defendants cite no authority in support of their position. The same reasoning applies to Defendants' additional spurious argument regarding the market reaction to news of May 15, 2022 (Def. Br. at 37), which cannot support dismissal of the FAC.

[39] Defendants' reliance on *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021), is misplaced.  *Wochos* applies an analysis that has not been endorsed or applied by any court in the Seventh Circuit and is otherwise inconsistent with the weight of authority addressing the standard for pleading loss causation.  Moreover, *Wochos* is factually distinguishable given that there were no false and misleading statements made after the one corrective disclosure there. *Id*. *Wade v. WellPoint, Inc.*, 892 F. Supp. 2d 1102, 1135-36 (S.D. Ind. 2012) is similarly inapposite.  *Wade* found loss causation lacking where, unlike here, the alleged corrective disclosure bore no connection to the alleged fraud; indeed, the plaintiff attributed the price decline to "external conditions" unrelated to the alleged fraud.  *Id*. at 1115, 1135-36.

[40] *See*, *e.g.*, *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at \*6 (N.D. Ill. Sept. 1, 2020) (holding that argument about what information was incorporated into the stock price "is a proper subject for discovery and a motion for summary judgment or trial, not a motion to dismiss.")

been "*new risks* added to the 10-Q related to [the Cumberland Facility] being non-compliant." *Id.* (emphasis added).[41]  The FAC thus properly pleads loss causation through this partial corrective disclosure. *See*, *e.g.*, *Hedick*, 2021 WL 3566602, at *17.[42]

May 20-21, 2022 Partial Corrective Disclosures.  The FAC properly pleads a connection between Defendants' misrepresentations and omissions and the $5.19 per share (28.3%) decline in Inotiv's stock price following the May 20-21, 2022 news of the raid on the Cumberland Facility and the DOJ Action (¶262).  Def. Br. at 36.  Defendants' argument ignores the FAC's clear allegations that this corrective information revealed the truth of Defendants' misrepresentations and omissions regarding the Cumberland Facility.  ¶¶161-185, 191-202, 206-230, 262.  Moreover, Defendants' contentions that news of the raid on the Cumberland Facility and entry of the Amended TRO was either "bad news" unconnected to the alleged fraud or concerned "previously disclosed" matters (Def. Br. at 36 and n.38) are pure fantasy.  There can be no credible dispute that the market reacted strongly to this news, which unquestionably concerned the longstanding AWA violations at the Cumberland facility alleged to have been concealed from investors.

June 13, 2022 Partial Corrective Disclosure.  In addition to raising similar, inappropriate, factual arguments concerning later stock price movement that fail for the same reasons described above, Defendants also erroneously contend—without citation to any authority—that size of the

---

[41] Contrary to Defendants' assertion, the Q1 2022 10-Q was the first instance in which Inotiv disclosed *both* the criminal subpoena and USDA enforcement together under a heading describing "Government Investigations." ¶261. As Defendants acknowledge, statements concerning the Cumberland Facility in the 10-K were not the same as those in the Q1 2022 10-Q.  Def. Br. at 35.  Indeed, statements in the 10-K were made within a broad discussion of matters following the Envigo acquisition, whereas the disclosures in the Q1 2022 10-Q were made in footnote 14 to the financial statements, providing information concerning a $413 million line item for "Contingencies" that included risks associated with the Cumberland Facility and the subpoena to Envigo.

[42] Defendants' authority is inapposite.  *See Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (short-seller report that specified that all information therein was "obtained from publicly available sources" was not corrective because it did not present new information to the market); *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (affirming *summary judgment* where "none of th[e] matters [in a disclosure] even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint").  Neither case concerns matters that, as alleged here, had not been disclosed prior to the corrective disclosure.

decline in Inotiv's stock price does not support loss causation.  Def. Br. at 36-37.  Where, as here, the FAC pleads a series of partial corrective disclosures, the relative size of any individual corrective disclosure is not a consideration at the pleading stage.  *See Klein v. Altria Group, Inc.*, 525 F. Supp. 3d 638, 669 (E.D. Va. 2021) (rejecting factual arguments regarding corrective disclosures and noting that, even where price declines "fall short of the double-digit drops seen in many securities fraud cases, at this stage Plaintiffs have pled sufficient loss causation").[43]

November 17, 2022 Partial Corrective Disclosure.  Defendants' contention that that the massive, nearly 57% ($9.03 per share), decline in Inotiv's stock price on November 17, 2022 is not connected to any "prior misstatements" (Def. Br. at 37) is plainly contradicted by the allegations in the FAC that, throughout the Class Period, Defendants concealed that the ongoing Criminal Investigation was focused on—as Inotiv disclosed on November 17, 2022—the Company's "principal supplier" of NHPs.  *See, e.g.*, ¶¶1, 3, 12, 14, 17, 119-20, 190, 205, 222, 227, 230, 241, 255-56, 258, 264.

