UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

In re INOTIV, INC. SECURITIES   )
LITIGATION   )   Cause No.  4:22-CV-045-PPS-JEM
   )

**OPINION AND ORDER**

This is a putative class action involving allegations of securities fraud by

Defendant Inotiv, Inc. and some of its key officers. The lead plaintiff is the Oklahoma

Police Pension and Retirement System,[1] which owned shares of Inotiv during the

operative time. Inotiv is a publically traded company in the medical field. Part of its

business involves the use of live animals to test the safety and efficacy of products. In

November 2021, as part of a strategic acquisition plan, Inotiv closed a stock and cash

acquisition of a company called Envigo. In January 2022, Inotiv acquired another firm

called Orient Bio Resource Center (OBRC). Envigo and OBRC specialized in breeding,

importing, and selling research models, including "large" animals like beagles and non-

human primates ("NHPs" or "primates" for short). These acquisitions were supposed to

enable Inotiv to expand into a new and potentially lucrative business segment. Inotiv

viewed these acquisitions as "transformational" to its business.

In the months that followed the acquisitions, they indeed proved to be

transformational—but for all the wrong reasons. In May 2022, the Department of Justice

obtained a temporary restraining order against Envigo based on what can only be

---

[1] Acknowledging that the putative class has not been certified, I will refer to Oklahoma Police Pension and Retirement System throughout this Opinion and Order as "Plaintiff."

described as appalling violations of the Animal Welfare Act dating back at least July 2021, when USDA conducted an inspection at a dog-breeding facility in Cumberland, Virginia. After the government brought the hammer down, Inotiv opted to close the Cumberland facility in June 2022. Then, in November 2022, a federal indictment was unsealed, charging six executives from Inotiv's primary NHP supplier on felony charges in connection with an international smuggling ring. This separate case implicated Envigo and OBRC, as well: an OBRC executive pleaded guilty to making false statements to federal investigators, Envigo and OBRC received grand jury subpoenas in the course of the government's investigation, and OBRC was ultimately identified as an unindicted co-conspirator in the smuggling ring.

To say the least, the acquisitions were nothing short of a public relations nightmare. Despite ongoing government investigations into Envigo and OBRC's sketchy operations, Plaintiff claims that none of these dirty details were shared with Inotiv's investors in public disclosures despite clear signals that the government investigations were likely to result in serious sanctions against Envigo, OBRC, and/or Inotiv's principal supplier of NHPs, which completely undermined the rosy financial projections Inotiv projected for the merged company. While the company's executives conducted due diligence and worked toward closing the acquisitions, Defendants allegedly concealed information that had a strong material impact on Inotiv's business. And after the information came to light in the market through a series of corrective

disclosures, Inotiv's stock price fell dramatically—from $55.55 per share to just $6.82, between September 2021 and November 2022.

The sharp decline in Inotiv's stock price prompted some investors to cry foul. This putative class action was filed by one such investor, Sergio Grobler, who claimed that Inotiv and its executives made various false or misleading statements or omissions concerning its business, operations, and prospects in connection with acquiring Envigo and OBRC. [DE 1.] Following publication of the early notice required by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4(a)(3)(A)(i), several other Inotiv investors appeared in the case and sought appointment as Lead Plaintiff. As noted above, I appointed the Oklahoma Police Pension and Retirement System as Lead Plaintiff for the putative investor class. [DE 37; *see* DE 18-2.]

In an unwieldy and sprawling complaint spanning 141 pages and 326 numbered paragraphs [DE 53 (FAC)], Plaintiff asserts violations of § 10(b), § 14(a), and § 20(a) of the Securities Exchange Act of 1934 against Inotiv and its executives and seeks to proceed on these claims on behalf of a class of investors that acquired Inotiv common stock from September 21, 2021 through November 16, 2022. Defendants have moved to dismiss the complaint [DE 67], asserting the amended complaint's factual allegations fall short of the standard required to plead plausible claims under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b).

For the reasons explained below, I find that Plaintiff has plausibly alleged violations of § 10(b), § 14(a), and by extension § 20(a). Therefore, Defendants' motion [DE 67] will be denied.

## Background

I will start by distilling the well pled factual allegations of the complaint, which I accept as true at this stage of the case. [DE 53 (FAC).[2]] As prefaced, this is not an insignificant task. Plaintiff provides a great deal of factual detail about the period leading up to Inotiv's acquisition of Envigo and OBRC [FAC at 16–26, 40]; the underlying investigations into the companies' operations [*id.* at 26–54]; Defendants' allegedly false and misleading public statements and omissions regarding material risks of the acquisitions between September 2021 and August 2022 [*id.* at 73–101]; events following the revelation of the disturbing conditions at the Cumberland facility [*id.* at 102–05]; Defendants' intent to mislead them and violations of SEC rules regarding disclosures in public filings [*id.* at 105–09]; and the financial harm they've experienced as a result [*id.* at 111–16]. Plaintiff also asserts various facts based on its ongoing investigation into Envigo's operations, including statements from Confidential Witnesses that worked at Envigo. *Id.* at 59–72.

---

[2] It is unclear to me why there are two amended complaints, one at DE 52 and another, filed nine days later, at DE 53. Everyone seems to agree that the amended complaint docketed at DE 53 is the operative complaint, so that's the one I have analyzed and will cite to. I refer throughout this Opinion and Order to the amended complaint docketed at DE 53, the First Amended Complaint, as "FAC," for short.

I.       **Background on Inotiv**

Inotiv is a contract research organization based in West Lafayette that provides services in the drug and medical device industry. In particular, it specializes in the commercial production and sale of laboratory "research models," like purpose-bred mice and "large research models" (*e.g.*, dogs, primates, rabbits). It's a public company listed and traded on the NASDAQ under the ticker symbol "NOTV." The Federal Drug Administration, a key regulator in the industry, requires companies to conduct a phased approach to drug and device development, including discovery and development and preclinical research stages. Those stages involve mandatory laboratory and live animal testing prior to human clinical trials. That's where Inotiv, and its supply of research animals, comes in.

In 2016, Inotiv was facing financial and strategic issues, including declining revenues, as big pharmaceutical companies moved their business to larger, multi-service contract research organizations ("CROs," for short). [FAC, ¶¶ 5-6.] In response, the company hired a new financial consultant, Robert Leasure; and in 2017, the company "'reinvented' itself under Leasure's guidance to become a 'fully integrated solutions-oriented CRO.'" *Id.* That strategy involved expanding Inotiv's business through "strategic acquisitions." *Id.* By one measure, this effort was a success—Plaintiff tells me that from 2016 to 2022, Inotiv grew its annual revenue from $20 million to a projected $460 million while completing more than a dozen acquisitions . *Id.*

Several executives at the company allegedly played roles in Inotiv's strategic acquisitions, hammering out the financial particulars and conducting due diligence on the targets' operations. They include Leasure (who was installed as its CEO in 2019), CFO Beth Taylor, Chief Strategy Officer John Sagartz, and VP of North American Operations Carmen Wilbourn, all of whom have been named as defendants in this case. Plaintiff refers to Leasure and Taylor collectively as the "Control Defendants," based on their positions at the highest levels of Inotiv's corporate management, participation in the due diligence process leading up to the strategic acquisitions, and their direct involvement in preparation and disclosure of allegedly false or misleading statements to investors concerning the acquisitions.

## II.    Envigo and the Cumberland Facility

As early as November 2019, Inotiv had some interest in acquiring a company called Envigo, a provider of research models and services. [FAC, ¶ 41.] Starting in April 2021, Inotiv began to discuss ways the companies could potentially "work together," and on May 21, 2021, they entered a mutual non-disclosure agreement to explore whether they could strike a deal. *Id.* A presentation entitled "Envigo Corporate Overview" was provided to Leasure by Inotiv's former CEO shortly thereafter, which included "details about the Envigo business." This primer was followed by "consistent calls every week" from June to September 2021, in which Envigo representatives "followed up regarding business matters, due diligence, agreements, closing issues and post-closing issues." *Id.*, ¶ 43. Leasure and Sagartz twice met with Envigo

representatives in June 2021 to discuss Envigo's business and "additional due diligence related follow-up questions." *Id.*, ¶ 44.

While the companies figured out the financial particulars, Leasure, Sagartz, and Wilbourn conducted a due diligence "tour," visiting 17 of 22 Envigo facilities between July 20, 2021 and August 20, 2021. *Id.*, ¶ 45. Along the way, they visited Envigo's dog-breeding facility in Cumberland, Virginia and a primate facility in Alice, Texas. According to statements Plaintiff obtained from confidential witnesses with knowledge of the site visits, these visits would entail half a day to a full day at each Envigo facility, during which time Inotiv personnel would be toured around the facility and engage in "information gathering discussions" with Envigo's on-site staff. One witness (CW2) alleges that Leasure asked questions of Envigo personnel and was directly involved in gathering information about the sites, while other Inotiv personnel and advisors also visited facilities to compile information for summaries provided to Leasure, Taylor, and Sagartz. After Inotiv concluded its due diligence, the company negotiated a reduced purchase price for Envigo, down to $485 million from $500 million asking. *Id.*, ¶ 46. Plaintiff claims that the basis for this $15 million reduction was not explained beyond "a reference to the elimination of certain representations and warranties," without reference to specific operational issues. *Id.*

A proposed merger of the firms was announced September 21, 2021, with a sticker price of $485 million, comprised of $200 million in cash and 9,365,173 Inotiv common shares valued at $285 million. [FAC, ¶ 47.] On September 24, Inotiv filed a

Preliminary Proxy Statement containing matters to be approved by Inotiv's shareholders to consummate the transaction. [DE 69-5.] A Definitive Policy Statement was filed October 5, advising shareholders they had until November 4 to vote or designate proxies on these matters. [DE 69-6.] Numerous documents were incorporated by reference into the Proxy Statements, as delineated at paragraph 48 of the Amended Complaint. [FAC, ¶¶ 47–48. On October 21, Inotiv issued an update on its Form 8-K containing supplemental disclosures. *Id.*, ¶ 50.[3] The resolutions needed to consummate the merger were approved by shareholders, with some 95–99% of shareholders voting in favor. *Id.*, ¶¶ 49, 51. On November 5, 2021, the deal closed and the transaction was announced by press release and via Form 8-K filed with the SEC. *Id.*, ¶ 52.

When the deal closed, Inotiv acquired a Research Models and Services ("RMS") business segment, making it a one-stop shop for the entirety of discovery and nonclinical development. Defendants called the deal "transformational to [Inotiv's] underlying business" because it resulted in the creation of its new RMS business segment, which accounts for nearly three quarters of Inotiv's revenue and involves the "breeding, importing, and selling of live animals for research purposes, as well as the manufacture and distribution of various products and services associated with the use of animals in research." *Id.*, ¶¶ 1, 7, 9, 35–40. In addition, the acquisition helped the

---

[3] A Form 8-K is filed by a publicly traded company after an unscheduled material event occurs; a Form 10-K, by contrast, is an annual report that is required to be filed by publicly traded companies each year.

company's existing business segment by providing an in-house source of research animals. *Id.*, ¶ 7.

In the process, Inotiv became the owner of a purpose-bred canine facility in Cumberland, Virginia. "Purpose-bred canine facility" is a fancy phrase for what most folks would simply call an industrial puppy mill. Prior to its acquisition, Envigo had a significant share of the market for beagles used in drug testing (some 25%). Beagles are used in drug trials because, as most dog owners know, they typically have a docile demeanor, and researchers prefer to work with research models that have good health and temperament. There was strong demand for the dogs—Envigo used to sell them for upwards of $1,000 a pop (or pup, as it were).

But even dogs bred and raised for purely instrumental purposes are afforded minimal standards of welfare. The law provides protections reflecting that they are still living, breathing creatures worthy of basic dignity. Indeed, pursuant to the Animal Welfare Act, breeders and dealers of regulated animals must be licensed with the United States Department of Agriculture. The USDA, in turn, sets standards for the humane care of animals and monitors compliance through inspections (both routine inspections and "focused," or unannounced inspections). [FAC, ¶¶ 53–59.]

In 2019, Envigo obtained a "Class A" license under the Animal Welfare Act to breed and sell dogs at the Cumberland facility. *Id.*, ¶ 60. The USDA performed five inspections of the Cumberland facility between July 2021 and May 2022, and issued public findings, which are available to view on its website, about "noncompliant items"

found at the facility. In July, USDA found 18 noncompliant items at the facility; in October 2021, it found 13 noncompliant items; in November 2021, the number rose to 26 noncompliant items. The following year, in March 2022 and May 2022, noncompliant items were still found at the facility, including several repeat violations. [*Id.*, ¶¶ 61, 70, 77, 87, 91; *see id.* ¶¶ 196, 210; DE 53-1 at 3.]

Plaintiff rehashes the so-called "non-compliant items" in detail, and to say the least, they are appalling. Just to list a few, in the July 2021 inspection, which took place during Inotiv's due diligence process, investigators reported findings including "a listless puppy covered in dried excreta that had been trapped in a pan underneath the cage in which its mother and litter mates were living"; nursing beagles that were "deliberately denied food for 42 hours" with food "just out of reach outside of their cages where the dogs could see and smell it"; housing areas with temperatures exceeding 90 degrees; a feed silo "contaminated with a variety of live insects"; and insufficient staffing to determine if dogs required veterinary care (*i.e.*, *one* attending veterinarian overseeing care for more than 5,000 dogs). [FAC, ¶ 66.] "Critical" findings included inadequate documentation of veterinary care—records indicated over 300 puppy deaths attributed to "unknown causes"—a persistent failure to separate fighting or incompatible dogs, resulting in fight wounds and deaths; and failures to meet minimum enclosure requirements to prevent injuries. *Id.*, ¶ 67. Sadly, this listing is not exhaustive—reprinting all of the violations identified by inspectors would literally take pages to unpack.

USDA inspectors granted Envigo an opportunity to address the problems and set deadlines for compliance. *Id.*, ¶¶ 68–69. Inspectors returned for additional investigations in October and November 2021—right around the same time Inotiv was closing a deal to buy Envigo. *Id.*, ¶¶ 70–86. They found that Envigo had failed to correct many of the significant violations initially identified. In October, after finding repeat violations, USDA inspectors set a deadline for Envigo to address the issues by November 5–8, 2021. *Id.*, ¶ 74. They also held an "exit briefing" with Envigo personnel, including Defendant Wilbourn (then Envigo's VP for North American Operations) and an unnamed "Chief Operating Officer." *Id.*, ¶ 75.

