**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | |
|---|---|
| In re: INOTIV, INC. SECURITIES LITIGATION | Case No. 4:22-cv-00045-PPS-JEM |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
<u>**CLASS REPRESENTATIVE AND CLASS COUNSEL**</u>

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT .................................................................................................................. 6

I.    Class Certification Standards ................................................................................ 6

II.    This Action Satisfies All Requirements of Rule 23(a)cam ................................... 7

    A.    The Proposed Class Is Numerous ................................................................... 7

    B.    The Proposed Class Shares Common Questions Of Law And Fact .............. 8

    C.    Lead Plaintiff's Claims Are Typical Of The Class ........................................ 9

    D.    The Proposed Class Representative And Class Counsel Are Adequate Under
Rule 23(a) ....................................................................................................... 9

        1.    Lead Plaintiff's Interests Are Not Adverse To The Class ...................... 10

        2.    Proposed Class Counsel Will Adequately Represent The Class .............. 11

III.    The Predominance And Superiority Requirements of Rule 23(b)(3) Are Satisfied ...... 12

    A.    Common Questions of Law And Fact Predominate .................................... 12

        1.    Common Questions Predominate for the Section 14(a) Claims .............. 12

        2.    Common Questions Predominate for the Section 10(b) Claims .............. 13

        3.    Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance With Respect
to the Section 10(b) Claim Because Inotiv Common Stock Traded In An Efficient
Market ...................................................................................................... 15

            a.    Inotiv's Shares Were Listed and Traded on the NASDAQ, A Presumptively
Efficient Market ................................................................................ 15

            b.    The *Cammer* Factors Demonstrate That Inotiv Common Stock Traded In An
Efficient Market ................................................................................ 15

                i.    *Cammer* Factor One: Inotiv's Large Weekly Trading Volume Indicates The
Presence Of An Efficient Market .................................................... 16

                ii.    *Cammer* Factor Two: A Significant Number Of Securities Analysts Followed
Inotiv, Demonstrating Market Efficiency ....................................... 17

                iii.    *Cammer* Factor Three: The High Number of Market Makers and Arbitrageurs
Trading Inotiv's Stock Demonstrates Market Efficiency ................ 18

                iv.    *Cammer* Factor Four: Inotiv's Form S-3 Status Weighs In Favor Of Market
Efficiency ........................................................................................ 19

                v.    *Cammer* Factor Five: Inotiv's Stock Price Reacted To Information Disclosed
To The Market, Illustrating Market Efficiency ............................... 20

        4.    Damages Are Measurable Using A Common Methodology ..................... 22

    B.    Class Treatment Is Superior To Other Methods Of Adjudication ................. 23

IV.    Proposed Class Counsel Satisfy Rule 23(g)...................................................................... 24

CONCLUSION............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972) ................................................................................................ 15

*Alexander v. Centrafarm Grp., N.V.*,
    124 F.R.D. 178 (N.D. Ill. 1988) ............................................................................ 10

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .......................................................................................... 6, 12

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................................... 7, 13, 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................ 3, 14

*Bell v. PNC Bank, Nat. Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ................................................................................... 7

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................... passim

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
    No. 12-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) ..................................... 20

*Coe v. Circle Express, Inc.*,
    No. 89 C 0884, 1991 WL 30243 (N.D. Ill. Mar. 1, 1991) ...................................... 8

*Erica P. John Fund, Inc. v. Halliburton Co. (\Halliburton I\)*,
    563 U.S. 804 (2011) ................................................................................... 3, 6, 13

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ................................................................................. 13

*Halliburton Co. v. Erica P. John Fund, Inc.*
    573 U.S. 258 (2014) ........................................................................................ 14, 16

*Helfand v. Cenco, Inc.*,
    80 F.R.D. 1 (N.D. Ill. 1977) ................................................................................... 8

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) ................................................................................... 7

*In re Bank One Sec. Litig./First Chicago Shareholder Claims*,
    No. 00 CV 0767, 2002 WL 989454 (N.D. Ill. May 14, 2002) ................................. 1

*In re Conseco, Inc. Sec. Litig.*,
    120 F. Supp. 2d 729 (S.D. Ind. 2000) ................................................................... 10

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008) ............................................................................ 18

*In re Groupon, Inc. Sec. Litig.*,
    No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ................. 16, 17, 19, 20

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017) ................................................................................. 21

*Issen v. GSC Enters., Inc.*,
   522 F. Supp. 390 (N.D. Ill. 1981) ................................................................... 9

*Koos v. First Nat'l Bank*,
   496 F.2d 1162 (7th Cir.1974) ......................................................................... 9

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .................................................................. 21

*Kuebler v. Vectren Corp.*,
   13 F.4th 631 (7th Cir. 2021) .......................................................................... 13

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) .................................................................. 19

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012) ......................................................................... 12

*Olson v. Brown*,
   284 F.R.D. 398 (N.D. Ind. 2012) .................................................................... 9

*Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
   No. 16-CV-10632, 2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ................... 16

*Ridings v. Canadian Imperial Bank of Com. Tr. Co. (Bahamas)*,
   94 F.R.D. 147 (N.D. Ill. 1982) ...................................................................... 24

*Roofer's Pension Fund v. Papa*,
   333 F.R.D. 66 (D.N.J. 2019) ............................................................... 17, 18, 21

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ................................................................ 8, 9, 10

*Roth v. Aon Corp.*,
   238 F.R.D. 603 (N.D. Ill. 2006) ................................................................. 7, 24

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ......................................................................... 14

*Schleicher v. Wendt*,
   No. 1:02-cv-1332-DFH-TAB, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009) .............. 15, 16

*Shah v. Zimmer Biomet Holdings, Inc.*,
   No. 3:16-CV-815-PPS-MGG, 2020 WL 5627171 (N.D. Ind. Sept. 18, 2020) ................. 7, 8

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................... 15

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   No. 13-6731, 2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .............................. 20

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ....................................................................... 14, 15

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
   No. 15-CV-3187, 2018 WL 1535156 (N.D. Ill. Mar. 29, 2018) ................. 10, 22

## Other Authorities

*Reproposal of Comprehensive Revision to System for Registration of Securities Offerings*,
   SEC Release No. 6331, 46 Fed. Reg. 41,902-01 (Aug. 18, 1981) .................. 20

**Rules**

Fed. R. Civ. P. 23(a)(1) ............................................................................................. 7

Fed. R. Civ. P. 23(a)(2) ............................................................................................. 8

Fed. R. Civ. P. 23(a)(3) ............................................................................................. 9

Fed. R. Civ. P. 23(a)(4) ......................................................................................... 9, 12

Fed. R. Civ. P. 23(b)(3) ........................................................................................ 12, 23

Fed. R. Civ. P. 23(g)(1) ............................................................................................ 24

Fed. R. Civ. P. 23(g)(1)(a) ....................................................................................... 25

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiff Oklahoma Police Pension and Retirement System ("Oklahoma Police" or "Lead Plaintiff") respectfully requests that the Court: (1) certify the Class (defined below); (2) appoint Lead Plaintiff as Class Representative; and (3) appoint Berman Tabacco as Class Counsel and CohenMalad, LLP as Class Liaison Counsel.