### E.    The FAC Properly Pleads a Section 14(a) Claim

The FAC alleges the elements of a Section 14(a) claim, namely actionable misstatements and omissions in Inotiv's Proxy Solicitations, and loss causation based on Inotiv misleading investors about the Envigo acquisition.  *See* Sections III.A, III.D, *supra*.  Inotiv's arguments for dismissal of Lead Plaintiff's §14(a) claim merely rehash arguments on falsity, materiality, and loss causation that fail for the same reasons Lead Plaintiff has abundantly explained at Section III.B (falsity and materiality) and Section III.D (loss causation).

On falsity, as the FAC alleges in detail, the Proxy and documents incorporated therein

---

[43] Although factual inquiry is inappropriate at this stage, Defendants nonetheless incorrectly portray the June 13, 2022 disclosure as an ordinary change of course and not a further revelation of the alleged fraud regarding the Cumberland Facility.  Def. Br. at 36-37.  This ignores that the June 13, 2022 announcement represented a dramatic reversal of Inotiv's repeatedly stated intent to continue operating Cumberland Facility.  ¶¶16, 107-09.

materially misstated and failed to disclose the severity of AWA violations at the Cumberland Facility and that the Company's principal supplier of NHPs was a target of the ongoing Criminal Investigation, the omission of which made the Proxy Solicitations, and other specific statements therein, false and misleading. ¶¶47-49, 161, 165-69, 172-176, 307-321. Moreover, Regulation S-K specifically imposes an affirmative duty to disclose material known trends, legal proceedings, and risk factors in "proxy and information statements," as well as periodic filings incorporated into Inotiv's Proxy by reference. 17 C.F.R. § 229.10(a)(2)

As to loss causation, the FAC details the value of the losses to shareholders when the truth was revealed about operations obtained as part of the Envigo acquisition and the source of three-quarters of the combined Company's revenues. ¶¶256-70, 309-13. Far from speculative and contrary to Defendants' characterization, the FAC specifies the amount by which Inotiv's stock price fell in response to revelations concerning Envigo's operations. This suffices to plead loss causation under *Dura*. *See* Section III.D, *supra*.[44]

### F.  The FAC Sufficiently Alleges Control Person Liability

As the FAC adequately pleads primary violations of Sections 10(b) and 14(a) and sufficient allegations of Leasure's and Taylor's control over Inotiv (which Leasure and Taylor do not dispute), this Court should sustain Lead Plaintiff's control person liability claims. *See United States Sec. & Exch. Comm'n v. Kameli,* 2020 WL 2542154, at *23 (N.D. Ill. May 19, 2020).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[45]

---

[44] Defendants' authority, Def. Br. 38-39 nn.39-40, where acquisition target shareholders alleged insufficient merger consideration, are inapposite. *See, e.g., Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d 977, 999-1000 (S.D. Ind. 2018) (loss causation insufficiently pled where allegedly *depressed* share price paid to acquired company investor not connected to alleged economic harm, *e.g.*, a higher-priced offer for the investor's shares of the acquired company).

[45] Should the Court grant Defendants' motion to dismiss in part or in whole, Plaintiff respectfully requests leave to amend. *See Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 472-73 (N.D. Ill. 2021) (Fed. R. Civ. P. 15(a)(2) directs courts to freely give leave to amend when justice so requires).

DATED: March 28, 2023                    **BERMAN TABACCO**

                                         */s/ Steven J. Buttacavoli*
                                         Patrick T. Egan (*pro hac vice*)
                                         Steven J. Buttacavoli (*pro hac vice*)
                                         Justin Saif (*pro hac vice*)
                                         Christina L. Gregg (*pro hac vice*)
                                         One Liberty Square
                                         Boston, MA 02109
                                         Telephone: (617) 542-8300
                                         Facsimile: (617) 542-1194
                                         Email: pegan@bermantabacco.com
                                                 sbuttacavoli@bermantabacco.com
                                                 jsaif@bermantabacco.com
                                                 cgregg@bermantabacco.com

                                         *Counsel for Oklahoma Police Pension and*
                                         *Retirement System and Lead Counsel for the*
                                         *Proposed Class*

                                         and

                                         **COHEN & MALAD, LLP**
                                         Scott D. Gilchrist, No. 16720-53
                                         Richard E. Shevitz, No. 12007-49
                                         One Indiana Square, Suite 1400
                                         Indianapolis, IN 46204
                                         Telephone: (317) 214-0321
                                         Facsimile: (317) 636-2593
                                         Email: sgilchrist@cohenandmalad.com
                                                 rshevitz@cohenandmalad.com

## CERTIFICATE OF SERVICE

I certify that on this 28th day of March, 2023, a true and correct copy of the foregoing

document was served on all counsel of record through the Court's CM/ECF system.

Dated: March 28, 2023

                                         */s/ Steven J. Buttacavoli*
                                         Steven J. Buttacavoli

41