Inspectors came back to the facility in November and found several "Direct Repeat" violations. To name a few: they included staff members authorized to perform euthanasia without following approved procedures (*i.e.*, euthanizing dogs without the use of anaesthesia); dogs suffering from dental disease identified as early as August 2021 without any care to address the issues; improper handing and housing of animals (*e.g.*, "21 puppies were found to be handled in a manner that they were damp, shivering, and cold"; 25 puppies found dead due to cold exposure over the prior eight weeks); persistent "dog fights" resulting in "serious" injuries to dogs; inadequate staffing; and dirty food containers, including containers with a "large number of live maggots." *Id.*, ¶ 79. Inspectors also found additional violations that cast a pall on Envigo's remediation efforts. *Id.*, ¶¶ 80–83.

Following the November inspection, inspectors gave Envigo another opportunity to address certain issues, reminded it of its obligations under the Animal Welfare Act, and on December 17, 2021, another "exit briefing" was held with company personnel, including Wilbourn and a "Manager of Operations." [FAC, ¶¶ 84–85.] But even after Inotiv closed the Envigo acquisition, the issues persisted—in March and May 2022, following focused inspections, USDA inspectors again found repeated AWA violations at the facility. *Id.*, ¶¶ 87–93. After the May inspection, Wilbourn, a Manager of Operations, and a "Chief Operating Officer" attended another exit meeting with investigators. *Id.*, ¶ 93.

Plaintiff claims that because of the due diligence efforts Defendants undertook from May to September 2021, they had knowledge about the terrible conditions at the Cumberland facility. These conditions were obvious to anyone on a tour of the facility, including Leasure, Sagartz, and Wilbourn, who personally visited the site. [*See* FAC, ¶ 95.] That's because the violations found at the Cumberland facility were blatant—they included conditions such as overpowering odors from visibly accumulated animal waste and other unclean conditions, dogs visibly injured due to fighting, dogs kept in overcrowded enclosures, facilities that were in obvious states of disrepair, and a facility that was understaffed and unable to provide adequate care for the thousands of dogs living under their care. Sadly, this information is consistent with findings of violations at the facility going back to *2017* (when it was under the management of another

company Envigo acquired in 2019), suggesting that it would have been a point of focus for anybody conducting a due diligence "tour" through the facility. *See id.*

Approximately ten months after the Cumberland facility was cited for over 60 AWA violations, the government decided enough was enough. At that point, a civil enforcement action was added to the picture. On May 18, 2022, federal law enforcement officials executed a search warrant and raided the facility. [FAC, ¶¶ 96.] The government then obtained a temporary restraining order based on the finding that Envigo was engaged in serious and ongoing violations of the AWA. *Id.*, ¶¶ 98–99. *See generally United States v. Envigo RMS, LLC*, Cause No. 6-22-CV-028-NKM (W.D. Va.). The court in that case noted there were several violations found in May 2022 that had been first observed back in July 2021 and issued a TRO mandating Envigo's compliance with numerous AWA requirements the company had consistently failed to meet. [FAC, ¶¶ 99–100.]

The following month, the court held a hearing on the government's request for a preliminary injunction. A memorandum opinion was issued June 17, 2022 granting an injunction, in which the court observed that the motion "was all but uncontested." *See id.*, ¶¶ 107–08. *United States v. Envigo RMS, LLC*, 2022 WL 2195030, at *1 (W.D. Va. June 17, 2022). In opposing the motion, Envigo (of course, under Inotiv's management) took the position that it would close the Cumberland facility. The company was willing to submit to a court order designed to ensure its AWA compliance in the interim. The court accepted this stipulation and concluded that it was unnecessary to enjoin Envigo

from fulfilling its existing contractual obligations (*i.e.*, it could keep selling puppies) while winding down its Cumberland operations. In deciding there was "good reason" to allow Envigo to fulfill its existing contracts, the court specifically noted "expert" testimony submitted in support of Envigo's opposition brief stating that dogs produced at that particular facility were "exceedingly important to domestic pharmaceutical discovery and development," and the facility "has historically produced up to 25 percent of the domestic supply of beagles for research." That information reinforced the strategic importance of the facility to clinical research and Envigo's business in an environment where "the existing supply of research animals is insufficient to meet the current needs of research institutions." 2022 WL 2195030, at *3. [*See also* FAC, ¶ 108.] The court also specifically cited testimony from Sagartz that he could not "argue with a USDA inspection report that identifies areas that are identified to be out of compliance." *Id.* at *2. [*See also* FAC, ¶ 108.] Notably, those reports had been in Envigo's records dating all the way back to July 2021.

That night, Inotiv issued a press release announcing the closure of the Cumberland facility. [FAC, ¶ 109.] The asserted basis for this move was that it was cheaper to shut down the facility than to make "required investments" to improve its operations. *Id.* Plaintiff asserts that Envigo's (and by extension Defendants') position in the injunction proceeding was a "dramatic reversal," because up to that point the company had "sought to downplay or deny the seriousness of the AWA violations" and "publicly maintained that [it] intended to bring the Cumberland Facility into

compliance." *Id.*, ¶ 107. On June 24, 2022, Inotiv announced that James Harkness, the former COO of Inotiv's RMS business segment, would be retiring effective September 30, 2022. [FAC, ¶ 237; *see id.*, ¶ 204.]

### III.    OBRC and the International Primate Smuggling Ring

Plaintiff provides less detail about Inotiv's acquisition of a second company called Orient Bio Research Center in January 2022 and the due diligence efforts the company undertook prior to this separate acquisition. It's not specifically stated in the complaint, but it appears that prior to the merger agreement, Envigo and OBRC may have been related in some way. Both of the companies had primate facilities in the city of Alice, Texas. As noted above, part of Inotiv's due diligence "tour" through Envigo's operations included a site visit at a primate facility in Alice, Texas. The amended complaint does not specifically allege that Inotiv personnel separately visited an OBRC facility in Alice. That said, it's entirely possible Envigo and OBRC had no corporate relationship prior to the Inotiv-Envigo merger and simply owned separate facilities in the same location. Plaintiff appears to treat them as separate companies, both prior to and after the acquisitions, and I will assume that to be the case for present purposes. OBRC was not part of the initial merger agreement that closed in November 2021. Instead, Inotiv closed the acquisition of OBRC on January 27, 2022. [FAC, ¶ 128 n.10.] As part of that separate deal, OBRC transferred three percent of the purchase price to an executive at the company named Gary Tucker. *Id.* More on Mr. Tucker in a moment.

OBRC imports non-human primates. This activity is regulated internationally pursuant to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES" for short), to which the U.S. is a party, and domestically pursuant to the Endangered Species Act (ESA), the Lacey Act, and regulations promulgated by the United States Department of the Interior and the U.S. Fish and Wildlife Service. [FAC, ¶ 110.] While acknowledging the regulated nature of the business, Inotiv touted the acquisition of OBRC because it provided the company a key competitive advantage: "increased access to critical research models" in a supply-constrained environment. *Id.*, ¶¶ 1, 8, 38, 118, 201, 204, 224. But the risks quickly subsumed the rewards, as it came to light that Tucker, OBRC, and Envigo were all the subject of a criminal investigation into the illegal importation of primates.

On June 22, 2021, a criminal case against Gary Tucker was unsealed in the U.S. District Court for the Southern District of Florida. *Id.*, ¶ 113. *See United States v. Tucker*, Cause No. 1:21-CR-20263-WPD (S.D. Fla.). Also in June 2021, Envigo and OBRC received grand jury subpoenas in connection with Justice Department's investigation into the importation of NHPs from certain countries in Southeast Asia. *Id.*, ¶ 116. The subpoenas issued in 2021 related to a previous round of subpoenas issued in 2019 to OBRC and Covance Research Products, a company Envigo had later acquired prior to its merger with Inotiv, seeking production of documents and information related to DOJ's investigation into NHP smuggling. *Id.*, ¶¶ 119, 235. While the charges against Tucker were unsealed, at that point, the fact that OBRC and Envigo had received grand

jury subpoenas as part of the larger criminal investigation still remained out of public view.

On August 4, 2021, Tucker pleaded guilty to a charge of making false statements to agents of the U.S. Fish and Wildlife Service and a joint factual statement was filed in the case. [FAC, ¶ 114.] The statement reflects that in 2019, Tucker was interviewed by investigators in Washington, D.C., and that he lied in response to questions about his involvement in the procurement of long-tailed macaques (a small primate regularly used in drug trials) as an executive at OBRC. *Id.* The government issued a press release concerning Tucker's plea the same day, stating that the case related to an ongoing criminal investigation into "international trafficking of primates into the United States." *Id.* In an October 2021 press release about his sentencing, the government stated that Tucker had lied in response to questions "about potential illegal trafficking of wildlife," involving the "procurement and importation to the U.S. of long-tailed macaques" for use in scientific research. *Id.*, ¶ 115. (He ultimately received a sentence of home confinement and a $5,000 fine. *Id.*)

On November 16, 2022, the other shoe dropped in the Justice Department's investigation. A second and more wide-ranging criminal case was unsealed in the Southern District of Florida charging eight members of an international primate smuggling ring. *Id.*, ¶ 117. *See United States v. Keo*, Cause No. 1:21-CR-20340-KMW (S.D. Fla.). The indictment named a company based in Alice, Texas as an unidentified coconspirator in the smuggling ring. The description suggests that this company is

17

OBRC. [FAC, ¶ 118.] On November 17, 2022, in a Form 8-K issued before markets opened, Inotiv informed investors that key employees of its supplier of NHPs had been indicted on multiple felony counts in connection with the international primate smuggling ring. *Id.*, ¶¶ 117, 241. The disclosure indicated that the day prior, Inotiv had been informed that its supplier's employees had been criminally charged, along with Cambodian government officials, with conspiring to illegally import NHPs from December 2017 through January 2022 and in connection with seven specific incidents between July 2018 and December 2021. *Id.* This announcement came on the heels of the unsealing of documents in the federal case against the officials, including the indictment that referred to "Unindicted Co-Conspirator 2," which appears to implicate OBRC. *Id.*

While charges were never filed against OBRC or Envigo, Plaintiff claims that through the course of their due diligence, Defendants were aware of the pending criminal investigation, the subpoenas issued to the companies, and their resulting productions of documents to DOJ. *Id.*, ¶ 119. Plaintiff specifically alleges that while the sprawling criminal case remained under seal, Defendants became aware of the fact that a company called "Vanny," along with OBRC and Envigo, were the focus of the government's investigation. That was a serious cause for concern, because Vanny was Inotiv's "principal supplier" of NHPs, and access to a stable supply of NHPs was a "key justification" for acquiring Envigo and OBRC. *Id.* By the company's own account, it was aware of the subpoenas (it must have been in the course of its due diligence) and cooperated with the government and both Envigo and OBRC produced documents

18

related to the importation of NHPs dating back to 2014. *See id.*, ¶¶ 116, 219. However, none of this information was shared with investors until February 2022 and May 2022, respectively. *Id.*, ¶¶ 120, 219, 229, 235.

## IV.    Statements from Confidential Witnesses

Plaintiff asserts additional facts based on statements obtained from four confidential witnesses. All four worked for Envigo in various capacities and provide additional details based on their personal knowledge of the company's operations leading up to Inotiv's acquisitions.

CW1 was an employee at Envigo from 2019 until April 2022 and supported both the Cumberland, Virginia and Alice, Texas facilities. CW1 personally visited the Cumberland facility and stated that the conditions uncovered by USDA inspectors "were impossible to miss" and the facility only had one attending veterinarian, who had worked remotely during the pandemic. [FAC, ¶¶ 121–22.] CW1 further states that prior to Inotiv's acquisition, audits and inspections conducted by non-profit organizations and Envigo clients found deficiencies with the Cumberland facility, most notably a "lack of human contact with the dogs," which had "led to complaints that the . . . dogs were difficult to work with." *Id.*, ¶ 123.

In addition, CW1 provides information about the company's alleged knowledge of the criminal matter involving OBRC executive Tucker, including discussion among management-level employees at Envigo ahead of Inotiv's acquisition of OBRC. *Id.*, ¶¶ 127–28. Leasure and Tucker were both allegedly present at a meeting of executives

held shortly before the announcement of Inotiv's acquisition of OBRC, at which CW1 states there was "general knowledge among the attendees" of Tucker's prior guilty plea and sentencing in connection with his criminal case. *Id.*, ¶ 128. CW1 understood that Tucker would not be continuing in his role with OBRC following the acquisition, in part due to the criminal investigation—rather, he got a buyout from OBRC as part of the deal. *See id.* & n.10.

CW2 worked at Envigo as a manger of operations in St. Louis from December 2020 to March 2022 and recalls participating in the due diligence process. [FAC, ¶ 129.] CW2 recalls Defendants Leasure and Wilbourn visiting the St. Louis facility in July or August 2021 for around four hours. During this time Inotiv personnel asked questions about the facility's operations and took a facility tour. Leasure specifically asked CW2 about financial matters and whether CW2 reviewed those matters on a monthly basis, while others on Inotiv's executive team asked Envigo personnel about scientific and IP-related questions. *Id.*, ¶¶ 130–31. CW2 learned about conditions uncovered at the Cumberland facility from Envigo management shortly after the initial inspection in July 2021. *Id.*, ¶ 132. While Envigo stated a "town hall" meeting would be held to discuss employee concerns, the focus of the internal communication was "about certain animal rights organizations taking action against Envigo," and the town hall did not take place before CW2 left the company in March 2022. *Id.*

CW3 worked for Envigo in Indianapolis as a scientist and researcher from 2015 to December 2021. [FAC, ¶ 133.] In 2021, CW3 worked with a startup customer

conducting a study requiring the use of dogs, which required CW3 to visit the Cumberland facility for four days in March 2021, prior to USDA's initial findings of noncompliance in July 2021. *Id.* CW3 observed many issues later documented by USDA in its reports, including empty dog feeders, openings in kennel floor grates that puppies could slip through, and dogs with feet covered in feces "so thick that it became stuck to the walls of the containers" used to transport them. *Id.*, ¶¶ 134–36. In addition, CW3 noted the older dogs "were not socialized," and would be frightened when CW3 performed veterinary checks, as well as other dogs in the study that were aggressive. *Id.*, ¶ 137. Although the customer for the study wanted to adopt the dogs after the study had completed, "only one dog in the study was able to be adopted" because the dogs "had teeth that were in such bad condition that they could not be adopted." *Id.* Moreover, CW3 was aware that many of the dogs at the Cumberland facility had a genetic condition called "wet paw," which would cause excessive sweat and irritation on the animals' paws. Some customers would not purchase dogs from the facility because these issues went unaddressed. *See id.*, ¶ 138. Based on discussion with colleagues with knowledge of the USDA's findings, CW3 states that the reports would have accurately reflected the conditions at the Cumberland facility. *Id.*, ¶ 139.