## INTRODUCTION

It is well settled that a class action is a particularly appropriate vehicle for the adjudication of federal securities cases. *See, e.g., In re Bank One Sec. Litig./First Chicago Shareholder Claims*, No. 00 CV 0767, 2002 WL 989454, at *2 (N.D. Ill. May 14, 2002) (describing securities claims as "uniquely situated to class action treatment," with the class action being "the most fair and practicable means to address claims in securities cases") (citations omitted). This case is no exception. Lead Plaintiff asserts claims pursuant to Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") alleging that: (1) Defendants[1] made materially false and misleading statements and material omissions throughout the Class Period in violation of Section 10(b) of the Exchange Act; (2) the Section 14(a) Defendants made false and misleading statements and material omissions in the Proxy in violation of Section 14(a) of the Exchange Act; and (3) the Control Person Defendants violated Section 20(a) of the Exchange Act in connection with the Section 10(b) and 14(a) claims.

Pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Lead Plaintiff now seeks certification of the following class ("Class"):

---

[1] Defendants are Inotiv, Inc. ("Inotiv"), Robert W. Leasure ("Leasure"), Beth A. Taylor ("Taylor"), John E. Sagartz, DVM, Ph.D., DACVP ("Sagartz"), and Carmen Wilbourn ("Wilbourn"). As used herein: (1) Defendants Inotiv, Leasure, and Taylor are the "Section 14(a) Defendants"; and (2) Defendants Leasure and Taylor are the "Control Person Defendants." Unless otherwise specified herein, capitalized terms have the same meanings as defined in Lead Plaintiff's First Amended Complaint for Violations of the Federal Securities Laws (the "FAC"), ECF No. 53. Stand-alone references to "¶ __" are to the paragraphs in the FAC.

All persons and entities who (1) purchased or otherwise acquired the common stock of Inotiv from September 21, 2021 through May 20, 2022, inclusive (the "Class Period") and were damaged thereby; or (2) held shares of Inotiv common stock and were entitled to vote on matters necessary to effectuate the acquisition of Envigo at a special meeting of Inotiv shareholders on November 4, 2021.

Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries of Inotiv; (ii) present or former officers, directors, or controlling persons of Inotiv, its subsidiaries, or its affiliates, and their immediate family members; (iii) Inotiv's directors' and officers' liability carriers and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant has or has had a controlling interest; and (v) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

This action thoroughly satisfies the requirements of Rule 23.

*First*, Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy are easily satisfied. The proposed Class consists of thousands of shareholders, and joinder would be impracticable, satisfying numerosity. Further, common questions of law and fact abound. This action arises out of a common course of conduct, namely the misrepresentations and omissions made to Inotiv's investors alleged in the FAC. For purposes of the Section 14(a) claims, this action presents common questions regarding whether the Section 14(a) Defendants made misrepresentations or omissions in the Proxy, whether any such misrepresentations or omissions were material, and whether losses were caused by Defendants' misstatements. For purposes of the Section 10(b) claims, this action presents common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, loss causation, and damages, thereby satisfying commonality. Similarly, typicality and adequacy are easily satisfied. Oklahoma Police was injured by the same wrongful conduct as other Class members and has demonstrated its commitment to the vigorous prosecution of this action. Oklahoma Police is also the quintessential institutional investor lead plaintiff contemplated under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Moreover, Oklahoma Police has selected proposed Class Counsel with significant experience prosecuting federal securities class actions and who will

zealously prosecute this action, satisfying adequacy.

*Second*, Rule 23(b)(3)'s predominance and superiority requirements are readily met. Questions common to all Class members predominate over any potential questions affecting only individual Class members. Notably, Plaintiffs will establish through common proof that the alleged misrepresentations and omissions in the FAC were materially false and misleading, which is an objective question with a common answer for all Class members. This central question predominates over any individualized ones. In addition, for purposes of Lead Plaintiff's claims arising under Section 10(b) of the Exchange Act which include an element of reliance, Zachary Nye, Ph.D., has demonstrated that the market for Inotiv stock was efficient during the Class Period, entitling Class members to a common presumption of reliance on Defendants' misstatements and omissions, and that the calculation of damages for all Class members is subject to a common methodology. *See* Expert Report of Zachary Nye, Ph.D. (the "Nye Report").[2] Where, as here, securities trade in an efficient market, the fraud-on-the-market doctrine establishes reliance on a class-wide basis. *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988); *see also Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 809 (2011) (individual questions of reliance do not predominate where plaintiffs properly invoke the fraud-on-the-market theory). Proceeding as a class action is also superior to other available methods for fairly and efficiently adjudicating Class members' claims.

## FACTUAL BACKGROUND

The Court is well-acquainted with the factual allegations in the FAC, having addressed them extensively in its Opinion and Order denying Defendants' motion to dismiss (ECF No. 75). The following summary of Lead Plaintiff's core allegations demonstrates that this case presents a

---

[2]  The Nye Report is attached as Exhibit A to the Declaration of Steven J. Buttacavoli ("Buttacavoli Decl." or "Buttacavoli Declaration."), filed concurrently herewith.

paradigmatic example of a federal securities action that is routinely certified as a class action. Lead Plaintiff is confident that discovery will provide further evidence in support of the FAC's factual allegations.

The claims in this action arise out of Inotiv's November 5, 2021 acquisition of Envigo, a key supplier of "research model" animals that are essential to Inotiv's business as a Contract Research Organization ("CRO"), including "large" research models such as beagle dogs and non-human primates ("NHPs"). ¶¶ 1, 7, 9, 35-40, 162-170, 173-176, 200-201. Starting on September 21, 2021, Defendants claimed that the Envigo acquisition would be "transformational" to Inotiv by securing an in-house supply of critically needed and purportedly high-quality research models that would be unique among Inotiv's competitors, as well as due to the fact that Envigo's businesses would be massive revenue generators for Inotiv—providing as much as three-quarters of the combined Company's revenues. *Id*. Defendants also repeatedly touted Envigo as a leading source of research quality animals and a company with a commitment to the highest degree of animal welfare. ¶¶ 10, 15, 35, 54, 162-168, 184, 193, 197, 207-210.