CW3 also provides information about "serious problems" with the "practices and behavior" of Dr. Dawn Gau, the attending veterinarian at the Cumberland facility. [FAC, ¶ 140.] CW3 specifically states that during one study, Gau did not use proper anaesthesia during biopsies performed on the dogs, and they woke up during surgery.

*Id.* "[N]umerous complaints" were made about Gau's practices but nothing was done to address the concerns because it would've been too hard for the company to find a replacement. *Id.* CW3 further states that there were no written Standard Operating Procedures at place in the Cumberland facility for certain "sensitive and high-risk procedures being performed on dogs," which contrasted with the practice at other Envigo facilities and "likely contributed to poor conditions at the site." *Id.*, ¶ 141. Finally, the Cumberland site director allegedly told CW3 that "investors" visited the facility "during the summer of 2021." CW3 believes those investors were Inotiv executives and they would have observed the same issues as CW3 upon touring the site. *Id.*, ¶ 142.

CW4 also worked for Envigo in Indianapolis and served as a talent acquisition specialist. [FAC, ¶ 143.] One of CW4's duties was hiring dog handlers and other operational staff positions for Cumberland facility. According to CW4, the facility was a "revolving door," and the site took up "20% to 30% of CW4's time." *Id.*, ¶ 144. The low pay and poor work conditions at the site made it hard to keep employees, and many would remain there for under a year before finding a new job. *Id.* CW4 believes that the high employee turnover "contributed to the problems" identified by inspectors. *Id.* Finally, while CW4 concedes that they did not "have any prior indication of the problems" at the Cumberland facility, shortly before the conditions at the site became public knowledge, they were asked by managers to gather personnel information about

employees at the facility and instructed to conduct "social media investigations" pertaining to whether the employees had ties to animal rights groups. *See id.*, ¶ 145.

## V.    Defendants' Partial Corrective Disclosures and Plaintiff's Injuries

Plaintiff's theory of harm in this case is that Defendants deceived the market and their conduct artificially inflated the price of Inotiv's stock. After the truth about Defendants' false statements or omissions came to light, the hot air flew out of Inotiv's stock price and it came hurtling down to earth. As it fell, Plaintiff and other similarly situated owners of Inotiv stock lost money, independent of any losses traceable to changed market conditions or Inotiv-specific facts in the market unrelated to Defendants' allegedly fraudulent conduct. [FAC, ¶¶ 256–59.]

In support of this theory, Plaintiff points to a "series of partial corrective disclosures" Defendants made after November 15, 2021. They peg their financial losses to these partial corrective disclosures. On November 15, USDA posted its July 2021 inspection reports on its website and PETA issued a press release including links to copies of two of the reports. In response to this news, Inotiv's stock price fell by $2.80 per share, a decline of around 5%, to close at $52.75. *Id.*, ¶ 260.

On February 16, 2022, Inotiv filed its Q1 2022 Form 10-Q. [DE 69-10.] Plaintiff tells me this form contained two key disclosures. First, Inotiv disclosed for the first time that during the period July through December 2021, USDA had inspected "one of Envigo's U.S. facilities" multiple times and "issued inspection reports with findings of non-compliance." *Id.*, ¶ 261. The company had appealed certain findings in the

inspection reports but noted that "USDA has indicated . . . it intends to conduct a formal investigation" that "could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation." *Id.* The Q1 2022 Form 10-Q also disclosed for the first time that some eight months earlier, Envigo had received a grand jury subpoena issued by DOJ "requiring the production of documents related to the importation into the United States of live non-human primates" from Asian countries and that the company was "cooperating with the Department of Justice" in connection with its ongoing investigation. *Id.*

When this news was revealed to the market, the price of Inotiv stock fell $4.73 per share, a decline of approximately 17%, to close at $23.59 per share. *Id.* The news continued to spread in the market and Inotiv's stock continued to get pummeled, falling another $3.30 per share, nearly 14%, to close at $20.29 per share on February 17, 2022. *Id.* An article published in Bloomberg News attributed the precipitous decline, in part, to Inotiv's "disclos[ure] that [a] recently bought unit received a grand jury subpoena from Miami prosecutors investigating imports of primates from Asia," and another report published by an analyst at Lake Street Capital Markets attributed the declining stock price to factors including "new risks added to the 10-Q related to one of Envigo's research model facilities [in Cumberland, Virginia] being non-compliant" and "a DOJ investigation of NHP suppliers." *Id.* The Lake Street report continued: "In speaking with management, the center at risk is a small, non-core center producing minimal

revenue (single digit millions) and is not profitable. [Lake Street] expect[s] the needed changes have been made (or are in process) and the facility will regain compliance in the near-term." *Id.* As to the information about the grand jury subpoena, Lake Street's report added that it might be part of a broader inquiry, but it "hesitate[d] to draw any conclusions" while acknowledging that the news could "carry negative repercussions" for the company. *Id.*

Then, on May 20, 2022, Inotiv made an announcement following the close of markets that (1) on May 19, 2022, law enforcement agencies had executed a search warrant at the Cumberland facility, and (2) the same day, DOJ had filed a civil enforcement action against Envigo in connection with AWA violations at the facility. [FAC, ¶ 262.] In response, on May 23 (the next trading day), Inotiv's stock price fell by $5.19 per share, dropping approximately 28%, to close at $13.14 per share on high trading volume. *Id.*

On June 13, 2022, after the close of markets, Inotiv issued a press release announcing the closure of two Envigo facilities, including the Cumberland puppy mill. *Id.*, ¶ 263. Leasure acknowledged there had been problems at the facility and Inotiv decided to close it rather than make "required investments to improve the facility." *Id.* Lake Street issued a report prior to the markets opening on June 14 suggesting that Inotiv's decision "should be well-received by investors" in part due to "recently increased" costs of investments needed to bring the Cumberland facility into AWA compliance but downgraded the target stock price from $75 to $50 per share. *Id.* When

markets opened, Inotiv's stock price fell yet again, declining by $0.25 per share (approximately 1.92%) to close at $12.78 per share. *Id.*

The beat rolled on in November 2022. Inotiv filed a Form 8-K stating that on November 16, 2022, the company "became aware" that the Justice Department had criminally charged employees of its main primate supplier, along with two Cambodian officials, for conspiring to import primates and pointed to seven specific imports between July 2018 and December 2021. [FAC, ¶ 264.] The Form 8-K noted the subpoenas issued to Envigo and OBRC, which the company had previously disclosed in its Q1 2022 Form 10-Q, and claimed that Inotiv "has been fully cooperating, and will continue to cooperate" with the Justice Department. *Id.* After this disclosure was made, on November 17, 2022, the price of Inotiv's stock fell by nearly 57%, down to $6.82 per share from the prior day's closing price of $14.85 per share. *Id.*

Lake Street subsequently downgraded Inotiv from a "buy" to a "hold" stock and lowered its price target by a mile: from $60 per share to a mere $7 per share. *Id.* The revelations risked a "worst case scenario" in the mind of Lake Street's analyst Frank Takkinen, in which primate supplies were cut off entirely and Inotiv's ability to service its existing debts could come into question. *Id.* Adding to this, a Bloomberg report published November 18 noted that Inotiv's stock price was continuing to fall after the November 17 spiral and observed that an analyst at Jefferies had cut the price target for the company's stock from $27 to $10 per share because "NHPs are a significant driver of

growth in [Inotiv's] business, an area of high demand and constrained supply." *Id.* On November 18, 2022, Inotiv's stock price fell another 15.7%, to close at $5.75 per share.

All told, the company's public valuation went from $1.45 billion in November 2021 to $303.45 million in May 2022, with more than 25.59 million shares outstanding. [FAC, ¶ 265(e).]

## VI.    Defendants' False and Misleading Statements or Omissions

The crux of this case is whether Defendants defrauded Inotiv's investors. So let's take a step back and distill the statements and omissions they made that allegedly pumped hot air into Inotiv's stock price. Plaintiff outlines a lengthy series of public statements and omissions (some of which are detailed above) Defendants made in connection with the Envigo and OBRC acquisitions and its primate business over an eleven-month span that Plaintiff claims are materially false and misleading. [FAC, ¶¶ 161–236.]

These alleged lies fall into two main buckets—first, statements or omissions about the ongoing AWA violations at the Cumberland facility, prior to Inotiv's decision to close the facility in response to the government enforcement action (*id.*, ¶¶ 161–69, 173–76, 181, 184, 193, 197, 200–01, 207–10, 217–18, 224–25, 232, 235); and second, statements or omissions concerning the fact that Inotiv's principal supplier of primates was in the crosshair of a criminal investigation implicating the company's supply chain and that Envigo and OBRC had received grand jury subpoenas in the course of the same investigation (*id.*, ¶¶ 169, 187–89, 200–01, 204, 219, 224, 229, 235). With respect to

its claim under § 14(a) of the Securities Exchange Act, Plaintiff specifically alleges

material misrepresentations and omissions in Inotiv's proxy and documents

incorporated therein. *Id.*, ¶¶ 47–48, 161, 165–69, 172–76. I'll examine each of these

"buckets" of alleged lies in turn.

> **A.    Defendants' Materially False and Misleading Statements or Omissions Pertaining to Envigo's Cumberland Facility**

The statements pertaining to the Cumberland facility date back to Inotiv's initial

deal announcement on September 21, 2021. Specifically, Plaintiff takes issue with the

following statements made in a conference call, investor presentation, and an associated

merger agreement provided to investors on September 21:

- *First*, a statement Leasure made describing Envigo as "a best-in-class provider of high quality research models" with a "dedication to quality" that would benefit Inotiv, and agreed with the characterization of Envigo as a company providing "high-quality research-grade laboratory animals." [FAC, ¶¶ 161–64.]

- *Second*, statements in investor presentation slides referring to Envigo as a "leading provider of high-quality research models and services," and showing the Cumberland facility among the critical facilities to be acquired that made Envigo "a leader in research models services in key research locations," and noting Envigo's ability to "suppl[y] customers with genetically consistent research models time after time." *Id.*, ¶¶ 165–68.

- *Third*, assertions in a proposed merger agreement filed as an attachment to an Inotiv 8-K that Envigo was in full legal compliance and not under investigation, including that Envigo "is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement" or "guidance standards and policies" of any governmental authority, and that Envigo had not received any "inspection reports with findings of material deficiencies." *Id.*, ¶¶ 161, 169.

Plaintiff claims these three statements were misleading because they omitted material information about the low quality of the research models produced at the Cumberland facility and the appalling violations of the AWA first documented months earlier by federal government investigators. [FAC, ¶ 171.] Absent that important context, the market responded to the deal announcement positively.

For example, analysts from the firm Craig-Hallum Capital Group LLC published a report on the heels of the deal announcement reiterating a "BUY Rating" for Inotiv stock and suggesting a healthy target price of $57. *Id.*, ¶ 170. Craig-Hallum based this recommendation, at least in part, on the belief that acquiring Envigo would provide Inotiv with "better access to animals," noting that this supply chain issue was a "key concern for customers" in the "pharma/biotech" industry. *Id.* The firm specifically reproduced pages from the investor presentation showing that large animal models, like primates and dogs, would constitute some 32% of revenues for the combined company, and noted that Inotiv was locking down supply "across many species, thereby eliminating risk." *Id.* The only risks identified in connection with the deal were risks that Inotiv would be acquired, struggle with financing, or face risks due to its own use of "live animals to test the safety and effectiveness of experimental drugs"—the same risks Craig-Hallum had identified in earlier reports—and not new risks related to Envigo's operations at the Cumberland facility or involvement in the importation of NHPs. *Id.*

Plaintiff further alleges that Defendants made similarly false or misleading statements in an October 5, 2021 Definitive Proxy Statement on Schedule 14A filed with the SEC (the "October 2021 Proxy"), and its November 5, 2021 closing press release. These allegedly false and misleading statements referred to Envigo's "research-quality animals," "high-quality small and large research models for basic research and drug discovery and development," and "high degree of focus on animal welfare," all of which Plaintiff claims omitted material information about the low quality of the research models produced at the Cumberland facility and the government's findings of widespread and ongoing AWA violations at the facility. [FAC, ¶¶ 172–82.] More specifically, the October 2021 Proxy referenced various factors that Inotiv's board considered in determining whether to approve the proposed merger agreement, including *"taking into account the results of Inotiv's due diligence review of Envigo,"* and acknowledged under the heading "Legal and Regulatory Risk Factors" that Envigo "expends significant resources on compliance efforts." *Id.*, ¶¶ 174–75 (emphasis added). Pointing to the fact that Defendants Leasure, Sagartz, and Wilbourn personally visited the site in the summer of 2021, and CW1 observed the same conditions and believed they were "impossible to miss," Plaintiff claims the positive statements in the October 2021 Proxy regarding Envigo's product quality and legal compliance were false and misleading to investors. *Id.*, ¶¶ 178, 182.

Between November 11, 2021 and February 2022, Defendants allegedly made three additional sets of misrepresentations and omissions in the course of responding to criticism of the conditions at the Cumberland facility. Specifically, these include:

- *First*, a statement on November 11 that Envigo had "participated in" USDA inspections in which inspectors provided "feedback" that the company was incorporating, and reiterating that "[t]he highest quality animal welfare is a core value of our company and is central to our business," and that Envigo "remain[ed] steadfast in [its] commitment" to animal welfare. [FAC, ¶¶ 191–94.]

- *Second*, a statement on November 16 (the same day USDA started its November 2021 inspection at the Cumberland facility) responding to animal rights' activists release of reports from the July 2021 inspection, which denied or downplayed inspectors' findings and claimed that Envigo was "tak[ing] the necessary corrective actions for all issues outlined in the reports" and "making an ongoing effort" to address "feedback" from inspectors, while reiterating its commitment to "[t]he highest quality of animal welfare [that] is a core value of our company and is central to our business." *Id.*, ¶¶ 196–98.