In reality, however, and unbeknownst to investors, Envigo—which was the "second largest breeder of canines for research" and supplied approximately 25% of all research beagles to the market (¶¶ 8, 207, 245)—had been under regulatory scrutiny since July 2021 for serious animal welfare violations at the Company's massive beagle breeding facility in Cumberland, Virginia (¶¶ 61-94). USDA inspectors first identified serious AWA violations and stunning animal cruelty at Envigo's Cumberland Facility in July 2021 (¶¶ 61-69), which coincided with Inotiv's due diligence on Envigo and were present at approximately the same time that Defendants Leasure, Sagartz, and Wilbourn visited the site (¶¶ 94-95). The FAC details how, starting in July 2021 and continuing through four follow-up USDA inspections over a 10-month period, beagles were kept

in conditions of severe neglect the Cumberland Facility in violation of the AWA, which resulted in aggressive and unhealthy dogs unsuitable for use in research.  ¶¶ 61-94.  The persistent nature of the AWA violations at the Cumberland Facility led to a May 18, 2022 raid of the Cumberland Facility by federal and state law enforcement agents, the rescue of approximately 4,000 beagles, and judicial proceedings in the Western District of Virginia that led to the closure of the Cumberland Facility.  ¶¶ 2, 16, 96-109.  Federal investigation of criminal misconduct at the Cumberland Facility continued after the Class Period and, on June 3, 2024, Inotiv agreed to enter a guilty plea that would result in it paying the "largest ever" criminal fine for violations of the AWA.  The U.S. Department of Justice, *Animal Breeder Pleads Guilty to Animal Welfare and Pollution Crimes and Will Pay More than $35M, Including Record Fine in an Animal Welfare Case*,    https://www.justice.gov/usao-wdva/pr/animal-breeder-pleads-guilty-animal-welfare-and-pollution-crimes-and-will-pay-more-35m.

Further, for purposes of Lead Plaintiff's Section 14(a) Claim, the Proxy also failed to disclose material risks related to another—and highly critical—category of Envigo's large research models: NHPs.[3]  Notably, the Proxy failed to disclose that the importation of NHPs from Asia faced grave risks due to a federal criminal investigation into the illegal importation of NHPs and that Envigo had received, and was producing documents in response to, a June 2021 grand jury subpoena in connection with that investigation.  ¶¶ 1, 3, 10, 12, 14-15, 110, 116.  The federal criminal investigation resulted in the indictment of multiple employees of the Company's principal supplier of NHPs for their participation in an international primate smuggling ring,

---

[3] While the Court dismissed the FAC's claims concerning NHP-related misrepresentations and omissions for purposes of Lead Plaintiff's Section 10(b) claim based on the FAC's allegations of scienter, *see* ECF No. 75 at 71-74 (addressing scienter allegations pertaining to the additional NHP-focused acquisition of a separate company, OBRC), scienter is not an element of a Section 14(a) claim.  Lead Plaintiff is confident that NHP-related Section 10(b) claims can be revived based on facts obtained through discovery.

When the truth of Defendants' misrepresentations and omissions was revealed through a series of partial corrective disclosures, Inotiv's stock price declined sharply, and Lead Plaintiff and members of the Class were damaged thereby. Inotiv's stock price has yet to recover.

The proposed Class representative is Oklahoma Police, a public pension fund and sophisticated institutional investor that manages public pensions for municipal police officers in the state of Oklahoma. As of June 30, 2024, Oklahoma Police covers 6,172 active members and 4,484 retirees and beneficiaries and, as of September 30, 2022, had nearly $3.2 billion in assets under management.[4] Since being appointed as Lead Plaintiff in this action on September 12, 2022 (ECF No. 37), Oklahoma Police has vigorously pursued the Class's claims, reviewing and authorizing the filing of the FAC, defeating Defendants' motion to dismiss, and engaging in discovery. *See* Oklahoma Police Decl. at ¶ 5. Lead Plaintiff fully understands the role and obligations of representing a class and is committed to protecting the interest of the entire Class in this action. *See id*. at ¶¶ 4, 6.

## ARGUMENT

### I.     Class Certification Standards

An action may be certified as a class action if the four prerequisites of Rule 23(a) (numerosity, commonality, typicality, and adequacy) are met, and the action qualifies under one of Rule 23(b)'s subdivisions (here, Rule 23(b)(3)). As the Supreme Court has long recognized, securities claims are well-suited for class treatment. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting that predominance of common issues "is a test readily met" in securities actions); *see also Halliburton I*, 563 U.S. at 812-13; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,

---

[4]   *See* Oklahoma Police Pension and Retirement System, *Annual Comprehensive Financial Report*, https://www.opprs.ok.gov/wp-content/uploads/2024/12/2024-OPPRS-ACFR-FINAL-November-22-2024.pdf;   *see also* Declaration of Ginger Sigler (the "Oklahoma Police Decl."), which is attached as Exhibit B to the Buttacavoli Declaration.

568 U.S. 455, 464-67 (2013).  Moreover, for purposes of Lead Plaintiff's Section 10(b) claim, the

fraud-on-the-market presumption that eliminates the need to prove individual reliance "makes

securities fraud cases better suited for class certification."  *In re Allstate Corp. Sec. Litig.*, 966 F.3d

595, 600 (7th Cir. 2020).

While Rule 23 must be satisfied by a preponderance of the evidence, *see Bell v. PNC Bank,*

*Nat. Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015), the Supreme Court has cautioned that "Rule 23

grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits

questions may be considered to the extent—but only to the extent—that they are relevant to

determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568

U.S. at 466.  As discussed below, the Rule 23 requirements are easily satisfied in this case.

## II.    **This Action Satisfies All Requirements of Rule 23(a)cam**

### A.  The Proposed Class Is Numerous

Under Rule 23(a), numerosity requires that "the class is so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is "practically a foregone

conclusion in large securities class action like this."  *Shah v. Zimmer Biomet Holdings, Inc.*,

No. 3:16-CV-815-PPS-MGG, 2020 WL 5627171, at *4 (N.D. Ind. Sept. 18, 2020); *see also*

William B. Rubenstein, Ed., *Newberg on Class Actions* § 3:12 (5th ed. 2019) ("[I]n class actions

involving nationally traded securities, courts generally presume that the numerosity requirement

is met.").  Lead Plaintiff easily establishes numerosity, as the proposed Class consists of thousands

of members.  During the Class Period, Inotiv had between 15.9 million and 25.6 million common

shares outstanding.  Nye Report at ¶ 28.  Moreover, Inotiv common stock was actively traded, with

an average weekly trading volume of 1,174,132 shares.  *Id.*  Thus, joinder of these thousands of

Inotiv investors would be impractical.  *See Roth v. Aon Corp.*, 238 F.R.D. 603, 608 (N.D. Ill. 2006)

(numerosity requirement satisfied where Plaintiff submitted average daily trading volume of stock

and number of holders during class period).