- *Third*, Wilbourn's February 3, 2022 testimony at a Virginia Senate Hearing stating that Envigo was "working hard to fix the current issues and [has] already taken many steps towards doing so" and was "doing everything we can" to ensure the compliant operation of the Cumberland facility; that the ongoing AWA violations were mere "temporary lapses" due to the pandemic that Envigo had acted "immediately" and "swiftly" to address; and that Envigo was focused on the "highest animal welfare standards" and was "working hard to fix" issues identified by USDA. *Id.*, ¶¶ 206–12.

Finally, Plaintiff alleges two additional sets of false and misleading statements and material omissions made in a quarterly SEC filing on February 16, 2022, and during a quarterly earnings call on May 13, 2022. [FAC, ¶¶ 216–27.] In both instances, Plaintiff claims Inotiv made false statements about the fact that animals bred and sold by its RMS business segment (which, as noted above, included the Cumberland facility

acquired from Envigo) were of "research quality" and did not mention AWA violations identified in the two inspections performed by USDA in 2022.

### B. Defendants' Materially False and Misleading Statements or Omissions Concerning Inotiv's NHP Business

The other bucket of alleged false statements and omissions Defendants' made pertain to its primate-related business in the course of acquiring Envigo and OBRC. Plaintiff reiterates that access to a stable supply of primates from a "limited international source of supply" was important to Inotiv's business. This fact allegedly formed a material consideration supporting its acquisition of Envigo—and Plaintiff claims it was essentially the sole justification for Inotiv's purchase of OBRC. *Id.*, ¶¶ 8–9, 14–15, 38–40, 110–11, 119, 170, 201.

Plaintiff points to numerous specific statements Defendants made about their primate related business and assert they were materially false and misleading or omitted material information. Here's a distillation of the specific material misstatements or omissions at issue:

- Statements in the September 21, 2021 investor call, presentation, and merger agreement concerning Inotiv's legal compliance that failed to disclose the June 2021 grand jury subpoena issued to Envigo (and after January 2022, the subpoena issued to OBRC) and the fact that Inotiv's principal supplier of primates was the target of a criminal investigation. [FAC, ¶¶ 116, 127–28, 169, 171(c).]

- Various statements in "Primate Fact Sheets" maintained on an Envigo-branded public website following the closing of the Envigo acquisition on November 5, 2021, stating that it was "the world's largest and most trusted source" of "high-quality" primate research models procured from "high-quality breeding farm partners." *Id.*, ¶¶ 186–89.

32

- Statements Mr. Leasure made at a November 16, 2021 virtual conference that the Envigo acquisition addressed "some of the risk [Inotiv] had to [its] business model" with respect to "supply chain in [its] access to research models, which is becoming more and more of a problem and is like a limiting resource," noting that primates were a concern addressed through the acquisition and it was now in a unique position of being "the only CRO that has access to all the research models"—a "real competitive advantage right now with the supply and demand chain where it is today." *Id.*, ¶¶ 199–201.

- Additional statements Leasure made at the November 16, 2021 conference that Inotiv had "an extensive supply of rhesus and cynomolgus [*i.e.*, macaque] models," "routinely conducts extensive audits of each farm to ensure supplier facilities are well maintained, the animals are well-cared for and healthy, and the export facilities are of high quality," that Inotiv is "very selective in our breeding farm partners," carries out an extensive audit program" of supplier facilities, and can provide its clients with the ability to "procure . . . [primates] when and where [clients] need them," and that Inotiv acquired Envigo to address "a concern that [Inotiv] did not have a significant source of [primates] that we could rely upon," giving the company a "competitive advantage" in that it was "the only CRO that has access to all the research models." *Id.*, ¶¶ 187–89, 201.

- Statements in the Inotiv press release announcing the OBRC acquisition on January 27, 2022 that the company was "a leader in primate welfare and supply" and that the acquisition would "accelerate growth, provide scale, and ensure that client needs are met with the highest level of animal welfare." *Id.*, ¶ 204.

- A statement from Leasure in announcing the OBRC acquisition on January 27, 2022 that OBRC would "provide increased access to critical research models" and "the highest level of service, animal welfare, and enhanced supply chain logistics." *Id.*

- A statement from Leasure on May 13, 2022 assuring investors that purchasing OBRC protected Inotiv from industry-wide primate supply constraints as it "provides an opportunity to further expand [Inotiv's] services and address client needs at a time when the industry demand is outstripping supply." *Id.*, ¶ 224. Similar statements (and omissions) regarding the grand jury subpoenas and focus of the criminal investigation into the smuggling ring were allegedly made on February

16, 2022, May 16, 2022, and August 12, 2022, in Inotiv's Q1–Q3 2022 Form 10-Qs signed by Leasure and Taylor. *Id.*, ¶¶ 216–19, 222, 228–30, 234–36.

- A statement from Leasure on an August 10, 2022 earnings call in response to a question from a financial analyst about "the supply side of [Inotiv's primate] business," that "[i]t's been a market where the . . . demand has been outstripping our supply" and Leasure did not "see the supply increasing any at this time," citing "what's taking place in Asia, China , Cambodia" and difficulty "get[ting] that information directly over the phone." *Id.*, ¶¶ 231–32.

## Discussion

Based on the above set of facts, Lead Plaintiff Oklahoma Police Pension and Retirement System asserts claims on behalf of a putative class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The asserted class consists of all persons and entities who (1) purchased or otherwise acquired Inotiv stock during the Class Period (September 21, 2021 through November 16, 2022) and were damaged thereby or (2) held Inotiv shares as of October 4, 2021 and were entitled to vote on the acquisition of Envigo at the November 4, 2021 meeting of shareholders. [FAC, ¶ 273; *see id.* at 7 (defining Class Period).] Prior to the start of the Class Period, on June 30, 2021, Inotiv had over 15.91 million shares of common stock outstanding, and as of April 26, 2022, it had more than 25.51 million shares outstanding, suggesting that the members of the putative class likely total in the thousands. *Id.*, ¶ 274.

On behalf of this putative class, Plaintiff brings four legal claims. *First*, Plaintiff asserts violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 based on Defendants' allegedly materially false and misleading statements and omissions that deceived the investing public, artificially inflated and maintained Inotiv's stock price,

and caused Plaintiff to purchase Inotiv stock at higher prices than it would have absent the artificial inflation. *Id.*, ¶¶ 293–301 (Count I). *Second*, Plaintiff asserts violations of § 20(a) of the Exchange Act against Leasure and Taylor as "controlling persons." *Id.*, ¶¶ 302–06 (Count II).

*Third* and *fourth*, Plaintiff brings separate proxy solicitation claims under §§ 14(a) and 20(a) of the Exchange Act, which it styles as its "Proxy Claims." *Id.*, ¶¶ 307–26 (Counts III, IV). These claims are "based solely on negligence" (*i.e.*, not Defendants' knowledge or recklessness) and are asserted only on behalf of investors who held Inotiv stock on the record date of November 4, 2021 (*i.e.*, those who were entitled to vote on matters necessary for Inotiv to acquire Envigo). *Id.*, ¶ 307. The theory for these claims is substantially similar to the § 10(b) claims: that Defendants made statements to solicit shareholder approval of the Envigo acquisition including the September 21 investor presentation deck (*see id.*, ¶¶ 156–63); the proposed merger agreement (*id.*, ¶ 164); and the October 2021 Proxy (*id.*, ¶¶ 167–74). In particular, Count III asserts "proxy claims" for violation of § 14(a) and Rule 14a-9 against Inotiv, Leasure, and Taylor, while Count IV is against Leasure and Taylor as "controlling persons" within the company under § 20(a) of the Exchange Act. *Id.*, ¶¶ 314–26.

Defendants seek dismissal of all counts. Before getting into the thrust of the arguments, let's first set out the controlling standards governing my decision making. Rule 8(a)(2) requires the complaint to state a "short and plain statement" of the claim showing that the plaintiff is entitled to relief. Rule 12(b)(6) permits a party to move for

dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires the plaintiff to plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

As for the fraud-related claims, Rule 9(b) requires pleading "with particularity." Fed. R. Civ. P. 9(b). This means the plaintiff must describe in his complaint who made the false statement, when and where it was made, the content of the misrepresentation and the method it was communicated. *Cornielsen v. Infinium Cap. Holdings, LLC*, 168 F. Supp. 3d 1033, 1040 (N.D. Ill. 2016) (citing *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)).

In addition, the Private Securities Litigation Reform Act (PSLRA) imposes heightened pleading requirements on securities plaintiffs. 15 U.S.C. §§ 78u–4(b); *Trahan v. Interactive Intelligence Group, Inc.*, 308 F. Supp. 3d 977, 986 (S.D. Ind. 2018) (citing *Beck v. Dobrowski*, 559 F.3d 680, 681–82 (7th Cir. 2009)). Plaintiffs alleging a proxy statement is misleading due to an omission must identify each statement alleged to have been misleading, the reason why each statement is misleading, and the relevant facts supporting that conclusion, as well as that the statement caused some type of economic

loss. *Id.*; *Kuebler v. Vectren Corp.*, 412 F. Supp. 3d 1000, 1003 (S.D. Ind. 2019), *aff'd*, 13

F.4th 631 (7th Cir. 2021) (citing § 78u–4(b)(4); *Grace v. Rosenstock*, 228 F.3d 40, 46–47 (2d

Cir. 2000)). *See also AnchorBank*, 649 F.3d at 617. I may not consider "catch-all" or

"blanket" assertions—what matter under the PSLRA is "particularly pled allegations."

*Id.* (citing *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019)).

### I.    Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person"

to "use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest

or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has promulgated Rule

10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. To state a securities fraud claim under § 10(b) of the Exchange Act

a plaintiff must typically allege "(1) a material misrepresentation or omission by the

defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance;

(4) economic loss; and (5) loss causation." *AnchorBank*, 649 F.3d at 617 (citing *Schleicher*

*v. Wendt*, 618 F.3d 679, 681–82 (7th Cir. 2010)). *See also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (listing elements plaintiff must prove to prevail on implied right of action for § 10(b) violation).

## A.    Defendants' Material Misrepresentations or Omissions

Defendants challenge Plaintiff's fraud claims on the basis that the amended complaint fails to allege any actionable fraudulent statements on their part. This argument is really two-fold. First, Defendants assert that they were under no duty to disclose imposed by affirmative law and thus there can be no liability. Second, even if a duty to disclose could be inferred, there was nothing "material" to disclose at any point prior to the end of the class period.

### 1.    Was There a Duty to Disclose?

It's well established that the Exchange Act does not codify "a system of continuous disclosure," and companies "are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001) (collecting cases). A firm "does not commit fraud by standing on its rights under a periodic-disclosure system." *Id.* at 810–11. Absent a duty to disclose imposed by positive law, disclosure is required when necessary to make statements made, in light of the circumstances in which they were made, not misleading. *Anderson v. Abbott Laby's*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001). Defendants tell me: (1) they disclosed all the information required by Item Nos. 303, 103, and 105 of the SEC's Regulation S-K; (2) they had no duty to disclose the allegedly

omitted information under Regulation S-K or any other source of positive law; and (3) they did, in fact, disclose the allegedly omitted information when they were obligated to do so. [DE 68 at 20–23.]

Plaintiff, in response, argues that the complaint plausibly alleges that Defendants violated affirmative disclosure duties imposed by Regulation S-K. As a general matter, Regulation S-K outlines how registrants should disclose material qualitative descriptors of their business on registration statements, periodic reports, and any other filings with the SEC (*i.e.*, within the confines of the Exchange Act's "periodic-disclosure system" explained in *Gallagher*). "Item 303(a)(3)(ii) of Regulation S–K . . . provides that registration statements and annual 10–K reports must reveal 'any known trends or uncertainties that have had or that the registrant *reasonably expects* will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *Gallagher*, 269 F.3d at 810; *see* 17 C.F.R. § 229.303(b)(2)(ii). Item 105 similarly requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). Finally, Item 103 requires companies to describe any material legal proceedings, including the principal parties, facts giving rise to the proceeding, and the relief sought. *See* 17 C.F.R. § 229.103.

It does not appear that the Seventh Circuit has ever held that Regulation S-K imposes a duty to disclose that gives rise to a fraud claim under the Exchange Act. Plaintiff does not meaningfully address this point in opposing Defendants' motion. Other circuits have taken the issue up and have reached different conclusions. *See*

*Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *8 (N.D. Ill. Feb. 10, 2023) (collecting

cases); *Twin Master Fund, Ltd. v. Akorn, Inc.,* 2020 WL 564222, at *7 (N.D. Ill. Feb. 5, 2020)

(same) (finding persuasive Second Circuit authority holding that "Item 303 does impose

a duty to disclose for the purposes of securities fraud claims, because silence as to Item

303 conditions in an SEC filing has the potential to mislead investors"). Even in

jurisdictions which recognize that Regulation S-K imposes a duty to disclose, it's not

like any information conceivably covered by Regulation S-K forms a basis for a fraud

claim. To prevail on such a claim, "an actionable securities violation also requires the

plaintiff to meet the materiality standard[.]" *Akorn, Inc.*, 2020 WL 564222, at *7.  The fact

remains that the circuit has not held that the disclosure obligations imposed by

Regulation S-K cannot form a basis for a § 10(b) claim. I will therefore assume for

present purposes that a failure to disclose information required under Regulation S-K

can form a basis for a fraud claim under the Exchange Act.[4]

Plaintiff doesn't really spell out how the allegedly omitted information fell

within the requirements of Regulation S-K. Its opposition brief simply provides a

citation to the relevant items in the regulation and a listing of the omitted material

information they claim was required to be disclosed. As outlined in detail above, that

information is that: (1) in June 2021, Envigo and OBRC received grand jury subpoenas

in DOJ's criminal investigation; (2) as a result of the criminal investigation and its focus

---

[4] Defendants seem to anticipate this possibility, in light of the unsettled law in this circuit, arguing
in the alternative that Plaintiff fails to sufficiently plead a violation of Items 303, 103 and 105 in the first
place. [*See* DE 68 at 21; DE 74 at 4.]

on Inotiv's principal primate supplier, Inotiv was exposed to risk that federal law enforcement would take actions resulting in significant costs and expenses or harm to Inotiv, including potential penalties or reputational damage, including cessation of primate imports; (3) USDA inspectors found serious and ongoing AWA violations at the Cumberland facility that had not been remediated over many months; (4) as a result of USDA's findings and the ongoing nature of the violations and the company's inadequate response, Inotiv was exposed to a present risk that the inspection process would result in civil or criminal actions and consequently impose significant costs, expenses, and reputational damage on the company; and (5) the criminal investigation and AWA violations could adversely affect Inotiv's bottom line. [DE 73 at 25.]