### B. The Proposed Class Shares Common Questions Of Law And Fact

Under Rule 23(a)(2), commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A "common nucleus of operative fact is usually enough" to satisfy the commonality requirement of Rule 23(a)(2). *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). In securities cases, the substantive issues as to what legal duties [Defendant] had to disclose, what it disclosed, and whether those disclosures were misleading" are all common to the class, satisfying commonality. *See Shah*, 2020 WL 5627171, at *4.

Here, Lead Plaintiff similarly has no difficulty establishing commonality. Common questions abound, including (i) whether Defendants violated the federal securities laws; (ii) whether Defendants' public statements during the Class Period misrepresented or omitted material facts; (iii) whether Defendants acted with scienter in issuing false and misleading statements; (iv) whether and to what extent the price of Inotiv common stock was artificially inflated by Defendants' false and misleading statements or omissions; (v) whether the members of the putative Class suffered damages and what the appropriate measure of those damages is; (vi) whether the Individual Defendants were controlling persons of the Company under Section 20(a) of the Exchange Act; (vii) whether Defendants' Proxy Solicitations included misstatements or omissions of material fact; and (viii) whether Defendants' misstatements or omissions of material fact in their Proxy Solicitations proximately caused foreseeable losses to Lead Plaintiff and members of the Class. The presence of these common questions of law and fact firmly establishes commonality. *See*, *e.g.*, *Coe v. Circle Express, Inc.*, No. 89 C 0884, 1991 WL 30243, at *2 (N.D. Ill. Mar. 1, 1991) ("A series of continuous similar misrepresentations can satisfy the 'common question' requirement of Rule 23(a) in a securities fraud action."); *see also Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 6 (N.D. Ill. 1977) (finding existence of common questions of fact in case

including claims pursuant to 10(b), 14(a), and 20 of the Securities Exchange Act of 1934).

### C.  Lead Plaintiff's Claims Are Typical Of The Class

To establish typicality under Rule 23(a), a plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario*, 963 F.2d at 1018 (citation omitted).  Class members need not share identical claims because the typicality requirement "is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Olson v. Brown*, 284 F.R.D. 398, 410 (N.D. Ind. 2012) (citation omitted).

The proposed Class satisfies the typicality requirement.  Lead Plaintiff and putative Class members all purchased Inotiv common stock and assert the same claims under Section 10(b), 14(a), and 20(a) of the Exchange Act.  There are no unique defenses to which Lead Plaintiff is subject, and certainly none "[w]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass." *Koos v. First Nat'l Bank*, 496 F.2d 1162, 1164 (7th Cir.1974).

### D.  The Proposed Class Representative And Class Counsel Are Adequate Under Rule 23(a)

Rule 23(a)(4)'s adequacy requirement seeks to ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Satisfaction of Rule 23(a)(4) requires that "the interests of the class representative must coincide with those of the rest of the class and both the class representative and his or her attorney must be prepared to prosecute the action vigorously, tenaciously, and with adequate financial commitment." *Issen v. GSC Enters., Inc.*, 522 F. Supp. 390, 404 (N.D. Ill. 1981).  In order to establish adequacy, "class

representatives must show that (1) their claims are not antagonistic to or in conflict with those of the proposed class, (2) they have sufficient interest in the outcome of the case, and (3) experienced, competent counsel represent them." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2018 WL 1535156, at *5 (N.D. Ill. Mar. 29, 2018). A class "is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018.

As set forth below, both Lead Plaintiff, as the proposed Class representative, and Berman Tabacco, as Lead Plaintiff's proposed Class Counsel, satisfy the adequacy requirement to fulfill their important roles on behalf of the proposed Class in this action.

### 1.  Lead Plaintiff's Interests Are Not Adverse To The Class

Lead Plaintiff and all putative Class members share the same interest in holding Defendants accountable for their misconduct, as Lead Plaintiff and putative Class members purchased Inotiv stock and were injured by the same materially false and misleading statements and omissions. This identical interest satisfies Rule 23's adequacy requirement. Moreover, Lead Plaintiff is not subject to unique defenses that would create a conflict with interests of the Class.[5]

As the Court has already determined, Oklahoma Police is qualified and appropriate to act as Lead Plaintiff in representing the proposed Class. *See* ECF No. 37; *In re Conseco, Inc. Sec. Litig.*, 120 F. Supp. 2d 729, 732 (S.D. Ind. 2000) (noting that an explicit goal of the PSLRA is to have institutional investors represent securities classes). Lead Plaintiff understands the role and obligations of representing a class and is committed to protecting the interests of the entire Class. *See* Oklahoma Police Decl. ¶¶ 4. Lead Plaintiff has vigorously pursued the proposed Class's claims since the inception of the case, reviewing and authorizing the filing of the Complaint, defeating Defendants' motion to dismiss, participating in discovery, propounding document

---

[5] *See, e.g., Alexander v. Centrafarm Grp.*, N.V., 124 F.R.D. 178, 185 (N.D. Ill. 1988) (finding absence of unique defense of reliance demonstrates adequacy).

requests, reviewing documents and responding to discovery. *Id.* at ¶ 5. Lead Plaintiff continues to be fully committed to actively prosecuting the action in the best interest of the Class. *Id.* at ¶¶ 5-6. Specifically, Lead Plaintiff has participated in numerous meetings with Lead Counsel, reviewed pleadings, provided documents to Lead Counsel to be produced in discovery, and monitored this litigation throughout all stages of the action to date. *Id.* at ¶ 5. Thus, Lead Plaintiff is an adequate class representative.