Defendants argue that the rules only require issuers to disclose known and material proceedings and risks under Items 103 and 105, and a violation of Item 303 requires "proof" of actual knowledge. In their view, none of the facts allegedly omitted from their proxy and Forms 10-Q and 10-K fit the bill. [DE 74 at 4.] The "reasonably expects" language in Item 303 of Regulation S-K has not been defined by the Seventh Circuit, but district courts in other circuits and the SEC have stated it requires more than a remote possibility but something less than more-likely-than not. *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp.3d 821, 837–38 (N.D. Ind. 2018) (collecting authorities). If a company expresses risks only in vague terms or as a hypothetical when those risks are coming down the pike or have already come to fruition, doing so can form a basis for liability under the securities laws. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167,

1172 (9th Cir. 2009), *aff'd sub nom. Matrixx Initiatives v. Siracusano*, 563 U.S. 27 (2011); *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013).

Defendants have failed to identify any controlling authority rejecting a duty to disclose in light of the detailed facts alleged indicating that the civil and criminal investigations into Envigo's and OBRC's sketchy operations were real and pressing concerns likely to result in significant financial and reputational harm to the company. I cannot say, as a matter of law, that Plaintiff's allegations fail to make out colorable violations of the relevant items in Regulation S-K. It would be improper to do so based solely on lower court authorities rejecting duties to disclose information about government investigations in distinct contexts, as Defendants invite me to do. That approach would essentially ignore the wealth of factual allegations presented indicating that Defendants knew full well that the investigations were serious concerns and not routine compliance proceedings. *See Oak Street Health, Inc.*, 2023 WL 198119, at *6 (noting that while there is no duty to "confess to uncharged, unadjudicated claims of wrongdoing," such an argument "misses the point" where plaintiffs plausibly allege defendants' statements "omitted the fact that [they] engaged in the . . . specific practices alleged to be illegal.") (citing *Heavy & Gen. Laborers' Loc. 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022); *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018)). *See also In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2016)).

Moreover, Plaintiff makes a related argument that, even if Defendants were under no obligation to "speak" under Regulation S-K, Defendants *did* make public statements that were rendered false and misleading in context by the failure to disclose additional information. [DE 73 at 24.] In other words, even if Defendants did not have a duty to disclose imposed by Regulation S-K, they assumed one by providing some information about the Envigo and OBRC acquisitions, its new RMS business segment, the Cumberland facility, and its primate business, but intentionally omitting others. *See, e.g.*, *Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d at 839 ("[W]hile *Gallagher* rightly stands for the proposition that there is no general duty to disclose bad news, plaintiffs allege that ZBH made statements while in possession of information that it knew would make them misleading, which is distinct from what occurred in *Gallagher*.").

In *Gallagher*, the Seventh Circuit held that Item 303's disclosure requirements did not impose a duty to disclose a letter the defendant received from the FDA because the allegedly misleading statement occurred days prior to the issuance of the letter. *Gallagher*, 269 F.3d at 810 ("The 10-K report was filed on March 9, 1999, and the FDA's letter is dated March 17, eight days later. Unless Abbott had a time machine, it could not have described on March 9 a letter that had yet to be written."). The court concluded that the defendants did not make any false or misleading statements about what the FDA was doing. Because the statements in the defendants' Form 10-K were not false at the time they were made and there was no duty to update, there could be no liability. *Id.* at 808.

43

But Plaintiff's case, as alleged, is broader. It is not strictly tied to the timing of the government's raid of the Cumberland facility or the unsealing of the criminal case against the primate smuggling ring, as Defendants suggest. Based on pervasive compliance issues over a span of many months at the Cumberland facility, which coincided with Inotiv's due diligence efforts and facility tours of Envigo facilities by Inotiv executives, Plaintiff alleges that it was entirely predictable to the powers that be that the company would not be able to bring the facility into compliance (and perhaps avoid an enforcement action) while meeting the financial goals the company was projecting. And in light of information Envigo and OBRC received in the course of the sealed criminal investigation, Plaintiff alleges that it was predictable that Inotiv's major supply of primates was in jeopardy of disappearing at a moment's notice, undermining its financial goals in this lucrative market.

In sum, Plaintiff has alleged that Defendants were in possession of information about serious AWA violations that existed at the Cumberland facility dating to at least July 2021, the issuance of grand jury subpoenas to Envigo and OBRC in June 2021, and the fact that the focus of the Justice Department's investigation was Inotiv's principal supplier of primates. And that's all information the Defendants knew would make their public statements misleading. As such, even if Defendants did not violate Regulation S-K *per se*, they were obligated "to tell the truth about material facts once they commence[d] speaking." *Ackerman v. Schwartz*, 947 F.2d 841, 846, 848 (7th Cir. 1991) ("Under Rule 10b–5, moreover, the lack of an independent duty does not excuse a

44

material lie. A subject of a tender offer or merger bid has no duty to issue a press

release, but if it chooses to speak it must tell the truth about material issues."); *Stransky*

*v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) (same); *Caiola v. Citibank,*

*N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) (same); *see also No. 84 Emp.-Teamster Joint*

*Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003).

Defendants make a final argument that they did eventually disclose the allegedly

omitted information and therefore didn't hide anything. [DE 68 at 21–23.] Before the

Envigo acquisition, they told investors, in broad strokes, that Envigo is subject to

governmental regulations and expends significant resources on compliance efforts, the

company's facilities are subject to routine formal inspections by regulatory agencies,

and failure to comply with applicable governmental regulations could harm its

business. The USDA reports were made public after they were finalized (the complaint

notes the first reports were posted on USDA's website on November 15, 2021, *see* FAC,

¶ 196). And after the search warrant was executed and the civil case was filed, Inotiv

promptly disclosed that information to investors. Inotiv also disclosed that, as a general

matter, Envigo depends on a limited source of supply for primates, a disruption of

supply could harm its business, and it had experienced disruptions of its supply.

Plaintiff asserts that the criminal investigation itself (in contrast to specific aspects of the

investigation implicating OBRC as an unindicted co-conspirator of the smuggling ring

and jeopardizing Inotiv's principal supply of NHPs) was "a matter of public record

since as early as June 22, 2021," prior to either acquisition. *Id.*, ¶¶ 113–14. Finally, Inotiv

disclosed the existence of the grand jury subpoenas issued to Envigo and OBRC in February and May 2022, only after it was publicly revealed that employees of its primate supplier had been indicted.

Notwithstanding these arguments, if Defendants wanted to provide investors with material information, they weren't permitted to tell half a story. In my view, based on what Defendants' said pertaining to the Envigo acquisition, it's hard to see how a buyer could beware (let alone be aware of) the risks posed by the acquisition. The disclosures Defendants point me to are essentially boilerplate. They simply noted opaque things like Envigo was subject to governmental regulations (who isn't?!) and failure to comply with them could harm the company's business, and that there were supply issues in the market for NHP research models.[5] Only later, after the investigations came to a head and the details of the government's investigations were thrown into public light, did Defendants offer more specific disclosures about risks to its business that, by all accounts, Plaintiff alleges were or should have been crystal clear to Defendants many months earlier. As exhaustively detailed above, Defendants' initial disclosures left out a significant amount of information about the appalling conditions

---

[5] District courts have parsed similar allegations about "general disclosures that did not alert investors to [a] very particular, concrete, and grave risk[]" about the defendant's facilities and associated risks. *See, e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 83 (S.D.N.Y. 2017) (risk disclosures that did not address facts plaintiffs alleged defendant knew of, including that certain facilities "*may not* comply with our standards,*" were materially false and misleading for pleadings purposes (emphasis added)); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583-84 (S.D.N.Y. 2016) (disclosures that the company was subject to scrutiny that "has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas" were insufficient as they "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation").

at the Cumberland facility. And they omitted details about the serious risk that Inotiv

would lose access to its main supply of primates in the course of wide-ranging

governmental investigations— both of a civil and criminal nature—into the smuggling

of these misfortunate creatures.

In sum, Plaintiff has plausibly alleged that Defendants chose to comment on

matters germane to issues in public filings but in doing so omitted critical information

about the context of the government investigations and significant risks facing the

company, leading a reasonable investor to falsely believe the Envigo and OBRC

acquisitions were going to be a positive development. Defendants surely have a factual

rejoinder to much of this, but that is for another day. For now, based on the allegations

in the amended complaint, the case is not subject to dismissal on this basis.

## 2.    Does the Complaint Sufficiently Allege Materiality?

To have a securities fraud claim, plaintiff must plead with particularity the falsity

of a statement of fact or omission and its materiality. "[T]o fulfill the materiality

requirement 'there must be a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered

the 'total mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224,

231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). *See*

*also Makor Issues & Rts., Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 596 (7th Cir. 2006), *as*

*modified on denial of reh'g* (July 10, 2006), *vacated and remanded*, 551 U.S. 308 (2007)

("*Tellabs I*") (reiterating that "[t]he crux of materiality is whether, in context, an investor

would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company").

An analog to the materiality standard is that if a "statement amounts to vague aspirations or unspecific puffery, it is not material." *City of Sterling Heights Gen. Employees' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *23 (N.D. Ill. Feb. 13, 2013) (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995)). Because puffery is "devoid of any substantive information," it "contains no useful information upon which a reasonable investor would base a decision. *Searls*, 64 F.3d at 1066. It is thus immaterial for purposes of the securities laws. *Id.*

Similarly, expressions of opinion or belief are typically not actionable, unless a plaintiff makes a showing that "the speaker did not hold the belief she professed," the opinion statement contained supporting facts that are objectively untrue, or the opinion statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when "those facts conflict with what a reasonable investor would take from the statement itself[.]" *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *9, *14 (N.D. Ill. Apr. 18, 2022) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86, 189 (2015)). Even statements that are "literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor." *Id.* at *11. I must make these evaluations in the "context of the 'total mix' of information" a reasonable investor

would consider. *Hospira, Inc.*, 2013 WL 566805, at *23–*25. *See also Omnicare, Inc.*, 575 U.S. at 190 ("[W]hether an omission makes an expression of opinion misleading always depends on context.").

For purposes of a motion to dismiss, the question is whether "the complaint includes factual allegations that state a plausible claim for relief"—not whether "*parts* of claims" fail to pass muster in isolation. *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *10 (N.D. Ill. Apr. 26, 2021) (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324-25 (7th Cir. 2015)). Given the standard elucidated by the Supreme Court in *Basic, Inc.*, it should come as no surprise that the materiality of a statement is quite fact intensive and as such the "materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 370 (7th Cir. 1997). "[T]hese assessments are peculiarly ones for the trier of fact." *Id. See also Stransky*, 51 F.3d at 1333 ("[M]ateriality is typically an issue to be resolved by the finder of fact.").

So too here. Defendants make an array of arguments for why various of the alleged statements or omissions outlined in the complaint are immaterial – including that they are "textbook puffery," the Cumberland facility was financially immaterial to Inotiv's business, and certain of the statements are protected by the PSLRA's safe harbor provision. [*See* DE 68 at 31–37.] I find that none of these arguments form a basis for dismissal of Plaintiff's § 10(b) claim for failure to plead the materiality of Defendants' alleged statements or omissions.

Initially, Defendants repeatedly characterize the alleged statements or omissions about the Cumberland facility as an attempt at "fraud by hindsight," arguing that Plaintiff simply relies on later-issued USDA reports to prove the falsity of statements Defendants had previously made. [*See, e.g.*, DE 68 at 28–29.] But that ignores Plaintiff's allegations that inspectors first identified the violations (which continued on and on for months leading up to the Envigo acquisition and then festered for months thereafter under Inotiv's management) in *July 2021*, prior to the start of the Class Period and nearly a year prior to the filing of the civil action. And it ignores Plaintiff's allegations that with each set of findings, the company was cited for violations and its top executives were told in no uncertain terms what it would take to fix the violations (*i.e.*, things they determined were financially unpalatable, in closing the facility). It would be inappropriate to find that the pervasive compliance issues identified at the Cumberland facility that became the subject of the USDA's inspections from July 2021 to May 2022, leading to the raid, TRO, and subsequent closure of the facility were not material to Inotiv's business. Likewise, it would border on the absurd to hold that OBRC's involvement (while short of indictment) in a criminal smuggling ring, including the indictment of one of its top executives for lying to investigators and the issuance of subpoenas to OBRC and Envigo, was not material to Inotiv's significant investments in its primate business.

As outlined in detail above, the complaint sets forth facts sufficient to support a strong inference that Defendants disregarded evidence that their public statements

contained material misrepresentations and omissions about the risks the company faced in acquiring Envigo and OBRC. Defendants assert that they acknowledged all outstanding issues of material concern to Envigo's business and no reasonable investor would have believed that Inotiv was "downplaying or denying anything." [DE 74 at 7–8.] But as explained above, their statements about the quality of research models produced at the Cumberland facility, remedial actions to address compliance issues at the facility, and Envigo's commitment to animal welfare are plausibly alleged to have minimized the repeated and continuing nature of the AWA violations USDA initially identified in July 2021.

In context, Plaintiff sets forth facts supporting the reasonable inference that no speaker professing the view that Envigo was a "best-in-class provider of high-quality research models and services," or that public allegations of AWA violations at the Cumberland facility were " misleading or lacking important context" could have believed these things to be true, or that these so-called opinions were based on objective facts. Plaintiff has alleged facts permitting the reasonable inference that research models produced at the facility fell far short of that standard, and that this issue was readily ascertainable to the folks in charge as Inotiv conducted its due diligence. Plaintiff avers that the models fell short of "research quality"—an important standard for animals supplied for clinical research purposes—precisely due to the shocking welfare violations persisting at the facility for months before and after Inotiv closed the deal. The same goes for statements to the effect that the company was "working hard to fix

the current issues" identified by inspectors prior to their public statements, "acted swiftly" to address them, and "showed improvement," given the same issues prevailed at the facility for months after the government's initial report documenting the AWA violations, mounting into a federal lawsuit against the company.