### 2. Proposed Class Counsel Will Adequately Represent The Class

Proposed Class Counsel, Berman Tabacco, and proposed Class Liaison Counsel, CohenMalad, LLP ("CohenMalad"), are well-qualified to represent all Class members. Berman Tabacco is highly experienced in securities class action litigation and has successfully prosecuted numerous matters on behalf of investors, as detailed in the firm's resume. *See* Buttacavoli Decl. Ex. C. Berman Tabacco is one of the country's premier class action law firms, with more than 40 years of experience prosecuting securities class actions. *Id.* The firm has been ranked as a *Top Ten Plaintiffs' Firm* by *Benchmark Litigation* and is listed among the firms with the most settlements on the *Top 100 U.S. Class Action Settlements of All Time* issued by Institutional Shareholder Services' Securities Class Action Services. *Id.* Since the passage of the PSLRA, Berman Tabacco has held leadership positions in more than 100 federal securities class actions, recovering billions of dollars on behalf of defrauded investors.[6] Moreover, Berman Tabacco's adequacy is further evidenced by the substantial amount of work that they put into investigating this action and litigating it past the motion-to-dismiss stage and into discovery. Similarly, CohenMalad, has extensive experience representing clients in class actions and complex litigation in this District, and is well qualified to serve in the role as Cass Liaison Counsel. *See* Buttacavoli

---

[6] Berman Tabacco's representative securities class action experience is described in the firm biography attached as Exhibit C to the Buttacavoli Declaration.

Decl. Ex. D.  Thus, Berman Tabacco and CohenMalad have demonstrated that they have, and will continue to, "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

**III.**    **The Predominance And Superiority Requirements of Rule 23(b)(3) Are Satisfied**

Lead Plaintiff seeks class certification pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both the predominance and superiority requirements are met here.

**A.  Common Questions of Law And Fact Predominate**

Rule 23(b)(3) requires that common questions of law and fact predominate over questions affecting individual class members.  "The predominance inquiry focuses on whether a proposed class is sufficiently cohesive to warrant adjudication by representation.  It is akin to, but ultimately a more demanding criterion than, the commonality inquiry under Rule 23(a)."  *Shah*, 2020 WL 5627171, at *5 (citation and quotation marks omitted).  Actions brought pursuant to the federal securities laws are particularly well suited to a finding of predominance, alleging a common harm from a common course of conduct, leading the Supreme Court to state that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Amchem Prod., Inc.*, 521 U.S. at 625.  Individual questions, to the extent there are any, "need not be absent" in order to satisfy the predominance requirement.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (noting that predominance focuses on whether there is a "common nucleus of operative facts and issues" in the elements of the claim) (citation omitted).

**1.  Common Questions Predominate for the Section 14(a) Claims**

The elements of Lead Plaintiff's Section 14(a) claim are: "(i) that the proxy statement

contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that

the proxy solicitation was an essential link in accomplishing the transaction." Op. & Order, ECF

No. 75 at 81-21 (quoting *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021)). Because

each of these elements focus on the Proxy, Defendants' conduct, and the alleged misstatements or

omissions themselves, there need not be adjudication of any individual questions in this action.

### 2.    Common Questions Predominate for the Section 10(b) Claims

Here, the elements of a Section 10(b) claim Lead Plaintiff must establish are: "(1) a material

misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen*, 568 U.S. at

488. Significantly, the Supreme Court has held that because falsity, scienter, materiality, and loss

causation are common merits issues in a securities fraud class action, proof of those elements is

not a prerequisite to class certification. *See id.* at 467 ("materiality is a 'common questio[n]' for

purposes of Rule 23(b)(3)" and not a prerequisite to class certification) (alteration in original); *id.*

at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements

or omissions are common questions that need not be adjudicated before a class is certified"); *see*

*also Halliburton I*, 563 U.S. at 813 (plaintiff need not prove loss causation at class certification as

"loss causation has no logical connection to the facts necessary to establish the efficient market

predicate to the fraud-on-the-market theory").

Under the fraud-on-the-market theory, there is a "rebuttable presumption of reliance for

anyone who purchased a security in an efficient market." *Glickenhaus & Co. v. Household Int'l,*

*Inc.*, 787 F.3d 408, 429 (7th Cir. 2015) (citing *Basic*, 485 U.S. at 224). The premise underlying

the fraud-on-the-market theory is that, "in an open and developed securities market, the price of a

company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic*, 485 U.S. at 241-42 (alteration in original) (citation and internal quotation marks omitted); *see also Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, 573 U.S. 258, 270 (2014) ("the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations") (quoting *Basic*, 485 U.S. at 246); *Amgen*, 568 U.S. at 466 ("in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price"). As a result, "reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Halliburton II*, 573 U.S. at 268 (alteration in original) (quoting *Basic*, 485 U.S. at 246-47).

Under *Basic* and *Halliburton II*, Lead Plaintiff may invoke the presumption of reliance by showing: (i) the alleged misrepresentations were publicly known; (ii) the plaintiff traded in the stock between the making of those misrepresentations and the alleged revelation of the truth; and (iii) the stock at issue traded in an efficient market. *Halliburton II*, 573 U.S. at 277-78. With respect to the required showing of an efficient market, "the Supreme Court has suggested that the burden required to establish market efficiency is not an onerous one." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (citation and internal quotation marks omitted). When a company's stock trades in a large and efficient market, common questions predominate, and class certification is routine if a suitable representative steps forward. *See Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010).

Here, Lead Plaintiff can establish each prerequisite to invoke the fraud-on-the-market presumption. First, Defendants' alleged misrepresentations and omissions were made in public

statements to the market at large.  Second, Plaintiff and all other members of the Class purchased

Inotiv stock during the Class Period, between the date of the first alleged misrepresentation and

the alleged revelation of Defendants' fraudulent conduct.  Third, as discussed below and in the

Nye Report, Inotiv common stock traded in an efficient market during the Class Period.

### 3. Lead Plaintiff and the Class Are Entitled to a Presumption of Reliance With Respect to the Section 10(b) Claim Because Inotiv Common Stock Traded In An Efficient Market[7]

#### a. Inotiv's Shares Were Listed and Traded on the NASDAQ, A Presumptively Efficient Market

Market efficiency is rarely, if ever, in question when a company's common stock, like

Inotiv's, trades on a major national exchange like the NASDAQ.  *See Strougo v. Barclays PLC*,

312 F.R.D. 307, 318 (S.D.N.Y. 2016) (noting that some courts have presumed market efficiency

when a stock trades on a national exchange while others treat that fact as being "a good indicator

of efficiency"), *aff'd on other grounds sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir.

2017); *Schleicher v. Wendt*, No. 1:02-cv-1332-DFH-TAB, 2009 WL 761157, at *7 (S.D. Ind. Mar.

20, 2009) (The "mere presence" of a stock on a public exchange "certainly tends to show an

efficient market."), *aff'd*, 618 F.3d 679 (7th Cir. 2010).  Throughout the Class Period, Inotiv

common stock was listed and traded on the Nasdaq Capital Market, which is part of the broader

NASDAQ stock market.  Nye Report ¶ 21.  The fact that Inotiv's stock was listed and traded on

the NASDAQ therefore supports a finding of market efficiency.  *Id.* at ¶¶ 21-25.