In seeking the dismissal of various statements or factual omissions as immaterial or mere puffery or opinion statements, Defendants seem to take the position that the government's enforcement action in May 2022 came as a broadside. The complaint paints a far different tale. Crediting the truth of Plaintiff's allegations, as I must at this stage, in the context of a longstanding government investigation involving routine "exit" discussions with executives at the company, the government's civil action strikes me as closer to inevitable than surprising. It is a perfectly predictable consequence of persistent failures to comply with basic animal welfare standards. And that drumbeat of violations didn't happen just anywhere – they were taking place while Inotiv conducted due diligence and eventually acquired Envigo's Cumberland facility, which historically produced some 25% of the beagles supplied as research models in the domestic market.

In that vein, Plaintiff specifically alleges that Leasure, Sagartz, and Wilbourn personally toured the Cumberland facility *at the very time* the repeated violations took place, and that based on experience of former Envigo personnel who visited the facility around the same time period, the conditions for which the company was cited were open and notorious. None of the pervasive AWA issues were mentioned whatsoever as Defendants touted the upside of the deal based, in part, on the quality of the research

models Envigo produced and its commitment to animal welfare and legal compliance. Plaintiff also specifically alleges information about the serious staffing shortages at the facility, which—if not on a personal tour through the facility in the summer of 2021—was information Inotiv knew or certainly should have known in the course of its due diligence, and which substantially undermines their public statements about Envigo's commitment to producing high-quality research models, animal welfare standards, and the condition of Envigo's research models.

Defendants also argue that the Cumberland facility was "just one facility of 22 in the RMS segment," comprised less than one percent of Inotiv's total revenue, and was not profitable – suggesting that information about the facility was not financially or otherwise material. [DE 68 at 35–36.] But there are numerous facts in the complaint, which if credited, belie the notion that the issues at the Cumberland facility were immaterial to investors. [*See, e.g.*, FAC, ¶ 156 (Leasure personally participated in lobbying efforts and retention of Virginia lobbyists to respond to negative publicity surrounding the release of the July 2021 inspection report), ¶ 210 (Wilbourn asserted that Inotiv was engaged in an "all hands on deck exercise"); *see also id.*, ¶¶ 39, 171, 207, 245, 311.] While opposing DOJ's motion for a preliminary injunction in June 2022, Inotiv itself tendered an expert witness who testified that the purpose-bred beagles produced at the Cumberland facility were essential to biomedical research and that 25% of the domestic supply of beagles for clinical research had historically been supplied from that facility. [FAC, ¶¶ 108, 245.]

The materiality standard is not so rigid, at the pleading stage, as to require Plaintiff to allege that the whole collapse of Inotiv's stock price was due to Defendants' alleged misstatements or omissions. Given the large dip in Inotiv's stock once the details underlying the government's longstanding investigation and Inotiv's decision to close the facility (rather than invest in its remediation) hit the market, I would find it hard to buy that this information is immaterial *as a matter of law. See Grimes v. Navigant Consulting, Inc.*, 185 F. Supp. 2d 906, 912–13 (N.D. Ill. 2002) (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock. . . . If a company's disclosure of information has no effect on stock prices, it follows that the information disclosed ... was immaterial as a matter of law.'")).

In sum, frankly, much of Defendants' argument on materiality strikes me as post hoc rationalization, asserting that their statements at the time were sufficient because the risks were not apparent—until they exploded disastrously into public view. To which I ask: doesn't that prove the point? Even accepting that the Cumberland facility was a small percentage of Envigo's overall operation (a position that cuts against the position Inotiv took in the civil enforcement action), the optics of what was happening at that location were horrifying; how could that information *not* be material to the stock price? At least in the short run, collective emotions are what often fuel stock market rallies and collapses. And there's not a lot more evocative than the photos in Plaintiff's

amended complaint of the hapless beagles at the Cumberland facility. [*See, e.g.*, FAC, ¶¶ 103, 105–06.] In all events, I view Defendants' materiality arguments as better tailored to summary judgment, when the issue can be evaluated with the benefit of additional facts elicited in discovery.

### B.    Application of the Safe Harbor Provision

A related argument Defendants raise is that some of the allegedly material statements are not actionable because they fall within the so-called "safe harbor" provision of the PSLRA. Safe harbor protects statements from liability under the securities laws, so long as certain conditions are met. The safe harbor applies to written or oral forward-looking statements if: (1) "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the statement is immaterial; or (2) if the plaintiffs fail to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(c)(1)(A)–(B); *see W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 2020 WL 6118605, at *21 (N.D. Ill. Oct. 15, 2020).

Defendants assert that both subsections of the statutory safe harbor apply to two sets of alleged statements (1) in Inotiv's November 5, 2021 and January 27, 2022 8-Ks and during the Q2 2022 earnings call concerning the future benefits of the Envigo and OBRC acquisitions, and (2) that Leasure made at a conference regarding the company's intent to "eventually" rebrand the companies' merged operations under the Inotiv

name. [DE 68 at 36–37 & n.29; DE 74 at 13–14; *see* FAC, ¶¶ 181, 201, 204, 224.] The cited

statements all include forward-looking language:

- A statement in Inotiv's November 5, 2021 press release stating that the company "will receive access to a wide range of high-quality small and large research models for basic research and drug discovery and development." *Id.*, ¶ 181.

- Leasure's statement at a November 16, 2021 conference that the company would "eventually brand everything under the Inotiv name." *Id.*, ¶ 201.

- A statement in Inotiv's January 27, 2022 press release from Inotiv's then-COO for the RMS business, John Harkness, that the acquisition of OBRC "will accelerate growth" and "will provide increased access to critical research models and expanded facilities." *Id.*, ¶ 204.

- A statement Leasure made on the May 13, 2022 Q2 2022 earnings call that Inotiv "anticipate[s] supporting growth in services and consolidating 2 existing RMS locations," including "facility improvements . . . to enhance animal welfare." *Id.*, ¶ 224.

Inotiv's Form 8-K, filed with the SEC on January 31, 2022, noted that "[s]uch

statements involve risks," including "the possibility that expected benefits may not

materialize as expected . . . and other risks that are described in [Inotiv's] latest [] Form

10-K and its other filings with the SEC." [DE 69-9 at 7.] Inotiv's proxy filed September

24, 2021 [DE 69-5] listed "legal and regulatory risk factors" in connection with the

Envigo deal, and generally stated that it was subject to governmental regulations,

expends significant resources on compliance efforts, was subject to routine inspections

by regulatory and supervisory authorities, and failure to comply with government

regulations "could harm [its] business." *Id.* at 8.

There was far more detail in Inotiv's Form 10-K for the fiscal year ending September 30, 2021, which was filed on December 21, 2021. Inotiv disclosed that "*if those authorities determine that [Envigo's] facilities or procedures do not meet applicable requirements,*" the company could be subject to an enforcement action. [DE 69-8 at 8 (emphasis added).] It further stated that from July through December 2021, one of Envigo's facilities "was inspected on several occasions by the USDA," after which USDA had issued "inspection reports with findings of non-compliance with certain USDA laws and regulations," and USDA "indicated it intends to conduct a formal investigation." *Id.* Then, as previously noted, Inotiv's Form 10-Q, filed February 16, 2022, included a whole subheading entitled "government investigations," which reiterated the above facts about the Envigo investigation and added that some eight months earlier, Envigo had received a grand jury subpoena issued by DOJ "requiring the production of documents related to the importation into the United States of live non-human primates" from Asian countries and that the company was "cooperating with the Department of Justice" in connection with its ongoing investigation. [DE 69-10 at 5.] In sum, while the September proxy simply noted generalized risk factors related to government investigations, Inotiv's filings in December 2021 and February 2022 included more specific details about the government's investigations into Envigo and OBRC, prior to the government's raid of the Cumberland facility in May 2022.

Plaintiff does not meaningfully contest that the statements made were forward-looking in nature. Rather, Plaintiff argues that even if the cited statements were

forward-looking, Defendants failed to provide "meaningful" cautionary language accompanying the statements. Defendants allegedly omitted information from their initial public disclosures necessary to render them not false or misleading, Plaintiff argues, and it follows that for the same reason they did not provide sufficiently cautionary language to invoke safe harbor. [*See* DE 73 at 31.] Plaintiff's arguments in response are frankly underdeveloped and do not lend much clarity on the relevant timeline for purposes of applying the safe harbor provision.

"The Seventh Circuit has explained that, to be meaningful, a firm's warnings must amount to something more than 'caveat emptor.'" *Gogo, Inc.*, 2021 WL 1608342, at *11 (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004)). While a company is not obligated to "list all factors that might affect results," language is meaningful and cautionary if it puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Thus, the warnings accompanying a forward-looking statement "must be more than boilerplate." It's not enough that "a statement warn of general risks applicable to any business (e.g. the state of the economy); rather, the risks should be specifically tailored to the company's business." *Id.* at 843–44. *See also Asher*, 377 F.3d at 733 (merely "highlight[ing] some parts of the business that might cause problems" is not enough to "avoid liability for statements implying that no such problems were on the horizon even if a precipice was in sight"); *In re MF Glob. Holdings*

*Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) ("By superficially warning of possible risks while failing to disclose critical facts, MF Global was akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

As to the latter two statements allegedly made in 2022 [FAC, ¶¶ 204, 224], Plaintiff does not really have a leg to stand on. The cautionary statements included in the Form 10-K and Form 10-Q, which were in turn incorporated into the January 27, 2022 press release and May 13, 2022 Q2 2022 earnings call, were more than boilerplate. Although they maintained that USDA had not "initiated" a formal investigation, these disclosures clearly stated that Envigo had findings of noncompliance stemming from inspections in the second half of 2021, and that there were specific legal compliance risks (including an enforcement action and forfeiture of Envigo's AWA license) associated with the inspections that had taken place. [DE 69-8 at 8; DE 69-10 at 5.] Plaintiff does not contend whatsoever with the specific language in Defendants' disclosures filed in December 2021 and February 2022, respectively, which both express caution as to risks of enforcement actions in connection with USDA's findings of noncompliance dating back to the July 2021 inspection.

Cautionary statements may be incorporated by reference, and the PSLRA "does not require the most helpful caution; it is enough to identify important factors that could cause actual results to differ materially from those in the forward looking statement." *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011

WL 814932, at *9–10 (N.D. Ill. Feb. 28, 2011) (citing *Asher*, 377 F.3d at 734; *Desai v. Gen. Growth Props., Inc.*, 654 F.Supp.2d 836, 844 (N.D. Ill. 2009)). Defendants have shown that they provided as much in connection with the two cited statements in Harkness's January press release and Inotiv's May 2022 earnings call.

As to the former two statements [FAC, ¶¶ 181, 201], however, Plaintiff gets the better of the argument—at least at this stage. The September 2021 proxy, incorporated by reference into the November 5, 2021 press release and Leasure's November 16, 2021 remarks, referenced in broad strokes potential legal and regulatory risks, including enforcement of AWA regulations by the USDA, but in the same breath emphasized that Envigo "expends significant resources on compliance." [DE 69-5 at 8.] Again, that was many months after the initial inspection and findings specifically referenced in Inotiv's later filings with the SEC in December 2021 and February 2022. With respect to these two statements, the amended complaint alleges specific information, known to Defendants, which made their disclosures about the risks of the Envigo acquisition false or misleading. Whether or not the general language in the September 2021 proxy was sufficiently cautionary strikes me as yet another issue ill-suited to resolution on the face of Plaintiff's complaint. *See, e.g.*, *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015) (declining to dismiss claim under safe harbor provision where there was "a question of fact concerning whether Defendants knew the 'potential' risks identified had already occurred"); *In re UTStarcom, Inc. Secs. Litig.*, 617 F. Supp. 2d 964, 972 n.12 (N.D. Cal. 2009) ("find[ing] that the application of the PSLRA safe harbor to

any purely forward-looking statements involves a factual dispute that is not appropriately resolved at the pleading stage").

In sum, Plaintiff may not proceed on its § 10(b) claim as to the alleged statements contained in paragraphs 204 and 224 of the amended complaint, as they fall within the safe harbor provision; but Plaintiff has sufficiently alleged that the statements contained in paragraphs 181 and 201 fall outside its scope and are actionable. In any event, as explained above, Plaintiff has sufficiently alleged other material misstatements or omissions pertaining to the Envigo and OBRC acquisitions sufficient to maintain a § 10(b) claim, so the claim will be allowed to proceed even though two of the alleged statements are not actionable because of the PSLRA's safe harbor provision.

### C.    Plaintiff's Allegations of Scienter

The next pleading hurdle imposed by the PSLRA is the requirement that Plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). While the scienter standard is a bit murky, the Seventh Circuit has described it as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. *See also S.E.C. v. Bauer*, 723 F.3d 758, 775 (7th Cir. 2013) (scienter may be established by showing defendant acted with "a reckless disregard of the truth").

The Supreme Court addressed the issue of scienter back in 2007 and stated that it is established when "a reasonable person would deem the inference of scienter cogent

61

and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("*Tellabs II*"). The inference that a defendant acted with scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 326. *See also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

Therefore, to determine whether scienter has been adequately alleged, my job is to conduct a balancing of the allegations and weigh inferences in Plaintiff's favor against any possible inferences of "plausible non-culpable explanations for the defendants' conduct." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("*Tellabs III*"). In making this determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. "While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . the absence of a motive allegation is not fatal." *Id.* at 325. *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002) ("Each individual fact about scienter may only provide a brushstroke, but the resulting portrait [may satisfy] the requirement for a strong inference of scienter under the PSLRA.").

Additionally, in the context of omissions, reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it." *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 855 (N.D. Ill. 2017) (finding statement made with reckless disregard of truth, but not intent to deceive, manipulate, or defraud, plausibly alleged scienter and would be "allowed to proceed" as pled) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). The relevant inquiry "is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the '*danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing.'" *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (quoting *Sundstrand*, 553 F.2d at 1045).

Defendants tell me that there are no "classic indicator[s]" of scienter in connection with the Envigo acquisition and issues identified at the Cumberland facility, such as "contemporaneous internal reports or communications suggesting a plot to defraud investors; no witnesses who claim to have firsthand knowledge of wrongdoing; and no suspiciously timed insider stock sales." [DE 68 at 11; *see id.* at 38–42.] They reiterate their arguments that there are no allegations supporting the reasonable inference that Inotiv knew the subpoenas issued to Envigo and OBRC as part of the primate-smuggling investigation would lead to the indictment of employees of its principal primate supplier and that nobody from Inotiv or its subsidiaries (aside from Gary Tucker, of course) was charged with any wrongdoing. *Id.* Plaintiff responds that these arguments are not enough to create reasonable inferences in Defendants' favor

that "defeat the whole factual picture of Defendants' scienter painted by the FAC."