#### b. The *Cammer* Factors Demonstrate That Inotiv Common Stock Traded In An Efficient Market

In addition to an exchange listing, when analyzing market efficiency, courts in this Circuit

---

[7] Here, the Class is also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), because Lead Plaintiff's claims are premised on the omission of material information from Defendants' disclosures in violation of established SEC Rules, including Regulation S-K.  In such cases, proof of reliance is not a prerequisite to recovery.  *See id.* at 153.  If the Court finds, as Lead Plaintiff submits it should, that the Class is entitled to a presumption of reliance under the fraud-on-the-market theory, it need to reach this issue.

consider the non-exhaustive factors outlined by *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). "Although the Seventh Circuit has not explicitly adopted the *Cammer* factors, it agrees that a presumption of reliance under the fraud-on-the-market theory exists for a large, well-followed firm, whose stock trades in a liquid market." *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *3 (N.D. Ill. Mar. 5, 2015), *objections overruled*, 2015 WL 13628131 (N.D. Ill. May 12, 2015).[8]  The *Cammer* factors are: (1) whether the security trades at a large weekly volume; (2) whether analysts follow and report on the security; (3) whether the security has market makers and whether there is a potential for arbitrage activity; (4) whether the company is eligible to file an SEC Form S-3; and (5) whether empirical facts show a cause-and-effect relationship between the release of new, material information about the company in question and a response in the security's price. *Cammer*, 711 F. Supp. at 1285-87.

As demonstrated by Dr. Nye, the *Cammer* factors establish that Inotiv's ordinary shares traded in an efficient market throughout the Class Period.  Nye Report at ¶¶ 18-57.  Thus, Lead Plaintiff is entitled to a presumption of reliance.  *See Halliburton II*, 573 U.S. at 279 ("if a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price").[9]

### i.   *Cammer* Factor One: Inotiv's Large Weekly Trading Volume Indicates The Presence Of An Efficient Market

A high weekly trading volume—measured as a percentage of outstanding shares traded on

---

[8] *See also Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, No. 16-CV-10632, 2020 WL 919249, at *4 (N.D. Ill. Feb. 26, 2020) (applying *Cammer* factors and granting class certification); *see also Schleicher*, 2009 WL 761157, at *5-10 (applying *Cammer* factors and granting class certification).

[9] *Halliburton II* further held that "plaintiffs need not directly prove price impact to invoke the Basic presumption." 573 U.S. at 279. Instead, "it is incumbent upon the defendant to show the absence of price impact." *Id.* at 284 (Ginsburg, Breyer, and Sotomayor, JJ., concurring). Defendants will not be able to prove a lack of price impact here. Nye Report ¶ 64 ("Price inflation may be measured on a Class-wide basis").

a weekly basis—supports a finding of market efficiency because "many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. Moreover, an average weekly trading volume of approximately "two percent or more … justif[ies] a strong presumption that the market for the security is an efficient one [and] one percent would justify a substantial presumption." *Id*.

The trading of Inotiv's shares easily meets this standard, as the average weekly trading volume during the Class Period was 4.9%. Nye Report ¶ 28. This is more than two times the 2% threshold that *Cammer* stated justifies a "strong presumption" of market efficiency. *Id.*; *see also Groupon*, 2015 WL 1043321, at *4 (certifying class where expert demonstrated average weekly trading volume of 1.8%).

### ii. *Cammer* Factor Two: A Significant Number Of Securities Analysts Followed Inotiv, Demonstrating Market Efficiency

Securities analysts research companies and provide investors with reports on the financial condition and business prospects of the companies that they cover. Nye Report ¶¶ 30-31. Analysts are important conduits to the market for information collected through means such as on-site visits, conference calls, and other contacts with senior management; they channel information to the market rapidly through published reports, online reporting services, and client alerts given to other employees of the same investment firm. *Id*. "Significant securities analyst coverage of a company's stock is 'persuasive' evidence of market efficiency." *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 82 (D.N.J. 2019). *See also Cammer*, 711 F. Supp. at 1286 ("it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period").

Inotiv was widely followed by securities analysts. During the Class Period, at least five well-known investment firms followed and published research reports on Inotiv that are publicly

available, including, but not limited to: Colliers Securities; Craig Hallum; Jefferies; Lake Street Capital Markets; and Streetwise Reports. Nye Report ¶ 32. During the Class Period, these analysts issued at least 85 analyst reports pertaining to Inotiv. *Id.* Moreover, articles and news coverage concerning Inotiv appeared in major domestic and international news media during the Class Period. *Id.* at ¶ 33. Investors also received information and analysis regarding Inotiv during the Class Period through investor conferences, trade magazines, and company presentations. *Id.* In addition, information relating to the financial status of Inotiv was publicly available online through the Company's website and the SEC's website. *Id.* at ¶ 34. The widespread coverage of Inotiv by securities analysts and the wide availability of public reporting on Inotiv illustrates that Inotiv's stock traded in an efficient market. *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 210 (E.D. Pa. 2008) (coverage by three analysts "was sufficient to favor a finding of market efficiency"), *aff'd sub nom. In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011).

### iii.    *Cammer* Factor Three: The High Number of Market Makers and Arbitrageurs Trading Inotiv's Stock Demonstrates Market Efficiency

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations ... and who stands ready to buy or sell these publicly quoted prices." *Roofer's Pension Fund*, 333 F.R.D. at 83 (alteration in original) (citations omitted). The existence of market makers weighs in favor of market efficiency because they "ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *See Cammer*, 711 F. Supp. at 1286-87.

During the Class Period, there were at least 90 active market makers that traded Inotiv stock. During the same period, Inotiv stock was traded on the NASDAQ, where "market participants are made up of market makers, order-entry firms and electronic communications

18

networks (ECNs) that utilize NASDAQ's trading services." Nye Report ¶¶ 37-38 (internal quotations omitted). "Market makers help to ensure a liquid market for a particular stock; a market in which willing buyers can readily find willing sellers, and vice versa." *Id.* A market maker "is obligated to engage in a course of dealings for its own account to assist in the maintenance, insofar as reasonably practicable, of fair and orderly markets." *Id.* ¶ 37 (internal quotations omitted). The more than 90 active market makers that handled a sizeable volume of Inotiv shares during the Class Period (*see id.* ¶ 38) exceeds *by more than three and a half times* the "twenty to twenty-five" market makers that have been observed to "tip[] towards a finding of market efficiency." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 509 (S.D. Tex. 2004).[10]