[DE 73 at 33; *see id.* at 33–42.]

One way plaintiffs can more specifically state scienter allegations is by relying on statements from confidential witnesses or the defendants themselves. As outlined above, here Plaintiff relies on statements from various individuals who worked for Envigo during the time in question. The parties dispute whether these statements have a meaningful bearing on Defendants' scienter. In *Tellabs III*, the Seventh Circuit specifically disclaimed a presumption to disregard confidential witness allegations. 513 F.3d at 712. District courts, including courts in this district, have followed this guidance where a complaint sets forth in sufficient detail the basis for a confidential witness's knowledge. *See, e.g., Hospira, Inc.*, 2013 WL 566805, at *17 (allegations from confidential witnesses are more believable when the complaint provides their "job title, duration of employment ..., and a description of employee responsibilities"); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at *9 (N.D. Ind. May 23, 2018) ("The Seventh Circuit has approved of confidential sources as providing an inference of scienter and has identified several factors which strengthen the inference, including a large number of confidential witnesses, descriptions of their jobs that indicate they had first-hand knowledge of the facts to which they are testifying, corroboration by other sources, and the inclusion of their real names.").

While the amended complaint sets forth details providing a basis for each confidential witnesses' knowledge, it's clear that these statements fall far short of

creating a 'smoking gun' supporting a strong inference of scienter. CW2 is alleged to have personally attended meetings with Leasure and Wilbourn during a site visit conducted as part of their due diligence tour. [FAC, ¶¶ 130–31.] While the visit was not conducted at the Cumberland facility, CW2 provides insight into the nature of the site visit and states that the Inotiv team was given a tour of the office space, laboratories, and animal housing areas over a span of approximately four hours. *Id.*, ¶ 131. Aside from that, CW1 recalled Leasure and Sagartz participated in visits to an Envigo primate facility in Texas, during which time "Inotiv personnel spent the entire day at the location and toured the facility." *Id.*, ¶ 126. This information requires a logical leap to infer that the site visit in Cumberland was similarly involved, but that inference strikes me as entirely reasonable in the context of an orderly due diligence review of Envigo's operations.

The balance of information Plaintiff draws from its confidential witness statements is flimsier and essentially anecdotal. CW1 personally visited the Cumberland facility on four occasions (it's not clear when), and in CW1's view, the "conditions at the Cumberland facility were impossible to miss" and there is "no way that Inotiv personnel who visited the Cumberland facility during the 2021 due diligence process would not have seen the poor condition of the dogs and the facilities at that time." *See id.*, ¶¶ 121–27. These statements relay CW1's "second-hand belief" that Defendants actually possessed knowledge of the conditions. *See, e.g.*, *Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009); *In re Bally Total*

*Fitness Sec. Litig.*, 2006 WL 3714708, at *4 (N.D. Ill. July 12, 2006) (framing "must have known" allegations as "an end-run around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly").

Similarly, CW1's statements that the ongoing NHP investigation was "general knowledge" and a topic of "water cooler" discussion among management-level employees at Envigo's primate facility in Alice, Texas amount to little more than CW1's second-hand belief about what executives at the company knew about the NHP-smuggling investigation. [FAC, ¶ 127.] These statements do not purport to provide insight on what anybody outside of Envigo's primate facility in Alice, Texas knew about DOJ's investigation. More fundamentally, these generalized statements do not permit a reasonable inference that Defendants knew or recklessly disregarded the key facts that DOJ's investigation targeted Vanny (Inotiv's primary supplier of NHPs) or that Envigo and OBRC had responded to subpoenas or were otherwise caught in the government's crosshair. The same goes for CW1's statement that Leasure was present at a leadership meeting and dinner along with Gary Tucker shortly before the OBRC acquisition and that it was a matter of "general knowledge" that Tucker had previously pled guilty to lying to federal investigators and "would not be continuing in his position with OBRC after the Inotiv acquisition, at least in part due to" his plea in that case." *Id.*, ¶ 128. CW1 may honestly believe that it was a matter of "general knowledge" that Leasure and other Inotiv executives knew of Tucker's guilty plea, OBRC's involvement in the smuggling ring, and that the government was circling in on Inotiv's

66

principal supplier of NHPs – but that does not speak to the *fact* that Leasure or other executives actually knew that sealed criminal charges were coming down against Inotiv's principal supplier of NHPs.

That said, the confidential witness statements are but one piece of Plaintiff's complaint. With respect to Plaintiff's claim based on the Envigo acquisition and issues identified at the Cumberland facility, I credit the amended complaint's well pled allegations regarding the participation of Leasure and Sagartz in overseeing an extensive due diligence process, which specifically included a tour of the Cumberland facility at the same period of time USDA inspectors uncovered open and notorious AWA violations scattered across the facility. [FAC, ¶¶ 11–14, 43–46, 243.] As noted above, the statements from CW2 and CW1 regarding the nature of the site visits during the due diligence tour, albeit in connection with other facilities, form a basis for a legitimate inference that Inotiv's visit to the Cumberland facility was of similar scope. According to Inotiv's proxy statement, between July 20, 2021 and August 20, 2021, Leasure and Sagartz visited Envigo locations, including a facility in Virginia, as part of their due diligence tour. *Id.*, ¶ 243. Plaintiff then explains how the conditions at the facility, as substantiated by declarations submitted by USDA inspectors, included overpowering odors from visibly accumulated animal waste and other unclean conditions, dogs fighting and injured due to fighting, dogs kept in overcrowded enclosures, facilities that were obviously in disrepair (such as the persistent flooring and flooding issues inspectors repeatedly documented), and a galling lack of staffing to care

for the thousands of dogs living at the Cumberland facility. *Id.*, ¶¶ 95, 243. Moreover, these conditions did not arise overnight – they went back to at least August 2017, when USDA issued similar findings of animal neglect at the facility prior to Envigo assuming ownership. *Id.*, ¶ 95. In other words, they were things to be on alert for at a site visit in Cumberland during a due diligence "tour."

As the investigation continued, key leaders attended several "exit meetings" with inspectors conveying the seriousness of the claims and the real costs of remediation; these meetings, which involved Wilbourn and (in some cases) Sagartz, dated all the way back to at least the October 2021 inspection. *Id.*, ¶¶ 75, 85, 93. Moreover, while Harkness (COO of the RMS segment) allegedly played an essential role in the due diligence process, in June 2022 he was removed from his role. *Id.*, ¶¶ 237, 247. While his ouster was characterized as a "retirement," courts have recognized that the departure of a key executive involved in matters that form the basis of alleged fraud supports a strong inference of scienter. *See, e.g., In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) (timing of departure to company's disclosure of misconduct "adds one more pieces to the scienter puzzle"). That's not to say that, in isolation, Harkness's departure is somehow a smoking gun; it's just one piece in a necessarily complex inquiry into what was going on in the minds of Inotiv's executives when they made the allegedly fraudulent statements and omissions. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (departures, while "not

sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

Drawing all reasonable inferences in Plaintiff's favor, with respect to Defendants' statements concerning Envigo and the issues identified at its Cumberland facility, the complaint essentially alleges that: (1) conditions at the facility were egregious for a long period of time, including between July and August 2021 when Leasure and Sagartz personally toured the facility; (2) Defendants knew of or consciously and recklessly disregarded the conditions and the USDA's repeated findings of noncompliance because they conducted due diligence while the investigation was heating up over the latter half of 2021 and after Inotiv assumed ownership of the facility in November 2021; and (3) Defendants intentionally misrepresented the integrity of their statements about the quality of research models Envigo produced and the company's commitment to legal compliance, notwithstanding partial corrective disclosures issued in Inotiv's December 2021 Form 10-K and February 22 Form 10-Q. The foregoing facts reinforce the significant magnitude of the problems persisting at the Cumberland facility, and paint a plausible picture that Defendants made statements and omitted details about Envigo's operations with reckless disregard for the truth.

These allegations and the voluminous facts underpinning them may be difficult to prove, but that is not the question when considering a motion to dismiss. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996). Plaintiff has alleged specific facts giving rise to a strong inference that Defendants

recklessly ignored key warning signs at the Cumberland facility in a manner that plausibly rendered their filings and other public statements fraudulent. In other words, the allegations before me are akin to a bevy of cases in which defendants "[d]eliberately ignoring 'red flags' such as those alleged here can constitute the sort of recklessness necessary to support § 10(b) liability." *Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 928–29 (N.D. Ill. 1998) (collecting cases).

Defendants push back on this view, arguing that "multiple facts" undermine an inference of scienter in connection with the Envigo acquisition and conditions identified at the Cumberland facility, including that three of the four individual defendants purchased Inotiv stock during the class period and none sold any stock; Inotiv made timely disclosures about the relevant risks and sent internal communications to employees about the Cumberland facility; and Defendants had no incentive to conceal the conditions at the facility given it was small potatoes financially. [DE 68 at 38, 40–42.] The inference of scienter raised in the complaint remains strong in light of these competing, plausible explanations offered by Defendants. I find it persuasive that none of the individual defendants sold their stock; Plaintiff does not suggest that Inotiv and its executives had financial motivation to lie about the conditions at the Cumberland facility. However, the law does not require plaintiffs to plead allegations of motive in order to sufficiently allege a strong inference of scienter. *Tellabs II*, 551 U.S. at 325, 127 S.Ct. 2499 ("absence of a motive allegation" is "not fatal"); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014) ("Although motive allegations might

meaningfully enhance the strength of the inference of scienter, a strong inference of scienter does not necessarily depend on such an enhancement.").

If Defendants are correct, they may turn out carrying the day on the merits. But I do not agree that these arguments so overwhelm Plaintiff's allegations of scienter as to warrant dismissal on the pleadings. *AnchorBank*, 649 F.3d at 617 (noting that "while the competing explanations regarding scienter and reliance could be useful to the trier of fact, they are insufficient . . . to justify dismissal for failure to state a claim on which relief can be granted"). *See, e.g.*, *Shah*, 348 F. Supp. 3d at 845 ("[A] tie goes to the plaintiff at this stage in the litigation.") (*citing ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008)).

The other half of the scienter story, involving the OBRC acquisition and DOJ's primate-smuggling investigation, is a closer question. As repeatedly outlined above, Plaintiff bases its claims on two sets of alleged misstatements or omissions—the preceding allegations about the Envigo acquisition and longstanding compliance issues at the Cumberland facility; and a separate set of allegations pertaining to the OBRC acquisition and information Defendants' allegedly concealed about the government's criminal investigation. Scienter is where the latter set of allegations fail to hold together to form a securities claim.

With respect to Defendants' scienter, Plaintiff has essentially alleged that:

(1) Leasure attended a leadership conference where CW2 claims, without any specific knowledge, he learned or would have learned of OBRC being embroiled in a criminal

investigation that was specifically focused on its principal supplier of NHPs; and (2) Envigo and OBRC received and responded to subpoenas during DOJ's criminal investigation. [FAC, ¶¶ 116–20, 128, 243.] Otherwise, Plaintiff asset that Inotiv's executives obtained personal knowledge sealed from public view—*i.e.*, that Vanny was the target of DOJ's investigation—by osmosis in the due diligence process undertaken in late 2021 and early 2022. The charges against Vanny, which included OBRC as an unnamed co-conspirator, were not unsealed until November 16, 2022. The fact that Envigo and OBRC received subpoenas in the course of the investigation and Tucker pled guilty to lying to investigators suggests that there was something amiss. But Plaintiff's argument that I can "infer Defendants' scienter" because receipt of the subpoenas and Defendants' "understanding the nature of the Criminal Investigation" somehow "transformed any hypothetical risks as to NHPs into realized risks" requiring public disclosure is not well taken in light of the PSLRA's heightened pleading requirements. [*See* DE 73 at 35.]

An inference that Defendants knew, or should have known prior to the unsealing of the federal indictment, that its principal NHP supplier was the target of the federal investigation, and thus its precious supply of NHPs was in jeopardy of being cut off entirely, is a bridge too far from the facts alleged in the complaint. USDA's investigation into the Cumberland facility yielded specific findings of violations over the span of many months that were discussed directly with the company's leadership and mirrored the claims ultimately filed against Envigo in the government's civil enforcement action.

By contrast, there is no suggestion that Inotiv's executives recklessly disregarded information about the target of DOJ's investigation and the risks it posed to its business. The fact that Envigo and OBRC received subpoenas is just that – they received subpoenas. They cooperated with the government and were not indicted. While it is a close question, in my view, the amended complaint provides no particularized facts supporting an inference that Inotiv and its executives knew or recklessly disregarded the fact that the target of a sealed criminal investigation was its "principal supplier" of NHPs. *See Rubinstein*, 241 F. Supp. 3d at 855 (reckless disregard entails "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care"). As soon as those charges were unsealed, Inotiv promptly disclosed the information to investors. Considering the allegations pertaining to OBRC and the NHP-smuggling investigation holistically, Plaintiff has failed to allege facts supporting a strong inference of scienter. That is not to suggest Plaintiff cannot plead more particularized facts that would establish a strong inference of scienter as to this set of alleged misrepresentations or omissions; but as it stands, the allegations before me do not satisfy the PSLRA's heightened pleading requirements.

In sum, Plaintiff has met its burden to allege facts supporting a strong inference of scienter with respect to Defendants' alleged statements and omissions concerning the Envigo acquisition and conditions identified at the Cumberland facility contemporaneous with its due diligence on the company. But Plaintiff's allegations fall

73

short of demonstrating that Defendants at least acted with reckless disregard for the truth in connection with their alleged statements and omissions regarding the OBRC acquisition and the government's NHP-smuggling investigation. Because Plaintiff's § 10(b) claim is predicated on both sets of alleged misstatements and omissions, the failure to adequately allege scienter as to the latter set of allegations does not mandate dismissal and Plaintiff may proceed on its claim as to the alleged statements and omissions concerning the Envigo acquisition and conditions identified at the Cumberland facility.

### D.    Loss Causation

The final argument Defendants present for dismissal of Plaintiff's securities fraud claim is failure to adequately plead loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Loss causation is an element under the PSLRA but it's not subject to the heightened pleading standard. *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *32 (N.D. Ill. Apr. 18, 2022). "To plead loss causation in the Seventh Circuit, '[t]he plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries.'" *Id.* (quoting *Ong ex rel. Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 749 (N.D. Ill. 2006). *See also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997). Because loss causation is not subject to the heightened pleading requirements of Rule 9(b), it suffices to provide a "short and plain statement" that provides "a defendant with some indication of the loss and the causal connection

74

that the plaintiff has in mind." *Id.* (quoting *Ong*, 459 F. Supp. 2d at 742). *See also Dura*, 544 U.S. at 338, 347.