### iv. *Cammer* Factor Four: Inotiv's Form S-3 Status Weighs In Favor Of Market Efficiency

A Form S-3 is a simplified form of registration that may be used by U.S. companies that meet certain requirements including that the company has met financial reporting requirements and conforms to other minimum stock requirements. *See, e.g.*, *Groupon*, 2015 WL 1043321, at *4; Registration Statement Under the Securities Act of 1933 (Form 3), U.S. Securities and Exchange Commission, http://www.sec.gov/about/forms/forms-3.pdf; *see also* Nye Report at ¶¶ 47-48. "[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. This is because the filing of a Form S-

---

[10] Additionally, Inotiv's stock was followed by arbitrageurs who partook in arbitrage activity. An arbitrageur is a sophisticated investor who can act rapidly to take advantage of security pricing discrepancies. Nye Report ¶ 39. "Arbitrageurs ensure that market prices reflect public information—the fundamental hallmark of market efficiency." *Id.* Here, Dr. Nye found a prevalent level of short interest in Inotiv's stock. *Id.* at ¶ 41 (discussing ability to short stock as an indicator of arbitrage activity and noting that Inotiv stock short interest was 7.9%, higher than the average short interest of 3.6% of the float for the total U.S. market). In addition, Dr. Nye found a large number of institutional investors holding Inotiv stock. *Id.* at ¶¶ 42-43 (discussing institutional ownership as indicator of arbitrage activity and noting that Inotiv's quarter-end holdings indicated that "institutions held between 56.9% and 79.7% of the Company's shares available to trade, and between 127 and 140 institutional investors held Inotiv stock during the Class Period") (footnotes omitted). Finally, the tightness of Inotiv's bid/ask spreads indicates that arbitrage activity for Inotiv's stock was widespread during the Class Period. *Id.* at ¶¶ 44-45 (discussing relationship between arbitrage and bid/ask spread noting that Inotiv's stock median bid/ask spreads were comparable to stocks randomly sampled). Taken together, this activity illustrates that the Company's stock was traded in an efficient market.

3 "is predicated on the Commission's belief that the market operates efficiently" for the company. *Id.* at 1284 (quoting *Reproposal of Comprehensive Revision to System for Registration of Securities Offerings*, SEC Release No. 6331, 46 Fed. Reg. 41,902-01, 41,904 (Aug. 18, 1981)).  Prior to and throughout the Class Period, Inotiv filed Form S-3s, which strongly supports market efficiency. Nye Report ¶ 49; *Groupon*, 2015 WL 1043321, at *4 (finding satisfaction of S-3 eligibility requirements supported market efficiency).

### v.  *Cammer* Factor Five: Inotiv's Stock Price Reacted To Information Disclosed To The Market, Illustrating Market Efficiency

Under *Cammer*, "one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." 711 F. Supp. at 1291.  "Experts use an event study to satisfy the fifth *Cammer* factor, which seeks a cause-and-effect relationship between the release of new information and movements in the stock price."  *Groupon*, 2015 WL 1043321, at *4.  "An event study includes regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events."  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (citation and internal quotation marks omitted).  While some courts "have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency," *see W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2016 WL 4138613, at *12-13 (E.D. Pa. Aug. 4, 2016), Lead Plaintiff easily satisfies this factor.

Dr. Nye's event study uses a widely accepted methodology and confirms the existence of a cause-and-effect relationship between Inotiv's disclosures and movements in the Company's stock price.  Nye Report ¶¶ 50-57, Appendix A & Exs. 11-12.  Specifically, Dr. Nye's event study examined dates during the Class Period on which Inotiv released quarterly or year-end financial

results.  *Id.* at ¶¶ 53-54.  These "earnings-related announcements are an objective set of events to examine, which has been shown in the academic finance literature to impact securities' prices," and these types of announcements are routinely used for event studies.  *Id.*; *see also Roofer's Pension Fund*, 333 F.R.D. at 84 (event study examined dates of earnings-related announcements); *Prudential*, 2015 WL 5097883, at *7 (event study analyzed dates of "earnings announcements or changes in earnings guidance").  Dr. Nye's event study revealed that, of the five events he examined, "three (*i.e.*, 60%) are associated with statistically significant Company-specific returns at or above the 95% confidence level."  Nye Report at ¶ 55.  Dr. Nye's study shows that this sample of Inotiv's earnings-related announcements "contains 12 times as many statistically significant return dates as should be expected from a randomly selected five-day sample (at or above the 95% confidence level)."  *Id.*  Moreover, although not required, *see In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017) (accepting district court finding that directionality was not required at class certification stage), Dr. Nye's report also shows that "the direction of the Company-specific return observed on each event date was consistent with that expected in an efficient market, thereby providing additional evidence of efficiency," Nye Report at ¶ 56.  Specifically, Dr. Nye's report shows that Inotiv's stock price showed statistically significant positive returns on dates when predominantly positive company news rose reached the market and, on dates associated with statistically insignificant Company-specific returns, "the Company's financial results were generally in line and/or conveyed a mix of offsetting positive and negative information, such that the insignificant price reactions are consistent with those expected in an efficient market."  *Id.*[11]

---

[11] In addition to the *Cammer* factors, Dr. Nye examines three additional factors that certain federal courts have applied to evaluate market efficiency, following *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).  The so-called *Krogman* factors include: (1) the company's market capitalization; (2) the bid-ask spread on transactions in the security; and (3) the security's public float.  Although the *Krogman* factors do not appear to be routinely applied by courts in the Seventh Circuit, Dr. Nye concludes that each of these additional factors contribute to a finding that Inotiv's stock

### 4.   Damages Are Measurable Using A Common Methodology

The calculation of per-share damages is a common question that can be measured on a class-wide basis.  As explained in Dr. Nye's report, damages can be calculated in this matter on a class-wide basis using formulaic methods common to all class members.

Section 10(b) damages can be calculated through the widely accepted and commonly used "out-of-pocket" methodology that involves: (1) a widely endorsed form of "event study" to measure the artificial inflation in the price of Inotiv's common stock after adjusting for market and industry forces; (2) removing from the artificial inflation any impact from non-fraud related sources; and (3) measuring the price inflation due to the alleged wrongdoing for each day during the Class Period.  *See* Nye Report at ¶¶ 62-67.  Using this methodology, damages will be measured based on the difference between the artificially inflated price at which Class Members purchased Inotiv common stock and the "but for" price for the stock absent Defendants' misrepresentations and omissions, less that difference on the date of any sale of stock.  *Id.*  The use of this "out-of-pocket" method is "commonly used," "generally regarded as reliable," and provides a measure of calculating damages consistent with the theory of liability for claims such as those alleged here. *See Walgreen Co.*, 2018 WL 1535156, at *3.

Section 14(a) damages can similarly be calculated on a class-wide basis using a common methodology.  As explained by Dr. Nye, Section 14(a) damages can be calculated using a straightforward formula based on either the value of Inotiv stock at the time of the closing of the Envigo acquisition (with a reduction of the price received on any sale of Inotiv stock) or—similar to the calculation of Section 10(b) damages—"out of pocket" damages based on the level of

---

traded in an efficient market, citing supporting cases.  *See* Nye Report at ¶¶ 58-59 (finding Inotiv's market capitalization, which reached as high as $1.45 billion, or greater than more than 61% of all NASDAQ-listed stocks); ¶ 60 (finding Inotiv's bid-ask spread to be comparable to a random sample of stocks on the NASDAQ Global Select Market); ¶ 61 (finding Inotiv's public float of 75.8% to support a finding of market efficiency).

artificial inflation in the price of Inotiv stock at the time of the Envigo acquisition minus the artificial inflation on the date of any sale of stock. *Id.* at ¶¶ 68-72. These per share damages will be the same for each Class member who held Inotiv common stock as of the record date and were entitled to vote on the measures necessary to effectuate the Envigo acquisition. *Id.*

The use of such straightforward and widely accepted methodologies to calculate common class-wide damages directly relates to Lead Plaintiff's theories of liability and supports predominance. While the results of Section 10(b) damages will differ for each class member based on the timing of their Inotiv stock purchases and sales, the share price inflation is the same for all shares and damages are calculated the same way for all Class members. *See* Nye Report at ¶¶ 8, 62-67. For purposes of Section 14(a), damages per share will be the same for all Class members who held Inotiv shares as of the record date (*see id.* at ¶¶ 9, 68-72); the only difference in individual damages will be the number of shares held by the Class member. Along with the presumption of reliance applicable to the Section 10(b) claims, questions of damages have common answers for all members of the putative Class and thus predominate over any individual issues.

**B. Class Treatment Is Superior To Other Methods Of Adjudication**

Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides four factors to guide this analysis: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Each of these factors demonstrates that litigating this case as a class action is the superior method for adjudicating Class members' claims.

23

First, Inotiv investors harmed by the misconduct alleged in this action would benefit from class treatment rather than having to litigate separate and costly individual actions. As the Seventh Circuit has recognized, "securities fraud cases are uniquely suited to class treatment and there is a policy in favor of class certification in such cases." *Ridings v. Canadian Imperial Bank of Com. Tr. Co. (Bahamas)*, 94 F.R.D. 147, 156 (N.D. Ill. 1982) (citing *King v. Kan. City S. Indus., Inc.*, 519 F.2d 20, 26 (7th Cir. 1975)). Indeed, "class actions are often the most fair and practical vehicle for plaintiffs' claims in securities fraud suits" because injured individuals are not likely to seek to pursue individual actions "because individual claims might be small in monetary value" that would not justify being "prosecuted on an individual basis due to the costs of litigation." *Roth*, 238 F.R.D. at 608 (alterations omitted) (citations omitted). Second, Lead Plaintiff is not aware of any other class actions asserting claims on behalf of Inotiv investors arising from the same set of factual allegations as those asserted in the FAC. Third, in securities actions such as this, "'[j]udicial economy and efficiency' will be promoted by certifying th[e] class, and resolving these matters in one suit." *Id.* (citation omitted). This Court is the best forum for adjudicating the Class's claims because Inotiv maintains its headquarters in this District and this Court has already considered and denied Defendants' motion to dismiss. Fourth, securities fraud claims are routinely certified and present no manageability issues.

## IV.    Proposed Class Counsel Satisfy Rule 23(g)

Rule 23(g) provides that "a court that certifies a class must appoint class counsel" who "must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1), 23(g)(4). "In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing

the class." Fed. R. Civ. P. 23(g)(1)(a). All of these factors favor appointing Berman Tabacco as Class Counsel and CohenMalad as liaison counsel for the Class.

Berman Tabacco has extensive experience prosecuting securities class actions other complex class action litigation in courts throughout the United States. *See* Buttacavoli Decl. Ex. C. Among its efforts, Berman Tabacco filed a detailed amended complaint, defeated Defendants' motion to dismiss, is pursuing fact discovery from Defendants, and has retained an expert in market efficiency and damages, demonstrating its willingness to commit substantial resources to the successful prosecution of this action. CohenMalad has extensive experience in class action litigation and has provided support to Berman Tabacco regarding local practice matters and otherwise supported the prosecution of this action. *See Id.* Ex. D. For these reasons and the reasons addressed in Section II(D)(2), Berman Tabacco and CohenMalad meet Rule 23(a)(4)'s adequacy requirements and should be appointed under Rule 23(g) to serve as Class Counsel and Class Liaison Counsel.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this Action as a class action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint Lead Plaintiff as Class Representative pursuant to Rules 23(a) and 23(b)(3); and (iii) appoint Berman Tabacco as Class Counsel and CohenMalad LLP as Class Liaison Counsel pursuant to Rule 23(g).

//

Dated: February 10, 2025                    /s/ Steven J. Buttacavoli

                                            **BERMAN TABACCO**
                                            Patrick T. Egan (*pro hac vice*)
                                            Steven J. Buttacavoli (*pro hac vice*)
                                            Justin N. Saif (*pro hac vice*)
                                            Christina L. G. Fitzgerald (*pro hac vice*)
                                            One Liberty Square
                                            Boston, MA 02109
                                            Telephone: (617) 542-8300
                                            Facsimile: (617) 542-1194
                                            Email: pegan@bermantabacco.com
                                                    sbuttacavoli@bermantabacco.com
                                                    jsaif@bermantabacco.com
                                                    cfitzgerald@bermantabacco.com

                                            *Counsel for Lead Plaintiff Oklahoma Police
                                            Pension and Retirement System and Lead
                                            Counsel for the Proposed Class*

                                            and

                                            **COHENMALAD, LLP**
                                            Scott D. Gilchrist, No. 16720-53
                                            One Indiana Square, Suite 1400
                                            Indianapolis, IN 46204
                                            Telephone: (317) 214-0321
                                            Facsimile: (317) 636-2593
                                            Email: sgilchrist@cohenandmalad.com

                                            *Liaison Counsel for Lead Plaintiff and the
                                            Proposed Class*

## CERTIFICATE OF SERVICE

I certify that on this 10th day of February, 2025, a true and correct copy of the foregoing document was served on all counsel of record through the Court's CM/ECF system.

Dated: February 10, 2025

                                            /s/ Steven J. Buttacavoli
                                            Steven J. Buttacavoli

26