Proving this element of the claim is "often a complex and fact-intensive exercise that typically requires expert testimony." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022) (citing *Glickenhaus & Co. v. Household Intern.*, 787 F.3d 408, 421 (7th Cir. 2015)). But "*pleading* loss causation requires no proof, just plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." *Id.* In assessing Plaintiff's allegations, I am guided by the notion that loss causation "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets*, 482 F.3d 991, 995 (7th Cir. 2007).

Courts have further explained that where a plaintiff alleges a "fraud on the market," as Plaintiff does in this case [*see* FAC, ¶¶ 265, 267, 280], loss causation is often demonstrated circumstantially, by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

*Meyer v. Greene*, 710 F.3d 1189, 1196–97 (11th Cir. 2013) (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011)). A corrective disclosure "need not . . . be a 'mirror image' of previous misstatements." *In re Boeing*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022) (quoting *In Re Motorola Sec. Litig.*, 505 F. Supp. 2d. 501, 543 (N.D. Ill. 2007) (holding that a damaging disclosure that appears "on its face unrelated to any fraudulent scheme" can be a basis for showing loss causation.")). "[A] disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions." *Id. See also In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006)

Plaintiff tells me that they "easily met the pleading standard." Defendants provide an additional four pages of arguments for why the allegations don't satisfy this standard. [DE 73 at 42; *see* DE 68 at 43–46.] Having determined that Plaintiff's allegations concerning the OBRC acquisition and threats to Inotiv's NHP business do not form a basis for its fraud claim due to inadequate allegations of scienter, I will set them aside for purposes of evaluating this element of the claim.

As summarized above, Plaintiff points me to a trio of "partial corrective disclosures" Defendants made after November 15, 2021 that relate back to their misstatements and omissions about Envigo and the issues at the Cumberland facility:

- *First*, Plaintiff alleges that on November 15, USDA posted its July 2021 inspection reports on its website and PETA issued a press release including links to copies of two of the reports. In response to this news, Inotiv's stock price fell by $2.80 per share, a decline of around 5%, to close at $52.75. [FAC. ¶ 260.]

- *Second*, on February 16, 2022, Inotiv filed its Q1 2022 Form 10-Q. [*See* DE 69-10.] Plaintiff tells me this is when Inotiv disclosed for the first time that during the period July through December 2021, USDA had inspected "one of Envigo's U.S. facilities" multiple times and "issued inspection reports with findings of non-compliance." [FAC, ¶ 261.] The company had appealed certain findings in the inspection reports but noted that "USDA has indicated . . . it intends to conduct a formal investigation" that "could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation." *Id.* The same disclosure contained information pertaining to Envigo's receipt of a grand jury subpoena pertaining to its NHP-smuggling investigation. *Id.* When this news was revealed to the market, the price of Inotiv stock fell $4.73 per share, a decline of approximately 17%, to close at $23.59 per share. *Id.* The news allegedly continued to spread in the market and Inotiv's stock continued to get pummeled, falling another $3.30 per share, nearly 14%, to close at $20.29 per share on February 17, 2022.[6] *Id.*

- *Third*, on May 20, 2022, Inotiv made an announcement following the close of markets that (1) on May 19, 2022, law enforcement agencies had executed a search warrant on the Cumberland facility, and (2) the same day, DOJ had filed a civil enforcement action against Envigo in connection with AWA violations at the facility. [FAC, ¶ 262.] On May 23 (the next trading day), Inotiv's stock price fell by $5.19 per share, dropping approximately 28%, to close at $13.14 per share on high trading volume.

Initially, Defendants make a fact-bound argument in connection with the

November 2021 disclosure, asserting that it cannot support a theory of loss causation

because Inotiv's "stock price quickly rebounded after an initial loss." [DE 68 at 43.]

---

[6] Bloomberg News attributed the precipitous decline, in part, to Inotiv's "disclos[ure] that [a] recently bought unit received a grand jury subpoena from Miami prosecutors investigating imports of primates from Asia," and another report published by an analyst at Lake Street Capital Markets attributed the declining stock price to factors including "new risks added to the 10-Q related to one of Envigo's research model facilities [in Cumberland, Virginia] being non-compliant" and "a DOJ investigation of NHP suppliers." [FAC, ¶ 261.] The Lake Street report reflected that the Cumberland facility was not a big issue in the eyes of management, but that the issuance of the subpoena could be part of a bigger inquiry and the news could "carry negative repercussions" for the company. *Id.* That said, the FAC does allege that the stock price decline in February 2022 was caused, in part, by further disclosures regarding the Cumberland facility, including the disclosure of, as one analyst put it, "new risks added to the 10-Q related to [the Cumberland facility] being non-compliant." *Id.*

Whether or not the stock rebounded so as to undermine Plaintiff's theory of causation in this case strikes me as a premature fact dispute. *See, e.g.*, *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d at 829 (noting Supreme Court's guidance in *Dura* that "pleading rules are not meant to impose a great burden upon a plaintiff" and finding loss causation allegations sufficient where they provided Defendants "with some indication of the loss and the causal connection that [they have] in mind"). Crediting the amended complaint's allegations as true, the market did respond to the publication of the USDA findings and PETA's press release, reflected in a 5% decline in the company's stock price day-over-day. Plaintiff plausibly ties the information back to Defendants' alleged misstatements and omissions about the conditions at the Cumberland facility that had resulted in repeated findings of noncompliance between July and November 2021 and that the company had been given opportunities to cure the conditions first documented in July 2021, but failed to do so.

Defendants get the better of their second argument, which is that the February 2022 disclosure came on the heels of its December 2021 Form 10-K, which as previously noted included a nearly identical risk disclosure regarding the USDA inspections. [*See* DE 68 at 44. *Compare* DE 69-8 at 8 (December 2021 Form 10-K), *with* DE 69-10 at 5 (February 2022 Form 10-Q).] This disclosure therefore did not "present facts to the market that are new, that is, publicly revealed for the first time." *Meyer*, 710 F.3d at 1197–98.

Finally, Defendants argue that Plaintiff cannot connect the stock drop following the May 2022 corrective disclosure revealing DOJ's execution of a search warrant at the Cumberland facility and filing of a civil complaint against Envigo to their fraud, as opposed to the market's reaction to those shocking facts. [DE 68 at 45.] This argument speaks past Plaintiff's allegations that this disclosure revealed the truth of Defendants' misrepresentations and omissions regarding the serious, repeated nature of the findings of noncompliance at the facility. [FAC, ¶¶ 161–85, 191–202, 206–30, 262.] It strikes me as another attempt to inject premature fact disputes into the analysis. Defendants also point out that the amended complaint alleges the DOJ action reported conditions that were consistent with prior USDA inspection reports. *See id.*, ¶ 101. Viewing this allegation in isolation does not undermine the inference that, notwithstanding the consistency between the DOJ's allegations in the civil case and past violations identified and reported at the facility, the stock dropped partly due to the revelation that Defendants had been understating the seriousness of the government's reported findings and potential for fixing the issues in the absence of an enforcement action. That's information Plaintiff plausibly claims Defendants kept hidden from investors until it sprung into the public light in May 2022. In sum, for pleadings purposes Plaintiff has done enough: the amended complaint sufficiently alleges that the market responded to the May 2022 Form 8-K because it revealed the truth of Defendants' misstatements and omissions regarding the longstanding AWA violations identified at the Cumberland facility and the serious risk of an enforcement action, particularly in

light of repeated failures to remediate the facility over the better part of a year in which the facility remained in flagrant noncompliance with the AWA.

I previously determined that Defendants' statements pertaining to its supply of NHPs and the subpoenas issued to Envigo and OBRC are not actionable for failure to plausibly allege Defendants' scienter. Some of those statements post-date the May 2022 Form 8-K. [FAC, ¶¶ 231–36.] Defendants point out that Plaintiff last purchased Inotiv stock on May 26, 2022. [DE 53-1 at 3.] Plaintiff argues that this does not affect the scope of its claim on behalf of the putative class given that the FAC alleges that the truth as to those matters was not fully revealed until November 2022. [DE 73 at 23 n.17.] But, as presently pled, the cited statements are not actionable, because Plaintiff does not provide a particularized set of facts supporting a strong inference of Defendants' scienter. The fact remains that Plaintiff did not buy any Inotiv securities after May 2022; it follows that Plaintiff cannot plausibly allege losses based on statements made after May 2022.

The circuit has explained that it is "proper" to dismiss claims for "failure to allege loss causation" where a claim is predicated on statements or omissions made after a plaintiff's purchase of securities. *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992) ("Roots alleges that defendants made several statements following Roots' July 25th purchase that violate Rule 10b–5. Such post-purchase statements cannot form the basis of Rule 10b–5 liability, because the statements could not have affected the price at which plaintiff actually purchased.") (citing *Blue Chip Stamps v. Manor Drug*

80

*Stores*, 421 U.S. 723, 755 (1975) (Rule 10b–5 proscribes only fraud in connection with the purchase or sale of securities)). *See also Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 705 (N.D. Ill. 2005) (rejecting plaintiff's claim that "as long as he has standing based on some claim, he can state claims for which he does not have standing on behalf of putative class members," noting that "[m]any courts in this circuit have dismissed securities fraud claims in accord with th[e] principle" that "post-purchase statements cannot form the basis of Rule 10b–5 liability"). Therefore, Plaintiff's fraud claim is limited to losses allegedly tied to statements made prior to its purchase of securities—namely, in November 2021 and May 2022.

## II.    Section 14(a) of the Exchange Act and Rule 14a-9

Section 14(a) of the Exchange Act prohibits soliciting proxies in violation of SEC rules and regulations. 15 U.S.C. § 78n(a)(1). The SEC's Rule 14a-9, in turn, prohibits proxy solicitation "by means of any proxy statement . . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). In the context of a proxy statement, a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991); *TSC Indus., Inc.*, 426 U.S. at 448–49. The elements of a claim under Section 14(a) are: "(i) that the proxy statement contained a material misstatement or omission that (ii) caused

the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384–85 (1970)).

The proxy solicitation claim has been brought against Inotiv, Leasure, and Taylor. In seeking its dismissal, Defendants reiterate their arguments for dismissal of the § 10(b) claim. Defendants' arguments as to materiality fail for substantially the same reasons discussed above. Plaintiff has sufficiently alleged that the alleged omissions rendered false or misleading information Defendants provided in their proxy in violation of Rule 14a-9.

Defendants further argue that the claim must go by the wayside because a § 14(a) plaintiff must plead both economic loss and proximate causation. [DE 68 at 47–48.] *Kuebler*, 13 F.4th at 645. They tell me that Plaintiff's allegation that it and members of the putative class suffered losses measured by "the difference between the value Inotiv shareholders received and Envigo's true value at the time of the acquisition"—in essence, that shareholders approved Envigo's acquisition for more than its true value— is insufficient under this standard. [FAC, ¶¶ 318–19.] Defendants point me to no fewer than six cases, including a case in this district, analyzing similar allegations and concluding that it does not suffice to allege loss causation for a proxy solicitation claim based on claims that a company's stock was undervalued at the time of a merger or that losses are equal to "the difference between the price [] stockholders received and the 'true value' of their shares." *See, e.g., Trahan v. Interactive Intel. Grp., Inc.*, 308 F. Supp. 3d

977, 1000 (S.D. Ind. 2018); *In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *4 (D.

Del. Feb. 1, 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022);  *In re Ocera Therapeutics,*

*Inc. Sec. Litig.*, 2018 WL 7019481, *11 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 603 (9th

Cir. 2020). In *Trahan*, for example, the plaintiffs alleged that shareholders were induced

to approve a merger by actionable misrepresentation and their damages were

measurable by "the difference between the price [the acquired company's] shareholders

received and the [acquired company]'s true value at the time of [the merger]." 308 F.

Supp.3d at 1000.

Plaintiff argues that these authorities are a little out of place, insofar as they

involve claims by shareholders of *targets* of acquisitions who were deemed to have

insufficiently alleged that they were given lesser consideration in mergers (*i.e.*, less

value in the acquiring company's stock) than would have been the case in the absence

of the defendants' alleged misstatements or omissions in proxy solicitations. [DE 73 at

48 n.44.] Defendants do not respond to this argument, while claiming that Plaintiff has

"abandon[ed]" an "insufficient claim that shareholders approved the Envigo acquisition

for more than its true value." [DE 74 at 21.]

Whatever value the foregoing cases have in this distinct context, Defendants are

speaking past the relevant allegations. The amended complaint specifies when and by

how much Inotiv's stock dropped following the alleged misstatements or omissions

contained in Inotiv's proxy after information about Envigo and the issues at the

Cumberland facility burst into public view and Defendants made partial corrective

disclosures in November 2021 and May 2022. [*See* FAC, ¶¶ 256–60, 262, 309–13.] As for the § 10(b) claim, that suffices to plausibly allege loss causation supporting Plaintiff's proxy solicitation claim under § 14(a), so the proxy claim can proceed as pled.

### III.    Control Person Liability Under § 20(a) of the Exchange Act

The final issue to address concerns Plaintiff's claims that Leasure and Taylor are liable as "control persons" under the Exchange Act. "Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and Section 15 of the 1933 Act, 15 U.S.C. § 77o, both set out 'control person' liability—providing a vehicle to hold one defendant vicariously liable for the securities violations committed by another." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). There are three elements to such a claim: (1) a primary violation of the securities laws; (2) the exercising of general control over the operations of the company; and (3) possession of "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Control person liability does not require any heightened pleading standard or scienter. *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 843 (N.D. Ill. 2000). Finally, any doubts as to whether or not dismissal is warranted is resolved in plaintiffs' favor because "[d]etermination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (internal citation omitted).

Defendants' sole argument for dismissal of the § 20(a) claims (Counts II, IV) is based on the failure to plead a primary violation of the securities laws. [DE 68 at 48.] Because I have concluded that Plaintiff adequately pleads primary violations of § 10(b) and § 14(a), Plaintiff may proceed with the § 20(a) claims against Leasure and Taylor, as well.

**ACCORDINGLY:**

For the reasons explained in this Opinion and Order, Defendants' motion to dismiss [DE 67] is **DENIED**.

**SO ORDERED**.

ENTERED: March 29, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT